**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

SS UNITED STATES PRESERVATION FOUNDATION, INC.
a Florida Not-for-Profit Corporation, and
STEVEN R. PERRY,

Case No. 3:26cv - -

Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
and WILLIAM H. "BUTCH" GRAHAM, JR., Lieutenant General, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers;
and ADAM R. TELLE, Acting Secretary of the Army;
and COL. BRANDON L. BOWMAN, Commander and District Engineer, U.S. Army Corps of Engineers, Jacksonville District,
and OKALOOSA COUNTY, FLORIDA.

Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

INTRODUCTION

1. Plaintiffs, the SS United States Preservation Foundation Inc. ("the Foundation"), and Steven R. Perry ("Perry"), bring this civil action for declaratory and injunctive relief against defendants Okaloosa County, Florida ("the County") and the Department of the Army and the United States Army Corps of Engineers defendants (collectively referred to as "the Corps"), pursuant to the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., for violations of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306108, 306113, the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321, et seq., and the pertinent rules and regulations implementing the NHPA and NEPA. Despite the Foundation's repeated requests for environmental review records, including counsel's May 19, 2026, request under the Freedom of Information Act and multiple subsequent efforts to obtain these critical NEPA documents, the Corps did not provide its Environmental Assessment to the Foundation until October 19, 2026, just fifteen days before this filing. For nearly a year, the Foundation pursued its concerns through the federal review process, submitting laboratory findings and expert materials accepted into the administrative record and repeatedly seeking substantive consideration of that evidence. The Foundation also sought to address those findings with Okaloosa County through direct communications and public meetings. Those efforts left the concerns underlying this action unresolved. Receipt of the NEPA Environmental Assessment finally enabled the Foundation to examine the Corps' stated reasons for its environmental conclusions, although other requested supporting records remain outstanding. This request for emergency relief follows sustained efforts to secure agency consideration and disclosure. With the tow of the *SS United States* anticipated for November 9, 2026, and its sinking to follow, immediate relief is necessary to prevent the irreversible destruction of

the historic vessel and the potential release of chromium-bearing contaminants into the marine environment before the Court can review the lawfulness of this challenged federal action.

2. Plaintiffs are seeking injunctive and declaratory relief to halt ongoing destructive actions by Okaloosa County, the owner of the historic *SS United States,* a retired ocean liner that is listed in the National Register of Historic Places.

3. On October 2, 2026, the Corps issued a Memorandum for the Record containing the Corps' Environmental Assessment and Statement of Findings ("EASOF") for the Project approving the application of Okaloosa County, Florida for a permit under Section 10 of the Rivers and Harbors Act to sink the historic SS United States at Large Area Artificial Reef Site ("LAARS") C, approximately 22 nautical miles southwest of Destin East Pass in the Gulf of Mexico, in connection with Department of the Army Permit SAJ-1996-03565. *See* Exhibit 1 (USACE Environmental Assessment and Statement of Findings, Permit SAJ-1996-03565, Modification 4). (Again, this document was not publicly available, and was provided to the Foundation only on October 19, 2026.) Okaloosa County announced that the vessel is scheduled to be sunk on November 12, 2026, weather permitting, stating: "The vessel will be towed from her Mobile, Alabama location to the deployment site days in advance. Deployment operations are scheduled to begin at the deployment site on November 12 [2026] at 10 a.m." In its October 29,

2026, Marine Safety Information Bulletin, however, U.S. Coast Guard Sector Mobile identified November 9, 2026, as the anticipated tow departure date, subject to weather conditions or unforeseen delays.

4. The Corps' permit approval violates its obligations under the NHPA and the NEPA. Plaintiffs are seeking declaratory and injunctive relief to prevent irreparable injury to the historic ship in violation of the law.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a Defendant), and 5 U.S.C. § 704 (Administrative Procedure Act).

5. This Court may grant declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

6. Plaintiffs seek judicial review pursuant to Chapter 7 of the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 5 U.S.C. § 703 (Administrative Procedure Act) & (e), as well as Local Rule 3.1(A)(1).

8. There is a present and actual case and controversy between the parties.

PARTIES

9. Plaintiff SS United States Preservation Foundation Inc. ("the Foundation") is a nonprofit organization composed of U.S. veterans, Merchant Mariners, and American heritage preservationists. The Foundation's mission is to preserve the SS United States and related historical artifacts for future generations and educational purposes, excluding "preservation" in the form of reefing or scrapping.

10. Plaintiff Steven R. Perry is a member, Co-Founder and Vice President of the SS United States Preservation Foundation. Perry resides in Miami, Florida and is a working Marine Engineer, former U.S. Merchant Mariner, and retired Commander (0-5) in the United States Naval Reserve. Perry's early fascination with the *SS United States* was a driving force in his decision to pursue a career in the United States Maritime Service as a U.S. Merchant Mariner. This led him to pursue an education in marine engineering and naval architecture by attending the United States Merchant Marine Academy in Kings Point, NY. Perry had studied and conducted technical work about and aboard the SS United States for 35 years, including planning and redevelopment efforts in 2016, where he was specifically chosen to serve as a Marine Engineering Consultant for Atlantic Logistics, Inc. on behalf of Crystal Cruises during its return-to-service feasibility study, wherein he further developed his close familiarity with the ship, including the interior spaces, systems, configuration and physical condition of the *SS United States*. Further,

Perry has studied *SS United States* for nearly fifty years, been aboard the ship hundreds of times over the last 30 years, and has maintained close contact with the SS United States through his ongoing research and public speaking engagements focused on the vessel, while establishing and maintaining a professional relationship with every private owner since 1992.

11. The Foundation and its members have concrete, particularized, and continuing interests in the preservation and use of the *SS United States*, a specific historic resource currently located in Mobile, Alabama. Plaintiff and its members do not assert standing merely because they find the challenged action aesthetically objectionable. Rather, the Foundation's members, including Plaintiff Perry, have personally used, studied, visited and enjoyed the SS United States on numerous occasions and have a continuing and concrete intention to do so in the future

12. For example, for over 30 years, Plaintiff Perry has regularly visited the *SS United States*, including while the vessel was docked in Newport News, Virginia, and Philadelphia, Pennsylvania from 1996 until 2025, for the purpose of touring the *SS United States*, studying its significant features, conducting technical research, and photographing its historic features. Plaintiff Perry has concrete plans to continue these activities, but for the challenged project.

13. These activities are not incidental observation of a government project from

a distance. They constitute Plaintiff Perry's direct use, enjoyment, study, and appreciation of the particular historic resource that is the subject of this action.

14. The challenged action will directly impair Plaintiffs' and the Foundation's members' use and enjoyment of the *SS United States*. The SS United States Preservation Foundation, Inc. is a Florida not-for-profit corporation dedicated to preserving, protecting, documenting, and advancing public understanding of the *SS United States* and her historic, cultural, maritime, and national significance. If the *SS United States* is sunk, the Foundation loses its sole reason for existence. Foundation members will no longer be able to visit and study the ship within its historic context and setting on the surface of the sea. If sunk, the vessel will no longer be directly accessible to the general public. Direct, in-person access will be limited to individuals capable of undertaking the necessary offshore shipwreck dive. Approximately 2.7 million Americans, representing less than one percent of the United States population, participated in scuba diving in 2022. However, according to the Divers Alert Network, less than half of this number of divers possess the specialty training, certification, and baseline skill set to participate in diving on shipwrecks, particularly at the depths that would be required to dive on the SS United States.

15. Due to the Project (sinking for an artificial reef), the historic features of the ship will deteriorate and decompose; the Foundation's members, including

Plaintiff Perry, will no longer have access to study the ship or access the property; the Plaintiffs will no longer be able to observe, photograph, research or experience the character-defining features of the ship; the Plaintiffs will no longer be able to conduct established recreational, educational, cultural, or preservation activities related to the ship; otherwise, all activities the Plaintiffs undertake related to the ship will no longer be possible.

16. Some of the Foundation's members also live near and use and enjoy the waters of the Gulf of Mexico in Okaloosa County, for a variety of activities, including swimming, boating, fishing, and viewing marine wildlife. For example, Foundation member Tracy Steely resides in Santa Rosa Beach, Walton County, Florida, and has lived along the Emerald Coast in Okaloosa and Walton Counties for more than sixteen years. Ms. Steely regularly uses Gulf coastal waters and beaches for swimming, snorkeling, fishing, boating, and observing marine wildlife, including snorkeling near the jetties in Okaloosa County and boating to Crab Island. She visits local beaches approximately weekly, observes marine wildlife almost daily, and intends to continue these established activities regularly while remaining a resident of the area. Her recreational and aesthetic interests in these waters and marine resources are concrete, particularized, and continuing. The release of hazardous materials from the proposed sinking of the *SS United States* threatens to impair her use and enjoyment of those waters and resources, including

threatened and endangered species protected by the ESA.

17. The Foundation and its members have an interest in ensuring that federal agencies comply with their own directives, policies, and plans, and take a "hard look" under NEPA, the NHPA, and the ESA (Endangered Species Act) at all impacts and alternatives to major federal actions before making important and significant decisions that affect sensitive environmental and historic resources.

18. The Foundation and Perry are adversely affected by the Corps' actions and planned actions, including its failure to comply with NEPA, ESA, and NHPA. Plaintiffs have also suffered procedural injury by the Corps' failure to comply with the NHPA and NEPA.

19. If this Court issues the relief requested, the harms to the Plaintiff's interests will be reduced or eliminated. Thus, the Plaintiffs' injuries are legally redressable by judicial intervention.

20. Defendant William H. ("Butch") Graham is sued in his official capacity. In that capacity, he is directly responsible for the supervision, management, and control of the Corps, including oversight of the Corps' decision challenged here. His official residence is in Washington, D.C.

21. Defendant Adam Telle is sued in his official capacity as the Acting Secretary of the Army. In that capacity, he is ultimately responsible for overseeing the work of the Corps, an agency within the Department of the Army. His official

residence is in Washington, D.C. Telle is the agency official responsible for the actions and planned actions challenged in this complaint.

22. Defendant Colonel Brandon Bowman is sued in his official capacity as Commander and District Engineer of the U.S. Army Corps of Engineers, Jacksonville District. In that capacity, Bowman is responsible for the Jacksonville District, which is administering Department of the Army Permit SAJ-1996-03565 and the actions and planned actions challenged in this complaint.

23. Defendant United States Army Corps of Engineers is a federal agency within the Department of the Army responsible for the agency actions and planned actions challenged in this complaint.

24. Defendant Okaloosa County is a political subdivision of the State of Florida. The County may be sued in its own name pursuant to Fla. Stat. § 125.15.

## FACTUAL BACKGROUND

### The *SS United States*

25. The *SS United States* is considered the most powerful, modern, and advanced American superliner ever built, as well as the world's fastest ocean liner. She made her record-breaking maiden voyage in 1952, capturing the prestigious Blue Riband (blue ribbon) for the fastest transatlantic crossing, a record she still holds nearly 75 years later. The ship was dubbed "America's Flagship" and was

known as the "First Lady of the Seas," the "Queen of the Seas," the "Big U," and a "Ship of State." It remains presently the symbolic flagship of the U.S. Merchant Marine.

26. In addition to being a transatlantic ocean liner, the ship was designed to be a national security asset, capable of being transformed into a state-of-the-art, top secret military vessel. Designed by renowned American naval architect and marine engineer William Francis Gibbs, co-founder of Gibbs & Cox in collaboration with the U.S. Maritime Commission, U.S. Lines, and the U.S. Navy, the ship could be rapidly converted to a military troopship capable of carrying approximately 14,000 troops 10,000 miles without refueling.

27. As described by the *New York Times*, in Jesse Pesta, “Can the *SS United States* be Saved?” (Aug. 19, 2024), the *SS United States* is a “ship bigger than the Titanic, one that is nearly as long as the Chrysler Building is tall. A ship so luxurious that it was the first choice of presidents and royalty. A ship so trusted that it once carried the Mona Lisa. A vessel so fast that its mammoth propellers and hull design, churning the sea beneath its grand promenades and shipboard orchestras, were Cold War state secrets.” The *SS United States* is the last American-built ocean liner remaining afloat, the largest passenger ship ever built

in the United States, and is considered the crowning masterpiece of America's most prominent and influential ship designer of the 20th century, William Francis Gibbs. It is an example of what the NHPA refers to as "[our] irreplaceable heritage."

28. The ship was abruptly retired in 1969. As a reserve ship for the U.S. Navy, the ship was hermetically sealed at her berth in order to preserve her interiors and machinery and remained "mothballed" in Newport News, Virginia until 1978, available to be deployed by the Navy should the situation arise. In 1978, the Navy determined that the ship was no longer needed as a military asset, and it was sold and re-sold to a series of private owners from 1978 to 2009. Following the economic crisis of 2009, the ship's then-owner Norwegian Cruise Lines, after unsuccessfully attempting to sell the ship, began accepting bids from scrappers.

29. The threatened scrapping galvanized preservationists. The S.S. United States Foundation, officially chartered as a Virginia nonprofit corporation in March 1998, and the SS United States Preservation Society supported the ship's nomination to the National Register of Historic Places. The ship was listed in the National Register on June 3, 1999, even though she was less than 50 years old at the time, due to her "compelling national significance." The National Register of Historic

Places nomination states that "the *SS United States* is exceptionally important for engineering for its hull design and propulsion system."

30. Its important historic features include its hydrodynamic efficient hull design (kept top-secret until 1977), all-aluminum superstructure (largest use of aluminum at the time), as well as its high-speed propellers and rudders.

31. In 2011, the SS United States Conservancy succeeded in raising funds for the ship's purchase and restoration and maintained the ship at Pier 82 in Philadelphia, PA

32. In October 2024, as a result of a threat to the Ship's continued ability to remain berthed at Pier 82 that could not be resolved, the Conservancy chose to sell the ship to Okaloosa County pursuant to a Purchase and Sale Agreement stating the County's intent to deploy the vessel as an artificial reef and not to scrap or break the vessel. The County knew or should have known at that time of the ship's historic significance.

Department of the Army Permit SAJ-1996-03565: Chronology

33. Department of the Army Permit SAJ-1996-03565 was originally issued to Okaloosa County on July 9, 1997, authorizing its artificial-reef program. The sites for proposed artificial reef sites are known as Large Area Artificial Reef Sites, or

LAARS.

34. In 2016, the Corps reauthorized the permit for three sites, LAARS A, B, and C, establishing March 10, 2026, as the deadline for completing the authorized work.

35. On August 21, 2020, the Corps issued Modification 1, expanding qualifying reef materials to include certain heavy-gauge ferrous and aluminum-alloy vessels, subject to applicable preparation, inspection, clearance, and other requirements. Modification 1 expressly retained the March 10, 2026, completion deadline.

36. On August 13, 2021, the Corps issued Modification 2, removing the 40-foot maximum-profile limitation and revising applicable clearance provisions. Modification 2 also expressly retained the March 10, 2026, completion deadline. Neither modification specifically evaluated deployment of the *SS United States*.

37. On October 25, 2024, the Corps published notice of the County's request to modify Department of the Army Permit SAJ-1996-03565 to change the minimum authorized depth of LAARS B from -140 feet (from the surface) to -60 feet, to accommodate the deployment of large vessels having greater height. Earlier Corps permit documents described LAARS Site A as approximately 15 miles southeast of Destin Pass, LAARS Site B as approximately 23 miles south of Destin Pass, and

LAARS Site C as approximately 15 miles southwest of Destin Pass. The notice of the County's requested permit modification stated that, "The Corps is not aware of any known historic properties within the permit area."

38. According to the County's subsequent representations in federal court, the County sought reauthorization and an extension in July 2025.

39. During a January 7, 2026, federal court proceeding, counsel for the County stated: "Last week the Army Corps of Engineers gave us a letter that said basically we're not going to be able to review this completely, but we're giving you an interim extension until December 30, 2026." Counsel further stated: "I'm happy to file that with the Court if the Court wants to look at it."

40. On January 21, 2026, Foundation representatives Carlos Camacho Jr. and Steven R. Perry attended a meeting with Corps personnel in Pensacola, Florida. Corps personnel stated that the County had verbally requested an extension and that the Corps had verbally granted it so the County could continue other reef deployments while Section 106 (of the NHPA) review concerning the *SS United States* remained underway. No written extension was provided at that meeting.

41. During the February 24, 2026, Section 106 consulting-party meeting, Corps personnel again stated that the County had verbally requested an extension and that

the Corps had verbally granted it to allow other reef deployments while review of the *SS United States* continued. No written extension was provided at that meeting.

42. On March 10, 2026, the completion deadline stated in the 2016 permit, and expressly retained in the 2020 and 2021 modifications, was reached.

42. On March 13, 2026, the Corps published a public notice stating that the County sought to modify the existing permit to change the minimum authorized depth of LAARS B from -140 feet to -60 feet, authorize deployment of the *SS United States* within LAARS C, and extend the permit for ten years. The notice stated that the existing permit would expire on December 30, 2026, rather than on March 10, 2026, a date that, of course, had already passed.

43. The County subsequently publicly reported that it had received a ten-year reauthorization from the Corps and announced that *SS United States* would be sunk on November 12, 2026, weather permitting. The Coast Guard's October 29, 2026, Marine Safety Information Bulletin subsequently identified November 9, 2026, as the anticipated tow departure date, subject to weather conditions or unforeseen delays.

44. On October 5, 2026, Foundation representatives Carlos Camacho Jr. and

Steven R. Perry attended a meeting with Corps personnel in Pensacola, Florida. Corps personnel stated that all regulatory reviews were complete and that the NEPA document had been signed on October 2, 2026, but that final approval remained pending the Secretary of the Army's signature.

45. The records provided to the Foundation have not included the executed interim extension establishing the December 30, 2026, deadline or the executed permit modification authorizing the proposed sinking of the *SS United States*. Although the County has publicly reported receiving authorization, the Foundation has therefore been unable to verify the terms, conditions, effective dates, and scope of those authorizations.

The County Moves Forward With Plans to Sink the *SS United States*

46. On or about October 24, 2024, Okaloosa County contracted with Vinik Marine for the towing to Mobile, Alabama, and with Coleen Marine for the remediation, preparation, and deployment of the *SS United States*.

47. On or about February 19, 2025, Vinik Marine began towing the *SS United States* to a shipyard in Mobile, Alabama.

48. On March 2, 2025, the New York Coalition to Save the Steam Ship, Inc. a/k/a New York Coalition to Save the SS United States, Inc. ("New York Coalition") filed Case No. 3:25cv212-MCR-HTC in this Court naming Okaloosa County, Florida as the sole defendant. The Coalition sought to prevent Okaloosa County from dismembering, destroying, and sinking the *SS United States* for use as an artificial reef in the coastal waters off the shores of Okaloosa County, in order to "provide the Executive Branch of the United States reasonable time to decide whether [the] SSUS should be taken for public use, with just compensation paid to the County." The complaint generally alleged a Congressional and Executive Branch interest in the ship, but no federal agency was named in the complaint. The complaint did not purport to state a cause of action pursuant to NHPA. The Complaint also alleged that the New York Coalition had organizational standing based on alleged injuries to its organizational interests.

49. On or about March 3, 2025, the *SS United States* arrived in Mobile, Alabama and was berthed at the Austal USA West Campus.

50. On April 18, 2025, the New York Coalition amended its complaint, including the following claim for relief: to prevent Okaloosa County from

"effecting an 'end run' around the combined and interactive provisions of the Ocean Dumping Act and the National Historic Preservation Act of 1966." No federal agency was named as a defendant or identified by name in the complaint, and the complaint did not describe the Corps' permitting authority over the County's plans to sink the *SS United States*.

51. Beginning in April 2025, months before the Section 106 Review required under the NHPA began, Coleen Marine began to deconstruct the ship to ready it for deployment within the County's artificial reef program off Destin, Florida. Workers removed windows and portholes throughout the *SS United States*. They also removed wiring, PCB-containing deck material, interior flooring, oil, and other materials. Openings were cut into the port side of the hull near the stern so anchor chains could be run through the vessel for hurricane-season mooring.

52. In April 2025, the Foundation contacted the Army Corps of Engineers, Jacksonville District, after learning that the County intended to sink the historic *SS United States* for use as an artificial reef in waters off Destin, Florida, raising the question of what permit would be required from the Army Corps to authorize this activity and whether this action would be a Section 106 undertaking.

53. On August 6, 2025, this Court dismissed the New York Coalition's lawsuit on the grounds that the New York Coalition had failed to establish organizational standing to bring its lawsuit.

Section 106 Review

54. On June 17, 2025, the Army Corps advised the Foundation that the Corps had initiated the NHPA Section 106 review of the County's plans to sink the historic *SS United States* as part of a proposal to modify a prior Army Corps permit issued to Okaloosa County. The Army Corps asserted that to advance the Section 106 review, it had requested additional information from the permittee, Okaloosa County.

55. By email dated June 18, 2025, the Foundation requested "consulting party" status in the Section 106 review, and informed the Army Corps that Okaloosa County actions in "deconstructing" portions of the *SS United States*, including the removal of character defining features that allow the vessel to convey its historical significance for which it was listed in the National Register of Historic Places (NRHP) (under Criterion C, engineering), constituted "anticipatory demolition" under Section 110(k) of the NHPA.

56. Between June 2025 and July 2026, the Corps conducted a historic properties

review for the Project pursuant to Section 106 of the NHPA. Representatives of the Foundation were accepted by the Corps as Consulting Parties. The Foundation representatives participated in the consultation process, and during that process they repeatedly expressed significant concerns about the Project's adverse effects on historic resources, the Corps' failure to consider less-damaging alternatives, the Corps' failure to ensure the Section 106 review process was completed before the County began work on the vessel, and Section 110(k) of the NHPA.

57. While the Section 106 review was ongoing, Okaloosa County continued removing contributing features from the *SS United States* while the ship was docked in Mobile, Alabama. For example, in August 2025, the County's contractor removed numerous character-defining features from the *SS United States*, including both funnels (smokestacks) and the radar mast of the ship that contributed to the ship's historic significance.

58. On November 18, 2025, the Army Corps determined that the undertaking, the proposed sinking of the *SS United States* as an artificial reef, would result in an adverse effect on historic properties and specified that "[s]uch effects include removal of the vessel from the context of its historic use (from atop the water to the seafloor), and the probable increase of the degradation rate of the ship's hull,

superstructure, and propulsion system elements." The Corps determined that, "[T]he most recent alterations to the ship include removal of the two 'stacks' (funnels), the final remaining propeller, and the portholes while docked in Mobile, Alabama. Collectively, these alterations have all impacted the integrity of the originally launched vessel." Nonetheless, the Corps stated that, "Despite a great deal of removed elements, the Corps believes that the hull, superstructure, and remains of the propulsion system retain sufficient integrity to maintain representation of the unique construction and design of this vessel and so likely retain NRHP eligibility."

59. The Corps stated that "the Corps does not consider these activities to constitute an intentional effort to avoid the requirements of Section 106 by "intentionally significantly adversely affecting a historic property (*see* Section 110(k) of the NHPA) in order to remove its eligibility. "

60. On December 18, 2025, the Florida State Historic Preservation Officer ("SHPO") concurred with the Corps' determination that the proposed sinking of the *SS United States* as an artificial reef in LAARS B ("the Project") would result in an adverse effect to historic properties, including the *SS United States*.

61. By letter dated February 17, 2026, the Army Corps informed the Section 106 consulting parties that the LAARS B location for the requested, proposed sinking of

the ship has been changed to an area within LAARS C. The Army Corps also determined that because "the undertaking is now entirely focused on the proposed sinking of the vessel under an existing Corps permit," "[t]he permit area and the associated area of potential effect has accordingly expanded from the proposed placement area, which is now LAARS C for which a permit already exists, and includes the vessel itself wherever the vessel may be. Consequently, the preparation activities that have occurred in Mobile during Section 106 review of the project are being considered by the Corps as part of the review of effects to historic properties."

62. On information and belief, on February 26, 2026, the Corps verbally communicated with the Alabama State Historic Preservation Office ("AL SHPO") to inquire if the AL SHPO would elect to consult on the undertaking. However, the Corps did not provide the AL SHPO with any of the Section 106 documentation or explain that the undertaking's Area of Potential Effects (APE) had been expanded to include Alabama and the resulting jurisdictional basis for the Alabama SHPO's participation. On information and belief, based on information dating from November 2025, the AL SHPO incorrectly assumed that there was no federal undertaking while the ship was in Alabama, and declined to participate in the Corps' Section 106 consultation.

63. By letter dated March 8, 2026, the National Trust for Historic Preservation advised the Army Corps' Jacksonville District that the County's actions in moving forward with the project without awaiting completion of the necessary Section 106 review process is the very essence of anticipatory demolition, in violation of the NHPA and its implementing regulations.

64. By letter dated March 16, 2026, the Army Corps concluded that, "based on the totality of the circumstances as presently understood by the Corps and the fact that the ship will likely remain eligible for listing after all the preparations for deployment have been completed, the Corps does not consider these activities to constitute an intentional effort to avoid the requirements of Section 106 by 'intentionally significantly adversely' affecting a historic property (*see* Section 110(k) of the NHPA) in order to remove its eligibility."

65. By letter to the Army Corps dated March 28, 2026, the National Trust for Historic Preservation stated that, "We strongly disagree with the Army Corps' conclusion that the applicant has not engaged in unlawful anticipatory demolition, in violation of Section 110(k) of the NHPA, 54 U.S.C. § 306113 and 36 C.F.R. § 800.9(c). . . . Even if the applicant was initially 'not entirely aware of the necessary scope of Section 106 review,' the applicant cannot claim that level of ignorance after

the outpouring of public opposition,' and "even if the Army Corps was 'not specifically aware' of the adverse effects being caused by the applicant during August 2025, the Corps can no longer claim that level of ignorance." The National Trust for Historic Preservation also expressed its concern that the Corps had failed to coordinate with the Alabama SHPO as part of its Section 106 review.

66. By letter dated March 28, 2026, the National Trust for Historic Preservation, also a Consulting Party within the Section 106 review process, disputed various portions of the Corps' Section 106 Assessment, specifically stating: "The applicant continues to engage in anticipatory demolition, which requires the Army Corps to deny the application…. Less harmful alternatives are being unlawfully foreclosed by the applicant's anticipatory demolition."

67. Consulting parties to the Section 106 review, including the Plaintiff Foundation, advocated for an alternative under which the County would pursue its artificial-reef objectives using a suitable federal disposal vessel within the Maritime Administration's Ship Disposal Program, which accepts applications from coastal States, U.S. Territories, and foreign government possessions to use obsolete National Defense Reserve Fleet ("NDRF") vessels as offshore reefs for marine life conservation. The Foundation has identified three SL-7 fast cargo ships (not

considered historic) available now through this disposal program. Any one of these SL-7 vessels would allow the County to achieve its goal of having the world's largest artificial reef, as the SL-7 is 946 feet long (only 44 feet less than the length of SS United States). If an SL-7 ship is used, the *SS United States* may be preserved and marketed for federal or public-private participation, interim berthing and stabilization, and ultimately the pursuit of a suitable adaptive-reuse location such as New York City. The New York City Council unanimously passed Resolution 0649 on December 18, 2025, asking the United States Congress or President to assist in bringing the ship back to its original home port to be docked at Brooklyn's Gowanus Bay Terminal.

68. Between July 14 through 16, 2026, Okaloosa County, the Corps, and the Florida State Historic Preservation Office executed a Memorandum of Agreement ("MOA") concluding the Section 106 consultation process. The MOA does not provide any meaningful measures that mitigate or avoid the Project's adverse effects on the *SS United States*.

69. Despite the extensive deconstruction activities undertaken unlawfully by Okaloosa County, the *SS United States* still conveys a high level of historic significance allowing it to retain its listing on the National Register of Historic

Places. Specifically, following the unlawful deconstruction activities conducted in preparation for reefing, the ship still retains over 75% of its original material from its period of significance. By comparison, the *USS Constitution*, generally considered America's most historic ship, has less than 18% of its original material from its period of significance.

Environmental Issues

70. In January and February 2026, the Foundation submitted certified laboratory results from York Analytical Laboratories, which analyzed physical coating samples collected from the *SS United States*, showing that the paint from the interior and exterior of the *SS United States* contains high levels of chromium, including hexavalent chromium. *See* Exhibit 2 (York Analytical Laboratories, Technical Report T5E0446). The Foundation also submitted a letter written by Dr. Todd Osborne, Ph.D. Professor of Estuarine and Aquatic Biogeochemistry Whitney Laboratory for Marine Bioscience, University of Florida, who independently verified, based on the historical coating specifications documented in the 1952 Newport News Shipbuilding Painting Schedule for the *SS United States*, the presence of zinc chromium and hexavalent chromium. Based on this evaluation, Dr. Osborne estimated approximately 59,334 pounds of zinc chromate using historical

painting specifications, modeled interior surface area, paint coverage rates, specified numbers of coats, and period-specific paint-composition assumptions, and warned that deterioration of zinc-chromate-bearing coatings under seawater exposure could release contaminants with potentially severe, long-term consequences for the marine environment. *See* Exhibit 3 (October 29, 2025 assessment by Dr. Todd Z. Osborne).

71. The EPA–MARAD (Environmental Protection Agency – Maritime Administration) guidance identifies chromium and zinc among potentially toxic constituents of interior and exterior vessel paints and recommends removal of harmful active exterior hull antifouling systems and deteriorated paint. (EPA–MARAD, National Guidance: "Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs," May 2006.) Its general recommendation permitting retention of intact paint does not establish the release behavior or environmental effects of the particular chromium-bearing primers identified aboard the *SS United States*. Dr. Osborne described the zinc-chromate coating as chemically bonded to the ship's steel and aluminum surfaces. *See* Exhibit 3, *supra*, at page 1. The historical Painting Schedule specifies repeated zinc-chromate primer applications in multiple areas. See Exhibit 4 (Newport News Shipbuilding Painting Schedule, Drawing No. 830-54).

72. Contemporaneous technical literature distinguishes the primer or anticorrosive layer from the antifouling coating applied over it. *See* Woods Hole Oceanographic Institution, *Marine Fouling and Its Prevention* (1952), at 314. Removal of loose or deteriorated paint therefore does not, by itself, establish removal of underlying chromium-bearing primers.

73. In its Environmental Assessment, the Corps relied in part on guidance concerning aged underwater antifouling coatings and the retention of intact paint. *See* Exhibit 1, *supra,* pp. 32, 53. The Foundation's evidence identified a separate concern: chromium-bearing anticorrosive primers, including interior coatings not intended for continuous seawater immersion. The historical painting schedule specifies zinc-chromate primer applications, and laboratory testing confirmed hexavalent chromium in sampled coatings. Dr. Jeremey Fein's October 29, 2026, letter, which the Foundation submitted to the Corps, challenged the Corps' application of the guidance to the sampled interior primers. *See* Exhibit 5, p. 2, item 5 (Dr. Fein letter). Although the Corps separately discussed chromium release, it failed adequately to explain how the guidance supported its prediction of negligible environmental effects from those primers upon permanent submersion.

74. On March 13, 2026, the Jacksonville District of the Corps issued a public notice that it had received an application from Okaloosa County pursuant to Section 10 of the Rivers and Harbors Act To modify the existing Department of the Army Permit to revise the required minimum authorized depth (vertical clearance) of LAARS B to accommodate the deployment of larger vessels and to deploy the *SS United States* within LAARS C. The notice stated that all comments the Corps receives are used in the preparation of an Environmental Assessment (EA) and/or an Environmental Impact Statement ("EIS") pursuant to NEPA.

75. In response to the March 13, 2026, public notice, a wide variety of stakeholders expressed concern about the Project's impacts. The Foundation, among others, informed the Corps that the Project would have significant impacts on historic resources, aesthetics, recreation, health and safety, and socioeconomics.

76. On numerous occasions, the Foundation requested that the Corps provide information about the status of the NEPA process and its environmental review of the Project. The Corps failed to provide this information, instead directing the Foundation to submit a request for this information under the Freedom of Information Act ("FOIA").

77. The Foundation also requested information about the status of environmental

reviews of the Project from the U.S. Environmental Protection Agency ("EPA") and from Okaloosa County, but received no responsive information.

78. On September 2, 2026, the Foundation provided a letter from Dr. Jeremy Fein, Professor of Civil and Environmental Engineering and Earth Sciences and Director, Center for Environmental Science and Technology at the University of Notre Dame. *See* Ex. 6. Dr. Fein asserted that York Analytical Laboratories, Inc., and Eurofins Environmental Testing, the two companies who conducted the paint analyses described above, are prominent and reputable environmental testing companies. The analytical procedures that they used for the paint analyses are, according to Dr. Fein, EPA approved methods. Both companies followed proper QA/QC (Quality Assurance/Quality Control) protocols and used appropriate standards. Dr. Fein also noted that while only a few of paint samples were analyzed, "these samples appear to have been selected at random from the ship, and appear to be representative of the extensive paint coatings still present on the interior of the ship." Dr. Fein concurred with the findings and opinions of Dr. Todd Osborne regarding the significant likelihood that chromium-bearing coatings will be released due to paint erosion and dissolution when the vessel is submerged and continuously exposed to seawater under artificial reef conditions.

79. On October 19, 2026, the Army Corps responded to the Foundation's May 19, 2026, FOIA request by producing the October 2, 2026, EASOF (again, Environmental Assessment Statement of Findings, Ex. 1, *supra.*)

80. The EASOF acknowledged that paint samples analyzed by York Laboratories indicated that the samples were coated with zinc chromate paint, which contains hexavalent chromium and zinc. *See* Exhibit 2 (York Analytical Laboratories, Technical Report T5E0446); Exhibit 1(USACE Environmental Assessment and Statement of Findings, Permit SAJ-1996-03565, Modification 4), pp. 11–12. But the EASOF asserted that the limited paint samples analyzed by York Laboratories did "not establish a vessel-wide inventory of Cr (VI) or zinc chromate, nor does it establish the concentration or rate of constituent release that would occur following deployment." *See* Exhibit 1, p. 12. However, rather than requiring the applicant to undertake additional analysis of the paint to determine the extent of these hazardous materials, the EA proceeded without establishing the vessel-wide extent of these materials or their potential release following deployment. Instead, the EASOF asserted without any supporting evidence, that ships cleaned in accordance with the EPA-MARAD National Guidance are expected to have no more than a minimal adverse effect on marine organisms in

the vicinity of the vessel. *See* Exhibit 1, p. 32.

81. The EASOF also acknowledged that the proposed project would occur within the known range of and/or critical habitat of numerous endangered species, including but not limited to the endangered Rice's Whale. Ex. 1, at 59-63. The EASOF concluded that, based on a Biological Opinion ("BiOp"), the Project is not likely to adversely affect these endangered species from risks of entanglement, vessel collision, noise, oil spills, and the transport and discharge of reef materials. However, neither the BiOP nor the EASOF considered the risk of harm to these identified endangered species from the release of hexavalent chromium into the waters and critical habitat of these species.

82. Based on this evaluation, the EASOF found the Project would not have a significant impact on the quality of the human environment, and that an Environmental Impact Statement (EIS) will not be required.

83. The Corps therefore concluded that "the permit will be issued with appropriate conditions included to ensure minimal effects, ensure the authorized activity is not contrary to the public interest and/or ensure compliance of the activity with any of the authorities identified in Section 10 of the Rivers and Harbors Act."

84. In his letter of October 29, 2026, which the Foundation provided to the

Corps, Dr. Fein commented on several of the conclusions reached by the Army Corps in its EASOF for the Project. Dr. Fein explained that the analyzed interior primers were not intended for continuous seawater immersion and called for further environmental assessment before sinking. See Exhibit 5. Dr. Fein concluded that, "…these conclusions [reached in EASOF regarding the potential for negative impacts on the environment due to Cr(VI) and possibly Pb contamination] are based on faulty logic or a lack of data, and in my opinion as an environmental geochemist, a more detailed environmental impact assessment should be conducted prior to the sinking…" *Id.* Dr. Fein explained that the analyzed samples came from interior zinc-chromate corrosion-inhibiting primers not intended for continuous seawater immersion and challenged the Corps' application of the coating guidance. *Id.*

85. The EASOF referred to comments by Okaloosa County asserting that Dr. Osborne's estimate incorrectly relied on "an assumption that the paint is 100% composed of zinc chromate." See Exhibit 1, p. 12, (Applicant's Response). However, Dr. Osborne's assessment expressly used an assumed zinc-chromate content averaging "50% by weight," rather than 100%. See Exhibit 3, p. 2. That distinction does not eliminate uncertainty in the estimate, but contradicts the

County's description of its composition assumption. The Corps acknowledged that the submitted information did "not establish a vessel-wide inventory of Cr(VI) or zinc chromate, nor does it establish the concentration or rate of constituent release that would occur following deployment." *See* Exhibit 1, p. 12 (Corps Evaluation). The laboratory findings established hexavalent chromium concentrations in the analyzed coating samples, rather than a vessel-wide inventory or predicted seawater concentrations. Addressing the uncertainties associated with the available data, Dr. Fein stated: "It makes no sense to criticize the assumptions made in this estimation without providing better data – more samples and a better determination of the surface area covered by the high-Cr and Pb paint." *See* Ex. 5. He further stated: "Although the paint analyses and Dr. Osborne's surface area estimations lead to high uncertainties, they do serve to demonstrate that there is a reasonable potential for Cr and Pb contamination." *Id.,* p. 1, item 1.

86. On information and belief, Defendant Army Corps of Engineers, Jacksonville Florida district, has approved the application of Defendant Okaloosa County for a modification to permit SAJ-1996-03565 to sink the *SS United States* as an artificial reef off the coast of Florida.

87. Okaloosa County has announced plans to tow the *SS United States* from

Mobile, Alabama to waters off Destin, Florida on November 9, 2026, where the ship will then be sunk in an artificial reef. On information and belief, the *SS United States* will be sunk promptly upon the ship's arrival in Florida coastal waters.

<u>Claim 1</u>
<u>Violation of the National Environmental Policy Act (NEPA)</u>

88. Plaintiffs repeat and incorporate the allegations contained in paragraphs above.

89. NEPA mandates the preparation of a detailed Environmental Impact Statement (EIS) prior to the approval of any major federal action that may significantly impact the human environment. The human environment is defined comprehensively to include the natural environment, the built environment, and the relationship of people to the environment. 42 U.S.C. § 4332(c).

90. The Army Corps of Engineers is required to develop an Environmental Impact Statement if the proposed activity is likely to have reasonably foreseeable significant effects. 33 C.F.R. § 333.12(a)(ii).

91. In considering the potentially affected environment, the Corps' District Engineer may consider, as appropriate to the specific activity, the affected area (national, regional, or local) and its resources. The District Engineer may, as

appropriate, consider the regulated activity's effect on factors such as conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. 33 C.F.R. § 333.12(b)(i).

92. NEPA provides that "[a]n agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown, unless the agency finds that the proposed agency action is excluded pursuant to one of the an agency's categorical exclusions or other provision of law. 42 U.S.C. § 4336(b)(2).

93. Among other things, the human environment includes historic and cultural sites, resources, properties, and landscapes. In evaluating the significance of an action's potential impacts on the human environment, federal agencies are required to take into account several considerations, including, without limitation, the degree to which effects on the human environment are likely to be controversial; the degree

to which structures listed in or eligible for listing in the National Register may be adversely affected; unique characteristics of the geographic area such as proximity to historic or cultural resources; the degree to which possible effects may be uncertain or involve unique or unknown risks; the extent to which the action, when combined with other past, present, and reasonably foreseeable projects, may have cumulatively significant impacts; the extent to which the action may cause loss or destruction of significant scientific, cultural, or historic resources; and whether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment.

94. An environmental assessment ("EA") shall be a "concise public document" that "sets forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." 42 U.S.C. § 4336(b)(2)

95. In preparing an EA, an agency must take a hard look at the reasonably foreseeable environmental consequences of its proposed action and provide a reasoned explanation for its conclusions concerning the significance of those effects. 42 U.S.C. § 4336(b)(2).

96. The Corps' NEPA regulations provide that, "until the Corps issues a record

of decision or a finding of no significant impact, or makes a categorical exclusion determination, as applicable, the permit applicant should take no action concerning their application that would: (1) have an adverse environmental effect within an area under the jurisdiction of the Corps; or (2) limit the choice of reasonable alternatives." 33 CFR 333.13(b).

97. Okaloosa County's actions in deconstructing the ship while it was docked in Mobile, Alabama, which has been determined to be within the area of the Project's potential effects and therefore under the Corps' jurisdiction, has adversely affected the SS United States by removing features that contribute to the ship's historic significance.

98. The proposed Project involves the intentional sinking of the *SS United States* in the Gulf of America pursuant to a permit issued by the Army Corps.

99. The ship is coated with zinc chromate paint, a coating containing hexavalent chromium (Cr(VI)) and zinc. These substances are regulated as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) that can adversely affect water quality and aquatic organisms when released into the marine environment.

100. The ship's painted surfaces of the *SS United States* will be submerged in ocean

water following its sinking. Over time, seawater exposure, corrosion, deterioration of the ship's hull and coatings, according to scientist's opinions as stated above and attached, may cause zinc chromate-containing paint to deteriorate, detach, and release chromium and zinc into the surrounding marine environment.

101. The sinking of the *SS United States* therefore presents a reasonably foreseeable risk of introducing hexavalent chromium, zinc, and potentially chromium-containing paint particles into ocean waters and surrounding marine sediments.

102. The release of these contaminants may adversely affect ocean water quality, marine organisms, aquatic habitat, and the ecological resources of the surrounding marine environment. Potential impacts include toxic effects on marine organisms, including acute and chronic toxicity, impairment of aquatic biological processes, and contamination of marine sediments and the marine food web.

103. The potential release of hexavalent chromium and zinc from the *SS United States'* paint is not speculative or unrelated to the proposed action. It arises directly from the placement of a vessel bearing those coatings into the marine environment and the foreseeable deterioration of those coatings following prolonged submersion.

104. The environmental significance of these potential impacts depends upon,

among other things, the quantity and concentration of zinc chromate present on the Vessel; the surface area and condition of the painted surfaces; the rate at which the coatings may deteriorate or release contaminants; the chemical form and concentration of chromium released; the extent to which chromium may be present as hexavalent chromium; the behavior and persistence of the contaminants in seawater and sediments; and the sensitivity of marine organisms and habitats in the vicinity of the proposed sinking site.

105. The U.S. Environmental Protection Agency (EPA) and the Maritime Administration (MARAD) have jointly recognized the potential environmental hazards associated with toxic metals in marine vessel coatings. Their publication, "National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs" (May 2006), identifies chromium and zinc among the potentially toxic heavy metals that may be present in marine paints and recognizes that vessel coatings may pose acute and chronic toxicity risks to marine organisms. The guidance further recognizes that physical disturbance and biological degradation can reactivate harmful coatings after a vessel has been sunk.

106. The Corps failed adequately to explain how the cited guidance and preparation measures, considered together with its chromium-release analysis, support its

prediction of negligible environmental effects notwithstanding the Foundation’s laboratory findings and expert evidence.

107. Despite the known presence of zinc chromate paint on the Vessel and the reasonably foreseeable potential for release of hexavalent chromium and zinc into ocean waters, the Corps' Environmental Assessment ("EA") fails to evaluate the potential impacts of these contaminants on ocean water quality or the marine environment.

108. Specifically, the EA fails to:

a. Identify or adequately describe the zinc chromate coatings present on the SS United States, including their location, extent, surface area, condition, and chemical composition;

b. Determine the quantity or concentration of hexavalent chromium and zinc contained in the ship’s paint;

c. Evaluate whether the Vessel's painted surfaces will deteriorate, corrode, or release paint particles, hexavalent chromium, or zinc into surrounding ocean waters following sinking;

d. Evaluate the potential rate, extent, duration, and concentration of any release of chromium or zinc into ocean waters;

e. Evaluate the chemical behavior, fate, transport, and persistence of chromium and zinc in seawater and marine sediments, including whether released chromium may remain in or convert to the toxic hexavalent chromium form;

f. Evaluate the potential acute and chronic toxic effects of released chromium and zinc on marine organisms, including fish, shellfish, benthic organisms, and other aquatic species;

g. Evaluate the potential for accumulation of chromium and zinc in marine sediments or biological tissues and the resulting impacts on marine habitat and the marine food web;

h. Evaluate whether the ship's zinc chromate coatings should be removed or otherwise treated before the Vessel is sunk to prevent or minimize the release of hazardous contaminants;

i. Identify and evaluate mitigation measures sufficient to prevent or reduce the release of hexavalent chromium and zinc into the marine environment; and

j. Explain the scientific basis for any conclusion that the zinc chromate coatings will not adversely affect ocean water quality or marine organisms following the sinking of the Vessel.

109. The Corps also failed to evaluate whether sampling and testing of the ship' coatings, including chemical analysis to determine the presence and concentration of hexavalent chromium and zinc, were necessary to make an informed determination concerning the environmental consequences of the proposed action.

110. The Corps' failure to evaluate these impacts is particularly significant because the proposed action will permanently place the SS United States in the marine environment, where its painted surfaces will remain exposed to seawater and the natural processes of corrosion, deterioration, and physical disturbance.

111. The EA failed to evaluate whether the potential release of hexavalent chromium and zinc would have a significant negative impact on endangered species, including the Rice's whale, and loggerhead and green turtles, and their critical habitat that are known to occur or be located in the vicinity of the Project.

112. The EA's failure to evaluate the potential release and environmental consequences of hexavalent chromium and zinc deprives the Corps of an adequate

factual basis for determining whether the proposed action will have significant environmental effects.

113. The Corps therefore cannot reasonably conclude, on the basis of the EA, that the proposed sinking of the Vessel will have no significant impact on the quality of the human environment.

114. To the extent the Corps determined that the proposed action would have no significant environmental impact and issued a Finding of No Significant Impact ("FONSI"), that determination was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because the Corps failed to consider an important aspect of the environmental consequences of its proposed action.

115. The Corps' failure to evaluate the potential impacts of hexavalent chromium and zinc contamination also renders its environmental review inadequate to support its decision to authorize the sinking of the SS United States.

116. By failing to evaluate the reasonably foreseeable environmental consequences of the proposed action, the Corps violated NEPA, 42 U.S.C. §§ 4332 and 4336, and acted arbitrarily, capriciously, and not in accordance with law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

117. These considerations, both individually and collectively, required Defendants

to prepare an EIS for the Project. In deciding not to prepare an EIS before approving the Project, Defendants (i) failed to take into account the potential for negative impacts on the environment due to the high levels of hexavalent chromium, integrated over the amount of paint used to coat the ship's interior, which represents an amount of hexavalent chromium that could lead to severe environmental consequences due to paint erosion and dissolution once exposed to a marine environment. Cr(VI) and possibly Pb contamination; (ii) failed properly to evaluate the few considerations that were taken into account; (iii) failed to address the concerns of the federal, state, and local agencies with jurisdiction and expertise over affected resources; ; and (iv) failed properly to determine whether mitigation would reduce the Project's impacts to less-than-significant levels . Each of these failures was arbitrary, capricious, an abuse of discretion, and a violation of law.

118. Plaintiffs' members have been and will continue to be adversely affected by the Corps' unlawful action. Some of the Foundation's members also live near and use and enjoy the waters of the Gulf of Mexico in Okaloosa County, for a variety of activities, including swimming, boating, fishing, and viewing marine wildlife. For example, Foundation member Tracy Steely resides in Santa Rosa Beach, Walton County, Florida, and has lived along the Emerald Coast in Okaloosa and Walton

Counties for more than sixteen years. Ms. Steely regularly uses Gulf coastal waters and beaches for swimming, snorkeling, fishing, boating, and observing marine wildlife, including snorkeling near the jetties in Okaloosa County and boating to Crab Island. She visits local beaches approximately weekly, observes marine wildlife almost daily, and intends to continue these established activities regularly while remaining a resident of the area. Her recreational and aesthetic interests in these waters and marine resources, particularly the continued protection of endangered species such as loggerhead and green turtles, are concrete, particularized, and continuing. The release of hazardous materials from the proposed sinking of SS United States threatens to impair her use and enjoyment of those waters and resources, including threatened and endangered species protected by the Endangered Species Act (ESA).

119. Unless the Corps' decision is set aside and the Corps is required to comply with NEPA before authorizing the proposed sinking, Plaintiff and its members will suffer irreparable harm to their environmental, recreational, aesthetic, and other interests.

<u>Claim II</u>
<u>Violation of Section 106 of the National Historic Preservation Act</u>

120. Plaintiffs repeat and incorporate the allegations contained above.

121. In enacting the NHPA, Congress specifically declared a policy that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people," and, further, that "the preservation of [our] irreplaceable heritage is in the public interest." The purposes of the NHPA include preserving "the historical and cultural foundations" of the United States in order to "[e]nsure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation" in the face of proposals to extend "urban centers, highways, and residential, commercial, and industrial developments." Pub. L. No. 89-665, 80 Stat. 915 (Oct. 15, 1966).

122. Section 106 of the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108, requires the head of a federal agency with jurisdiction over a proposed federal or federally assisted undertaking, or authority to license an undertaking, to take into account the effect of the undertaking on historic properties before approving the expenditure of federal funds or issuing a license. Section 106 further requires the agency to afford the Advisory Council on Historic Preservation ("ACHP") a reasonable opportunity to comment.

123. Section 106 of the NHPA generally requires federal agencies to "take into account" the impact of their undertakings on any site listed on or eligible for listing in the National Register of Historic Places." 54 U.S.C. § 306108. Congress gave the ACHP authority to promulgate regulations governing the implementation of Section 106. *Id.*, § 304108. Among other things, those regulations provide that agencies must consult with other parties to determine whether a proposed undertaking will have an adverse effect on historic properties and, if so, to discuss ways to avoid, minimize, or mitigate such effects. 36 C.F.R. §§ 800.4-800.6.

124. In this case, the Corps' approval of a permit modification under the Rivers and Harbors Act to allow Okaloosa County to sink the *SS United States* in an artificial reef is a federal undertaking within the meaning of Section 106 of the NHPA and its implementing regulations

125. Section 106 and its implementing regulations, 36 C.F.R. Part 800, establish the process by which agencies must discharge their statutory obligation to take into account the effects of the undertaking on historic properties. Among other things, that process requires agencies to consult with the appropriate State Historic Preservation Officer(s) to determine whether the undertaking will have an adverse effect on historic properties within the area of potential effects and consult regarding

measures to avoid, minimize, or mitigate those adverse effects.

126. The Corps serves as the responsible federal agency for the undertaking and has determined in consultation with the Florida SHPO, that the undertaking's area of potential effects include both Okaloosa County, Florida, where the ship will be sunk and Mobile, Alabama, where the ship is currently docked.

127. Under the Section 106 regulations, "[a]s part of its initial planning, the agency official shall determine the appropriate SHPO or SHPOs to be involved in the section 106 process." 36 C.F.R. § 800.3(c).

128. If more than one State is involved in an undertaking, the involved SHPOs may agree to designate a lead SHPO to act on their behalf in the section 106 process, including taking actions that would conclude the section 106 process." 36 C.F.R. § 800.3(c)(2)

129. The proposed sinking of the *SS United States* in LAARS C is an undertaking that involves the state of Alabama, where the ship is currently docked and being prepared for deployment to an artificial reef in Florida, as well as the Florida SHPO.

130. On information and belief, the Corps coordinated exclusively with the Florida SHPO on the undertaking and failed to formally invite the Alabama SHPO to participate as a consulting party, notwithstanding the Corps' February 17, 2026,

notification that the undertaking's area of potential effects includes Mobile, Alabama, where the ship is currently docked.

131. On information and belief, the Army Corps failed to provide the Alabama SHPO with the Corps' findings and determinations regarding the undertaking, including its determination that the area of potential effects includes Mobile, Alabama, and its determination of adverse effect, as required by the Section 106 regulations. 36 C.F.R. § 800.3(c)(2)

132. On information and belief, the Corps failed to consult with the Alabama SHPO to identify historic properties within the area of potential effects, as required by36 C.F.R. § 800.4(b).

133. To the extent the Corps communicated verbally or informally with the Alabama SHPO regarding participation in the Section 106 process, those communications fail to comport with the Section 106 regulations, which contemplate a more formal process under which the Alabama SHPO must be given an opportunity to participate in the consultation, identify historic properties within the area of potential effects, and review pertinent findings and determinations by the Corps. 36 C.F.R. §§ 800.3(c), 800.4(b). See also 33 C.F.R. § 325, Appendix C, 4(a).

134. At the time the Alabama SHPO determined in November 2025 that the ship

was not subject to federal jurisdiction during "decommissioning," the Alabama SHPO had not been notified by the Army Corps of the undertaking or invited to participate as a consulting party, as required by applicable Section 106 regulations. 36 C.F.R. § 800.3(c).

135. The Corps' failure to consult and provide information with the Alabama SHPO deprived the Alabama SHPO with an opportunity to consult on the effects on the undertaking, the resolution of adverse effects, and including the destructive actions taken by Okaloosa County while the ship was docked in Mobile, as required by 36 C.F.R. §§ 800, 33 C.F.R. § 325, Appendix C, 7(d), 8.

136. The Corps' approval of the proposed modification to Okaloosa County's permit will have an adverse effect on the *SS United States*.

137. Defendants failed to undertake the consultations required by Section 106 and failed to consider reasonable alternatives to avoid an adverse effect on the *SS United States*. These failures are arbitrary, capricious, an abuse of discretion, and a violation of law.

<u>Claim III</u>
<u>Violation of Section 110(k) of the National Historic Preservation Act</u>

138. Plaintiffs repeat and incorporate the allegations contained above.

139. Section 110(k) of the NHPA, which is known as the ‘anticipatory demolition” provision, provides as follows: “Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant who, with intent to avoid the requirements of section [106] of [the NHPA], has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed the significant adverse effect to occur, unless the agency, after consultation with the [Advisory Council on Historic Preservation], determines that circumstances justify granting assistance despite the adverse effect created or permitted by the applicant.” 54 U.S.C. § 306113; 36 C.F.R. § 800.9(c).

140. Under Section 110(k) “a federal agency may not grant a permit to an applicant who has already adversely affected historic property…Section [110(k)] works to punish those who would seek to manipulate the 106 process by denying them access to post-demolition permits.” *Committee to Save Cleveland’s Huletts v. U.S. Army Corps of Engineers,* 163 F. Supp. 2d 776, 792-93 (N.D. Ohio 2001).

141. Guidance issued by the National Park Service provides further background on the Corp’s responsibilities under Section 110(k): “Full consideration of historic properties includes development of procedures to identify, discourage, and guard

against "anticipatory demolition" of a historic property by applicants for Federal assistance or license. Agency procedures should include a system for early warning to applicants and potential applicants that anticipatory demolition of a historic property may result in the loss of Federal assistance, license or permit, or approval for a proposed undertaking. When a historic property is destroyed or irreparably harmed with the express purpose of circumventing or preordaining the outcome of Section 106 review (e.g., demolition or removal of all or part of the property) prior to application for Federal funding, a Federal license, permit, or loan guarantee, the agency considering that application is required by Section 110(k) to withhold the assistance sought, unless the agency, after consultation with the [Advisory Council on Historic Preservation], determines and documents that "circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant." 63 Fed. Reg. 20,503 (Apr. 24, 1998) (Standard 4, Guideline (g)).

142. Section 106 of the NHPA, 54 U.S.C. § 306108, requires federal agencies to take into account the effects of their undertakings on historic properties and afford the ACHP an opportunity to comment before approving an undertaking that may affect such properties.

143. The *SS United States,* currently docked in Mobile, Alabama, is listed in the

National Register of Historic Places and constitutes a historic property protected by the NHPA.

144. Before beginning and completing the review required under Section 106 of the NHPA, the County intentionally undertook, authorized, directed, or permitted its contractor to commence and continue to deconstruct the historic ship while it was docked in Mobile, Alabama, by removing numerous features of the historic boat, including its funnels, radar mast, and remaining propeller that contribute to the ship's historic significance. These deconstruction activities resulted in the loss, destruction, or impairment of, and adversely affected, the historic ship.

145. On information and belief, the County purchased the *SS United States* in October 2024 with the intent to sink the ship for an artificial reef. On information and belief, the County knew or should have known at that time that a permit or permit modification from the Army Corps would be required and also knew or should have known of the ship's historic significance.

146. On information and belief, the County's 2024 request to modify the existing Department of the Army Permit to change the minimum authorized depth of LAARS B from -140 feet to -60 feet to accommodate the deployment of large vessels (Modification 3) was undertaken for the purpose of sinking the historic *SS United*

*States*. On information and belief, the County failed to disclose this intent at the time of its application, with the result that the Corps' public notice asserted that, "The Corps is not aware of any known historic properties within the permit area."

147. Okaloosa County undertook and directed these activities with the intent to avoid, circumvent, or undermine the review and consultation requirements of Section 106 of the NHPA. The activities described above occurred before the Corps approved the permit modification, and before the Corps completed the applicable Section 106 review

148. The Corps knew and was informed of the County's actions to deconstruct the *SS United States* and the resulting adverse effects though numerous letters written by various stakeholders, including the Foundation and the National Trust for Historic Preservation. The Corps was also aware, or should have considered the evidence showing, that Applicant's conduct was undertaken with intent to avoid Section 106 review.

149. By authorizing or proposing to authorize the Project without complying with Section 110(k), the Corps has acted unlawfully and, to the extent applicable, arbitrarily and capriciously, in excess of statutory authority, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. § 706(2)(A), (C),

and (D).

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

Declare the Corps has violated and continues to violate Section 106 and Section 110(k) of the NHP and NEPA, as alleged herein;

Set aside and remand the Corps' decision to approve the Memorandum of Agreement and permit modification;

Set aside and remand the Corps' decision to approve any Finding of No Significant Impact and any decision not to prepare an environmental impact statement under NEPA;

Set aside and remand the challenged Permit, Memorandum of Agreement, and associated findings as required by the NHPA and NEPA;

Enjoin Defendants and their officers, administrators, agents, employees, and those in active concert or participation with them from issuing any further approvals or permits until they have fully complied with NEPA and the NHPA;

Enjoin the scheduled towing and sinking of the *SS United States*;

Award Plaintiffs their reasonable attorneys' fees and costs, pursuant 54 U.S.C. § 307105 and/or 28 U.S.C. § 2412;

Grant Plaintiffs such other and further temporary, preliminary, and permanent relief that this Court deems just and proper; and

Retain continuing jurisdiction of this matter pending the Defendants' compliance with this Court's orders;

Respectfully submitted this 3rd day of November, 2026.

FARMER & FITZGERALD, P.A.

/s/ Matthew Farmer
Matthew P. Farmer
Fla. Bar No. 0793469
800 W. De Leon St.
Tampa, Florida 33606
(813) 928-1131
FAX (813) 224-0269
Mattfarmer1@aol.com

COUNSEL FOR PLAINTIFFS