**MEMORANDUM FOR RECORD**

**SUBJECT: Department of the Army Environmental Assessment and Statement of Findings for the Above-Referenced Standard Individual Permit Application**

This document constitutes the Environmental Assessment, Public Interest Review, and Statement of Findings for the subject application.

## 1.0 Introduction and Overview

Information about the proposal subject to the US Army Corps of Engineers' (Corps') Section 10 Rivers and Harbors Act regulatory authority is provided in Section 1, detailed evaluation of the activity is found in Sections 2 through 11 and findings are documented in Section 12 of this memorandum. Further, summary information about the activity including administrative history of actions taken during project evaluation is attached (ORM2 Summary) and incorporated in this memorandum.

### 1.1 Applicant name

Okaloosa County Board of County Commissioners
ATTN: Alex Fogg, Natural Resources Chief

### 1.2 Activity location

The Large Area Artificial Reef Sites (LAARS) project sites are in the Gulf of America (formerly Gulf of Mexico), south of Okaloosa County, Florida. LAARS Site A is 15 miles southeast of East Pass, near Destin, Florida, LAARS Site B is 23 miles south of East Pass, and LAARS Site C is 15 miles southwest of East Pass.

**Table 1: Corner Coordinates of the LAARS**

| | Latitude | Longitude |
|---|---|---|
| **Large Area Artificial Reef Site – A (LAARS A)** | | |
| Northwest Corner | 30.166666° | -86.416666° |
| Northeast Corner | 30.166666° | -86.283333° |
| Southeast Corner | 30.033333° | -86.283333° |
| Southwest Corner | 30.033333° | -86.416666° |
| **Large Area Artificial Reef Site – B (LAARS B)** | | |
| Northwest Corner | 29.983333° | -86.527666° |
| Northeast Corner | 29.982833° | -86.377500° |
| Southeast Corner | 29.808500° | -86.378666° |
| Southwest Corner | 29.809166° | -86.528333° |
| **Large Area Artificial Reef Site – C (LAARS C)** | | |
| Northwest Corner | 30.158500° | -86.827666° |
| Northeast Corner | 30.157666° | -86.526833° |
| Southeast Corner | 30.114166° | -86.527000° |
| Southwest Corner | 30.114833° | -86.827666° |

Figure 1. Location Map




1.3 Description of activity requiring permit

The applicant seeks to modify the existing Department of the Army (DA) Permit to change the minimum authorized depth of LAARS B from -140 feet to -60 feet to accommodate the deployment of large vessels with significant vertical relief. This would result in a minimum distance of 60 feet between the tops of any reef structures and the elevation of the Mean Lower Low Water (MLLW). This modification would make the vertical clearance of LAARS B more consistent with LAARS A which has a minimum required clearance of - 60 feet at MLLW and LAARS C which has a minimum required clearance of -50 feet at MLLW. This would allow placement of high relief reef materials that would be more accessible to recreational scuba divers. The applicant also seeks to deploy the historic, ocean liner steamship *United States* (SSUS) within LAARS C as an artificial reef for recreational opportunities Deployment of the SSUS does not require modification of the permit but does require evaluation under Section 106 of the National Historic Preservation Act (NHPA) as the ship is listed on the National Register of Historic Places (NRHP). Additional information regarding the effects of the SSUS' deployment is also considered in this document. Additionally, the applicant has requested a 10-year time extension of the existing permit.

1.3.1 Proposed avoidance and minimization measures

The applicant has provided the following information in support of efforts to avoid and/or minimize impacts on the aquatic environment: The selected sites are devoid of submerged aquatic vegetation (SAV) and where there are no natural rock outcrops or hard bottom formations. The sites are existing artificial reef deployment areas with numerous deployments since 1996.

### 1.3.2 Proposed compensatory mitigation

Impacts to special aquatic sites are not proposed, therefore, no compensatory mitigation of aquatic impacts was required.

## 1.4 Existing conditions and any applicable project history

Existing Conditions: The project sites are three existing LAARS offshore of Okaloosa County, Florida. The habitat within the existing artificial reef sites contains medium to coarse grained sands, predominately unvegetated with a surficial layer of microalgae/cyanobacteria. There are no natural rock outcrops, hard bottom formations or submerged aquatic vegetation (SAV's) located within the reef deployment areas. LAARS Site A is approximately 7 nautical miles by 8.1 nautical miles, encompassing 75.1 square miles, with water depths that range from -100 feet to -166 feet relative to MLLW. LAARS Site B is approximately 8.3 nautical miles by 10.4 nautical miles, encompassing 114.4 square miles, with water depths that range from -180 feet to -300 feet at MLLW. LAARS Site C is approximately 2.6 nautical miles by 16.6 nautical miles, encompassing 57.4 square miles, with water depths that range from -90 feet to -160 feet at MLLW. Multiple deployments of authorized reef materials within the LAARS have been accomplished since the sites were originally authorized.

Permitting History:

- LAARS A was initially authorized by Corps permit number SAJ-1994-02365, granted to the Florida Department of Environmental Protection, on 12 October 1994. The permit included LAARS A offshore of Okaloosa County, Florida, and two LAARS (East and West) offshore of Escambia County, Florida. The permit for LAARS A was transferred to Okaloosa County on 3 March 2000.

- LAARS B and C were initially authorized by Corps permit number SAJ-1996-03565, granted to the Okaloosa County Board of Commissioners, on 9 July 1997.

- There were multiple permit modifications to the above-mentioned permits from 2000 to 2011 that included the following:

    - Multiple time extensions
    - Addition of authorized reef materials, including vessels
    - Modification of special conditions
    - Variances for transporting and deploying reef materials at night

- The current permit, SAJ-1996-03565, was granted to the Okaloosa County Board of County Commissioners on 7 September 2016. The permit reauthorized LAARS A, which was previously authorized under SAJ-1994-02365, and LAARS B and C, which were previously authorized under SAJ-1996-03565.

- Modification #1 – The permit was modified on 21 August 2020 to include heavy gauge ferrous vessels that have a hull length of no less than 60 feet. The Corps published a public notice for this permit modification.

- Modification #2 – The permit was modified on 13 August 2021 to remove the 40-foot maximum height restriction for reef materials. The minimum clearance depths between the tops of reef materials and the MLLW remained unchanged.

- Modification #3 – The permit was modified on 30 December 2025 to provide an interim time extension through 30 December 2026 for the Corps to continue their evaluation of the proposed permit modification. This time extension was consistent with guidance originally established by paragraph 3.a of Regulatory Guidance Letter 91-01, dated 6 November 1991.

1.4.1 Jurisdictional Determination

Is this project supported by a jurisdictional determination? No Jurisdictional Determination

The project is in tidal waters of the Gulf of America, formerly known as the Gulf of Mexico, within the Outer Continental Shelf, and more than three miles from the coastline. The three LAARS are all located more than three nautical miles from the coastline and therefore not subject to Section 404 of the Clean Water Act. The three LAARS are all located within the Outer Continental Shelf and therefore subject to Section 10 of the Rivers and Harbors Act. 33 USC 403; 33 CFR 320.2(b); 33 CFR 322.2(b) and (g).

1.5 Permit authority

The proposed activity is regulated under the authority of Section 10 of the Rivers and Harbors Act of 1899 (33 USC 403), including as extended by the Outer Continental Shelf Lands Act (43 USC 1333(e)).

**2.0 Scope of review for National Environmental Policy Act (i.e., scope of analysis), Section 7 of the Endangered Species Act (i.e., action area), and Section 106 of the National Historic Preservation Act (i.e., permit area)**

2.1 Determination of scope of analysis for National Environmental Policy Act (NEPA)

The scope of analysis always includes the specific activity requiring a Department of the Army permit that is located within the Corps' geographic jurisdiction. In addition, we have applied the four factors test found in 33 CFR Part 333 to determine if there are portions of the larger project beyond the limits of the Corps' geographic jurisdiction where the federal involvement is sufficient to turn these portions of an essentially private action into a federal action.

Based on our application of the guidance in 33 CFR 333, we have determined that the scope of analysis for this review includes only the Corps geographic jurisdiction.

Final description of scope of analysis: The Corps scope of analysis is the vicinity of the three LAARS within the Gulf of America.

2.2 Determination of the Corps' action area for Section 7 of the Endangered Species Act (ESA)

The Corps scope of analysis is the vicinity of the three LAARS within the Gulf of America.

2.3 Determination of Corps' permit area for Section 106 of the National Historic Preservation Act (NHPA)

The permit area includes only those areas comprising waters of the United States that will be directly affected by the proposed work/structures. Activities outside of waters of the U.S. are not included; all three tests in 33 CFR 325, Appendix C(g)(1) have not been met.

Final description of the permit area: The permit area (area of potential effects) for the modification of the clearance depth of LAARS B and the extension of the permit includes the vicinity of the three LAARS within the Gulf of America. The three sites are all located in the open waters of the Gulf of America, approximately 15 miles or more from the coast. The LAARS include a buffer that is intended to ensure that all deployed reef materials are within the defined boundaries of the respective LAARS.

For the associated undertaking of sinking the SSUS, the Section 106 permit area (area of potential effects) includes the vicinity of LAARS C within the Gulf of America as well as the location at which the vessel was docked for environmental remediation in Mobile Bay.

## 3.0 Purpose and Need

3.1 Project purpose and need

Project purpose and need for the project as provided by the applicant and reviewed by the Corps:

The LAARS are intended to enhance fisheries resources and provide opportunities for recreational fishing and scuba diving in the coastal waters of Okaloosa County, Florida. The current request by the applicant is to modify the minimum clearance depths in LAARS B and for a time extension of the permit.

3.2 Basic project purpose

The proposed activity does not involve a discharge of dredged or fill material and is not subject to Section 404 of the Clean Water Act. Therefore, a Section 404(b)(1) Guidelines analysis will not be conducted and a description of the basic project purpose and a determination about water dependency is not required.

3.3 Overall project purpose

Overall project purpose, as determined by the Corps: To create artificial reefs off Okaloosa County to improve recreational and commercial fishing and diving opportunities.

## 4.0 Coordination

4.1 Public Notice Results

The results of coordinating the proposal on public notice are identified below, including a summary of issues raised, any applicant response and the Corps' evaluation of concerns.

The Corps published a public notice on 23 October 2024 describing the proposed change to the minimum clearance between the top of reef structures and MLLW water for LAARS B to accommodate a large vessel and create consistency with LAARS A and C. *See* Section 1.3 for the full description of the proposed change to clearance depth. At the time of this public notice, the applicant had not provided information to the Corps regarding a specific vessel intended for use as an artificial reef.

The Corps published a second public notice on March 13, 2026, describing the previously proposed change to the minimum clearance within LAARS B, the proposed deployment of the historic SS United States (SSUS) as an artificial reef within LAARS C, and a proposed ten-year time extension for the permit. This notice also included the Corps' determination of adverse effects on historic properties pursuant to Section 106 of the NHPA.

Were comments received in response to the public notice? Yes

Were comments forwarded to the applicant for response? Yes

Was a public meeting and/or hearing requested, and if so, was one conducted?

Yes, a public meeting/hearing was requested but was not held. Upon a thorough review of the comments submitted, the Corps found that the substantial issues associated with the permit modification and with the sinking of the SS United States have been considered by the Corps in our evaluation of the application and there is no valid interest to be served by a hearing. All relevant information is addressed in this document. Okaloosa County has also made information about the SSUS publicly available on its website at www.myokaloosa.com/SSUSFAQs .

4.1.1. Agency Comments:

Comment 1: Florida Fish and Wildlife Conservation Commission (FWC): In response to the public notice issued on 23 October 2024, FWC recommended that the Corps coordinate with the US Coast Guard and other military branches to be sure there are no extenuating circumstances associated with the project area. FWC also indicated that they support the proposed modification.

Applicant's Response: *The County has been in coordination with USAF, USACE, and other relevant agencies regarding site selection and safety. The deployment site selection process has considered applicable environmental and safety assessments.*

Corps' Evaluation: The applicant and the Corps have been in communication with the USCG and they have not expressed any concerns with the project. They toured the ship with the applicant, the Corps, and the Sarasota Police Department Dive Team on 22 October 2025. During phone conversations with the Corps, the USCG indicated they will conduct navigational notifications prior to deployment of the vessel and are prepared to engage once, or if, the permit is issued. The applicant has been in coordination with USAF. The USAF did not provide comments to the Corps in response to either public notice issued by the Corps.

Comment 2: Florida Fish and Wildlife Conservation Commission (FWC): In response to the second public notice, issued on 13 March 2026, FWC recommended that the Corps combine the permit and all modifications and conditions into one document and requested that four special conditions be added to the permit, if issued, relating to the deployment of vessels, cargo manifests, pre- and post-deployment notification, and deployment tracking. They also recommended that the Corps consult with National Marine Fisheries Service on Rice's whale proposed critical habitat. Additionally, FWC recommended a correction in the site coordinates and requested that the Corps coordinate with NMFS and USCG to ensure that nautical charts reflect accurate navigation clearance and noted that pursuant to the Coastal Zone Management Act (CZMA), a CZMA consistency determination must be obtained from the Florida State Clearinghouse. Finally, FWC stated that they support the proposed modification and the deployment of the SSUS as an artificial reef.

Applicant's Response: The applicant received CZMA consistency determination on 15 June 2026 and provided it to the Corps the same day.

Corps' Evaluation: The new permit modification, if issued, would be updated to include all permit activities and all relevant special conditions, including those requested by FWC. While not required due to its proposed status, Rice's whale proposed critical habitat was included in the formal consultation with NMFS (See section 9.1.). The project's site coordinates have been corrected. The Corps will ensure that NMFS and USCG have a copy of the new permit modification, if issued. CZMA consistency concurrence was obtained by the applicant and has been received by the Corps.

4.1.2. Public Comments:

Comments received in response to public notice: Refer to the attached comment matrix (Appendix A) for a complete list of commenters and general topics raised. See below for a summary of comments, the applicants' response, and the Corps' evaluation.

**1. Economics:**

a. Summary of Comments: Comments related to the economic benefits of an alternate use of the SSUS rather than sinking the ship for use as an artificial reef: Comments advocated for the restoration of the SSUS for use as a museum, hotel, restaurant, educational facility, and similar uses, stating it would increase tourism and bring about a greater economic benefit. Several commentors stated that restoration of the SSUS should be funded by tax dollars or wealthy benefactors. One commenter suggested that the ship be repurposed into consumer market products through the smelting process.

i. Applicant Response: *After extensive review of the available options, the County determined that the artificial reef project represents the most viable path forward for the ship, providing a lasting legacy as a world-class dive destination and marine habitat while honoring her storied history. Okaloosa County recognizes the historic significance of the SS United States. The vessel is listed on the National Register of Historic Places, and coordination under Section 106 of the National Historic Preservation Act (NHPA) is ongoing as part of the federal permitting process. The County remains committed to ensuring that all historic preservation requirements are addressed in accordance with applicable law. Okaloosa County is aware that various proposals for above-water preservation and restoration of the SS United States have been advanced over the years. The County carefully considered these alternatives; however, the substantial costs and logistical challenges associated with restoration made above-water preservation financially infeasible. The artificial reef project provides a responsible and lasting use for the vessel. Okaloosa County, in partnership with the SS United States Conservancy, acquired the vessel with the intent of creating a world-class artificial reef destination off the coast of Destin–Fort Walton Beach.*

ii. Corps Evaluation: Alternative uses of the ship as a museum, hotel, restaurant, educational facility, etc. would be reasonably expected to increase tourism and bring about an economic benefit. However, the cost to prepare and retrofit the ship would be significant, and, there is no approved plan or secured source of funding for restoration. The previous owner of the vessel, the SSUS Conservancy, attempted for many years to preserve the vessel before finally selling it to Okaloosa County. A former Chapter Chairman with the SSUS Conservancy stated in his comments "while its historical significance is not in question, the reality is that preserving the vessel in any meaningful, accessible, and financially sustainable form above water has long presented challenges

that have not been overcome despite decades of opportunity.” Tax dollars have not been earmarked for such restoration, and no wealthy benefactors have guaranteed funding if such alternative were to occur. Additionally, it is unknown if any increase in economic benefit from the restoration would offset the maintenance, upkeep and berthing costs of any of these alternate uses long term. It has been noted in comments that New York has offered berthing space for the ship. However, relocating the vessel to a New York would likely not generate an economic benefit for Okaloosa County, and a New York berth would require relocation expenses, dockage fees, and other costs associated with berthing the vessel, that are not feasible for the applicant. Alternative uses such as repurposing into consumer market products from smelting would have an economic benefit but would not increase recreational tourism. The smelting process, however, would eliminate all economic benefit associated with the vessel’s historic value. It is also important to note that Okaloosa County is in ownership of the vessel, and the Corps has no authority to compel the applicant to sell its property or dictate its use in this manner. See section 7.1 for additional discussion of economics.

b. Summary of Comments: Comments related to the economic benefits of sinking the SSUS as an artificial reef: Comments stated that restoration is no longer feasible and tourism benefits from reefing is the best economically viable option. Some commenters disagree that tax dollars should be used for the ship.

   i. Applicants Response: *We share your enthusiasm for the tremendous recreational, economic, and ecological opportunity this project represents for the Destin–Fort Walton Beach area and the broader Gulf Coast community. Artificial reefs are proven to provide significant ecological benefits, including the creation of new marine habitat, increased fish populations, and enhanced biodiversity. The SS United States, given her size, would become one of the largest and most significant artificial reef structures in the Gulf of Mexico, providing decades of environmental and recreational value for the region. Okaloosa County, in partnership with the SS United States Conservancy, acquired the vessel with the intent of creating a world-class artificial reef destination off the coast of Destin–Fort Walton Beach.*

   ii. Corps Evaluation: The applicant and many commenters indicated that the proposed reefing is the most viable economic option. The reefing has the potential to benefit the local tourism industry throughout Okaloosa and surrounding counties, creating increased revenue for diving shops and fishing charters, supporting businesses such as hotels and restaurants, as well as companies that sell diving and fishing equipment, among others. This increase would likely create additional jobs, resulting in a positive effect on the overall job market long term. As such, the Corps believes that the proposed project would have a beneficial effect on the local tourism industry and the overall

economics in the vicinity of the project. See section 7.1 for additional discussion of economics.

2. **Aesthetics**
   a. Summary of Comments: Comments stated that the SSUS is a beautiful and iconic ship that deserves to be preserved for its aesthetic value and emphasized its artistic and historical significance. Additional comments expressed a sense of national pride and sentimentality towards the ship and its design, engineering, and craftsmanship. Other commenters challenge that the ship has been stripped and is corroded and in poor condition, with some comments suggesting that based on the ship's current condition, scrapping the ship is the only realistic alternative to sinking. They expressed a sincere preference with reefing the vessel with mitigation rather than completely losing the vessel due to dismantling.

      i. Applicant Response: Okaloosa County did not directly respond to comments on aesthetics

      ii. Corps Evaluation: The historic SSUS, designed by naval architect and marine engineer William Francis Gibbs, was in service in the 1950s and 1960s and is the largest, and fastest, ocean liner ever built in America. Unfortunately, its interiors were dismantled in the 1980s and 1990s by previous owners, decades before the applicant acquired the ship. The previous owner, the SSUS Conservancy, spent many years trying to rehabilitate the ship with no success. The Corps visited the ship on 22 October 2025 in Mobile, Alabama, during its remediation and toured the entirety of the top four decks, confirming that the interior had largely been gutted to its skeletal infrastructure. The hull was determined by USCG to be structurally sound, but nothing remained of the interior appointments and finishings. The ship retains the nautical aesthetics of its refined hull shape and its innovative aluminum superstructure which retain historical significance; however, removal of exterior features such as the funnels, lifeboat davits, and portholes reduce its aesthetic merit. See section 7.1 for additional discussion of aesthetics.

3. **General Environmental Concerns**

   a. Summary of Comments: Comments expressed concerns regarding environmental hazards including toxic substances resulting from the biodegradation of anti-fouling paint present on the SSUS, primarily high concentrations of Zinc Chromate/Hexavalent Chromium (CrVI). SS United States Preservation Foundation (SSUSPF ) indicated they collected samples from the vessel and had them tested and reported the following results: "York Analytical Laboratories and commissioned by the SS United States Preservation Foundation Inc documented extremely high concentrations of hexavalent chromium six (4,520 mg/kg), trivalent chromium three (11,300 mg/kg), and total chromium (15,800 mg/kg). These results were produced using EPA-recognized analytical methods, including EPA Method 7196A for hexavalent chromium analysis, and are consistent with historical records"; "A second round of

independent testing [by Eurofins Environment Testing Northeast LLC] confirmed the presence of hexavalent chromium (146 mg/kg) as well as concentrations zinc (17,300 mg/kg).” Also provided was a letter from Todd Osborne, PhD, from the University of Florida (UF) estimating the amount of Zinc Chromate on the vessel to be 59,334 pounds, exceeding the reportable quantity of 10 pounds of CrVI under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). This conclusion was based on period specific data and historic paint schedule records and an estimated painted area of the ship. Comments also raised concerns that the applicant did not pursue testing after being informed of this information.

i. Applicant Response: *The Foundation’s submissions - assert that the SS United States (“SSUS”) contains hexavalent chromium (Cr(VI)) at concentrations that categorically prohibit reef deployment. The submissions also assert that Okaloosa County has failed to address this contamination. The County respectfully disagrees with many of the conclusions the Foundation has reached or otherwise drawn from the laboratory data it has submitted.*

*The Foundation cites York Analytical Laboratories Report T5E0446 (May 2025), which documented Cr(VI) at 4,520 mg/kg in paint chip samples at multiple sampling locations onboard the SSUS. Okaloosa County notes that these findings are consistent with some historical uses of zinc chromate primer in vessel construction during the 1950s. The presence of zinc chromate informed and shaped the County’s remediation planning from the outset of this project. More problematically, the County does not know where the Foundation collected its samples, nor what, if any, protocols the Foundation used in its sampling. Additionally, while the Foundation and its members were permitted limited access to the County’s vessel for unrelated activities, paint sampling and other malicious activities were not authorized on any level, and the Foundation’s activities were conducted in secret.*

*The Foundation’s characterization that “full remediation” comparable to the USS Oriskany program is required before deployment, and that no such remediation has occurred, misrepresents both the regulatory framework and the status of remediation activities. Okaloosa County’s remediation contractor, Coleen Marine Inc., has conducted systematic hazardous material abatement operations under applicable OSHA, ACOE, EPA, Florida Department of Environmental Protection, and other guiding standards and documents throughout the vessel preparation process. The County’s remediation activities are ongoing, documented, and subject to oversight by state and federal regulators.*

*The County notes that the Foundation’s estimate of 59,334 lbs. of zinc chromate aboard the SSUS, derived from Dr. Todd Osborne’s University of Florida Whitney Laboratory report, relies on generalized historical paint composition data and AI-assisted surface area modeling rather than vessel-*

*specific sampling or surveys. The County respects Dr. Osborne's academic background and the scientific concerns he raises regarding Cr(VI) in non-marine environments. However, a theoretical estimate extrapolated from historical paint schedules, an assumption that the paint is 100% composed of zinc chromate, and aggregate surface area calculations is not accurate and does not reflect the actual condition or what is aboard the vessel. Using actual naval paint and primer specifications from the Instructions for Painting and Cementing Vessels of the United States Navy publication (the standard the SSUS followed), and correcting the flawed surface area assumptions made by the Foundation, the County's calculations indicate that the hexavalent chromate present is less than one-third of what the Foundation claims.*

*Furthermore, a review of Dr. Osborne's approximately 78 publications reveals that all 78 focus on freshwater, riverine, estuarine, and semi-enclosed systems, with the majority centering on contamination and heavy metals. The County can find no evidence of Dr. Osborne's expertise in open ocean or Gulf saltwater environments, mesophotic, reef systems, or seafloor sediment analysis, nor any familiarity with how Navy paints and primers are formulated or how they degrade in such conditions. The County also notes that since Dr. Osborne made his comments, he appears to have retracted his claims, as evidenced by the removal of his video and related materials from the University of Florida's website. Additionally, the County notes that the Foundation's submissions compare laboratory results expressed in mg/kg (a solid-phase concentration measure) directly to EPA drinking water standards expressed in mg/L, which is a dissolved-phase concentration measure. These are not directly comparable metrics. The relevant regulatory thresholds for artificial reef deployment are those applicable to the marine environment under Army Corps of Engineers permitting framework and review from all regulatory agencies during that process, not drinking water standards. Okaloosa County is committed to demonstrating compliance with the applicable marine environmental standards through the permitting process.*

ii. Corps Evaluation:
The Corps considered comments and supporting materials concerning the potential presence of hexavalent chromium [Cr(VI)], zinc chromate, and other paint-related constituents on the SSUS. The laboratory results submitted by commenters indicate that Cr(VI) was detected in the paint-chip samples analyzed. However, the submitted information does not establish a vessel-wide inventory of Cr(VI) or zinc chromate, nor does it establish the concentration or rate of constituent release that would occur following deployment.

The submitted laboratory results appear to be based on one or a limited number of samples. The record does not identify the precise sampling location(s), whether the laboratories analyzed the same or separate samples, the sampling protocols used, or the chain of custody. In addition, the samples were collected before completion of vessel remediation. Given the size,

condition, and varied coating history of the vessel, one or two samples are not sufficient to characterize the distribution or total quantity of Cr(VI), zinc chromate, or other constituents throughout the vessel.

The estimate of Cr(VI) or zinc chromate based on historic paint schedules and period-specific data is also subject to substantial uncertainty. Historic paint records reflect differing coating specifications across vessel areas, including varying numbers of zinc-chromate primer coats and areas excluded from particular coating requirements. Accordingly, an estimate that assumes uniform paint composition, concentration, application, and distribution across the vessel may overstate or understate the amount remaining onboard. Such estimates also do not account for the removal of loose or deteriorated coatings during remediation, prior coating loss and weathering, or the reduction in paint thickness and coverage over the vessel's service life.

The Corps recognizes that paint constituents may be released as coatings deteriorate in a marine environment. Antifouling paint is designed to leach out over time and leach rates were historically higher than those of modern products. Zinc and chromium present in exposed coatings may be released through degradation resulting from contact with seawater (Ramos-Filho, 2025); however, the rate and extent of release depend on coating formulation and condition, as well as site-specific factors such as pH, salinity, temperature, hydrodynamic conditions, corrosion, and biological colonization. The composition and distribution of microorganisms that colonize the vessel's surfaces may also affect coating degradation over time, and those microbial communities are influenced by the characteristics of the underlying materials (Van Landuyt et al, 2022).

Available studies concerning sunken vessels generally focus on fuel and munitions contamination, while studies addressing Cr(VI) more commonly evaluate groundwater or other non-marine environments. The limited available information concerning Cr(VI) in saltwater environments indicates that release may occur slowly over time as coatings deteriorate. Research also suggests**, i**n the first 24 to 48 hours of immersion, a rapid "burst" of Cr(VI) occurs as the chromate near the immediate paint surface dissolves" (*Furman et al, 2006*).Thereafter, a steady and sustained release occurs over time. The available literature further indicates that chromate release is greater due to a greater solubility under acidic conditions (greatest for a pH of 1) and decreases as pH increases to 7 (Scholes et al, 2006). Gulf waters are generally alkaline, with pH commonly ranging from approximately 7.5 to 8.1. See Scholes et al. (2006). Slower releases are more likely to reduce Cr(VI) into Cr(III), which is a natural less toxic micronutrient; however, the extent and timing of that transformation is site-specific. The available information does not support direct comparison of paint-chip concentrations expressed in milligrams per kilogram to dissolved-water standards expressed in milligrams per liter, nor does it establish that the reported results would result in a significant marine

environmental effect.

The Corps considered the commenters' concerns, the submitted laboratory results and estimate (assuming accuracy), the applicant's response, the vessel-remediation information in the administrative record, and available scientific data. Based on the current record, the comments do not demonstrate that Cr(VI) or zinc chromate remaining on the vessel would create a substantial risk of causing harm to human health or the environment sufficient to make the deployment of the SSUS contrary to the public interest or to otherwise preclude deployment as an artificial reef. The Corps' determination is based on the applicable marine environmental review and permitting requirements, the remediation measures undertaken for the project, the EPA/Maritime Administration (MARAD) remediation Best Management Practices (BMPs) and review by the relevant state and federal regulatory agencies. Based on the above, the Corps anticipates that these effects to the marine environment will be negligible. See section 7.1 for additional discussion of general environmental concerns. See Appendix B for citations.

b. Summary of Comments: Comments expressed concerns about the presence of lead, Polychlorinated biphenyls (PCBs), and other contaminants throughout the ship. The SSUSPF indicated they collected samples from the vessel and had them tested for lead by Criterion Laboratory.

iii. Applicant Response: *The Foundation's submissions document lead-based paint at concentrations ranging from 0.46% to 2.65% at various sampling locations, including the Enclosed Promenade (2.65%), Main Mast interior (1.57%), Starboard Bridge Wing (1.0%), and Navigation Bridge (0.46%). While Okaloosa County acknowledges these findings, lead paint abatement is not included in the remediation process for artificial reef construction as outlined in EPA guiding documents. Documentation of abatement activities, waste manifests, and disposal records of specific waste items are being maintained as required with applicable law.*

*The Foundation's submissions raise concerns regarding polychlorinated biphenyls (PCBs) and other contaminants, including mercury gauges and petroleum residues. The County confirms that significant PCB testing has been conducted and that identified PCB-containing materials are being addressed in accordance with EPA regulations at 40 CFR Part 761. Mercury-containing devices are subject to removal under applicable Resource Conservation and Recovery Act (RCRA) universal waste rules. The County's remediation scope encompasses all categories of hazardous materials identified through the vessel survey process, consistent with the applicable BMP guidance.*

iv. Corps Evaluation: Lab results for lead were based on six samples and source locations and a chain of custody were provided. Samples were obtained prior to completion of remediation. Removal of peeling and flaking paint, as required for

PCB abatement, would have also removed lead based paint. The lead remaining on the intact paint is not expected to have a significant effect on the marine environment as lead has a low leaching rate, low solubility, and does not bioaccumulate. See section 7.1 for additional discussion of general environmental concerns.

b. Summary of Comments: Commenters raised concerns that the vessel will not be sufficiently remediated and will pollute the marine environment and enter the local food chain, potentially affecting fisheries in the area, even creating a superfund site. They believe that the Corps has not adequately addressed these issues and a remediation report has not been submitted to EPA.

   i. Applicant Response: *Thank you for submitting your concerns regarding hazardous materials aboard the SS United States, including hexavalent chromium, zinc chromate, lead paint, and PCBs. Okaloosa County takes these concerns seriously and is committed to ensuring that all hazardous materials aboard the vessel are addressed in accordance with applicable EPA, FDEP, and federal permitting requirements prior to the vessel's deployment as an artificial reef. The County has been engaged with regulatory agencies regarding the identification and proper handling of these materials, and remediation requirements will be incorporated into the permitting conditions.*

   ii. Corps Response: At the time the PN was issued, the ship was undergoing remediation, so the remediation report had not yet been completed. The remediation has been completed and the report has been finalized. The report was submitted to EPA for their review, and the EPA did not provide the applicant or the Corps with any concerns or recommendations resulting from their review. The Corps does not anticipate more than negligible effects to the marine environment, and beneficial effects to the local fisheries, resulting from the project. (See also Section 3(a)(ii), above, and section 7.1, below, for additional discussion of general environmental concerns.)

c. Summary of Comments: Comments expressed concerns that the project fails to meet the permit's requirements for reef materials to be *"clean and free from asphalt, petroleum, other hydrocarbons, and toxic residue*":

   i. Applicant Response: *The Foundation argues that permit SAJ-1996-03565's requirement that "reef materials shall be clean and free from asphalt, petroleum, other hydrocarbons and toxic residues" categorically prohibits use of the SSUS as an artificial reef given the presence of hazardous materials aboard the vessel. The County's position is that this permit condition requires that the vessel be prepared to meet applicable environmental standards through the remediation process, not that the vessel must be entirely free of every substance that could be characterized as a toxic residue in any concentration, nor any desired standard required by an outside party intent on acquiring the vessel from its owner. Permit conditions are interpreted by the*

*issuing authority, and the County is working with the USACE and applicable regulatory agencies to ensure that the SSUS meets the applicable standards as interpreted by those authorities. The County has not been advised by the USACE that current conditions of the vessel categorically preclude permit use*

ii. Corps Response: Remediation of the vessel has been completed in accordance with EPA guidelines. The associated remediation report was finalized and submitted to EPA. The EPA did not provide the applicant or the Corps with any concerns or recommendations resulting from their review of the report. The Corps is satisfied that the remediated vessel is not out of compliance with EPA standards or the Corps' permit conditions. See section 7.1 for additional discussion of general environmental concerns.

d. Summary of Comments: Comments stated concerns that the introduction of a massive foreign structure like the SSUS can change sediment movement, water flow, and local chemistry, and lead to unintended environmental consequences. Comments also stated concerns for the potential adverse interactions between the SSUS and salt water.

i. Applicant Response: *Prior to the sinking, the vessel will undergo comprehensive hazardous materials remediation in coordination with the U.S. Environmental Protection Agency (EPA), the Florida Department of Environmental Protection (FDEP), and the U.S. Army Corps of Engineers to ensure all applicable regulatory requirements — including those under the Resource Conservation and Recovery Act (RCRA), the Toxic Substances Control Act (TSCA), the Clean Water Act (CWA), and other applicable federal and state statutes — are satisfied before any permit is acted upon. Okaloosa County's position is that all remediation obligations must be demonstrated and documented prior to the vessel's deployment.*

ii. Corps Evaluation: The Corps concurs with the applicant's response. With regard to the "massive" size of the structure, relative to the Gulf of America, the ship would occupy a relatively small area. Additionally, many large vessels have been intentionally reefed or unintentionally sunk that have not led to significant irreversible changes in sediment movement, water flow, or water chemistry, so the Corps does not anticipate these types of impacts from the project. See section 7.1 for additional discussion of general environmental concerns.

e. Summary of Comments: Comments state that reefing the SSUS would violate the following environmental laws:

i. **National Environmental Policy Act (NEPA):** Comments stated that the Corps would violate NEPA due to not taking a "hard look" at chemical contamination. Comments also stated concerns that neither an Environmental Assessment (EA) nor an Environmental Impact Statement (EIS) have been completed and

that an EIS is required for the project. Furthermore, commenters stated that the Corps should provide the NEPA documents to the public.

a) Applicant Response: With regard to NEPA, *the County acknowledges the ongoing environmental review and is actively participating in Section 106 consultation.*

   *The Foundation asserts that no Environmental Assessment (EA) or Environmental Impact Statement (EIS) has been completed for the proposed reef deployment and that the Corps' reliance on an incomplete EA is insufficient for an undertaking of this magnitude, citing the 2019 James River decision as precedent for requiring an EIS when documented hazardous material exceedances are present. As the permit applicant, Okaloosa County has provided and continues to provide all information requested by the USACE in support of that review.*

   *With respect to the appropriate level of NEPA review, the determination of whether an EA is sufficient or whether an EIS is required is made by the USACE as the lead federal agency, based on its assessment of the significance of environmental impacts under 42 U.S.C. § 4332 and 40 CFR Part 1500. Okaloosa County is not in a position to make that determination but notes that the USACE has not indicated to the County that an EIS will be required.*

   *The Foundation's submissions request access to all records of testing, inspections, certifications, and regulatory evaluations performed by Okaloosa County and regulatory agencies in preparation for reef deployment. Okaloosa County notes that requests for agency records are appropriately directed to the relevant federal agencies through Freedom of Information Act (FOIA) requests. The County is committed to transparency and has been working cooperatively with the USACE and regulatory agencies to ensure that all required documentation is properly maintained and made available through the appropriate legal channels. To the extent the County maintains custody of certain records, those records are available in accordance with Chapter 119, Florida Statutes.*

b) Corps Evaluation: Under NEPA, if the quality of the human environment is not significantly affected after considering the impacts of the proposed action and required mitigation, a Finding of No Significant Impact (FONSI) will be made and an Environmental Impact Statement will not be required. The Corps has evaluated both the short-term and the long-term effects of the proposed project. The Corps evaluated the probable impact which the proposed activity may have on the public interest. The Corps completed consultation pursuant to the ESA for impacts to threatened and endangered species, and the NHPA for impacts to historic properties. The Corps has determined the impacts of the project are not significant and, therefore, do

not rise to a level commensurate with the need to prepare an EIS. The Corps is not required to provide or publish NEPA materials including notification of the environmental assessment and finding of no significant impact.

The proposed project would have both beneficial and adverse effects, although none of the effects would be significant (see Section 7.1 & 7.4). The project would not have an adverse effect on public health and safety, or adverse economic effects (see Section 7.1). There are no known risks that would result in substantial damage to lives, structures, and ecosystems. The SSUS itself is an historic resource (see Section 9.3). However, it would have no effect to park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. The Corps has not identified any highly uncertain effects or unique or unknown risks that could reasonably foreseeably cause or contribute to significant (or substantial) effects on the human environment or large areas of the human environment. . The SSUS was evaluated relative to its potential effects on threatened and endangered species pursuant to Section 7 of the ESA. A report of listed species, consultation areas, and or designated critical habitat for the project area was assessed within the Action Area as described in Section 10.1. The Corps completed formal consultation with NMFS pursuant to Section 7 of the ESA. The NMFS reviewed the consultation and provided a BO for the project on 26 August 2025. The Service concurred with the Corps' effect determinations and stated that the proposed project would not jeopardize the continued existence of any listed species. The permit, if issued, will contain a special condition that requires compliance with the Terms and Conditions of the BO. Based on the Corps evaluation in Section 9.3, the proposed project would cause an adverse effect to an historic property; however, adverse effects have been appropriately mitigated. As described in this EASOF, the proposed action complies with all regulatory requirements.

The SSUS has had opposition from a share of the public, including many non-governmental organizations such as SS United States Preservation Foundation (SSUSPF or Foundation), The New York Coalition to Save the SS United States (NYCSSSUS), National Trust for Historic Preservation (NTHP), and the Center for Biodiversity. Conversely, the SSUS has had sustained support from other public commenters including, a former member of the SS United States Conservancy and a former engineer from Newport News Shipbuilding. The Corps coordinated all comments received from federal, state, and local agencies, and the public with the applicant during the evaluation of the proposed project. The Corps requested formal and informal requests for information throughout the evaluation of the proposal to notify the applicant of comments and concerns so that they may be addressed. The Corps has taken a hard look at the proposed project and its effects on the environment and determined that the effects would not be

significant. The Corps has determined the proposed project is not contrary to the public interest. Section 7 requirements under the ESA and Section 106 obligations pursuant to the NHPA have been fulfilled. There are no outstanding comments or concerns with any federal or state agencies.

ii. **Resource Conservation and Recovery Act (RCRA):** Comments expressed concern that the ship contains hazardous waste, with one stating that RCRA exclusions do not apply to hexavalent chromium.

a) Applicant Response: *With respect to RCRA and TSCA, the County's remediation contractor is conducting systematic hazardous material abatement under applicable EPA, OSHA, and other regulatory standards, and the County is committed to obtaining all required regulatory approvals before deployment.*

b) Corps Evaluation: In these circumstances, the SSUS will be properly deployed for use as an artificial reef. This action constitutes the intentional placement of material for a beneficial, productive use as an artificial reef which does not amount to the disposal, discarding, or abandonment of any material. When reefed, the SSUS will not constitute "solid waste" under the RCRA and, because the SSUS does not constitute solid waste, the SSUS itself is not subject to regulation under RCRA subtitle C as a “hazardous waste.” *See generally* 42 USC 6903(3) and (5); 40 CFR 261.2; 40 CFR 261.3(a);40 CFR 261.4.

Hexavalent chromium is regulated by the EPA as a toxic hazardous waste under the RCRA if it leaches above 5.0 mg/L via the Toxicity Characteristic Leaching Procedure (TCLP). Hexavalent chromium in the antifouling paint of a vessel prepared for artificial reefing is considered a hazardous waste under RCRA, provided it is scraped, blasted, or otherwise removed from the hull during preparation and fails the Toxicity Characteristic Leaching Procedure (TCLP) test. The intact, applied antifouling paint on an active or sunken vessel is generally not a "waste" under RCRA Subtitle C. Its environmental impact is instead regulated by the Clean Water Act, the Marine Protection, Research, and Sanctuaries Act (Ocean Dumping Act), and international anti-fouling conventions. Furthermore, all peeling, flaking, or exfoliating paint must be scraped and mechanically removed from the hull before the ship can be legally sunk, in accordance with EPA's National Guidance for Preparing Vessels as Artificial Reefs. EPA has evaluated the completed remediation report prepared by the applicant for actions that fall within the laws under EPA’s purview. They did not provide concerns or objections to the project or reefing of the SSUS. See Section 4.1.2 (3.b.ii) above. As such, there is no RCRA violation.

iii. **Toxic Substances Control Act (TSCA):** Comments stated that the testing of

PCBs was not mentioned in the public notice, suggesting that no EPA review or approval for PCBs under TSCA was received for the project.

a) Applicant Response: *The Foundation asserts that TSCA § 6 requires EPA approval for disposal of PCBs present aboard the vessel and that no such approval has been obtained. Okaloosa County confirms that PCB-containing materials identified aboard the vessel are being addressed in accordance with EPA regulations under 40 CFR Part 761. The County and its contractors are maintaining the required manifests and disposal records and are ensuring that all PCB-related activities comply with applicable TSCA requirements. Any required EPA approvals for PCB disposal are being pursued through the appropriate regulatory.*

b) Corps Evaluation: The vessel was undergoing remediation at the time of the PN and the remediation of PCBs is under the purview of the EPA. The remediation has been completed, and the report has been finalized. The report was submitted to EPA for their review, and the EPA did not provide the applicant or the Corps with any concerns or recommendations resulting from their review.

iv. **Marine Protection, Research, and Sanctuaries Act/Ocean Dumping Act (MPRSA/ODA):** Comments contended the MPRSA/ODA had been violated because the sinking of the ship would be considered dumping and no EPA approval had been received.

a) Applicant Response: *The Foundation asserts that deployment of the SSUS requires an ocean dumping permit under MPRSA § 103. Okaloosa County notes that the reef deployment is being conducted in federal waters of the Gulf of Mexico under the authority of USACE permits issued pursuant to Section 10 of the Rivers and Harbors Act and in coordination with the Florida Fish and Wildlife Conservation Commission's artificial reef program. Moreover, for purposes of the MPRSA, "dumping" means "a disposition of material..." 33 U.S.C. § 1402(f). However, an exemption applies when disposition is "for a purpose other than disposal, when such construction or such placement is otherwise regulated by Federal or State law or occurs pursuant to an authorized Federal or State program." Id. Because the County does not intend to sink the vessel as a means of disposal, and because federal law regulates the sinking of the ship to create an artificial reef, the County's activities fall squarely within this exemption from the MPRSA. The applicability of MPRSA § 103 to this project is a legal determination properly made by the USACE and EPA as part of the regulatory review process.*

b) Corps Evaluation: MPRSA 33 USCS § 1402(f), which defines the operative term "dumping" for purposes of MPRSA, provides that "'Dumping' means a disposition of material" but it goes on to specifically

state that dumping does not include "the construction of any fixed structure or artificial island nor the intentional placement of any device in ocean waters or on or in the submerged land beneath such waters, for a purpose other than disposal, when such construction or such placement is otherwise regulated by Federal or State law or occurs pursuant to an authorized Federal or State program . . . ." In this situation, the reefing of the SSUS is not being authorized for the purpose of disposal. Rather, the SSUS is being reefed for the express purpose of creating an artificial reef and that activity is regulated under federal and state law. Consequently, as EPA also verified via email dated 14 May 2026, the reefing of the SSUS is not subject to MPRSA/ODA.

v. **Endangered Species Act (ESA):** Comments stated that the Corps is violating the ESA by relying on previous consultations from 2014 and sinking the ship would negatively impact threatened and endangered wildlife. Comments also stated that the project is subject to a 2021 NMFS Biological Opinion requiring construction that would only consist of boulders and prefabricated reef modules, and that vessels would not be allowed.

***a)*** Applicant Response: *Regarding the Endangered Species Act, the County supports the USACE's obligation to conduct current, scientifically adequate Section 7 consultation with NMFS and USFWS, and acknowledges that a 2014 consultation may not reflect the best available science. The Center's citation to the LAARS A/B/C NMFS conditions — which prohibited vessels as reef material and required contaminant-free materials is inaccurate. Modifications have been received to allow vessels as artificial reef material.*

*The Foundation raises concerns about impacts to endangered species, including sea turtles, smalltooth sawfish, giant manta rays, and Gulf sturgeon, from both the physical sinking of the vessel and from potential chemical contamination. Okaloosa County is committed to ensuring that the project does not jeopardize listed species or critical habitat. The USACE's permit review process includes coordination with the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (USFWS) pursuant to Section 7 of the ESA. The County is supporting that consultation process and will comply with any biological opinion or incidental take statement issued by the services.*

b) Corps Evaluation: Due to the listing of new species, the Corps determined that reinitiation of consultation was required. During NMFS' review, informal consultation was later changed to formal consultation. Consultation with NMFS-PRD was completed and a BO received on 26 Aug 2025. NMFS concluded that the project is likely to adversely affect but is not likely to jeopardize the continued existence of four species of swimming sea turtles and is not likely to adversely affect the remaining species under review. See section 10.1 for additional discussion of potential effects on Endangered

Species. Furthermore, the 2021 NMFS BO referenced by the comments applies to permitted projects for LAARS sites in Bay County, Florida, which are separate projects from the subject action. The current project's 2025 BO allows for vessels, including the SSUS, to be used as reef material.

vi. **National Historic Preservation Act (NHPA):** Comments stated that the Corps is in violation of the NHPA for not explaining how impacts to an historic property would be avoided since sinking the ship would completely destroy it and they believe that there are feasible alternatives available.

a) Applicant Response: *Okaloosa County recognizes the historic significance of the SS United States. The vessel is listed on the National Register of Historic Places, and coordination under Section 106 of the National Historic Preservation Act (NHPA) is ongoing as part of the federal permitting process. The County remains committed to ensuring that all historic preservation requirements are addressed in accordance with applicable law. Okaloosa County is aware that various proposals for above-water preservation and restoration of the SS United States have been advanced over the years. The County carefully considered these alternatives; however, the substantial costs and logistical challenges associated with restoration made above-water preservation financially infeasible. The artificial reef project provides a responsible and lasting use for the vessel. Okaloosa County appreciates your interest in participating in the public process. The public notice and comment period is the established mechanism for public input on this permit application. All written comments received are part of the official administrative record and will be given full consideration. The County encourages continued engagement through the established regulatory process.*

b) Corps Evaluation: The Corps has completed Section 106 consultation which resulted in a Memorandum of Agreement (MOA) with the applicant and the Florida State Historic Preservation Officer (SHPO) to resolve adverse effects. Among other things, prior to deployment of the SSUS, the MOA requires that Permittee document, image, scan, and prepare reports for areas such as the vessel's interior and exterior, components removed from the vessel in Mobile, Alabama; and provide funding for the creation of educational exhibits and interpretative displays that will convey the vessel's historical and nautical significance. The ACHP reviewed the Corps' Section 106 consultation efforts and provided a final response on August 6, 2026 that the Corps has fulfilled its Section 106 requirements. See sections 4.1(4) and 9.3 below. Note that the Section 106 process was conducted pursuant to the Section 106 regulations at 36 CFR Part 800.3-800.6 and not in coordination with NEPA under Part 800.8 as this is a separate process. See section 9.3 for additional discussion of Section 106 NHPA.

vii. **Administrative Procedures Act (APA):** Comments state that the public notice

was not sufficiently detailed to allow for meaningful comment due to a lack of information on the Section 106 consultation, and other comments stated that the Corps improperly relied on older, completed consultations. Furthermore, comments note that the applications state the current DA permit for the three sites will expire on December 30, 2026 and express concern that this something that was not communicated to the public.

a) Applicant Response: *The APA notice concerns raised are directed at the USACE and have been conveyed to that agency for response.*

b) Corps Evaluation: This project and the associated public notices are not associated with any proposed rulemaking. The Corps' public notice requirements at 33 CFR 325.3 require that the public notice must include "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment . . . A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be erected on fills or pile or float-supported platforms, and a description of the type, composition, and quantity of materials to be discharged or disposed of in the ocean." There are no specific requirements associated with the Section 106 consultation beyond a "statement of the district engineer's current knowledge on historic properties." The Corps published two public notices, one on 23 October 2024 and another on 13 March 2026. With respect to Section 106 issues, the initial 23 October 2024 public notice stated that the Corps was "not aware of any known historic properties within the permit area." The Corps chose to issue the second 13 March 2026 public notice after becoming aware of the County's intention to deploy the SSUS. That second public notice included statements on historic property identification and the Corps Section 106 adverse effect determination; Neither public notice stated that the Section 106 consultation was completed. Subsequently, the Corps completed Section 106 consultation and concluded the process with an MOA. Furthermore, an administrative time extension was required to allow sufficient time to evaluate the proposed project. Time extensions of this nature do not require issuance of a public notice.

viii. **Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA):** Comments indicate that CERCLA will be violated by the proposed project.

a) Applicant Response: *The Foundation cites CERCLA's reportable quantity (RQ) for chromium(VI) compounds of 10 lbs. and asserts that the Foundation's estimated 59,334 lbs. of zinc chromate aboard the vessel means that reef deployment would trigger CERCLA liability. The County notes that CERCLA's reportable quantity provisions apply to releases of*

*hazardous substances into the environment, not to the presence of those substances within a contained structure. The relevant legal question is not whether zinc chromate is present aboard the vessel, but whether the proposed reef deployment, following appropriate remediation, would result in a release that violates applicable environmental standards. That determination is properly made by the EPA and USACE through the permit review process, not through a theoretical and inflated extrapolation from historical paint schedules.*

b) Corps Evaluation: As discussed in 3.a.i.b above, the estimated amount of CrVI is based on an extrapolation of a single sample prior to remediation and does not reflect actual values that were on the ship prior to or post remediation. Any chromate remaining in the paint on the vessel would not be considered hazardous waste based on RCRA or TSCA definitions and is not expected to result in a release of hazardous substances that would trigger CERCLA.

ix. **Clean Water Act (CWA) 401(a)(2) and Coastal Zone Management Act (CZMA):** Comments indicated that the Clean Water Act and Coastal Zone Management Act will be violated by the proposed reefing of the SSUS.

a) Applicant Response: *The Foundation asserts that no discharge permit for toxicant release has been issued under CWA § 304(a). Okaloosa County notes that the CWA Section 404 permit process, through which this project is being reviewed by the USACE, is the applicable mechanism for evaluating water quality impacts from the reef deployment, including compliance with applicable water quality standards. The County is committed to demonstrating compliance with applicable CWA standards as part of the permitting process.*

b) Corps Evaluation: The project is located beyond the 3-mile limit of the territorial seas and outside of state waters. Therefore, Section 404 state water quality certification is not required. EPA also verified via email on 14 May 2026, that 401(a)2 neighboring jurisdiction does not apply. The applicant received CZMA clearance from the Florida State Clearinghouse via letter dated 15 June 2026.

f. Summary of Comments: Comments expressed concerns that unexploded ordinances (UXO) could be present at the project site, citing that no UXO clearance or interagency coordination has been conducted.

i. Applicant Response: *The Foundation's preliminary concerns letter raises the issue of unexploded ordnance (UXO) at the proposed deployment site, citing the Eglin Gulf Test and Training Range Final Environmental Assessment (October 2015) as confirmation that the site lies within a documented UXO zone, and asserting that no UXO clearance or interagency coordination has*

*been conducted.*

*Okaloosa County takes safety at the reef deployment site extremely seriously. The proposed deployment location and the UXO assessment for that site are considered for all artificial reefs. The County's staff have physically dived and inspected the deployment site and found no unexploded ordinance. Unexploded ordinances are not a concern for this project.*

*Additionally, the County has been in coordination with USAF, USACE, and other relevant agencies regarding site selection and safety. The deployment site selection process has considered applicable environmental and safety assessments. The County notes that the Foundation's characterization of the site, based solely on the 2015 Eglin Range EA, does not fully account for the site-specific survey and agency coordination activities that have occurred as part of the permitting process for this specific reef project.*

ii. <u>Corps Evaluation:</u> The permit sites (LAARS A, B, C) have been authorized and utilized since 1996. The USAF has not raised concerns in the last 30 years, nor did they provide comments or concerns to either of the PN's published for the current proposal. Additionally, the applicant has been coordinating with the USAF regarding deployment locations and available deployment windows to avoid any conflict with their missions.

g. <u>Summary of Comments</u>: Commenters have compared the remediation timelines of the USS Oriskany to the SSUS. They stressed that the USS Oriskany took four years to remediate, setting a precedent under EPA guidance and far exceeding the 14 months it took to remediate the SSUS.

i. <u>Applicant Response:</u> *With respect to the Oriskany precedent specifically, the Foundation asserts that because the Oriskany project required four years of remediation before that vessel was reefed, the SSUS must undergo and follow a comparable remediation timeline before any permit action. While the County acknowledges that the USS Oriskany program established important precedents for vessel-to-reef preparation, the Foundation's analogy is flawed. The Oriskany's remediation was conducted under a Navy-specific Ships-to-Reef program with distinct regulatory parameters. The SSUS is being prepared in accordance with more robust EPA/MARAD Vessel-to-Reef Best Management Practices Guidance (2006) and under the oversight of the USACE and EPA as part of the permitting process for SAJ-1996-03565. The specific scope and timeline of remediation required is ultimately determined by vessel condition, applicable regulatory agencies based on site-specific conditions, vessel-specific testing, applicable BMP standards, and contractor workforce/scheduling—not by an arbitrary timeline set because of the remediation work of another more intact vessel.*

ii. <u>Corps Evaluation</u>: The remediation timelines of the SSUS and the USS

Oriskany are not equivalent. The USS Oriskany, though a similarly sized vessel, was reefed 20 years ago by the U.S. Navy. It was a more intact vessel that followed different protocols and standards. The comparison is limited because publicly available records for the USS Oriskany confirm that the vessel underwent environmental remediation before reefing, including removal or minimization of materials of concern and EPA review of residual PCB-containing materials, but do not provide a complete, material-specific inventory for all potential contaminants. In particular, the records located do not document the removal, quantity, condition, or residual inventory of hexavalent chromium, chromium, zinc, or zinc-chromate coatings aboard the USS Oriskany.

Accordingly, the USS Oriskany timeline should not be treated as a direct benchmark for the scope or duration of SSUS remediation. Differences in vessel type, size, configuration, material condition, contaminant inventories, regulatory requirements, disposal planning, and site-specific conditions can materially affect both the work required and the time needed to complete it. The relevant consideration for SSUS is whether its remediation and reef-preparation activities satisfy applicable current environmental requirements, best-management practices, and agency approvals before deployment. The remediation of the SSUS has followed the current EPA/Maritime Administration BMPs and final documentation was submitted to EPA, and EPA had no objection or comment.

**4. Historic Properties**

a. <u>Summary of Comments</u>: Commenters state that the SSUS is a historically significant vessel that should be protected from reefing. Many note that it is listed on, or eligible for, the NRHP and request additional recognition or protection, such as designation as a National Historic Landmark, national monument, or national maritime landmark. Commenters identify the vessel as an important example of American maritime, engineering, industrial, transportation, and Cold War-era history because of its speed record, design innovations, association with William Francis Gibbs, potential troop-transport role, and connections to passengers, crew, immigrants, and public figures. Commenters also describe the vessel as a national symbol because it bears the country's name and state that preserving it would better reflect American heritage, innovation, and civic pride during the nation's 250th anniversary. Commenters include former passengers, family members, shipbuilders, veterans' families, maritime professionals, artists, historians, students, educators, and local residents who describe personal and community connections to the ship.

i. <u>Applicant Response:</u> *Okaloosa County appreciates your passion for the SS United States and understands that many people have a deep connection to this historic vessel. After extensive review of the available options, the County determined that the artificial reef project represents the most viable path forward for the ship, providing a lasting legacy as a world-class dive destination*

*and marine habitat while honoring her storied history. Okaloosa County recognizes the historic significance of the SS United States. The vessel is listed on the National Register of Historic Places, and coordination under Section 106 of the National Historic Preservation Act (NHPA) is ongoing as part of the federal permitting process. The County remains committed to ensuring that all historic preservation requirements are addressed in accordance with applicable law. Okaloosa County is aware that various proposals for above-water preservation and restoration of the SS United States have been advanced over the years. The County carefully considered these alternatives; however, the substantial costs and logistical challenges associated with restoration made above-water preservation financially infeasible. The artificial reef project provides a responsible and lasting use for the vessel.*

ii. Corps Evaluation: The SSUS is listed in the NRHP and would likely remain listed following reefing. Due to its listing in the NHRP, the Corps followed the Section 106 consultation process, pursuant to 36 CFR 800. (See Sections 9.3 for further discussion on the Section 106 consultation process.) The Corps considered commenters' requests for additional designations and protections. However, those designations are administered through separate processes and authorities. The Corps conducted extensive Section 106 consultation with the SHPO, the ACHP, and three organizations which exhibited a vested interest in the vessel's historical significance. Various alternatives for avoiding adverse effects to the vessel were addressed in consultation, though, ultimately, a MOA was executed to resolve adverse effects to the historically and nationally significant vessel.

b. Summary of Comments: Comments assert that sinking the vessel would constitute a permanent and irreversible adverse effect because it would destroy or substantially diminish the ship's physical integrity, design, materials, workmanship, setting, feeling, and association. Commenters emphasize that an underwater wreck would not preserve the ship in the same form as an above-water vessel and that deterioration after deployment would further erode its historic character. Commenters generally contend that documentation, artifact salvage, an onshore museum, retention of funnels or mast components, and interpretive materials would not fully mitigate the loss of the vessel as a historic property. Some commenters requested a mitigation plan that includes comprehensive photography and video; measured drawings and 3D scanning; oral histories and archival research; artifact identification, preservation, and long-term curation; and public interpretation. Comments in support of reefing often note that the vessel has lost much of its original fabric, lacks a viable, funded preservation plan, and would otherwise likely be scrapped. Some commenters view a managed artificial reef, combined with thorough documentation and preservation of selected artifacts, as a more realistic means of retaining the vessel's legacy than full disposal. Some commenters state that reefing could also preserve public access through diving, remote imagery, interpretive materials, and an associated museum.

i. Applicant Response: *The Foundation asserts that the removal of the SSUS's funnels and radar mast in August 2025, prior to completion of Section 106 consultation, constitutes an adverse effect under 36 CFR § 800.5(a)(2)(i) and (vii) and triggers enforcement implications under 54 U.S.C. § 306113 (Section 110(k)) of the National Historic Preservation Act.*

*Okaloosa County acknowledges that modifications to the vessel's physical characteristics, including the removal of the funnels and radar mast, have occurred. However, these modifications were undertaken as part of the vessel preparation and remediation process to save these material components for their use at a future land-based celebration (museum) of the ship. The County has been transparent about this approach from the beginning, and this plan was conditioned in the County's purchase of the vessel by the former owner of ship for 16 years, the SSUS Conservancy (the "Conservancy"). The components were saved for the Conservancy, and it was the Conservancy that petitioned to list the vessel on the national register in the first place. The County recognizes that the Section 106 process, led by the U.S. Army Corps of Engineers, must account for these changes in the Corps' review. Okaloosa County has not been instructed to suspend remediation activities at any point during this project. It should be noted that the County has substantially completed its remediation effort and is now undergoing final cleaning and preparations for deployment.*

*The County notes that the removal of the funnels and radar mast was necessitated, in part, by physical and logistical constraints associated with the vessel's movement and safe preparation for reef deployment. The County did not undertake these modifications with any intent to circumvent the Section 106 process. The County has kept the USACE informed of all significant vessel preparation activities.*

ii. Corps Evaluation: The Corps conducted a Section 106 review in which comments, effects to the ship, and alternatives to avoid effects were intensively assessed in association with consulting parties. The Corps considered comments that the vessel has lost substantial original features, lacks a viable funded preservation alternative, and may otherwise be scrapped. The Corps recognizes that reefing would alter the vessel's condition and setting and that documentation and salvage measures cannot fully replace preservation of the vessel in its current above-water form. Although the removal of character-defining features constitute an adverse effect, the Corps does not find that these effects would eliminate the vessel's ability to convey its original and significant design elements. In assessing the Corps' permit decision and mitigation of adverse effects, the Corps finds substantial public benefit in the combined effect of measures to minimize impacts to the vessel; existing documentation and collections associated with the vessel; continued public access through recreational engagement; planned public interpretation; and

proposed mitigation measures. This review concluded with the development and execution of an MOA that mitigated adverse effects. See Appendix C for a detailed discussion of the Section 106 review and consultation process.

*c.* Summary of Comments: Commenters expressed concerns that ongoing physical work on this SSUS would result in additional adverse effects to the vessel and requested that work be halted until Section 106 consultation was completed. Comments also asserted that the applicant violated Section 110(k) of the NHPA.

*i.* Applicant Response: *The Foundation claims that additional physical work on the vessel is ongoing, including cutting into deck spaces and other alterations, and the Foundation asserts that these actions further compromise the vessel's historic integrity and constitute additional adverse effects under 36 CFR § 800.5(a)(2). The County confirms that vessel preparation activities, including structural modifications necessary for safe reef deployment, are ongoing. All such activities are, and have been, disclosed to the USACE as the lead Section 106 agency and are being considered in the context of the ongoing consultation process.*

*The Foundation's request that all physical work be paused pending completion of the Section 106 review has been conveyed to the USACE. The County notes that the decision to require a work stoppage as a protective measure during Section 106 consultation is within the authority of the federal lead agency, not Okaloosa County, and that the USACE has not issued such a directive. Be that as it may, there is no additional significant work to be completed for this project prior to deployment. A work stoppage is irrelevant at this point in the project.*

*Okaloosa County is an active participant in the Section 106 consultation led by the USACE Jacksonville District as the federal lead agency. The County notes that the USACE has confirmed its awareness of the physical alterations to the vessel and is taking adverse effects into account as part of its ongoing Section 106 review. The County is cooperating fully with that process and with all consulting parties, including the SHPO and ACHP.*

*ii.* Corps Evaluation: While adverse effects occurred to the vessel by the applicant's preparations for deploying the ship as a reef, the alterations that were considered significant (removal of funnels, the radio mast, and portholes) were specifically addressed in the purchase and sale agreement between the County and seller with regards to the salvage of these items for future preservation. The Corps was not aware of these removal activities while they were occurring in early August 2025. However, the intent of the removals was in keeping with the original purchase and sale agreement and the focused efforts to prepare the SSUS for deployment. These actions do not appear to have been animated by an intent or desire to avoid Section 106 review, and these activities did not prevent a Section 106 review. The remainder of the physical alterations that were occurring did not appear to be significant changes

that altered the defining features of the ship and that would constitute adverse effects. The SHPO and the ACHP reviewed these assessments and offered no objection to this analysis. Therefore, the Corps did not issue a stop work order during this timeframe.

*d.* Summary of Comments: Comments request full compliance with Section 106 of the NHPA. They ask the U.S. Army Corps of Engineers to fully consider alternatives that avoid or minimize adverse effects, including preservation afloat, relocation, transfer to another owner, adaptive reuse, or land-based display. Several commenters contend that the review should not treat reefing as inevitable before alternatives have been fully evaluated. Some comments state that the hull and other important features retain enough integrity to support preservation, while other comments state that past alterations, deterioration, and restoration costs make preservation impractical. If reefing proceeds, commenters request preservation of significant features and artifacts, such as the funnels, mast, bridge equipment, propellers, machinery, artwork, signage, and furnishings, for transfer to museums, educational institutions, or a dedicated interpretive facility. Many commenters also state that preserving the vessel above water could provide tourism, jobs, waterfront redevelopment, educational programming, hospitality revenue, and long-term cultural benefits. They argue that an above-water attraction could serve a broader public than a dive site and suggest that preservation could be supported through public-private partnerships, federal assistance, nonprofit stewardship, philanthropy, or phased restoration. Well-developed alternative plans were also submitted to the Corps by Section 106 consulting parties.

*i.* Applicant Response: *Okaloosa County appreciates your concern for the preservation of the SS United States and acknowledges her listing on the National Register of Historic Places. The County has thoroughly explored various preservation alternatives over the course of this project; however, the significant financial and logistical challenges associated with above-water restoration and museum conversion made those options infeasible. The artificial reef project is designed to provide the vessel with a lasting legacy — as a thriving marine habitat and premier dive destination — while the ongoing Section 106 consultation ensures that all historic preservation requirements under federal law are properly addressed.*

*Okaloosa County understands and respects the deep emotional connection many people around the world feel toward the SS United States and her significance as a maritime achievement. After careful consideration of all available options for the vessel, the County determined that an artificial reef represents the most viable and lasting path forward — one that will provide significant ecological benefits, create a world-class dive destination, and allow the SS United States to continue contributing to the community in a meaningful way. The County is committed to ensuring the project is carried out responsibly and in full compliance with all applicable laws.*

ii. Corps Evaluation: Consistent with the Section 106 process, the Corps evaluated alternatives and modifications that could avoid, minimize, or mitigate adverse effects on historic properties. The Corps concluded that certain alternatives could theoretically avoid adverse effects to the SSUS. However, the current record does not demonstrate that these alternatives are practicable or feasible. Many proposed preservation alternatives depend on congressional and federal agency action, substantial funding, and support from multiple federal agencies; however, the record contains no evidence of such support or interest. Past rehabilitation efforts also demonstrate significant funding and management challenges that call into question the feasibility of long-term preservation. In addition, transfer alternatives depend on the owner's willingness to sell the vessel, and the Corps lacks authority to compel a sale. Cumulatively, the existing documentation and collections associated with the vessel, the accessibility of the ship for recreational engagement, the planned public interpretation of the vessel, and the measures planned for mitigation in the Section 106 MOA provide a level of benefit to the public that is substantial and that assures public benefits are realized.

5. **Fish and Wildlife Values**

a. Summary of Comments: Some comments acknowledged that artificial reefs can benefit marine life, other comments questioned the effectiveness and long-term sustainability of using a vessel as a reef compared with structures specifically designed for ecological purposes. Concerns raised included possible fish aggregation and overfishing effects, altered biodiversity patterns, potential habitat stress, invasive species colonization, and the release of contaminants or materials that could adversely affect marine organisms.

*i.* Applicant Response: *Artificial reefs are proven to provide significant ecological benefits, including the creation of new marine habitat, increased fish populations, and enhanced biodiversity. The SS United States, given her size, would become one of the largest and most significant artificial reef structures in the Gulf of Mexico, providing decades of environmental and recreational value for the region. Okaloosa County, in partnership with the SS United States Conservancy, acquired the vessel with the intent of creating a world-class artificial reef destination off the coast of Destin–Fort Walton Beach. The County has worked with federal and state regulatory agencies, including the U.S. Army Corps of Engineers and the Florida Department of Environmental Protection, to ensure the project meets all applicable permitting requirements.*

ii. Corps Evaluation: The vessel would be placed in an area devoid of submerged aquatic vegetation (SAV), corals, hardbottom, or natural rock outcrops. Placement at this location would introduce structural complexity and create additional habitat in an area currently lacking those features. Although the vessel was not specifically designed as an artificial reef, it nonetheless has the potential to support a diverse marine community. Placement of the SSUS and

other reef materials would provide surfaces and habitat for various marine algae, phytoplankton, and encrusting species that contribute to the food web. In turn, it is expected that various species of fish and invertebrates would utilize the structure for foraging and habitat. Commenters expressed concerns about possible fish aggregation and overfishing effects, altered biodiversity patterns, potential habitat stress, invasive species colonization, and the release of contaminants or materials that could adversely affect marine organisms. There is a possibility that the deployment of the SSUS would result in aggregation of fish around the vessel and overfishing effects. However, the National Artificial Reef Plan indicates that artificial reefs can increase the total biomass of fish, indicative of increased fish populations associated with artificial reefs. LAARS A, B, and C, offshore of Okaloosa County, and additional LAARS in neighboring counties, have been in place for years and have created a patchwork of reef materials, including vessels, that provide additional habitat that would help distribute fish populations across a greater area. Additionally, not all species of fish using the artificial reef would be species targeted by fishing. As discussed in section 7.1 below, at least 38 species of fish have been observed at the USS Oriskany, located approximately 12 nautical miles from the proposed location of the SSUS. Construction of artificial reefs, including placement of vessels, is expected to increase biodiversity in the vicinity of the project as the reefs would provide additional and varying habitat, including surfaces that allow for growth of marine algae, phytoplankton, and corals. Potential minor detrimental effects include possible fish aggregation and overfishing effects, altered biodiversity patterns, potential habitat stress, invasive species colonization, and the release of contaminants or materials that could adversely affect marine organisms. Reef materials must be clean in accordance with the Approved Reef Materials special condition that was included in the prior permit and would be included in the permit modification, if granted. Additionally, any vessels deployed would be cleaned in accordance with the *National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs* (U.S. Environmental Protection Agency and U.S. Maritime Administration, May 2006). PCBs, fuel, peeling paint, floatables, and similar substances would be removed from vessels prior to deployment as an artificial reef. Any remaining ant-fouling coatings would leach into the marine environment, as designed over a period of several years. As indicated in the *National Guidance*, referenced, above, if surfaces have been underwater for approximately 12 years and are covered with marine growth then it can be assumed that biocide activity is minimal. If parts of vessels have remaining biocides, it may result in delayed colonization of those surfaces by marine organisms. Ships cleaned in accordance with the *National Guidance* are expected to have no more than a minimal adverse effect on marine organisms in the vicinity of the vessel. The concerns discussed above are expected to be minimal and do not outweigh the potential habitat benefits associated with construction of artificial reefs within the LAARS. In addition, the creation of a new reef sites could help distribute fishing activity and reduce pressure on other nearby reef areas.(See sections 7.3 and 9.1 for further discussion of effects to species/fishing.) As previously noted, PCBs,

fuels, and other toxic materials have been removed through remediation.

6. **Navigation**
   a. Summary of Comments: Commenters expressed concerns that reefing the SSUS would result in navigational hazards, potentially due to storm events and bi-metal corrosion causing the structures to break down. Some commenters stated that the proposed vertical clearance at LAARS B is appropriate since the activity would not be in the vicinity of a federal navigation channel and similar allowances have been permitted elsewhere.

      i. Applicant Response: Okaloosa County did not directly respond to comments about navigation.

      ii. Corps Evaluation: The proposed change to clearance depth of LAARS B would be consistent with LAARS A and C. Displacement from storm activity is not expected as similar and smaller sized vessels in the vicinity (ex. Oriskany) have remained stable in such circumstances. The breakdown of the structure is expected to result in subsidence or tipping of the structure, creating a greater clearance depth of the structure below the waterline. A clearance depth of -60 will have negligible impacts to navigation. See section 7.1 for additional information on navigation.

7. **Recreation and Safety:**
   a. Summary of Comments: Recreation: Several commentors expressed support of the recreational diving opportunities and "world class dive site" the reefing would create. Comments also noted it would attract visitors which would increase the local tourist revenue. Alternatively, some comments expressed concerns that reefing would make the ship inaccessible to most people as not every person has the ability or can afford to scuba dive. They argue that preserving the ship would provide more meaningful and long-term benefits for tourism and education and would allow the public to appreciate its historic significance and enjoy recreational activities. Many suggest alternative uses for the ship that include a museum, hotel, restaurant, educational center, event center, or mixed-use or tourist attraction, among others.

      *i.* Applicant Response: *Artificial reefs are proven to provide significant ecological benefits, including the creation of new marine habitat, increased fish populations, and enhanced biodiversity. The SS United States, given her size, would become one of the largest and most significant artificial reef structures in the Gulf of Mexico, providing decades of environmental and recreational value for the region. Okaloosa County, in partnership with the SS United States Conservancy, acquired the vessel with the intent of creating a world-class artificial reef destination off the coast of Destin–Fort Walton Beach. The County has worked with federal and state regulatory agencies, including the U.S. Army Corps of Engineers and the Florida Department of Environmental Protection, to ensure the project meets all applicable permitting requirements.*

ii. Corps Evaluation: Recreational diving opportunities associated with a reefed vessel would provide a tourism benefit to the local area, including increased visitation and related economic activity. At the same time, it is recognized that only a limited portion of the population is able or likely to participate in diving activities directly. However, other potential reuse alternatives for the vessel - such as conversion to a hotel, museum, restaurant, or similar attraction - also involve practical limitations, including feasibility, cost, access, long-term maintenance, and overall public utilization.

b. Summary of Comments: Safety: A few commenters expressed concerns about the safety risks of unanticipated dangers to divers associated with exploring the ship's superstructure and regarding safe diving depths. They also cited the potential risks to divers of harm or entrapment caused by collapse of ship from corrosion and deterioration of the structure or "storm-event dispersal" affecting the long-term structural stability. Additional comments express concern regarding dangers to the public resulting from future contaminant release of legacy toxic paint leaching from the structure into the environment and subsequently into the seafood.

i. Applicant Response: Okaloosa County did not directly respond to comments about safety.

ii. Corps Evaluation: Divers experienced in large shipwreck exploration are responsible for assessing their own qualifications, equipment, and limits in determining whether to undertake a dive, the depth at which they can do so safely, and whether conditions within or around a given vessel are acceptable. As commenters noted, potential risks may include unanticipated hazards associated with the ship's superstructure, unsafe diving depths for less experienced divers, possible injury or entrapment from structural collapse caused by corrosion or deterioration, and changes in structural stability resulting from storm-event dispersal. Accordingly, responsibility for dive planning, risk acceptance, and personal safety rests with the individual diver, while the broader environmental concerns identified by commenters remain separate public-safety considerations. (See Section 3, General Environmental Concerns above).

8. Water Quality

a. Summary of Comments: Commenters expressed concern that reefing the SSUS could adversely affect water quality and the surrounding ecosystem. Specific issues raised included the potential release of contaminants from lead paint, toxic primer, and corrosion of the aluminum superstructure. One commenter asserted that interaction between aluminum and salt water could result in byproducts such as aluminum chloride and aluminum hydroxide, which the commenter believed could bioaccumulate in fish and pose risks to human health. Commenters also raised concerns about possible long-term or lifetime effects on surrounding

waters.

i. Applicant Response: Okaloosa County did not directly respond to comments about water quality.

ii. Corps Evaluation: These comments raise concerns regarding the potential for contaminant release and related effects on water quality, marine resources, and the broader ecosystem. The concerns identified by commenters - including possible releases from legacy coatings, corrosion-related degradation, and potential long-term environmental effects - were considered in the environmental review of the proposed reefing action. See section 3 above. The project is located beyond the 3-mile limit of the territorial seas and beyond CWA Section 404 jurisdiction so Section 401 Water Quality Certification is not required.

9. Other Items:

a. Summary of Comments: Commenters raised broader public policy concerns regarding political controversy, legal disputes, educational value, heritage-driven redevelopment, national security implications, the international legality of scuttling in the Gulf of America (GOA), and the potential precedent of using a historic vessel for financial gain. Commenters also referenced the *Sea to Shining Sea Project*, Public Law 92-296, Public Law 94-536, the *SHIPS for America Act*, New York City Resolution 0649-2024 Version A, the proposed *America 250 Maritime Heritage Act and the SS United States Master Advocacy Document (MAD)*, the Great American Comeback Executive Order proposal, and Oregon Senate Joint Memorial 10 (2025) as evidence of support for preservation or restoration alternatives to reefing.

i. Applicant Response: ***Preservation Alternatives – America 250 Maritime Heritage Act Proposal and Executive Order Proposal***
*The Foundation has submitted two formal federal preservation proposals: the America 250 Maritime Heritage Act proposal, which would designate the SSUS as a National Maritime Monument; and a proposed Executive Order titled "The Great American Comeback: Saving the SSUS for America 250." These proposals have been entered into the administrative record, and neither impacts the County's project.*

*The America 250 Maritime Heritage Act is a draft legislative proposal that has not been introduced as legislation in Congress, nor has the proposed Executive Order been issued by the President. The County is not in a position to delay or abandon the artificial reef project based on preservation proposals that remain speculative in nature.*

*Should Congress enact legislation or the President issue an Executive Order*

*that legally requires the federal government to reacquire or preserve the SSUS, Okaloosa County would comply with applicable federal law, provided there was proper compensation and legal protections from the County's contracted obligations. In the absence of such authority, the County will proceed with the project as authorized under applicable law.*

***SL-7 Fast Sealift Ship Alternative***
*The Foundation's submissions propose the use of SL-7 Fast Sealift Ships (Algol-class vessels scheduled for decommissioning) as an alternative to the SSUS for the artificial reef project, arguing that these vessels would offer a safer environmental profile due to their use of zinc phosphate rather than zinc chromate coatings.*

*The Foundation's hypothetical concept ignores the reality that acquisition of Navy vessels for artificial reefing is governed by a distinct and complex federal process involving coordination between the Navy, MARAD, and state artificial reef programs. Neither Okaloosa County nor the Foundation have the ability or legal authority to simply substitute a federal Navy vessel for the SSUS, nor is such a substitution within the scope of the current permit application. The Foundation's proposed alternative is not grounded in fact or reality and does not alter the existing legal authority under which the project is proceeding.*

***New York City Council Resolution 649-A and State Legislative Support***
*The Foundation submits New York City Council Resolution 649-A, which calls on Congress to pass legislation funding restoration of the SSUS and its relocation to New York City, and references legislative support from Oregon State Senator Noah Robinson. A City Council resolution and a bill that did not advance in a state legislature do not constitute binding legal authority requiring federal action or imposing any obligation on Okaloosa County. These submissions are noted as expressions of public interest and have been entered into the administrative record. The County could secure such expressions of public interest supporting its positions but because they are not material, has chosen not to.*

***Litigation***
*The Foundation's preliminary concerns letter references pending litigation captioned SS United States Preservation Foundation Inc. v. Okaloosa County, FL et al., Case No. 2025-CC-002516-C, filed in Okaloosa County Court on August 4, 2025, seeking injunctive relief. However, characterizing this matter as "active" is misleading. Notwithstanding the glaring legal defects apparent from the face of the purported "affidavit," no actual pleading has been filed or served upon the County, and the Foundation has taken no further action to advance the matter since August 2025. Concerns about litigation raised by the very organization that filed it and then abandoned it, strains credibility. Moreover,*

*even if the litigation were valid or were to become so, its existence alone does not prevent the County from continuing the permitting process or proceeding with lawful project activities. The County will address any litigation through the appropriate legal channels, where substantive arguments will be properly considered and adjudicated.*

***Fiscal Concerns***
*The Foundation's submissions reference what it characterizes as fiscal defects in the project, including alleged underestimated budgets, misrepresented insurance coverage, and contracting irregularities, and notes that the County later requested an additional $2.995 million in funding. Okaloosa County acknowledges that, as with any large-scale infrastructure and remediation project of this complexity, budget adjustments have been necessary as the scope of work has been more fully defined through the vessel survey and remediation process. The Okaloosa County Board of County Commissioners has been transparent regarding budget needs, and all budget adjustments have been approved through the County's established public governance processes. The County's financial management of this project is subject to standard government accountability mechanisms, internal controls and oversight by the County Comptroller/Clerk of the Court, as well as audit procedures by an outside independent auditing firm. The characterization as fiscal defects, underestimated budgets, misrepresented insurance coverage, and contracting irregularities, are misleading and categorically false.*

ii. <u>Corps Evaluation</u>: The Corps considered comments regarding broader public-policy, legal, historic-preservation, and redevelopment considerations associated with the proposed disposition of the SSUS, including requests for preservation afloat, relocation, transfer, adaptive reuse, land-based display, and other alternatives to reefing. The referenced legislation, resolutions, memorials, advocacy initiatives, and preservation proposals demonstrate continued public and governmental interest in restoration, relocation, and heritage-based reuse. However, these comments do not, by themselves, establish the legal, technical, or financial feasibility of a particular alternative. Consistent with the Section 106 process, the Corps evaluated alternatives and modifications that could avoid, minimize, or mitigate adverse effects on historic properties. Although certain alternatives could theoretically avoid adverse effects to the vessel, the current record does not demonstrate that they are practicable or feasible. Many proposed preservation alternatives depend on congressional action, substantial funding, support from multiple federal agencies, and willing preservation partners. However, the record contains no evidence of congressional action, committed funding, or federal-agency support for such alternatives. Similarly, the record contains no evidence that MARAD intends to convey a decommissioned vessel directly to Okaloosa County. Past rehabilitation efforts further demonstrate significant funding and management

challenges, and transfer alternatives depend on the owner's willingness to sell the vessel, which the Corps lacks the authority to compel. Accordingly, the existing documentation and collections associated with the vessel, the accessibility of the ship for recreational engagement, the planned public interpretation of the vessel, and the measures planned for mitigation in the Section 106 MOA provide a level of benefit to the public that is substantial and that assures public benefits are realized.

b. Summary of Comments: A few commenters stated that the public was not provided a meaningful opportunity to comment on the project. Some commenters also questioned the County's processes concerning public involvement to weigh in on the sale of the vessel or County plans for the vessel.

i. Applicant Response:
*Okaloosa County appreciates your interest in participating in the public process. The public notice and comment period is the established mechanism for public input on this permit application. All written comments received are part of the official administrative record and will be given full consideration. The County encourages continued engagement through the established regulatory process. Okaloosa County, in partnership with the SS United States Conservancy, acquired the vessel with the intent of creating a world-class artificial reef destination off the coast of Destin–Fort Walton Beach. The County has worked with federal and state regulatory agencies, including the U.S. Army Corps of Engineers and the Florida Department of Environmental Protection, to ensure the project meets all applicable permitting requirements.*

*The Foundation raises procedural concerns regarding the County's public process, including references to transcript misattributions, alleged suppression of Foundation evidence at public meetings, and selective enforcement of presentation rules. Okaloosa County, to include the Board of County Commissioners, takes the integrity of our public processes seriously. All public meetings related to this project have been conducted in accordance with Florida's Government in the Sunshine Law, and all materials submitted by the Foundation have been received, logged, and made part of the public record. The County records all Commission meetings and makes them publicly available online and adopts official meeting minutes rather than verbatim transcripts. These meetings exist to conduct the business of the County.*

*They are not, however, an open forum for outside groups to take unlimited time promoting their beliefs, characterizations of fact, opinions, or self-developed theories, whether for purposes of publicity or fundraising. The County provides a standard three-minute public comment period, available at the beginning and end of each meeting, during which individuals may speak freely on any subject. Members of the Foundation have made extensive use of that opportunity. Written materials, including emails, letters, and videos, may be submitted at*

*any time and have likewise been provided by this group. If the Foundation believes specific procedural irregularities occurred at a public meeting, it may raise those concerns through appropriate Florida administrative or legal channels.*

*The Foundation also references over 20,000 public signatures opposing the deployment of the SSUS as an artificial reef. Okaloosa County acknowledges the significant public engagement with this project, both in favor and in opposition. The Board of County Commissioners has considered public input in its deliberations and made its decision through the established democratic processes of county government. However, the County continues to value public engagement and has participated fully in the public comment process established by the USACE for permit application SAJ-1996-03565.*

ii. Corps Evaluation: Consistent with its regulations, the Corps provided opportunities for public review and comment commensurate with the nature and scope of the proposed federal action. Specifically, the Corps issued two public notices regarding the proposed action, the first providing a 21-day comment period and the second providing an additional 15-day comment period. Through these notices, interested agencies, Tribes as applicable, organizations, and members of the public were afforded notice of the proposed action and an opportunity to review available environmental information and submit comments for the Corps' consideration. The Corps reviewed and considered all timely comments received during the noticed comment periods as part of its NEPA analysis and decision-making process. In addition, comments received both before and after the formal comment periods were included in the administrative record. During the 15-day comment period, the Corps received more than 700 comments, which reflects substantial public participation, although the Corps' determination regarding the adequacy of public involvement is based on the overall process and applicable legal requirements rather than the number of comments received. In addition to the Corps' public-notice process, the Permittee's preparatory actions for the sinking of the ship have received international broadcast with, according to the tracking by Okaloosa County, over 5,400 independent mentions on television, radio, internet and social media in over 80 countries since October 2024. Additionally, the County states that at Permittee public meetings over eight publicly noticed agenda items were presented related to the ship and public comment was received at 15 different public meetings. However, it is important to note that Okaloosa County owns the SSUS and the Corps has no authority to compel the applicant to sell its property or generally dictate the use of its ship. Moreover, the County is responsible for public involvement in the aforementioned public meetings and processes.

4.2 Comments regarding activities and/or effects outside of the Corps' scope of

review

Summary of Comments: Commenters cited H.R 4163.

Corps Review: This is a U.S. House bill associated with tax filing and IRS code and is beyond the scope of the Corps' federal control and responsibility.

Summary of Comments: One commenter stated that "there are environmental and Classified U.S. Army Military Technology concerns. The ship's engine is a prototype for today's U.S. aircraft carriers. By sinking the ship in international waters, this technology is open to all governments."

Corps Review: The commenter's concern regarding classified military technology is not supported by the vessel's historical status. The SSUS was built as a commercial passenger liner with certain Navy-informed design features and the potential for wartime troop transport. It is not an aircraft carrier, and its propulsion plant was not a prototype for the power plants used on current U.S. aircraft carriers. The ship used four steam turbines and eight boilers designed for commercial service.

Further, the relevant defense-related design information was declassified during the 1968–1977 period, and Congress subsequently authorized disposition of the vessel to private ownership. Thus, the historical record does not indicate that the vessel retains classified propulsion technology whose exposure through reefing would provide foreign governments access to protected U.S. military capabilities. Any final disposition should nevertheless remain subject to the applicable current environmental, security, export-control, and disposal reviews.

## 5.0 Alternatives Analysis

(33 CFR Part 333 and RGL 88-13). An evaluation of alternatives is required under NEPA for all jurisdictional activities. NEPA requires discussion of a reasonable range of alternatives, including the no action alternative, and the effects of those alternatives.

### 5.1 Site selection/screening criteria

Criteria for evaluating alternatives as evaluated and determined by the Corps:

**Table 2: Screening Criteria**

| **Factor** | **Measure and/or constraint** |
|---|---|
| Location | Maximize use of previously authorized location of the three LAARS offshore of Okaloosa County, Florida |
| Habitat Creation | Maximize habitat for fishing and diving opportunities |
| Economics | Drive economic growth associated with fishing and diving opportunities in the coastal waters of Okaloosa County, Florida |
| Endangered Species Act | Minimize potential impacts to Federally protected species (Threatened and/or Endangered) and/or their designated critical habitat |

| | |
|---|---|
| Coral / Hard Bottom | Avoid and/or minimize adverse effects on corals or hard bottom resources |
| Submerged Aquatic Vegetation (SAV) | Avoid and/or minimize adverse effects on SAV |
| Navigation | Minimize effects on general navigation, navigation channels, and/or safety fairways. |

5.2 Description of alternatives

Alternatives to the proposed modification of the permit to change the minimum authorized depth (i.e., navigational clearance) of LAARS B from -140 feet to -60 feet and to extend the duration of the permit by 10 years are considered in this section.

Additionally, the current permit was modified on 21 August 2020 to include heavy gauge ferrous and aluminum alloy metal-hulled vessels, which have a hull length of 60 feet or greater, on the list of materials authorized for deployment. All vessels to be deployed as reefs must be remediated and/or cleaned in accordance with the standards and special conditions of the existing permit. As such, the proposed deployment of the SSUS within LAARS C does not require modification of the permit and the effects of the deployment were considered under the permit. Nonetheless, the Corps has conducted additional review of the proposal focusing on the SSUS, specifically.

5.2.1 No action alternative

The proposed placement of reef materials within navigable waters of the United States requires a DA permit. Therefore, the no-action alternative would involve denial of the permit modification. The no-action alternative would have a negative effect on existing LAARS locations as it would not allow for continued use of the three LAARS that were previously authorized by multiple DA permits and would not allow for changes to the LAARS B navigational clearance to be consistent with LAARS A and C. The no-action alternative would have no effect on Habitat Creation as it would not allow for continued deployment of reef materials to the existing artificial reef locations and would not generate additional opportunities for fishing and diving. Additionally, no action would not allow a change to the clearance depth and would limit the uses of certain high relief structures and vessels that could otherwise be used as artificial reef materials to enhance habitat within LAARS B. The no-action alternative would have no economic effect as it would not create additional opportunities for fishing and diving in the coastal waters of Okaloosa County, Florida. The no-action alternative would have no effect on the Endangered Species Act, Coral/Hardbottom, SAV, or Navigation criteria as no further work would occur, and no additional artificial reef materials would be deployed.

If the SSUS is not deployed as an artificial reef, then it could be disassembled and used as scrap metal or it could continue to degrade within a nearshore environment. Alternatively, the SSUS could be sold and restored for another viable use. However, opportunities to restore the SSUS have been available as the ship was had multiple

owners since 1980 and was owned by the SS United States Conservancy from 2011 through 2024, prior to purchase by Okaloosa County. This history strongly indicates that funding for restoration and commercial development of the vessel is not economically feasible. Degradation of the ship in place and possible sinking while docked would have a negative effect on navigation as it could create an obstruction. Furthermore, if the SSUS remains in its current location and is not deployed to the LAARS, the degradation of the ship in place could have a more negative impact on the marine environment nearshore compared to the LAARS locations. If the SSUS remains in its current location it will not benefit the artificial reef network of the LAARS or benefit recreational tourism in the area. The no action alternative would also result in a negative effect on economics because of the financial burden associated with ongoing storage and/or removal of the vessel. It is also possible that removing or scrapping the vessel would not result in the preservation of its historic features; depending on whether a federal authorization or permit is required, the SSUS could potentially removed or scrapped without any requirements to the vessel to preserve its historic features. The no action alternative for the SSUS would be expected to have minimal effects on the Endangered Species Act, Coral/Hardbottom, Submerged Aquatic Vegetation.

### 5.2.2 Off-site alternatives

Off-site alternative 1:Off-site alternatives were not considered for this project. The applicant's request is for modification of the existing permit to extend the minimum authorized depth and extend the duration of permit to allow for the continued use of the LAARS sites. The requested modification to the navigational clearance within LAARS B is consistent with prior modifications for navigational clearances within LAARS A and C. The three LAARS were previously evaluated and authorized under multiple DA permits as specified in section 1.4 of this MFR. Instead of expanding the current size, scale, and duration of the existing LAARS sites, as proposed, off-site alternatives to the project could include creation of new artificial reef locations off Okaloosa County. However, the placement of artificial reef materials in an alternate location within the marine waters offshore of Okaloosa County, Florida, would be expected to have similar, and potentially greater, effects on environmental resources compared to the current site because previous siting, evaluation, and permitting of these sites helped to ensure minimization of adverse effects on the screening criteria. Offsite alternatives could result in adverse effects to resources and/or screening criteria such as critical habitat for endangered species, navigation, or hardbottom. As there are no conflicts regarding resource use for the proposed modification, offsite alternatives were not considered. Similarly, offsite alternatives were not considered for alternative deployment sites for the SSUS. Offsite alternatives could result in potentially more adverse effects to resources and/or screening criteria such as critical habitat for endangered species, navigation, or hardbottom. As there are no conflicts regarding resource use at the LAARS C site, offsite alternatives were not considered.

### 5.2.3 On-site alternatives

On-site alternative 1 (applicant's preferred alternative): The applicant's preferred

alternative is modification of the permit to change the minimum authorized depth (i.e., navigational clearance) of LAARS B from -140 feet to -60 feet and to extend the duration of the permit by 10 years. This alternative would make the minimum authorized depth more consistent across LAARS A, B, and C. The minimum authorized depths in LAARS A and C are -60 feet and -50 feet, respectively. This alternative would meet the project purpose and need to create artificial reefs off Okaloosa County. This alternative would have a positive effect on Location and Habitat Creation as it would allow for the continued deployment of reef materials within the previously authorized sites and take advantage of the existing reef structures to create a more comprehensive reef network. The reef materials provide substrate for algal growth and encrusting organisms and become a source of food and shelter for various species of fish and invertebrates, as discussed in sections 7.1 and 9.9.2. The applicant's preferred alternative would have a positive effect on Economics as it would expand on the existing reef network and create additional opportunities for recreational fishing and diving at a more accessible depth in the coastal waters of Okaloosa County, Florida. Both fishing and scuba diving contribute to tourism and economic opportunities within Okaloosa County. This alternative would have a minor effect on the Endangered Species Act criterion as discussed further in section 9.1. These effects include covering a small area of substrate used by some species, hazards to species during transport and deployment of reef materials, and the risk of entanglement from abandoned fishing lines and gear. This alternative would not affect corals or hardbottom. This alternative would not affect SAV. This alternative would have no more than a minor effect on navigation. The project sites are not located within a navigation channel or safety fairway (designated shipping lane). The minimum required navigational clearance between the tops of reef materials and the MLLW would be 60 feet, which would be more than sufficient for most vessels entering that area. The locations of the LAARS have been previously provided to the U.S. Coast Guard and National Oceanic and Atmospheric Administration (NOAA) for addition to nautical charts. Any vessel requiring more than 60 feet of depth could locate the LAARS on nautical charts and avoid those areas or use the safety fairway

As further evidence of the expected benefit to the economy, Visit Pensacola, the official tourism marketing organization for Escambia County, Florida, invested $1.5 million in Okaloosa County's efforts to deploy the SSUS as an artificial reef. The marketing for the SSUS indicates that the USS Oriskany and SSUS will be about 12 nautical miles apart and will help make northwest Florida a premier diving destination (Mollye Barrows, "Visit Pensacola sinks $1.5 million with Okaloosa County to reef SS United States", Pensacola News Journal, November 20, 2025, https://www.pnj.com/story/news/local/escambia-county/2025/11/20/ss-united-states-reef-partnership-with-okaloosa-visit-pensacola/87350799007/). The sinking of the SSUS would have no more than a minor effect on navigation. The sinking of the SSUS would have no impact on hardbottom. There are potential adverse effects from chemicals leaching from the structure; however, prior to deployment, the vessel will be remediated and cleaned as approved by EPA, and must comply with all standards and special conditions regarding its materials. Therefore the effects to the resources at the site is expected to the negligible. This alternative allows for the use of the SSUS as an artificial

reef while still preserving some of the historic significance of the vessel, as outlined in the MOA in Appendix C. The project site is not located within a navigation channel or safety fairway (designated shipping lane) and the vessel would not exceed the minimum clearance of LAARS C. The locations of the LAARS have been previously provided to the U.S. Coast Guard and NOAA for addition to nautical charts. Any vessel requiring more than 60 feet of depth could locate the LAARS on nautical charts and avoid those areas or use the safety fairway.

5.3 Alternatives evaluation under NEPA

The no-action alternative would not allow for the continued use of the previously permitted LAARS and would not allow for creation of additional large-scale, high-relief artificial reefs off of Okaloosa County by the applicant as the permit would expire and deployments to the LAARS would no longer be authorized. Additionally, the no action alternative would not allow for the deposition of large high-relief reef structures into LAARS B that would exceed the existing minimum clearance of -140 feet, reducing the potential habitat creation for artificial reefs in LAARS B and minimizing the draw for divers and other recreational activities due to the significant clearance depth for upper limit of the reef. Alternative sites were not considered for the proposed permit modification as there were no conflicts regarding resource use and alternative locations would have similar, or potentially greater, effects on the screening criteria. For example, alternative locations could result in greater adverse effects to navigation, hardbottom, or endangered species, as compared to the applicant’s preferred alternative. Furthermore, off-site alternatives would not be able to take advantage of the existing reef networks throughout LAARS A, B, and C in order to maximize the environmental and recreational benefits that the reefs provide. The applicant’s preferred alternative to modify the clearance depth and extend the permit duration would meet the project purpose of the applicant. This alternative would maximize habitat creation for numerous fish species, enhance recreational tourism and economics, and have minimal or no effects on water quality, protected species, hardbottom habitat, or SAV. This alternative will not have a significant effect on the quality of the human environment

The sinking of the SSUS would meet the applicant’s project purpose and need to create artificial reefs within Okaloosa County. Alternatives to sinking the vessel in LAARS C, such as scrapping the vessel or sinking it in another location, are not feasible or reasonable alternatives. Deploying a large vessel in the existing LAARS sites would enhance the existing habitat in LAARS C, be financially feasible for the applicant, and maintain some historical components of the ship (See Section 9.3), while significantly enhancing commercial fishing and diving opportunities in Okaloosa County. This alternative would have negligible adverse effects on the quality of the marine environment due to the required conditions of the permit. This alternative will not have a significant effect on the quality of the human environment.

The permit modification, if approved, will include updates to the special conditions to ensure they are current. The Corps has determined that the applicant’s preferred alternative is not contrary to the public interest.

## 6.0 Evaluation for Compliance with the Section 404(b)(1) Guidelines

N/A, the proposed project is subject to only Section 10 of the Rivers and Harbors Act of 1899.

## 7.0 General Public Interest Review (33 CFR 320.4 and Regulatory Guidance Letter 84-09)

The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest as stated at 33 CFR 320.4(a). To the extent appropriate, the public interest review below also includes consideration of additional policies as described in 33 CFR 320.4(b) through (r). The benefits which reasonably may be expected to accrue from the proposal are balanced against its reasonably foreseeable detriments.

### 7.1 Public interest factors review

All public interest factors have been reviewed and those that are relevant to the proposal are considered and discussed in additional detail (see Table 3):

**Table 3 – Public Interest Factors**

| Factor | None | Detrimental | Neutral (mitigated) | Negligible | Beneficial | Not Applicable |
|---|---|---|---|---|---|---|
| 1. Conservation: See discussion below Table 3. | | | | | X | |
| 2. Economics: See discussion below Table 3. | | | | | X | |
| 3. Aesthetics: See discussion below Table 3. | | | | X | | |
| 4. General Environmental Concerns: See discussion below Table 3. | | | | | X | |
| 5. Wetlands: Not applicable. | | | | | | X |
| 6. Historic Properties: See discussion below Table 3. | | | X | | | |
| 7. Fish and Wildlife Values: See discussion below Table 3. | | | | | X | |
| 8. Flood Hazards: Not Applicable. | | | | | | X |
| 9. Floodplain Values: Not Applicable. | | | | | | X |
| 10. Land Use: Not Applicable. | | | | | | X |
| 11. Navigation: See discussion below Table 3. | | | | X | | |

| Table 3 – Public Interest Factors | | | | | | |
|---|---|---|---|---|---|---|
| **Factor** | **None** | **Detrimental** | **Neutral (mitigated)** | **Negligible** | **Beneficial** | **Not Applicable** |
| 12. Shoreline Erosion and Accretion: Not Applicable | | | | | | X |
| 13. Recreation: See discussion below Table 3. | | | | | X | |
| 14. Water Supply and Conservation: Not applicable | | | | | | X |
| 15. Water Quality: See discussion below Table 3. | | | | X | | |
| 16. Energy Needs: Not Applicable | | | | | | X |
| 17. Safety: See discussion below Table 3. | | | | X | | |
| 18. Food and Fiber Production: See discussion below Table 3. | | | | | X | |
| 19. Mineral Needs: Not Applicable | | | | | | X |
| 20. Consideration of Property Ownership: See discussion below Table 3. | | | | | X | |
| 21. Needs and Welfare of the People: See discussion below Table 3. | | | | | X | |

Additional discussion of effects on factors above:

Conservation: Deploying the ship in LAARS C and reducing the clearance depth in LAARS B would increase artificial reef habitat in the Gulf of America and may contribute to conservation of fisheries resources as indicated by NOAA's National Artificial Reef Plan, dated November 1985. Conservation would occur primarily through creation of additional habitat. The vessel would be placed in an area devoid of submerged aquatic vegetation (SAV), corals, hardbottom, or natural rock outcrops. Placement at this location would introduce structural complexity and create additional habitat in an area currently lacking those features. Although the vessel was not specifically designed as an artificial reef, it nonetheless has the potential to support a diverse marine community. Additionally, the project would reduce user pressure on existing artificial reefs and natural reefs in the region by creating additional reefs and distributing the users (fishers and divers) over a larger area which would help conserve existing resources. See additional discussion below Table 3 for additional information.

Economics: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B would have a beneficial economic impact because it would provide more opportunities for fishing and diving. Local businesses that provide fishing charters, bait and tackle, and dive charters are expected to benefit from the continued

creation of artificial reefs within the LAARS. Overall, increased tourism to the area for fishing and diving charters would also provide economic benefits to hotels, restaurants, and retailers. Establishing the SSUS as an artificial reef would be expected to create additional demand for dive charters originating from Okaloosa County and neighboring counties. As further evidence of the expected benefit to the economy, Visit Pensacola, the official tourism marketing organization for Escambia County, Florida, invested $1.5 million in Okaloosa County's efforts to deploy the SSUS as an artificial reef. The marketing for the SSUS indicates that the USS Oriskany and SSUS will be about 12 nautical miles apart and will help make northwest Florida a premier diving destination (Mollye Barrows, "Visit Pensacola sinks $1.5 million with Okaloosa County to reef SS United States", Pensacola News Journal, November 20, 2025, https://www.pnj.com/story/news/local/escambia-county/2025/11/20/ss-united-states-reef-partnership-with-okaloosa-visit-pensacola/87350799007/ ) As referenced above in section 5.2.3, Further, if the SSUS were not deployed as an artificial reef, there would be a financial burden on the applicant to keep the ship docked, scrap the vessel, or convert it to some other use. The financial burden of maintaining the ship is evidenced by court-ordered mediation between the prior owner, the SS United States Conservancy, and Penn Warehousing, where the ship was previously docked, due to dockage fees.

Aesthetics: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B would have a net negligible effect on aesthetics. The clearance depth of 60 feet ensures that artificial reefs have no above-water visual presence. The SSUS's current stripped condition has substantially degraded its appearance from the original design, and reefing would eliminate the vessel's above-water visual presence. However, this loss would be offset by the creation of a new underwater visual and recreational resources for divers, as well as the anticipated aesthetic value associated with marine-life colonization of the artificial reef.

General Environmental Concerns: Extending the permit, deploying the ship in LAARS C and reducing the clearance depth in LAARS B is expected to have a beneficial effect on the aquatic environment through creation of artificial reef habitat that would allow for growth of marine algae and vegetation and establishment of encrusting and fouling organisms that support the food web. Reef materials would provide additional habitat for various species of fish and invertebrates. Additionally, the project would not result in impacts to seagrasses, natural rock outcrops, corals, or hard bottom formations.

Historic Properties: See Section 9.3 for additional discussion. Extending the permit and deploying the SSUS in LAARS C would have a neutral (mitigated) effect on historic properties. Reducing the clearance depth in LAARS B would have no direct effect on historic properties as there are no known historic properties associated with LAARS B. The Section 106 review resulted in the Corps' assessment, in accordance with 36 CFR 800.5, that the undertaking, sinking the SSUS for use as an artificial reef, would result in adverse effects to a historic property. The ship was listed on NRHP in 1999 and is currently listed on the NRHP. While many features of the vessel had been removed over several decades, the Corps assessed that the ship still retained sufficient integrity

to maintain its NRHP eligibility. Through the Section 106 consultation process, a MOA to resolve adverse effects was ultimately executed by the Corps, permittee, and the SHPO on 16 July 2026. The ACHP concurred that the Corps had met all Section 106 obligations for adverse effects on August 6, 2026.

Fish & Wildlife Values: See Sections 9.1.2, 10.1 and 10.2 for additional discussion. Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B would allow for the continued use of the LAARS for creation of artificial reefs. There is a possibility that the deployment of the SSUS would result in aggregation of fish around the vessel and overfishing effects. However, the National Artificial Reef Plan indicates that artificial reefs can increase the total biomass of fish, indicative of increased fish populations associated with artificial reefs. The benefits of artificial reefs are well-established and discussed in NOAA's National Artificial Reef Plan, November 1985. The project would result in creation of habitat and surfaces that are capable of supporting various algae and encrusting/fouling organisms that would contribute to the food web within the Gulf of America. The habitat would provide food and shelter for various marine species. This diverse assemblage is the focus of both commercial and recreational fishing, as well as recreational diving for consumptive and non-consumptive uses. No adverse comments were received from the Gulf States Marine Fishery Commission or the Gulf of Mexico Fishery Management Council regarding impacts to managed fisheries or fishery resources. The proposed action is expected to have effects on threatened or endangered species, as further discussed in section 9.1. These effects could result from operation of vessels to deploy reef materials, effects associated with deployment of reef materials, and entanglement hazards associated with fishing line and gear that are snagged on reef materials and abandoned. Effects on protected species is expected to be minimal and the overall effect on fish and wildlife values is expected to be beneficial due to the increased availability of habitat. The surfaces of reef materials that allows for the growth of algae, phytoplankton, and corals, and colonization by encrusting species which contribute to the food web and support fish and wildlife values. LAARS A, B, and C, offshore of Okaloosa County, and additional LAARS in neighboring counties, have been in place for years and have created a patchwork of reef materials, including vessels, that provide additional habitat that would help distribute fish populations across a greater area. The effect on fish and wildlife values is expected to be beneficial.

Navigation: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B would result in negligible effects to navigation. Effects to navigation are expected to be negligible as regular deployments have been made within the three LAARS throughout the past 30 years. The proposed modification of navigational clearance to -60 feet within LAARS B would be very consistent with currently approved clearances within LAARS A and C (-60 and -50 feet, respectively). The permit was modified on 13 August 2021 to allow for these minimum navigational clearances for LAARS A and C and the Corps has not received any reports of impacts to navigation. This depth should be more than sufficient for most vessels passing through the area. For comparison, mooring areas for large vessels at the Port of Pensacola are maintained at depths between 35 and 40 feet. Vessels requiring a very

deep draft could use the safety fairway or navigate around the LAARS. Minimum navigational clearances within LAARS A and C were modified. The proposed deployment of the SSUS within LAARS C and future deployment of vessels or other approved reef materials in the LAARS sites, would need to comply with the minimum clearances required by the permit, subject to modifications. The Corps did not receive adverse agency comments regarding navigation. The LAARS are not located within a navigation channel or safety fairway. Previous permits required that the boundaries of the LAARS be provided to NOAA Nautical Datum Branch (NDB), and to the U.S. Coast Guard, for updates to nautical charts. If the permit is modified, the applicant would continue to report to NOAA-NDB and the U.S. Coast Guard. Due to the location and minimum navigational clearances that would be required, the proposed activity would not create an unreasonable obstruction to navigation and would have a negligible effect on this factor.

Recreation: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B would allow for the continued deployment of artificial reef material and increased opportunities for recreational fishing and diving in the coastal waters of Okaloosa County. Deployment of additional reefs, including the SSUS, will help distribute use pressure across a greater number of reefs and a larger geographic area and therefore is expected to reduce user conflict and enhance recreation. Additional reefs would allow for additional fishing and diving locations. Deployment of the SSUS is expected to create a scuba diving destination, especially considering its proximity to the USS Oriskany, for divers that seek out large wrecks and have the proper training. See additional discussion below Table 3.

Water Quality: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B is expected to result in negligible effects to water quality within the Gulf of America. Continued use of the LAARS would require that suitable reef materials be used. Special conditions would be included in the permit modification, if issued, specifying the types of material approved for use. The Reef Parameters special condition would require that reef materials be clean and free from asphalt, petroleum, other hydrocarbons and toxic residues, loose free-floating material or other deleterious substances. The Pre-Deployment Notification special condition would require that the applicant/permittee certify that all materials are free from asphalt, petroleum, other hydrocarbons and toxic residues. The Florida Fish & Wildlife Conservation Commission inspects all materials prior to deployment and can reject unfit materials from being deployed. Additionally, Okaloosa County has indicated that it cleans all reef materials in accordance with the *National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs* (U.S. Environmental Protection Agency and U.S. Maritime Administration, May 2006). Reef materials are expected to degrade over time, likely over many decades or longer, depending on the material. Metal-based materials, such as vessels, steel beams from bridge and/or building demolition, and utility poles, would undergo electrochemical corrosion and slowly degrade over time. Regarding the deployment of the SSUS, the Corps considered information provided by commenters and responses provided by the applicant, the vessel-remediation information in the administrative record, and available scientific data. Based on the

available information, Cr(VI) or zinc chromate remaining on the vessel does not preclude deployment of the SSUS as an artificial reef. Effects on the environment would be minimized as a result of the applicable marine environmental review and permitting requirements, the remediation measures undertaken for the project, the EPA and Maritime Administration (MARAD) remediation Best Management Practices (BMPs) and review by the relevant state and federal regulatory agencies. Considering the requirements to use suitable materials that have been cleaned in accordance with National standards, the proposed action is expected to have a negligible effect on water quality within the Gulf of America.

Safety: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B is expected to have a negligible effect on safety. Activities associated with transportation of reef materials would be conducted in accordance with State and Federal standards. The minimum navigational clearances required would afford safe navigation for most vessels. Vessels requiring more than 60 feet of draft would be able navigate around the LAARS and/or use the safety fairway. Scuba diving has inherent risks and divers are expected to stay within the limits of their training, experience, and capabilities.

Food & Fiber Production: As described in the National Artificial Reef Plan, construction of artificial reefs can enhance fishery resources, enhance recreational and commercial fishing opportunities, and increase total fish biomass within a given area. The additional of artificial reef materials to the three LAARS is expected to have a minor benefit to food production associated with increased artificial reef habitat and a corresponding increase in fishery resources.

Consideration of Property Ownership: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B is expected to have a beneficial effect on property ownership. The Ownership/Maintenance/Liability special condition requires the applicant, Okaloosa County, to acknowledge ownership of all reef materials. As the owner of those materials, the applicant's preferred use of those materials is creation of artificial reefs. Modification of the permit, as requested, would allow for the preferred use of reef materials, including vessels and the SSUS, that are owned by Okaloosa County.

Need & Welfare of the People: Extending the permit, deploying the ship in LAARS C, and reducing the clearance depth in LAARS B is expected to result in a beneficial effect on the needs and welfare of the people. The project may reduce user pressure at existing artificial reefs in the area. The artificial reef sites would provide increased recreational and commercial fishing and diving opportunities.

When the 98th Congress codified The National Fishing Enhancement Act of 1984, they determined that "properly designed, constructed, and located artificial reefs in waters covered under this chapter can enhance the habitat and diversity of fishery resources; enhance the United States recreational and commercial fishing opportunities; increase the production of fishery products in the United States; increase the energy efficiency of

recreational and commercial fisheries; and contribute to the United States and coastal economies", Title 33 U.S. Code Chapter 35, Section 2101 (a)(5). This Congressional finding provides further support for the positive effects of artificial reefs on the Conservation, Economics, Fish and Wildlife Values, and Food and Fiber Production factors discussed above. As stated in the National Artificial Reef Plan, "Properly constructed artificial reefs can enhance fish habitat, provide more accessible quality fishing grounds, benefit anglers and economies of shore communities, increase total fish biomass within a given area, and provide managers with another option for conserving and/or developing fishery resources".

In further support of the Conservation, Economics, Fish and Wildlife Values, and Recreation criteria, a comparison to the nearest, similar sized reef can be made. The USS Oriskany was intentionally sunk as an artificial reef offshore of Escambia County, Florida in 2006. The USS Oriskany is approximately 900 feet long and located in the Gulf of America approximately 12 nautical miles from the proposed deployment location of the SSUS. An online article stated "Since the sinking of the Oriskany, at least 38 fish species have been seen around the wreck. Additionally, Pensacola and Escambia County generated more than $4 million from the addition of the artificial reef in 2007 alone. This number is likely much, much higher today" (Maya Carlin, "This is What It Took for the U.S. Navy to Sink Its Own Aircraft Carrier", National Interest, October 4, 2024). Further, the ship is described as one of the most popular diving destinations in the United States by the Florida Panhandle Shipwreck Trail (www.floridapanhandledivetrail.com/Ships/Oriskany). It is expected that deployment of the SSUS would provide similar public benefits as the USS Oriskany, resulting in an increase in tourism associated with fishing and diving and associated stimulus to the local economy for dive shops, fishing charters, hotels, restaurants, etc.

7.2 Public and private need

The relative extent of the public and private need for the proposed structure or work:

The proposed project would help satisfy the public demand for recreational fishing and diving opportunities associated with artificial reefs in the coastal waters of Okaloosa County, Florida. It is important to note that fishing and diving charters would also utilize these areas and therefore contribute to the local economy. The availability of artificial reefs may also contribute to increased tourism to Okaloosa County by those seeking fishing and diving opportunities. The applicant is a county government and therefore does not have a private need. However, numerous businesses within the region would benefit from increased fishing, diving, and tourism associated with the LAARS artificial reef sites. Businesses such as fishing charters, dive charters, bait and tackle shops, hotels, restaurants, and other retails would likely benefit from ongoing and increased development of artificial reefs within the LAARS.

7.3 Resource use unresolved conflicts

If there are unresolved conflicts as to resource use, explain how the practicability of using reasonable alternative locations and methods to accomplish the objective of the

proposed structure or work was considered.

There were no unresolved conflicts identified as to resource use.

7.4 Beneficial and/or detrimental effects on the public and private use

The extent and permanence of the beneficial and/or detrimental effects that the proposed work is likely to have on the public and private use to which the area is suited is described below:

Detrimental effects are expected to be minimal and permanent.

Beneficial effects are expected to be more than minimal and permanent.

Detrimental effects of the action on public and private use of the area would be minimal and either temporary or permanent. The open-water areas that comprise the LAARS are suitable for navigation, commercial and recreational fishing, diving, conservation, offshore energy and mineral activities, government operations, and public infrastructures such as submarine cables. Deployment of reef materials may result in temporary disturbance to use of small areas within the LAARS. However, given the size and location of the LAARS, any use limitations during deployment activities would be minor. The existing and ongoing use of the LAARS for establishment of artificial reefs may limit future use of the area for offshore energy and mineral activities, certain governmental activities, and placement of submarine cables and would be relatively permanent. For example, it is not likely that the area would be suitable for use as a borrow area to obtain sand for beach nourishment. Any such detrimental effects on public and private use of the LAARS sites have likely already occurred since the sites were previously authorized more than 29 years ago, as indicated in section 1.4.

Beneficial effects include habitat creation, commercial and recreational fishing, and diving. Artificial reef materials consisting of concrete rubble, natural boulders, steel structures, and vessels, would likely last for many decades. The benefits associated with the artificial reefs would be relatively permanent. As a comparison, the USS Oriskany, a former aircraft carrier that is approximately 900 feet long, was deployed as an artificial reef offshore of Escambia County, Florida, in 2006. It is located approximately 12 nautical miles from the proposed deployment location of the SSUS. An online article stated "Since the sinking of the Oriskany, at least 38 fish species have been seen around the wreck. Additionally, Pensacola and Escambia County generated more than $4 million from the addition of the artificial reef in 2007 alone. This number is likely much, much higher today" (Maya Carlin, "This is What It Took for the U.S. Navy to Sink Its Own Aircraft Carrier", National Interest, October 4, 2024). Further, the ship is described as one of the most popular diving destinations in the United States by the Florida Panhandle Shipwreck Trail (www.floridapanhandledivetrail.com/Ships/Oriskany). It is expected that deployment of the SSUS would provide similar public benefits as the USS Oriskany, resulting in an increase in tourism associated with fishing and diving and associated stimulus to the local economy for dive shops, fishing charters, hotels, restaurants, etc.

## 8.0 Mitigation

(33 CFR 320.4(r), 33 CFR Part 332

### 8.1 Avoidance and minimization

Avoidance and Minimization: When evaluating a proposal including regulated activities in waters of the United States, consideration must be given to avoiding and minimizing effects to those waters. Avoidance and minimization are described in Section 1.3.1 above.

Describe other mitigative actions including project modifications implemented to minimize adverse project impacts? (see 33 CFR 320.4(r)(1)(i))

Avoidance and minimization were incorporated into the initial siting of the LAARS. The Protection of Existing Resources special condition would require the Permittee to complete an assessment of the bottom conditions by diver, submersible video camera, fathometer, depth/bottom sounder (e.g. “fish finder”), or side-scan sonar, no more than one year prior to deployment of reef materials. Additionally, the Permittee would maintain a deployment buffer of at least 200 feet from any submerged beds of seagrasses, coral reefs, live bottom, areas supporting growth of sponges, sea fans, soft corals, and other sessile macroinvertebrates generally associated with rock outcrops, oyster reefs, scallop beds, clam beds, or areas where there are unique or unusual concentrations of bottom-dwelling marine organisms. Reef materials would be cleaned in accordance with National and State standards and inspected by the FWC prior to deployment. These measures and the special conditions of the permit, and the modification, if authorized, would help minimize potential adverse effects on waters of the United States. The SSUS would be cleaned in accordance with the *National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs,* U.S. Environmental Protection Agency / U.S. Maritime Administration, May 2006, prior to deployment as an artificial reef, as required by the **Authorized Reef Materials** special condition that would be included in the permit, if issued. The guidance discusses paint and anti-fouling systems (coatings), including those containing zinc compounds. Per the guidance, anti-fouling systems inhibit marine growth and are typically found on the exterior hull at or below the water line. Portions of the underwater hull that are greater than 12 years old and covered with marine growth are not likely to have minimal biocide activity and can be left in place. Interior coatings that are blistering or peeling are considered “floatables” and the guidance is to remove any coatings that are blistering, peeling, and pitting. The guidance further states:

> “Removal of intact paints generally is not necessary. Topside paint may contain other constituents, such as trace metals or biocides. Unlike underwater hull paint containing high concentrations of biocides designed to leach rapidly, topside paints are designed for long life. They also may contain significantly lower levels of these substances than hull coatings. However, exfoliating paint (paint that is blistering, peeling, and pitting) and exfoliated paint

(paint chips and flakes) should be removed."

8.2 Compensatory mitigation requirement

Is compensatory mitigation required to offset environmental losses resulting from proposed unavoidable impacts to waters of the United States? No

Provide rationale: The proposed project consists of the modification to clearance depths in LAARS B and a time extension to allow the continued deployment of artificial reef materials. Impacts to special aquatic sites are not proposed.

## 9.0 Compliance with Other Laws, Policies and Requirements

9.1 Section 7(a)(2) of the Endangered Species Act (ESA)

Refer to Section 2.2 for description of the Corps' action area for Section 7 of the ESA.

9.1.1 Lead federal agency for Section 7 of the ESA

Has another federal agency been identified as the lead agency for complying with Section 7 of the ESA with the Corps designated as a cooperating agency and has that consultation been completed? No

9.1.2 Listed/proposed species and/or designated/proposed critical habitat

Are there listed or proposed species and/or designated critical habitat or proposed critical habitat that may be present or in the vicinity of the Corps' action area? Yes

Effect determination(s), including no effect, for all known species/habitat, and basis for determination(s):

Informal consultation with the National Marine Fisheries Service (NMFS) was initiated on 7 April 2014. NMFS concurred with the Corps' effect determinations in a letter dated 21 August 2014. Since additional species were listed since the conclusion of that consultation, the Corps reinitiated consultation with NMFS on 6 December 2024, as informal consultation. NMFS subsequently determined that Kemp's ridley and Loggerhead sea turtles are likely to be adversely affected and started formal consultation as 19 May 2025. NMFS provided their Biological Opinion on 25 August 2025. Table 4 below provides the corresponding agency determinations.

**Table 4 – ESA Species Effect Determinations**

| Species | ESA Listing Status | Designated Critical Habitat Present? | Corps Effect Determination | NMFS/FWS Effect Determination |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Green sea turtle (North Atlantic Distinct Population Segment (DPS)) | T | Yes (Proposed; Unit NA01: Sargassum) | NLAA | LAA (NMFS) |
| Hawksbill sea turtle | E | No | NLAA | NLAA (NMFS) |
| Kemp's ridley sea turtle | E | No | NLAA | LAA (NMFS) |
| Leatherback sea turtle | E | No | NLAA | NLAA (NMFS) |
| Loggerhead turtle (Northwest Atlantic DPS) | T | Yes (Unit LOGG-S-02) | NLAA | LAA (NMFS) |
| Giant manta ray | T | No | NLAA | NLAA (NMFS) |
| Gulf sturgeon (Atlantic sturgeon, Gulf subspecies) | T | No | NLAA | NLAA (NMFS) |
| Smalltooth sawfish (United States DPS) | E | No | NLAA | NLAA (NMFS) |
| Oceanic whitetip shark | T | No | NE | NLAA (NMFS) |
| Rice's whale | E | Yes (Proposed) | NLAA | NLAA (NMFS) |
| West Indian manatee | T | No | NLAA | NLAA (FWS) |

T = Threatened, E = Endangered
NLAA = Not likely to adversely affect, LAA = Likely to adversely affect, NE = No Effect
National Marine Fisheries Service (NMFS), U.S. Fish & Wildlife Service (FWS)

Species

**West Indian Manatee** (*Trichechus manatus*): May affect, not likely to adversely affect (NLAA).
Basis for determination: Based on the Corps of Engineers, Jacksonville District, and the State of Florida Effect Determination Key for the Manatee in Florida, (Key). Use of the Manatee Key resulted in the following sequential determination: A > B > C > G > N > O > P "may affect, not likely to adversely affect." This determination is based on the Applicant following the standard manatee construction precautions for the proposed activity. By letter dated 25 April 2013, the FWS stated that for proposed in-water activities analyzed with the April 2013 version of the Manatee Key in which the Corps reaches a "may affect, not likely to adversely affect" determination with respect to the manatee and/or its designated critical habitat, the FWS hereby concurs with the Corps determination in accordance with 50 CFR 402.14(b)1 and no further consultation with the FWS is required. The Applicant has agreed to follow standard manatee construction conditions that would be included in the permit, as referenced by the Manatee Conditions special condition.

**Hawksbill sea turtle** (*Eretmochelys imbricata*): NLAA
According to the *Recovery Plan for Hawksbill Turtles in the U.S. Caribbean Sea, Atlantic Ocean, and Gulf of Mexico*, prepared for NMFS and U.S. Fish & Wildlife Service, 10 November 1993, hawksbill turtles are distributed worldwide and, in the

United States, most commonly occur in southern Florida and the northern Gulf of Mexico, especially near Texas. In Florida, hawksbill turtles are most commonly observed near the Florida Keys and on the reefs off Palm Beach County (Lund 1985). Additionally, data from NOAA's Sea Turtle Stranding and Salvage Network was reviewed for Okaloosa County, and both neighboring counties, Santa Rosa and Walton, for the years 2013 through 2021. Out of 670 reports where the species was known, only two of those were hawksbill turtles. Due to the population distribution and available data, the Corps believes that it is unlikely that hawksbill turtles will be present in the action area and unlikely that they would be affected by the proposed activity. However, if present, hawksbill turtles may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, hawksbill turtles could be injured by vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. Turtles could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several project design criteria (PDCs), this is unlikely to occur. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Turtles could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their Biological Opinion (BO) dated 25 August 2025, NMFS concurred with the Corps' NLAA determination. NMFS concurrence with the NLAA determination, as stated in their BO, is due to the low likelihood of hawksbill turtles being present within the action area and because it would be "extremely unlikely they would be found interacting with artificial reef material". The Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Green sea turtle** (*Chelonia mydas*): NLAA
According to the *Recovery Plan for U.S. Population of Atlantic Green Turtles*, prepared for NMFS and U.S. Fish & Wildlife Service, 29 October 1991, green turtles are distributed worldwide within tropical and subtropical waters. In the United States, green turtles are found near the U.S. Virgin Islands, Puerto Rico, and continental U.S. from Texas to Massachusetts. The Corps believes that green turtles may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, green turtles could be injured by vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. Turtles could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several project design criteria (PDCs), this is unlikely to occur. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Turtles could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their BO dated 25 August 2025, NMFS determined that the proposed action is likely to adversely affect (LAA) green sea turtles. One of the increased risks for sea turtles, other than hawksbill and leatherback sea turtles, is that these species are likely to be present in the action area and, importantly, are at risk of entanglement in lost

fishing gear and marine debris. This risk is higher in areas where high relief artificial reef material, such as vessels, aircraft, decommissioned oil rigs, metal towers, and similar structures may be deployed and extend more than seven feet above the sea floor and have a footprint greater than 200 square feet. NMFS states that over time, more fishing gear and marine debris can accumulate and therefore risks for entanglement increase over time. The NMFS BO includes Reasonable and Prudent Measures and Terms and Conditions to implement those measures. Those Terms and Conditions include requirements for in-water cleanups on a regular basis and, if implemented, should reduce risks for entanglement. The Corps permit, if issued, would include multiple special conditions to incorporate PDCs intended to reduce risks to listed species and, additionally, would include a special condition (Biological Opinion special condition) requiring compliance with NMFS BO and its mandatory Terms and Conditions. Additionally, the Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Loggerhead sea turtle** (*Caretta caretta*): NLAA
According to the *Recovery Plan for the Northwest Atlantic Population of the Loggerhead Sea Turtle*, Second Revision, NMFS and U.S. Fish & Wildlife Service, 31 December 2008, loggerhead turtles are distributed throughout the temperate and tropical regions of the Atlantic, Pacific, and Indian Oceans. In the United States, loggerhead turtles next from Texas to Virginia. The Corps believes that loggerhead turtles may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, loggerhead turtles could be injured as a result of vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. Turtles could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several project design criteria (PDCs), this is unlikely to occur. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Turtles could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their BO dated 25 August 2025, NMFS determined that the proposed action is likely to adversely affect (LAA) loggerhead sea turtles. One of the increased risks for sea turtles, other than hawksbill and leatherback sea turtles, is that these species are likely to be present in the action area and, importantly, are at risk of entanglement in lost fishing gear and marine debris. This risk is higher in areas where high relief artificial reef material, such as vessels, aircraft, decommissioned oil rigs, metal towers, and similar structures may be deployed and extend more than seven feet above the sea floor and have a footprint greater than 200 square feet. NMFS states that over time, more fishing gear and marine debris can accumulate and therefore risks for entanglement increase over time. The NMFS BO includes Reasonable and Prudent Measures and Terms and Conditions to implement those measures. Those Terms and Conditions include requirements for in-water cleanups on a regular basis and, if implemented, should reduce risks for entanglement. The Corps permit, if issued, would include multiple special conditions to incorporate PDCs intended to reduce risks to listed species and, additionally, would include a

special condition (Biological Opinion special condition) that would require compliance with NMFS BO and its mandatory Terms and Conditions. Additionally, the Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Leatherback sea turtle** (*Dermochelys coriacea*): NLAA
According to the *Recovery Plan for Leatherback Turtles in the U.S. Caribbean, Atlantic, and Gulf of Mexico*, NMFS and U.S. Fish & Wildlife Service, 1992, leatherback turtles are distributed "circumglobally". Much of the distribution is based on known nesting locations, as the pelagic distribution of these turtles is not well known. The Corps' National Regulatory Viewer was used to determine that the known range of leatherback sea turtles includes the action area. Additionally, review of sea turtle stranding data indicates that multiple leatherback turtle strandings have been documented along the coasts of Okaloosa County as well as neighboring counties. The Corps believes that leatherback sea turtles may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, leatherback turtles could be injured as a result of vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. Turtles could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several PDCs this is unlikely to occur. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Turtles could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their BO dated 25 August 2025, NMFS determined that the proposed action is not likely to adversely affect (NLAA) leatherback sea turtles. NMFS concurrence with the NLAA determination, as stated in their BO, is due to the low likelihood of hawksbill turtles being present within the action area and because it would be "extremely unlikely they would be found interacting with artificial reef material". The Corps permit, if issued, would include multiple special conditions to incorporate PDCs intended to reduce risks to listed species and, additionally, would include a special condition (Biological Opinion special condition) that would require compliance with NMFS BO and its mandatory Terms and Conditions. Additionally, the Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Kemp's Ridley Sea Turtle** (*Lepidochelys kempii*): NLAA
According to the *Bi-National Recovery Plan for the Kemp's Ridley Sea Turtle*, Second Revision, Secretariat of Environment & National Resources, Mexico, National Commission of Natural Protected Areas, Mexico, Federal Attorney of Environmental Protection, Mexico, NMFS, and U.S. Fish & Wildlife Service, 22 September 2011, Kemp's ridley turtles have a "restricted" distribution. Nesting is largely limited to beaches within the western Gulf of Mexico, mostly in Mexico. Nesting also regularly occurs in Texas and less frequently in a small number of U.S. states. The Corps' National Regulatory Viewer was used to review the to determine that the known range of Kemp's

ridley turtles includes the action area. Additionally, review of turtle sea turtle stranding data indicates that multiple Kemp's ridley turtle strandings have been documented along the coasts of Okaloosa County as well as neighboring counties The Corps believes that Kemp's ridley turtles may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, Kemp's ridley turtles could be injured as a result of vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. Turtles could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several PDCs this is unlikely to occur. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Turtles could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their BO dated 25 August 2025, NMFS determined that the proposed action is likely to adversely affect (LAA) Kemp's ridley sea turtles. One of the increased risks for sea turtles, other than hawksbill and leatherback sea turtles, is that these species are likely to be present in the action area and, importantly, are at risk of entanglement in lost fishing gear and marine debris. This risk is higher in areas where high relief artificial reef material, such as vessels, aircraft, decommission oil rigs, metal towers, and similar structures may be deployed and extend more than seven feet above the seafloor and have a footprint greater than 200 square feet. NMFS states that over time, more fishing gear and marine debris can accumulate and therefore risks for entanglement increase over time. The NMFS BO includes Reasonable and Prudent Measures and Terms and Conditions to implement those measures. Those Terms and Conditions include requirements for in-water cleanups on a regular basis and, if implemented, should reduce risks for entanglement. The Corps permit, if issued, would include multiple special conditions to incorporate PDCs intended to reduce risks to listed species and, additionally, would include a special condition (Biological Opinion special condition) that would require compliance with NMFS BO and its mandatory Terms and Conditions. Additionally, the Protected Species Construction Conditions and Vessel Strick Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Gulf sturgeon** (*Acipenser oxyrinchus desotoi*): NLAA
The proposed project would occur within the known range of Gulf sturgeon. If present within the action area, Gulf sturgeon may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, it is possible that Gulf sturgeon could be injured as a result of vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. This is unlikely due to Gulf sturgeon being highly mobile and able to avoid those hazards. Gulf sturgeon could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several PDCs, this is also unlikely. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Although very unlikely, Gulf sturgeon could also become entangled in monofilament fishing line that snagged

on reef materials and was abandoned. Lastly, deployment of artificial reef material would cause a relatively small area of substrate to be unavailable to Gulf sturgeon for foraging. The Corps believes this would be a very minor effect as abundant similar habitat would be readily available within immediately adjacent areas. In their BO dated 25 August 2025, NMFS concurred with the Corps' NLAA determination for Gulf sturgeon. The Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Giant manta ray** (*Manta birostris*): NLAA
The proposed project would occur within the known range of the giant manta ray. If present within the action area, giant manta ray may avoid or evacuate the area during deployment of reef materials due to noise and associated disturbance in the immediate vicinity of the deployment. Additionally, it is possible that giant manta ray could be injured as a result of vessel strikes during transportation of reef materials or harmed by reef materials during deployment of those materials. This is unlikely due to this species being highly mobile and able to avoid those hazards. Giant manta ray could also potentially be entrapped in artificial reef material, vessels, or prefabricated modules, although with incorporation of several PDCs, this is also unlikely. Additionally, deployment activities would be of short duration, intermittent, would occur during daylight hours, and would affect a relatively small area of the seafloor and water column. Although very unlikely, giant manta ray could also become entangled in monofilament fishing line that was snagged on reef materials and abandoned. In their BO dated 25 August 2025, NMFS concurred with the Corps' NLAA determination for giant manta ray. The Protected Species Construction Conditions and Vessel Strike Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species are sighted in the deployment area.

**Smalltooth sawfish** (*Pristis pectinata*): NLAA
The proposed project would be located within the historical range of smalltooth sawfish. The NMFS' Biological Opinion to the U.S. Army Corps of Engineers for dredging of Gulf of Mexico navigation channels and sand mining ("Borrow") areas using hopper dredges by COE Galveston, New Orleans, Mobile, and Jacksonville Districts, dated 19 November 2003; commonly referred to as the Gulf of Mexico Regional Biological Opinion (GRBO), considered potential effects to smalltooth sawfish. According to the GRBO, smalltooth sawfish distribution has contracted to peninsular Florida; they are most commonly found off the extreme southern portion of the state; and the current distribution is centered in the Everglades National Park, including Florida Bay. The GRBO further states that "between 1990 and 1999, only four documented takes of smalltooth sawfish occurred in shrimp trawls in Florida (Simpendorfer 2000)"; the Corps notes that this statement refers to all of Florida and is not specific to northwest Florida. Similarly, the NMFS' *Smalltooth Sawfish Recovery Plan*, January 2009, in discussing distribution of smalltooth sawfish from Texas to the Florida Panhandle, indicates that "since 1971, there have been only three published or museum reports of smalltooth sawfish captured from this region, and all have been from Texas (1978, 1979, 1984 – See NMFS 2000 [status review])". Additionally, the action area does not support

mangrove or similar habitat that would be utilized by juvenile smalltooth sawfish. During deployment of reef materials, the disturbance may cause smalltooth sawfish to avoid or evacuate the action area. Additionally, placement of reef materials would reduce substrate available for foraging and resting. However, large areas of similar substrate is located within and adjacent to the LAARS sites. Smalltooth sawfish are highly mobile and could readily move into adjacent areas. Based on the currently known distribution of smalltooth sawfish and the minor area of substrate that would be affected, the Corps has determined that proposed action may affect but is not likely to adversely affect the smalltooth sawfish.

**Oceanic whitetip shark** (*Carcharhinus longimanus*): NLAA
The proposed project would occur within the range of the Oceanic whitetip shark. The *ESA Recovery Plan for the Oceanic Whitetip Shark (Carcharhinus longimanus)*, NMFS, July 2024, describes this species is globally distributed in tropical and subtropical waters and subject to bycatch and global fin trade stress. During deployment of reef materials, the disturbance may cause Oceanic whitetip shark to avoid or evacuate the action area. Although unlikely, it could also be affected by reef materials during deployment or subject to a vessel strike. As this species has high mobility, the Corps believes that there is very low likelihood for such effects to occur. The Corps has determined that the proposed project may affect but is not likely to adversely affect the Oceanic whitetip shark. The Corps notes that we did not initially include a determination for this species when initiating Section 7 ESA consultation with NMFS and NMFS indicated the Corps' determination as "no effect" in their BO. In their BO dated 25 August 2025, NMFS determined the proposed project is not likely to adversely affect Oceanic whitetip shark.

**Rice's whale** (*Balaenoptera ricei*): NLAA
As discussed in NOAA's *Recovery Outline* for Rice's whale, September 29, 2020, the species was formerly considered to be a subspecies of Bryde's whale. It was originally listed under the ESA as the Gulf of Mexico Bryde's whale. The species taxonomy was updated but protection under the ESA remains. Rice's whale is known to occur within the Gulf of America (formerly Gulf of Mexico), but little is known about its life history. Primary threats include, but are not limited to, exposure to oil spills, vessel collisions, fishing gear entanglements, and noise from shipping traffic and other vessels. Activities associated with the proposed project would involve transport of reef materials to the deployment area and discharge of reef materials into marine waters. Noise and disturbance associated with these activities may affect Rice's whale, if located within the vicinity of the activity. Rice's whale is at risk of entanglement in lost fishing gear and marine debris. This risk is higher in areas where high relief artificial reef material, such as vessels, aircraft, decommission oil rigs, metal towers, and similar structures may be deployed and extend more than seven feet above the seafloor and have a footprint greater than 200 square feet. NMFS states that over time, more fishing gear and marine debris can accumulate and therefore risks for entanglement increase over time. The NMFS BO includes Reasonable and Prudent Measures and Terms and Conditions to implement those measures. Those Terms and Conditions include requirements for in-water cleanups on a regular basis and, if implemented, should reduce risks for

entanglement. The Corps permit, if issued, would include multiple special conditions to incorporate PDCs intended to reduce risks to listed species and, additionally, would include a special condition (Biological Opinion special condition) that would require compliance with NMFS BO and its mandatory Terms and Conditions. Additionally, the Protected Species Construction Conditions and Vessel Strick Avoidance Measures would be included in the permit, if issued, and would require work to cease if protected species were sighted in the deployment area.

<u>Habitat</u>

**Loggerhead sea turtle Designated Critical Habitat (DCH)**: NLAA
The proposed project would be located within LOGG-S-02 Sargassum unit of Loggerhead sea turtle DCH, which provides food and refuge for post-hatchling loggerheads. Its essential features are floating Sargassum accumulations, associated prey and cover, suitable surface-current/convergence conditions, and water deeper than 10 meters with offshore transport. Creation of artificial reefs would not likely affect those features directly. However, potential adverse effects could include temporary disturbance from vessels deploying reef materials; debris, turbidity; and increased vessel activity, from fishing and diving, that disrupt use of nearby Sargassum mats or affect turtles. The Corps has determined that the proposed project may affect but is not likely to adversely affect Loggerhead sea turtle DCH. The Corps notes that we did not include a determination for this DCH when initiating Section 7 ESA consultation with NMFS and therefore NMFS indicated the Corps' determination as "no effect" in their BO. In their BO dated 25 August 2025, NMFS determined the proposed project is not likely to adversely affect Loggerhead sea turtle DCH.

**Green sea turtle Proposed Critical Habitat**: NLAA
The proposed project would be located within the NA01 Sargassum unit of Green sea turtle Proposed Critical Habitat, which provides food and refuge for post-hatchling and surface-pelagic juvenile Green sea turtles. Its essential features are floating Sargassum accumulations, associated prey and cover, suitable surface-current/convergence conditions, and water deeper than 10 meters with offshore transport. Creation of artificial reefs would not likely affect those features directly. However, potential adverse effects could include temporary disturbance from vessels deploying reef materials; debris, turbidity; and increased vessel activity, from fishing and diving, that disrupt use of nearby Sargassum mats or affect turtles. The Corps has determined that the proposed project may affect but is not likely to adversely affect Green sea turtle DCH. The Corps notes that we did not include a determination for this Proposed Critical Habitat when initiating Section 7 ESA consultation with NMFS and therefore NMFS indicated the Corps' determination as "no effect" in their BO. In their BO dated 25 August 2025, NMFS determined the proposed project is not likely to adversely affect Green sea turtle Proposed Critical Habitat.

**Rice's Whale Proposed Critical Habitat**: NLAA
The proposed project would be located within the Gulf of America Proposed Critical Habitat for Rice's whale. The habitat includes the continental shelf and slope-

associated waters between the 100-meter and 400-meter isobaths (depth contours). Its identified physical/biological feature is the density, quality, abundance, and accessibility of small demersal and vertically migrating prey needed to support Rice's whale foraging. The habitat also includes sufficiently quiet conditions for normal use and occupancy by Rice's whale. As stated in Section 3.2.3 of NMFS 25 August 2025 BO, neither LAARS A nor LAARS C overlaps the continental shelf and slope feature. The southwest corner of LAARS B does overlap this feature. Deployment of artificial reef materials in proximity to Proposed Critical Habitat within LAARS B may affect prey and quiet conditions within the Proposed Critical Habitat for Rice's whale. The Corps has determined that the proposed project may affect but is not likely to adversely affect Rice's whale Proposed Critical Habitat. The Corps notes that we did not include a determination for this Proposed Critical Habitat when initiating Section 7 ESA consultation with NMFS and therefore NMFS indicated the Corps' determination as "no effect" in their BO. In their BO dated 25 August 2025, NMFS determined the proposed project is not likely to adversely affect Rice's whale Proposed Critical Habitat.

9.1.3 Section 7 ESA consultation

Consultation with either the National Marine Fisheries Service and/or the United States Fish and Wildlife Service was initiated and completed as required, for any determinations other than "no effect" (see the attached ORM2 Summary sheet for begin date, end date and closure method of the consultation)

Consultation was initiated as informal and concluded as formal. See 10.1.2 above for details.

9.2 Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), Essential Fish Habitat (EFH)

9.2.1 Lead federal agency for EFH provisions of the Magnuson-Stevens Act

Has another federal agency been identified as the lead agency for complying with the EFH provisions of the Magnuson-Stevens Act with the Corps designated as a cooperating agency and has that consultation been completed? No

9.2.2 Magnuson-Stevens Act

Did the proposed project require review under the Magnuson-Stevens Act? Yes

9.2.3 EFH species or complexes

Were EFH species or complexes considered? Yes

Effect determination and basis for that determination: No effect. The NMFS EFH Mapper indicated that the proposed project sites within the Gulf of America (also known as the Gulf of Mexico) includes EFH for 43 species of reef fish, 4 species of shrimp, 7 species of shark, sailfish, and coastal migratory pelagic species. The report indicated

there are no Habitats of Particular Concern (HAPCs) or EFH Areas Protected from Fishing within the report area. Additionally, the proposed reef deployment areas would not be located in areas supporting SAV, natural hardbottom habitat, reef assemblages, and other such resources.

9.2.4 National Marine Fisheries Service consultation

Consultation with the National Marine Fisheries Service was initiated and completed as required (see the attached ORM2 Summary sheet for begin date, end date and closure method of the consultation)

The public notice, published on 23 October 2024 and 13 March 2026, initiated consultation with NMFS Habitat Conservation Division (HCD) as required by the Magnuson-Stevens Act. NMFS-HCD responded to the public notice by e-mail dated 25 October 2024. NMFS-HCD stated they anticipate any adverse effects that might occur on marine and anadromous fishery resources would be minimal and they do not have any EFH conservation recommendations to provide regarding the activities.

9.3 Section 106 of the NHPA

Refer to Section 2.3 for permit area determination.

9.3.1 Lead federal agency for Section 106 of the NHPA

Has another federal agency been identified as the lead federal agency for complying with Section 106 of the NHPA with the Corps designated as a cooperating agency and has that consultation been completed? No

9.3.2 Historic properties

Known historic properties present? Yes

For the permit modification in LAARS B, no historic properties were identified as existing within the permit area during the initial Corps assessment. However, the Corps learned of the permittee's plans to deploy the SSUS into LAARS B following an inquiry from the ACHP on March 13, 2025. Subsequently the Corps notified the permittee of the need to conduct a Section 106 review for proposed activities they planned for the ship itself in association with deployment under a Corps permit. The Corps review identified the SSUS as a historic property listed on the NRHP. No other historic properties are known to exist in the LAARS A, B, or C permit area.

Effect determination and basis for that determination: Adverse Effect

The review for Section 106 of the NHPA resulted in the Corps' assessment, in accordance with 36 CFR 800.5, that the undertaking, sinking the vessel for use as an artificial reef, would result in adverse effects to a historic property. The ship was listed on the NRHP in 1999 and is currently listed on the NRHP. While many features of the vessel had been removed over several decades, the Corps assessed that the ship still

retained sufficient integrity to maintain its NRHP eligibility. Section 106 consultation on the adverse effects involved coordination with the SHPO, the ACHP, and three invited consulting parties: the *SS United States Preservation Foundation*, the *New York Coalition to Save the SS United States*, and the *National Trust for Historic Preservation*. These organizations ("the parties") requested consulting party status and the Corps and SHPO agreed to invite them to consult. The Corps sent out consultation letters to all parties on 28 November 2026 stating the adverse effects determination.

Consultation with all parties, including the ACHP (which participated in an advisory capacity) occurred over a period of eight months. Consultation included numerous written updates by the Corps, two online meetings, ongoing guidance with the ACHP, and many submitted comments and requests from the parties to be addressed by the Corps at various stages of the consultation. A summary of consulting party comments is provided in Section 4 and in Appendix C along with a timeline of notable Section 106 review activities in Appendix C. A large proportion of the information requests and related comments focused on the Corps' administrative details related to the Section 106 review, and information subject to the Corps' internal, deliberative process. While these comments/requests were considered, only the information and requests relevant to consulting party coordination were addressed in detail to the parties.

The Corps issued a public notice on 13 March 2026 which included a summary of the undertaking's adverse effects and requested comments on the adverse effects determination. The Corps received over 700 public comments. A majority of the comments expressed opposition to the sinking of the historic ship. These comments are documented in this EASOF in Section 4.

Following intensive research, coordination, and consideration of information provided by consulting parties (the SHPO, the parties, and ACHP) and the public, a detailed synopsis of the Corps' Section 106 assessment was provided to the consulting parties on March 16, 2026. The synopsis is included in Appendix C and it details the review steps taken by the Corps to adhere to the 36 CFR 800 and 33 CFR 325, Appendix C, regulations. The synopsis also notified consulting parties that the presented options for avoidance of adverse effects were unachievable largely based upon the fact that all options call for the permittee to choose to sell the vessel, which the permittee was not willing to do and which the Corps had no authority to compel. Consequently, the Corps noted in the synopsis that consultation will transition to a focus on mitigation of adverse effects.

A draft memorandum of agreement (MOA) created to resolve adverse effects was developed by the Corps, permittee, and the SHPO and provided to the parties on April 7, 2026, with the request to review and provide comments on the draft within 15 days. Following the comment period for the first draft, the Corps worked with the permittee and SHPO to further develop the MOA. The Corps sent a consultation update letter on May 22, 2026, along with a second draft to all consulting parties for additional review and comment, requesting a 10-day review period. Comments were received from all consulting parties and the Corps, SHPO, and permittee developed a final draft. An

update letter to consulting parties was sent out by the Corps on June 25, 2026, providing the parties with the final draft, and providing responses to the comments received on the second draft. Notably, with agreement from the SHPO, the Corps opted not to invite the additional consulting parties to be signatories on the MOA for reasons stated in this June update letter.

Among other things, prior to deployment of the subject vessel, the MOA requires that Permittee Okaloosa County document the vessel's interior and exterior areas for posterity via capture laser scans, photogrammetric imagery, etc. MOA, Section I.A (i), pdf 2-3. That documentation will be submitted to the Florida Master Site File and the National Park Service Heritage Documentation Program. *Id*. Additionally, the MOA requires Okaloosa County to prepare a report listing distinct components removed from the vessel in Mobile, Alabama to further document pre-deployment changes. *Id.*, Section I.A (ii), at 2. Post-deployment, the MOA requires, *inter alia*, Okaloosa County to create a 3D photogrammetric model of the vessel, which will be relied on as interpretative documentation (as well as an indicator of the initial deployment status and a dive map); prepare a National Register of Historic Places (NRHP) submittal to reassess the vessel's eligibility; and perform a two-year monitoring study on vessel's deployment in collaboration with Woods Hole Oceanographic Institute. *Id.*, Section I.B, at 3-4. Furthermore, the MOA requires Okaloosa County to provide funding of at least $1,300,000 to be used for the creation of a series of educational exhibits and interpretative displays that will convey the vessel's historical and nautical significance. *Id.*, Section II, at pdf 4-5. Finally, the MOA requires consultation pursuant to 36 C.F.R. § 800.13 in the event that new potential historic properties or unanticipated effects on historic properties are discovered in the course of the undertaking, *id.*, Section V, at pdf 5, and the submission of a monitoring reports every 6 months for the period that the MOA is in effect. *Id.*, Section VI, at pdf 6.

This final draft was agreed upon by all signatories to the MOA (the SHPO, Permittee, and the Corps) and the document was signed and went into effect on July 16, 2026. A copy of the executed MOA is provided in Appendix C . The signing of the MOA resolved adverse effects to the vessel and effectively concluded Section 106 review and consultation. The ACHP sent out a confirmation email on August 6, 2026, notifying all consulting parties that the Corps has fulfilled the requirements of Section 106 of the NHPA and its implementing regulations, "Protection of Historic Properties" (36 CFR Part 800).

9.3.3 Consultation with the appropriate agencies, tribes and/or other parties for effect determinations

Consultation was initiated and completed with the appropriate agencies, tribes and/or other parties for any determinations other than "no potential to cause effects." (see the attached ORM2 Summary sheet for begin date, end date and closure method of the consultation)

9.4 Tribal Trust Responsibilities

9.4.1 Tribal government-to-government consultation

Was government-to-government consultation conducted with federally-recognized tribe(s)? No

9.4.2 Other Tribal consultation

Other Tribal consultation including any discussion of Tribal Treaty rights. N/A

9.5 Section 401 of the Clean Water Act – Water Quality Certification (WQC)

9.5.1 Section 401 WQC requirement

Is an individual Section 401 WQC required, and if so, has the certification been issued or waived? N/A, a WQC is not required.

9.5.2 401(a)(2) Process

If the certifying authority granted an individual WQC, did the United States Environmental Protection Agency make a determination that the discharge 'may affect' water quality in a neighboring jurisdiction? N/A

9.6 Coastal Zone Management Act (CZMA)

9.6.1 CZMA consistency concurrence

Is a CZMA consistency concurrence required, and if so, has the concurrence been issued, objected to, or presumed?

An individual CZMA consistency concurrence is required and has been issued by the appropriate agency. By letter to the applicant, dated 15 June 2026, the Florida State Clearinghouse stated the "…the proposed authorization will be consistent with the FCMP if the terms of the MOA outline above and in the attached correspondence are satisfied." The Memorandum of Agreement (MOA) referenced in their letter is the *MOA Regarding Deployment of the SS United States as an Artificial Reef, Okaloosa County, Florida.*

9.7 Wild and Scenic Rivers Act

9.7.1 National Wild and Scenic River System

Is the project located in a component of the National Wild and Scenic River System, or in a river officially designated by Congress as a "study river" for possible inclusion in the system? No

9.8 Effects on Corps Civil Works Projects (33 USC 408)

9.8.1 Permission requirements under Section 14 of the Rivers and Harbors Act (33

USC 408)

Does the applicant also require permission under Section 14 of the Rivers and Harbors Act (33 USC 408) because the activity, in whole or in part, would alter, occupy, or use a Corps Civil Works project?

No, there are no federal projects in or near the vicinity of the proposal.

9.9 Artificial Reefs, 33 CFR 322.5(b) Special Policies

9.9.1 Review of Provisions for siting, construction, monitoring, operation, maintenance, and management of the proposed artificial reef area.

9.9.1.1 Siting. The site is properly situated to provide fishing and diving opportunities to the regional area. The materials proposed for deployment have been utilized in this environment and found to be both stable and durable. An assessment of the site, by the applicant, found no aquatic resources other than microalgae and no historical resources on the seafloor.

9.9.1.2 Construction. Prior to construction the applicant would accomplish a fathometer scan of the proposed deployment area to verify bottom composition, depth, and other site characteristics. Preconstruction meetings would occur and the applicant would be integrally involved during all construction activities. The applicant would accomplish all activities associated with and required by the pre-deployment and post deployment notifications.

9.9.1.3 Monitoring. The applicant's monitoring procedures would begin with land-based inspection of the material to be deployed to verify compliance with permit conditions. Each new artificial reef deployment within LAARS A, B and C sites would be monitored yearly for the life of the site. Additionally, the County would conduct yearly monitoring on 10% of the artificial reefs deployed in the prior year. As part of the yearly monitoring process. the applicant would conduct a fathometer scan once per year to verify material location and condition and compare to such information from the *Florida Artificial Reef Materials Placement Report and Post-Deployment Notification* and/or previous monitoring events to distinguish changes in either. The monitoring report would include a spreadsheet representation of the site inspected and data gained with a written narrative. Additionally, the applicant has agreed to be responsible for maintenance associated with the site including removal of entanglement hazards and other such assessments to ensure safe operation.

9.9.1.4 Operation. In response to the monitoring, the applicant would adjust their use of the site and implement any necessary management controls (adaptive management principles) required to facilitate the use of the site in a manner that is safe and in accordance with their objectives as well as the regulatory requirements under which it was authorized.

9.9.1.5 Maintenance. The County would conduct maintenance as determined necessary from data or information generated by the planned monitoring.

9.9.1.6 Management. The County intends to utilize monitoring data to select and apply adaptive management principles for management of the site. The County could coordinate with local interest groups and the general public to ensure the site is managed to provide optimal recreational fishing and diving opportunities and ancillary benefits.

9.9.2 Standards required by the National Fishing Enhancement Action of 1984

9.9.2.1 Enhancement of Fishery Resources to the Maximum Extent Practicable: The materials proposed for deployment would consist of clean concrete or rock, heavy gauge steel products (¼-inch thickness or greater), oil rig jackets, military surplus items, prefabricated structures that are a mixture of clean concrete and heavy gauge steel, chicken transport devices, and heavy gauge ferrous and aluminum alloy metal hulled vessels which equal or exceed 60 feet hull length. These materials would provide a stable and long-lived habitat for marine organisms ranging from fouling and encrusting species to those species higher in the food chain such as, but not limited to, demersal and pelagic fish. The materials would provide appropriate substrate to support demersal species as well as vertical profiles that would support pelagic species.

9.9.2.2 Facilitation of access and utilization by United States Recreational and Commercial Fisherman. The deployment site would be publicized by the County with the assistance of other stakeholder groups and potentially other marine related organizations.

9.9.2.3 Minimization of conflicts among users of the Navigable Waters or Waters Overlying the Outer Continental Shelf and of the resources in such water. The County acknowledges that there could be a need to implement management controls that support both recreational diving and fishing opportunities which are often at odds. Based on visitor use, public input, and monitoring data, the County is prepared to implement such controls as may be required.

9.9.2.4 Minimization of environmental risks to personal health and property. The County's use of the proposed reef materials that have been utilized in this environment and found to be both stable and durable reduces the risk of damage to the environment. The County has located the site at sufficient distance from the safety fairways and the federally maintained navigation channel to reduce the risk of injury or property damage. Additionally, the County would have control over the types of material to be deployed, which would ensure that no inappropriate material would be deployed.

9.9.2.5 Generally accepted principles of International Law. There is no apparent conflict between the proposed activity and International Law.

9.9.2.6 Prevention of any unreasonable obstructions to navigation. The applicant would reduce potential obstructions to navigation by locating the site an appropriate distance from the safety fairway and federally maintained navigation channel, adhering to the authorized minimum depth, and conducting compliance monitoring. Monitoring would include assessing impacts to navigation. Additionally, the site has been mapped on NOAA charts and would maintain a minimum clearance between the tops of reef materials and the elevation of the MLLW. Minimum clearances would be 60 feet at MLLW within LAARS A, 60 feet at MLLW within LAARS B, and 50 feet at MLLW within LAARS C. These minimum clearances would reduce potential impacts to navigation.

9.9.3 Other factors required for review. If authorized, the Corps permit would include an **Ownership/Maintenance/Liability** special condition to address the requirements of 9.9.3.1, 9.9.3.2, and 9.9.3.3, below.

9.9.3.1 Title to the Artificial Reef Construction Material is Unambiguous: The applicant would have clear title to the materials proposed for deployment.

9.9.3.2 Responsibility. The applicant has agreed to be responsible for maintenance associated with the site including removal of entanglement hazards and other such assessments to ensure safe operation.

9.9.3.3 Financial ability to assume liability for all damages that may arise with respect to the proposed artificial reef: Okaloosa County has claimed sovereign immunity as a legal subdivision of the State and Florida and is therefore able to insure itself. There is no indication that the County is not capable of assuming liability for all damages that may arise as a result of this site and the deployment of reef materials at this site

9.10 Other (as needed) N/A

9.11 Compliance Statement

The Corps has determined that it has fulfilled its responsibilities under the following laws, regulations, policies, and guidance:

**Table 5 – Compliance with Federal Laws and Responsibilities**

| Laws, Regulations, Policies, and Guidance | Yes | N/A |
|---|---|---|
| Section 7(a)(2) of the ESA | X | |
| EFH provisions of the Magnuson-Stevens Act | X | |
| Section 106 of the NHPA | X | |
| Tribal Trust | | X |
| Section 401 of the Clean Water Act | | X |
| CZMA | X | |
| Wild and Scenic Rivers Act | | X |
| Section 408 - 33 USC 408 | | X |

| Table 5 – Compliance with Federal Laws and Responsibilities | | |
|---|---|---|
| Corps Wetland Policy (33 CFR 320.4(b)) | | X |
| Other: | | X |

## 10.0 Special Conditions

10.1 Special condition(s) requirement(s)

Are special conditions required to ensure minimal effects, ensure the authorized activity is not contrary to the public interest and/or ensure compliance of the activity with any of the laws above? Yes

10.2 Required special condition(s)

See Appendix D for a list of special conditions and supporting rationale.

## 11.0 Findings and Determinations

11.1 Section 176(c) of the Clean Air Act General Conformity Rule Review:

The proposed permit action has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. It has been determined that the activities proposed under this permit will not exceed *de minimis* levels of direct or indirect emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153. Any later indirect emissions are generally not within the Corps' continuing program responsibility and generally cannot be practicably controlled by the Corps. For these reasons a conformity determination is not required for this permit action.

11.2 Presidential Executive Orders (EO)

11.2.1 EO 11988, Floodplain Management

This action is not located in a floodplain.

11.2.2 EO 13112, Invasive Species, as amended by EO 13751

There are no invasive species issues involved in this proposed project.

11.2.3 EO 13212 and EO 13302, Energy Supply and Availability

The proposal is not one that will increase the production, transmission, or conservation of energy, or strengthen pipeline safety.

11.3 Findings of No Significant Impact

Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action will not have a

significant impact on the quality of the human environment. Therefore, an environmental impact statement will not be required.

11.4 Public interest determination

Having reviewed and considered the information above, I find that the proposed project is not contrary to the public interest. The permit will be issued with appropriate conditions included to ensure minimal effects, ensure the authorized activity is not contrary to the public interest and/or ensure compliance of the activity with any of the authorities identified in Section 10.

**PREPARED BY:**

Date: 2 October 2026

HOLLY MILLSAP
Project Manager

**REVIEWED BY:**

Date: 2 October 2026

SHAYNE HAYES
Chief, Pensacola Permits Section

**APPROVED BY:**

Digitally signed by BOWMAN.BRANDON.L.1033516602
Date: 2026.10.02 14:44:01 -04'00'

Date: 2 October 2026

BRANDON L. BOWMAN
Colonel, EN
Commanding

# APPENDIX A

*COMMENT MATRIX*

*** Duplicate entries with only files/photos were deleted and photos added to comment entry (column C).

| | RRS ID | FILES | COMMENTER FIRST | COMMENTER LAST | EMAIL | COMMENT | PHONE | COMPANY | DATE | 1. ECONOMICS | 2. AESTHETICS | 3. GENERAL ENVIRONMENTAL CONCERNS | 4. HISTORIC PROPERTIES | 5. FISH AND WILDLIFE VALUES | 6. NAVIGATION | 7. RECREATION and SAFETY | 8. WATER QUALITY | 9. OTHER ITEMS | 13. GENERALLY SUPPORT | 14. GENERALLY OPPOSE | 15. NEUTRAL/UNDETERMINED | 16. PUBLIC HEARING REQUEST | 16. PUBLIC HEARING ACKNOWLEDGEMENT SENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3726 | | Alan | Looper | Alanlooper@yahoo.com | Hello, My name is Alan Looper and I am responding to the p | +1 (860)836-6719 | N/A | 3/17/2026 1:33 | | | X | X | | | X | X | | | X | | X | X |
| 2 | 3727 | | Charlie | McDowell | Charliepatrick066@gmail.com | My last shot at trying to see if Ill save her | +61 403037564 | N/A | 3/17/2026 2:36 | | | | | | | | | | | X | | | |
| 3 | 3728 | | Micah | Heaney | micahheaney522@gmail.com | I do not believe the SSUS should be reefed, if there is any cl | +1 (336)590-3925 | N/A | 3/17/2026 2:36 | | | | X | | | | | | | X | | | |
| 4 | 3729 | | William | Apel | N/A | A piece of American history, one of the last ocean liners in th | N/A | N/A | 3/17/2026 2:38 | | | | X | | | X | | | | X | | | |
| 5 | 3730 | | Dwight | Galluzzi | Mardoggo@gmail.com | I believe that the SS United States should be preserved and | N/A | N/A | 3/17/2026 2:38 | | | | X | | | X | | | | X | | | |
| 6 | 3731 | | Kevin | smith | Ksmith86tx@gmail.com | The SS United States is part of US history it shouldn't be turr | +1 (713)534-4337 | N/A | 3/17/2026 2:38 | | | | X | | | X | | | | X | | | |
| 7 | 3732 | | Jeremy | Lowe | Tascomic@gmail.com | Sinking the United States is a loss of a great technological w | N/A | N/A | 3/17/2026 2:38 | | | | X | | | | | | | X | | | |
| 8 | 3733 | | James | Joyner | marinec1855@gmail.com | The ss united states should not be sunk but instead restored | +1 (706)360-4991 | N/A | 3/17/2026 2:40 | | | | X | | | X | | | | X | | | |
| 9 | 3734 | | Hayden | Gagnon | haydengagnon04@gmail.com | the SS United States is a symbol of American and World His | +1 (541)380-0958 | N/A | 3/17/2026 2:44 | | | | X | | | X | | | | X | | | |
| 10 | 3735 | | Tyler | Shemenkowski | N/A | The future of the SS United States needs to be heavily looke | N/A | N/A | 3/17/2026 2:45 | X | | | X | | | X | | | | X | | | |
| 11 | 3736 | | Harrison | Shaw | harrisonshaw@yahoo.com | The SS United States stands as an irreplaceable piece of An | N/A | N/A | 3/17/2026 2:45 | | | | X | | | | | | | X | | | |
| 12 | 3737 | | Carleo | Casayuran | ctc.legomasterbuilder@gmail.com | Please do not sink America's Flagship, she is the last Americ | +1 (843)518-8315 | N/A | 3/17/2026 2:46 | | | X | X | | | X | | | | X | | | |
| 13 | 3738 | | Nathan | Zimbrich | nathan@zimbrich.com | I highly ask that the sinking please be reconsidered. As a big | +1 (815)585-3482 | N/A | 3/17/2026 2:47 | | | X | X | X | | | | | | X | | | |
| 14 | 3739 | **20200703_155250.jpg** | Xavier | Bliege | xavierbliege@gmail.com | The S.S. United States is a ship who has been through a lot | +1 (860)459-7579 | N/A | 3/17/2026 2:48 | | | | X | | | X | | | | X | | | |
| 15 | 3740 | | Matthew | Buonanno | matt.buon21@gmail.com | I feel that aside from it being a great shame to sink a ship tha | +1 (570)390-9230 | N/A | 3/17/2026 2:48 | | | X | X | | | | | | | X | | | |
| 16 | 3741 | | Martin | Schoneck | N/A | I just feel that, at the very least, it should be repurposed into | N/A | N/A | 3/17/2026 2:49 | | | | | | | | | X | | X | X | | |
| 17 | 3742 | | Julie | Boswell | jboswellphoto@gmail.com | Please list the ship on the register of National Historic places | +1 (817)797-4186 | N/A | 3/17/2026 2:49 | | | X | X | | | | | | | X | | | |
| 18 | 3743 | | John | Powers | jpptuba@yahoo.com | Please consider saving this historic ship above water. With th | N/A | N/A | 3/17/2026 2:50 | | | | X | | | | | | | X | | | |
| 19 | 3744 | **USACOE Request1.pdf** | Jason | Lashin | jlashin81@gmail.com | Dear Members of the United States Army Corps of Engineers | +1 (916)521-1003 | N/A | 3/17/2026 2:51 | | | X | X | | | X | | | | X | | | |
| 20 | 3745 | | Christian | Fras | N/A | I do not believe that the SS United States should be sunk. Gi | N/A | N/A | 3/17/2026 2:55 | | | X | X | | | X | | | | X | | | |
| 21 | 3746 | **20250219_165959.jpg** | Samuel | Reichert | Russianbiad@gmail.com | Hello I'm commenting here in protest in the sinking of the ss | +1 (717)817-1736 | N/A | 3/17/2026 2:55 | | | | X | | | | | | | X | | | |
| 22 | 3747 | | Robert | Dumont | Robtgd52@aol.com | Save the ss united states from being referred. This historic s | +1 (260)403-4751 | N/A | 3/17/2026 2:57 | | | | X | | | | | | | X | | | |
| 23 | 3748 | **Messenger_creation_BE23CI** | Mason | Fisher | N/A | I am under the belief that the SS United States should be tak | N/A | N/A | 3/17/2026 2:57 | | | X | X | X | | X | X | | | X | | | |
| 24 | 3749 | | Kevin | Roache | K.roache@me.com | Do not sink this ship. Its a part of our nation's history. If its | +1 (757)995-4887 | N/A | 3/17/2026 2:59 | | | | X | | | | | | | X | | | |
| 25 | 3750 | | Jeffrey | Matthews | jefncin1@gmail.com | The SS United States deserves to declared a historical natio | +1 (757)894-9883 | N/A | 3/17/2026 3:00 | | | | X | | | | | | | X | | | |
| 26 | 3751 | | Glen | Biggers | biggersboyz@rocketmail.com | Believe sinking of such a historically significant ship to be sha | N/A | N/A | 3/17/2026 3:01 | | | | X | | | | | | | X | | | |
| 27 | 3752 | | Bradley | Tate | N/A | Reefing her is the best thing that has happened to her in 50 | N/A | N/A | 3/17/2026 3:02 | | | | | | | | | | X | | | | |
| 28 | 3753 | | Tyler | McCall | N/A | The SS United States is an important piece of American mar | +1 (815)217-4918 | N/A | 3/17/2026 3:02 | | | | X | | | X | | | | X | | | |
| 29 | 3754 | | Laurence | Bowmaker | homeatbm@bigpond.com | Like many around the world, I still believe that the SS United | +61 447044383 | N/A | 3/17/2026 3:04 | | | | X | | | X | | | | X | | | |
| 30 | 3755 | | Richard | Cerqueira | xjguy@aol.com | The SS United States, America's flag ship, a historical ocean | N/A | N/A | 3/17/2026 3:04 | X | | | X | | | | | | | X | | | |
| 31 | 3756 | | Randal | Baron | rabanth@aol.com | This boat has an incredible history and should be preserved | N/A | N/A | 3/17/2026 3:04 | | | | X | | | X | | | | X | | | |
| 32 | 3757 | | Ezekiel | Ramzi | shelmelzeke12@gmail.com | The SS United States is a great feat of American Engineering | N/A | N/A | 3/17/2026 3:05 | | | | X | | | | | | | X | | | |
| 33 | 3758 | | Robert | Healey | rjh.healey@gmail.com | Restoring the SS United Stateds needs to be considered a n | +1 (908)992-2676 | N/A | 3/17/2026 3:05 | | | | X | | | | | | | X | | | |
| 34 | 3759 | | Michael | Mercier | N/A | The SS United States is an important piece to American histo | N/A | N/A | 3/17/2026 3:05 | | | | X | | | | | | | X | | | |
| 35 | 3760 | | Trey | Lewis | Treylewis123@gmail.com | This historical liner showcased the very best of American inn | +1 (615)593-6340 | N/A | 3/17/2026 3:05 | | | | X | | | | | | | X | | | |
| 36 | 3761 | | Nicholas | Christiano | nickchristiano209@gmail.com | Hello my name is Nicholas Christiano, Im 17 years old and li | +1 (484)764-5428 | N/A | 3/17/2026 3:07 | X | | X | X | X | | | | | | X | | | |
| 37 | 3762 | | Zackary | Haycraft | haycraftzack622@gmail.com | The SS United States is a valuable piece of civilian maritime | +1 (270)230-4706 | N/A | 3/17/2026 3:08 | | | | X | | | X | | | | X | | | |
| 38 | 3764 | | Marc | W | mrw5484@gmail.com | This artificial reef is intended to use the former passenger lin | N/A | N/A | 3/17/2026 3:09 | | | | X | | | X | | | | X | | | |
| 39 | 3765 | | Andy | Au | N/A | I strongly urge a full federal review under Section 106 of the | N/A | N/A | 3/17/2026 3:10 | | | X | X | | | X | | | | X | | | |
| 40 | 3766 | | Eric | Okanume | ericokanum@gmail.com | The SS United States represents a significant achievement i | N/A | N/A | 3/17/2026 3:11 | | | | X | | | | | | | X | | | |
| 41 | 3767 | | Matthew | Younes | Matthewyounes15@gmail.com | The sinking of the ss united states is a blatant disregard for c | +1 (518)416-3718 | N/A | 3/17/2026 3:11 | | | | X | X | | | | | | X | | | |
| 42 | 3768 | | Mary | Rohrer | Mary.rohrer@Qmi.care | The SS United States ocean liner is the last of her era and is | +1 (951)532-5711 | Restore the Q | 3/17/2026 3:12 | | | | X | | | X | | | | X | | | |
| 43 | 3769 | | Daniel | Lanier | Daniellanier@hotmail.com | Good day. My name is Daniel LanierIt is a grand American tr | +1 (828)773-5850 | N/A | 3/17/2026 3:12 | | | X | X | | | X | | | | X | | | |
| 44 | 3770 | | Brett | Schwartz | brettmichael2005@gmail.com | It would be such a great loss to American history if the Unite | +25 14439603211 | N/A | 3/17/2026 3:12 | | | | X | | | | | | | X | | | |
| 45 | 3771 | | Eric | Liscom | ealiscom@yahoo.com | I believe its a serious mistake to sink the SS United States. | +1 (321)229-1336 | N/A | 3/17/2026 3:15 | | | | X | | | | | | | X | | | |
| 46 | 3772 | | Emmanuel | Allen | emanallen11@gmail.com | The SS United States has now been in Mobile, Alabama for c | +1 (470)430-3675 | N/A | 3/17/2026 3:17 | | | X | X | X | | X | | | | X | | | |
| 47 | 3774 | | Henry | Ulrich | henry.a.ulrich@gmail.com | Sinking the SS United States is not only an environmental di | N/A | N/A | 3/17/2026 3:18 | X | | X | X | | | | | | | X | | | |
| 48 | 3775 | | Steve | Toth | N/A | Save our Ship | N/A | N/A | 3/17/2026 3:20 | | | | | | | | | | | X | | | |
| 49 | 3776 | | Jackie | Parks | Unityparks@aol.com | Apart from sinking hundreds of tons of Zink Chromite paint ir | N/A | N/A | 3/17/2026 3:21 | | | X | | | | | | | | X | | | |
| 50 | 3777 | | Eric | Fahner | N/A | The United States as a ship is important . It is our history. Ot | N/A | N/A | 3/17/2026 3:22 | | | X | X | X | | X | | | | X | | | |
| 51 | 3778 | | Denis | Byrne | denisbyrne@yahoo.com | I strongly believe that sinking the USS United States will resu | +1 (631)235-2544 | N/A | 3/17/2026 3:26 | | | X | | | X | X | | | | X | | | |
| 52 | 3779 | **IMG_0227 1.JPG** | Clinton | Cox | clintstlouis@yahoo.com | SS United States is of high historical significance. There is o | +1 (636)212-6246 | N/A | 3/17/2026 3:28 | | | | X | | | | | | | X | | | |
| 53 | 3780 | | Iaian | Allen | N/A | I for one believe this ship this icon of America is worth being | N/A | N/A | 3/17/2026 3:34 | | | | X | | | | | | | X | | | |
| 54 | 3781 | | Ty | Hall | N/A | Dont waste history, we should save it and preserve it. Not sir | N/A | N/A | 3/17/2026 3:35 | | | | X | | | | | | | X | | | |
| 55 | 3782 | **Screenshot_10-3-2026_22285** | Toniann | Fargiano | toniannfargiano@gmail.com | The United States faces a critical decision about the future o | N/A | N/A | 3/17/2026 3:37 | | | X | X | | | X | | | | X | | | |
| 56 | 3783 | | Roberta | Mixer | cortezroberta271@gmail.com | This beautiful ship has our history of positivity and spirit of th | +1 (309)333-2800 | N/A | 3/17/2026 3:38 | | | | | | | | | | | X | | | |
| 57 | 3784 | | claire | lacey | laceyeqs@gmail.com | It is my belief that this is an inappropriate use for this vessel | N/A | N/A | 3/17/2026 3:39 | | | | X | | | X | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 58 | 3785 | | James | Stringfellow | James.stringfellow@skadden.com | SS United States should be preserved in ship shape (ie, not | N/A | N/A | 3/17/2026 3:41 | | | | X | | | | | | | X | | | |
| 59 | 3786 | | Michael | Brennan | brn169@verizon.net | Sinking the SS United States to create an artificial reef may | +1 (848)240-0267 | N/A | 3/17/2026 3:43 | | | X | | X | | | | | | X | | | |
| 60 | 3787 | | Wesley | Wasserman | Wesleywasserman@gmail.com | I dont think we should be sinking a boat which should be a m | N/A | N/A | 3/17/2026 3:44 | | | | | | | X | | | | X | | | |
| 61 | 3788 | | Alex | Lohmann | alexcantsleep@gmail.com | This ship deserves to be saved in someway. Its a marvel of i | +1 (469)878-3921 | N/A | 3/17/2026 3:49 | | | | | | | | | | | X | | | |
| 62 | 3789 | | Benjamin | DeLong | Catboataddict@gmail.com | Would like to see SS US preserved afloat as a historic site | N/A | N/A | 3/17/2026 3:49 | | | | | | | X | | | | X | | | |
| 63 | 3790 | | Travis | Beck | travis.beck83@gmail.com | There are many things to be said about Americas ship, SS U | +1 (201)943-0100 | N/A | 3/17/2026 3:49 | | | | X | | | | | | | X | | | |
| 64 | 3791 | | Tom | Zimmerman | N/A | I would like to see this ship stay afloat. In my opinion its a tru | N/A | N/A | 3/17/2026 3:49 | | | | X | | | | | | | X | | | |
| 65 | 3792 | | Donovan | Murray | railhawk128@gmail.com | I feel that it would be a great tragedy to sink the SS United S | N/A | N/A | 3/17/2026 3:51 | | | | X | | | | | | | X | | | |
| 66 | 3793 | | Scott | Grant | rpdpiglet@hotmail.com | I feel that the sinking of the vessel is a poorly thought out en | N/A | N/A | 3/17/2026 3:51 | | | | X | | | | | | | X | | | |
| 67 | 3794 | | Tela | Shaffer | Telashaffer@gmail.com | Save her! She shouldnt be sunk for an artificial reef! Preserv | N/A | N/A | 3/17/2026 3:53 | | | | | | | | | | | X | | | |
| 68 | 3795 | | Thomas | Mixer | thomasmixer8@gmail.com | Please save the SS United States from being a reef. This is | +309 2521745 | N/A | 3/17/2026 3:53 | | | | | | | | | | | X | | | |
| 69 | 3796 | | Justin | Yselonia | JustinYselonia@yahoo.com | This is an issue near and dear to my heart.The SS United St | +1 (954)298-5805 | N/A | 3/17/2026 3:53 | | | X | X | X | | X | | | | X | | | |
| 70 | 3797 | | Douglas | Duke | dbduke@hotmail.com | I am a 1960 passenger aboard the SS United States and am | +1 (858)829-1616 | N/A | 3/17/2026 3:56 | | | X | X | | | | | | | X | | | |
| 71 | 3798 | | Staci | Jones | staci@camryman.org | It is an absolute travesty that the SS United States has been | +1 (803)507-4413 | N/A | 3/17/2026 4:01 | | | | X | | | | | | | X | | | |
| 72 | 3799 | | Andrew | hefner | ach.k9rescue@gmail.com | Dear Sirs, Upon reviewing the Okaloosa County reefing plan | +1 (919)904-9025 | N/A | 3/17/2026 4:02 | | | X | | X | | X | | | | X | | | |
| 73 | 3800 | | Nathan | Dodds | Deanjay879@gmail.com | The ship SS United States should not be reefed due to chem | N/A | N/A | 3/17/2026 4:03 | | | | X | X | | | | | | X | | | |
| 74 | 3801 | | Susanne | Spyros | N/A | This ship represents a UNIQUE piece of American history. F | N/A | N/A | 3/17/2026 4:06 | | | | X | | | X | | | | X | | | |
| 75 | 3802 | | Scott | Miller | smiller2850@hotmail.com | Public Comment SAJ-1996-03565 (Okaloosa County Artifici | N/A | N/A | 3/17/2026 4:06 | | | X | X | | | | | | | X | | | |
| 76 | 3803 | | Coltin | Riffle | Coltinr03@gmail.com | To the U.S. Army Corps of Engineers,I respectfully submit th | N/A | N/A | 3/17/2026 4:06 | | | | X | | | X | | | | X | | | |
| 77 | 3804 | | Hunter | Huff | hunterhuff02@gmail.com | The S.S. United States is the literal flagship of the nation. It s | N/A | N/A | 3/17/2026 4:09 | | | | X | | | | | | | X | | | |
| 78 | 3805 | | Gregory | Leo | leoenterprisesgregory@gmail.com | The proposed sinking of the SS United States represents the | +1 (973)865-5748 | N/A | 3/17/2026 4:09 | | | | X | | | | | | | X | | | |
| 79 | 3806 | **FB_IMG_1767798660612.jpg** | Harry | Latham | Harrylatham1612@gmail.com | My Summary Of Comments Is Basically Why I Would Want T | +121 07591922958 | N/A | 3/17/2026 4:11 | | | | X | | | | | | | X | | | |
| 80 | 3807 | | Evan | Wills | Evgfwa@gmail.com | Please save this historic ship. The ss United States is our co | +1 (425)387-1205 | N/A | 3/17/2026 4:11 | | | | X | | | | | | | X | | | |
| 81 | 3808 | | Leslie | Aubrey | vineyardalto@yahoo.com | The SS United States is a national treasure that deserves to | N/A | N/A | 3/17/2026 4:16 | | | | | | | | | | | X | | | |
| 82 | 3809 | | Thomas | Murphy | goobermurphy@yahoo.com | This ship should not be sunk. I agree with the Historic Prope | N/A | N/A | 3/17/2026 4:16 | | | | X | | | | | | | X | | | |
| 83 | 3810 | | conner | christensen | connerjamesch@aol.com | Im writing to officially oppose the plan to sink the SS United S | N/A | N/A | 3/17/2026 4:20 | | | | X | | | | | | | X | | | |
| 84 | 3811 | **LETTER TO SAVE SS UNITEI** | JERRY | BENZL | jfb@auroranovacorp.com | This comment opposes sinking the SS United States becaus | +1 (949)212-0999 | a Nova Corpo | 3/17/2026 4:28 | X | | | X | | | X | | | | X | | | |
| 85 | 3812 | | Liam | Falvey | N/A | Please save the ship as a monument to this country's greatn | N/A | N/A | 3/17/2026 4:31 | | | | | | | | | | | X | | | |
| 86 | 3813 | | Shane | Bruce | skyfather@gmail.com | This is the vessel of America, built and sailed from our shore | N/A | N/A | 3/17/2026 4:33 | | | | X | | | | | | | X | | | |
| 87 | 3814 | | Jordan | Berson | Collectionsmaterial@gmail.com | The SS United States is far too special to lose. It is one of ou | +1 (917)587-3437 | N/A | 3/17/2026 4:35 | | | | X | | | | | | | X | | | |
| 88 | 3815 | | Jeremy | Higgins | Jeremyhiggins23@gmail.com | The SS United States is a National and historical Landmark t | +1 (256)810-2989 | N/A | 3/17/2026 4:35 | X | | | X | | | X | | | | X | | | |
| 89 | 3816 | | Spencer | Hooker | N/A | This ship is a reminder of what the united state stands for ev | N/A | N/A | 3/17/2026 4:43 | | | | | | | | | | | X | | | |
| 90 | 3817 | | John | Moore | N/A | This ship has been through so much neglect, and she didnt d | N/A | N/A | 3/17/2026 4:45 | | | | | | | X | | | | X | | | |
| 91 | 3818 | | Justin | Byers | jbyers34@yahoo.com | To whom this may concern. I would like to see the vessel SS | +1 (641)229-0428 | N/A | 3/17/2026 4:45 | | | | X | X | | | | | | X | | | |
| 92 | 3819 | | Elizabeth | Spiegl | lizzvira2@hotmail.com | If the SS United States could be saved, that would be a fanta | +1 (347)371-0022 | N/A | 3/17/2026 4:47 | | | | | | | | | | | X | | | |
| 93 | 3820 | | Brenton | Nance | bjcomp2@bigpond.com | The SSUS should be protected and saved - not sunk for a re | +61 409342502 | N/A | 3/17/2026 4:47 | | | | X | | | | | | | X | | | |
| 94 | 3821 | | John | Petito | N/A | The SS United States needs to be saved and NOT made into | +1 (334)201-4440 | N/A | 3/17/2026 4:49 | | | | | | | | | | | X | | | |
| 95 | 3822 | | Bradley | Wood | tableman31108@gmail.com | The SS United States is a great ship of significance, holding | N/A | N/A | 3/17/2026 4:51 | | | | X | | | | | | | X | | | |
| 96 | 3823 | | Crystal | Crittle | arizona_loving.girl@yahoo.com | The SS United States should not be deployed as an artificial | N/A | N/A | 3/17/2026 4:54 | | | X | X | | | X | | | | X | | | |
| 97 | 3824 | | Phillip | Gallant | Pikachu48528702@aol.com | It would be a crime against history to sink the SS United Stat | N/A | N/A | 3/17/2026 5:01 | | | | X | | | | | | | X | | | |
| 98 | 3825 | | Walter | O'Hanlon | walteroh13@icloud.com | I disagree with the plan to turn the SS United States into a re | +1 (914)471-7655 | N/A | 3/17/2026 5:05 | | | | X | | | | | | | X | | | |
| 99 | 3826 | | Billy | Mikoliza | bjmikoliza@gmail.com | I speak only as an American citizen who knows nothing abou | +1 (573)587-2010 | N/A | 3/17/2026 5:05 | | | | X | | | | | | | X | | | |
| 100 | 3827 | | Jimmy | Patton | jbpatton_1@yahoo.com | It is a great tragedy, but the SS United States has gone to th | +1 (319)491-1436 | N/A | 3/17/2026 5:06 | | | | X | | | | | | | X | | | |
| 101 | 3828 | | Gary | Talent | gary@drinkingtea.net | This ship is historically significant in that it is:1. The last ocea | N/A | N/A | 3/17/2026 5:06 | | | | X | | | | | | | X | | | |
| 102 | 3829 | | Christopher | Skinner | N/A | The SS United States is a ship with significant historical valu | N/A | N/A | 3/17/2026 5:25 | | | | X | | | | | | | X | | | |
| 103 | 3830 | | Susan | Akins | susan.akins1@gmail.com | Stop the sinking of USS United States in the gulf near Pensa | +1 (334)425-5829 | N/A | 3/17/2026 5:26 | | | | X | | | X | | | | X | | | |
| 104 | 3831 | | Racheal | Jones | Racheal.fullerton@icloud.com | Please do not sink the SS United States into a reef. Now mo | +1 (972)757-3715 | N/A | 3/17/2026 5:32 | | | | X | | | | | | | X | | | |
| 105 | 3832 | | Shane | Ritter | sg6970@gmail.com | The SS United States ship should saved. It is a magnificent s | +1 (517)581-6389 | N/A | 3/17/2026 5:38 | | | | X | | | | | | | X | | | |
| 106 | 3833 | | Matt | Hultman | matthultman49@gmail.com | DO NOT SINK OUR FLAG SHIP! The SS United States is a g | +1 (708)990-1488 | N/A | 3/17/2026 5:38 | | | | X | | | | | | | X | | | |
| 107 | 3834 | | Brett | Pavlosky | Americanoutlawaz@gmail.com | Using the ship thats a national landmark as a reef is a traged | N/A | N/A | 3/17/2026 5:39 | | | X | X | | | | | | | X | | | |
| 108 | 3835 | | Jeff | Harris | N/A | It is a disgrace to sink a ship that bears our countrys name . | +1 (845)234-9335 | N/A | 3/17/2026 5:41 | | | | X | | | | | | | X | | | |
| 109 | 3836 | | Keith | Koenig | swimr8@hotmail.com | The SS United States deserves to be saved from being reefe | N/A | N/A | 3/17/2026 5:41 | | | X | X | | | | | | | X | | | |
| 110 | 3837 | | Michael T | Dunlap | Icemansta@gmail.com | Sinking of the United States should not happen. This ship ho | N/A | N/A | 3/17/2026 5:45 | | | | X | | | | | | | X | | | |
| 111 | 3838 | | kevin | giacobbe | kevin_giacobbe@yahoo.com | What are the actual environmental impacts of sinking a ship | +804 804 | N/A | 3/17/2026 5:50 | | | X | X | | | X | | | | X | | | |
| 112 | 3839 | | Chris | Rogers | chris@maxtremeinc.com | This is a historical ship that deserves to be saved, restored a | +1 (805)990-4062 | N/A | 3/17/2026 5:54 | | | | X | | | | | | | X | | | |
| 113 | 3840 | | Louise | Makey | N/A | Sinking the SS United Stayes is not only an environmental di | N/A | N/A | 3/17/2026 6:29 | | | X | X | | | | | | | X | | | |
| 114 | 3841 | | Adam | SkaloÅ¡ | skalosadamko@gmail.com | I strongly support preserving the SS United States as a histo | N/A | N/A | 3/17/2026 6:38 | | | | X | | | | | | | X | | | |
| 115 | 3842 | | Chris | Natchez | natchezchris51@gmail.com | This ship is very much a historic icon and should not be sunk | +1 (785)940-1582 | N/A | 3/17/2026 6:45 | | | X | X | | | | | | | X | | | |
| 116 | 3843 | | Grant | Burbach | N/A | My name is Grant and I am writing to you that you may take | N/A | N/A | 3/17/2026 6:45 | | | | X | | | | | | | X | | | |
| 117 | 3844 | | Daniel | Lambrecht | f3fan@aol.com | The USS United States should not be reefer. It is a historical | +518 5187925329 | N/A | 3/17/2026 6:49 | | | | X | | | | | | | X | | | |
| 118 | 3845 | | Sam | Lint | usersammy150@aol.com | I am unsure if I am doing this correctly, but I would like to say | N/A | N/A | 3/17/2026 6:56 | | | | X | | | | | | | X | | | |
| 119 | 3846 | | Kaleb | Schultz | schultzkaleb987@gmail.com | Please DON'T have this piece of history sunk!! She has hist | +1 (715)539-7461 | N/A | 3/17/2026 6:58 | | X | | X | | | | | | | X | | | |
| 120 | 3847 | **ForwebsiteSSUS_0.jpg** | Sean | Mead | smcmparadise@gmail.com | The S.S. United States is nothing short than an American Te | +1 (321)444-9522 | N/A | 3/17/2026 7:13 | | | X | X | | | | | | | X | | | |
| 121 | 3848 | | Lee | Cridland | lee_cridland@hotmail.co.uk | The integrity of the ship has been reported to be excellent, e | N/A | N/A | 3/17/2026 7:13 | X | | X | X | | | | | | | X | | | |
| 122 | 3849 | | John | Stumreiter | J.stumreiter@yahoo.com | Please reconsider sinking this historic vessel. This is a uniqu | N/A | N/A | 3/17/2026 7:15 | | | | X | | | | | | | X | | | |
| 123 | 3850 | | Chris | Stratas | Chrisstratas@gmail.com | Its a shame that the SS United States has not been given a c | +1 (702)283-4037 | N/A | 3/17/2026 7:22 | | | | | | | | | | | X | | | |
| 124 | 3851 | | Jaxon | Peterson | N/A | I do not think such a historic symbol of the country should be | N/A | N/A | 3/17/2026 7:23 | | | | X | | | X | | | | X | | | |
| 125 | 3852 | | Jeremy | Carr | animalwarlord77@gmail.com | I'm solely against the use of SS United States as an artificial | +716 7168212155 | N/A | 3/17/2026 7:34 | | | | X | | | | | | | X | | | |
| 126 | 3853 | | Alex | Schuchter | alex.schuchter1@gmail.com | I am writing in hopes that the SS United States can be allowe | +1 (859)479-7063 | N/A | 3/17/2026 8:22 | | | | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 127 | 3854 | | Michael | Abernethy | silverview360@gmail.com | Simply said, To sink the SS UNITED STATES ship and rot lik | +1 (630)542-3607 | N/A | 3/17/2026 8:26 | X | | | X | | | | | | | X | | | |
| 128 | 3855 | | Matej | Stanek | Yamatojapan500@gmail.com | I want the SS United States to become a museum and not in | +420 774910065 | N/A | 3/17/2026 8:39 | | | | X | | | | | | | X | | | |
| 129 | 3856 | | Tony | Bolte | tonybolte02@yahoo.com | You only get one shot at this. Its a ship filled with so much hi | N/A | N/A | 3/17/2026 8:42 | | | | X | | | | | | | X | | | |
| 130 | 3857 | | Nikolaus | Bautista | trainguru13@gmail.com | My name is Nikolaus Bautista, I am a writer and historian- wl | +1 (206)566-2794 | N/A | 3/17/2026 9:03 | | | X | X | | | X | | | | X | | | |
| 131 | 3858 | | Marek | Hathaway | marekhpunkt@gmail.com | To the U.S. Army Corps of Engineers,I am writing to strongly | N/A | N/A | 3/17/2026 9:09 | | | | X | | | | | | | X | | | |
| 132 | 3859 | | Jeff | Silber | silber-jeffrey@comcast.net | I believe this project will harm the environment of the Gulf of | +1 (802)353-6270 | N/A | 3/17/2026 9:21 | | | X | X | | | | | | | X | | | |
| 133 | 3860 | | Randy | Creed | moparcanndeere40@yahoo.com | I think its a waste of a very important part of our US history. | N/A | N/A | 3/17/2026 9:30 | | | | X | | | | | | | X | | | |
| 134 | 3861 | | Ty | Bowen | tybowen1029@gmail.com | This oceanliner is the last example of our greatest era when | N/A | N/A | 3/17/2026 9:52 | | | | X | | | | | | | X | | | |
| 135 | 3862 | | Herman | Naas | hermanjnaas@gmail.com | We request that the United States ship be restored to a natic | +1 (630)325-6430 | N/A | 3/17/2026 9:54 | | | | X | | | | | | | X | | | |
| 136 | 3863 | | James | Roe | jamesroe10@hotmail.co.uk | The sinking of SS United States would be a disgrace, especi | +44 7399424583 | N/A | 3/17/2026 9:56 | | | | | | | | | | | X | | | |
| 137 | 3864 | | Jon | Somerville | N/A | Its deeply concerning that we, as a country, would even cons | +1 (603)703-3596 | N/A | 3/17/2026 9:57 | | | X | X | X | | | | | | X | | | |
| 138 | 3865 | | Stephen | Curria | goldenwolf1979@gmail.com | The SS United States should not be sent to the bottom as a | N/A | N/A | 3/17/2026 10:03 | | | | X | | | | | | | X | | | |
| 139 | 3866 | | Christopher | Marshall | Christophermarshallv8@gmail.com | The planned sinking of the ss united states is detrimental to | N/A | N/A | 3/17/2026 10:07 | | | | X | | | | | | | X | | | |
| 140 | 3867 | | Richard | Rautio | mnaganter@gmail.com | I am writing to strongly support the preservation and restorat | +1 (904)955-1747 | N/A | 3/17/2026 10:18 | | | | X | | | | | | | X | | | |
| 141 | 3868 | | Douglas | Marley | Douglasjmarley@gmail.com | If possible the USS United States should be preserved as a | N/A | N/A | 3/17/2026 10:24 | | | | X | | | | | | | X | | | |
| 142 | 3869 | | Connie | Nieves | connienieves04@yahoo.com | The SS United States should be on the National Register of | N/A | N/A | 3/17/2026 10:33 | | | | X | | | | | | | X | | | |
| 143 | 3870 | | Riley | Cremean | riley.cremean@gmail.com | The SS United States being a mixture of steel and aluminum | N/A | N/A | 3/17/2026 10:34 | | | X | X | | | X | | | | X | | | |
| 144 | 3871 | | Julie | Krider | jbostel@gmail.com | Sinking ships is pollution of our environment plain and simple | N/A | N/A | 3/17/2026 10:44 | | | X | X | | | | | | | X | | | |
| 145 | 3872 | | Jim | Blackstone | Magictrixx@msn.com | Please save the ship from being sunk. Only remaining Ameri | N/A | N/A | 3/17/2026 10:48 | | | | X | | | | | | | X | | | |
| 146 | 3873 | | Finn | Hamilton | fhamilton@vt.ewsd.org | Dear USACE, my name is Finn Hamilton Im 15 years old and | +1 (802)777-9718 | N/A | 3/17/2026 11:02 | | | X | X | | | | | | | X | | | |
| 147 | 3874 | | Chance | Thill | cthill2011@yahoo.com | I would love to type out a million reasons to save this ship, b | N/A | N/A | 3/17/2026 11:04 | | | | X | | | | | | | X | | | |
| 148 | 3875 | | William | Shaw | bshaw6001@gmail.com | The preservation of this ship has been attempted and failed. | +1 (740)624-3149 | N/A | 3/17/2026 11:17 | | | | | | | | | | X | | | | |
| 149 | 3876 | | Charles | Ritchie | ceritchie1@aol.com | I do believe that in my experience working with one historic s | +1 (845)612-1950 | Fire Fighter I | 3/17/2026 11:25 | | | | X | X | | | | | | X | | | |
| 150 | 3877 | | Peyton | McBride | mcbridepeyton15@gmail.com | I would love to be able to visit this price of American history, | +1 (276)866-1350 | N/A | 3/17/2026 11:28 | | | | X | | | | | | | X | | | |
| 151 | 3878 | | Samantha | Johnston | samantha.johnston.28@hotmail.com | This ship is an iconic piece of engineering and history and sh | N/A | N/A | 3/17/2026 11:32 | | | | X | | | | | | | X | | | |
| 152 | 3879 | | Chris | Baker | Chrisbaker_7@hotmail.com | I believe it to be a huge waste of opportunity for the SS US n | +44 7713278266 | N/A | 3/17/2026 11:33 | | | X | X | X | | | | | | X | | | |
| 153 | 3880 | | Kimberly | Jones | KMJONES1970@aOL.COM | The SS United States is The name of our Nation period!She | N/A | N/A | 3/17/2026 11:43 | | | | X | | | | | | | X | | | |
| 154 | 3881 | | Thor | Thorson | N/A | This is truly a travesty to maritime history that the governmer | N/A | N/A | 3/17/2026 11:45 | | | | X | | | | | | | X | | | |
| 155 | 3882 | | Justin | Jurek | jtjurek@hotmail.com | The deployment of SS United States as an artificial reef cann | +1 (757)375-5240 | N/A | 3/17/2026 11:46 | | | X | X | X | | | | | | X | | | |
| 156 | 3883 | inbound41192954621481866 | Luke | Stitt | lstitt01@gmail.com | Hello, this is about the sinking of the SS. United States. I beli | +1 (717)956-8552 | N/A | 3/17/2026 11:51 | | | | X | | | | | | | X | | | |
| 157 | 3884 | | Charles | Adams | N/A | Save the ship! Place this on the historical register and find fu | N/A | N/A | 3/17/2026 11:55 | | | | X | | | | | | | X | | | |
| 158 | 3885 | | Richard | Bettencourt | N/A | Sinking this ship and the proposed plan will be a travesty to t | N/A | N/A | 3/17/2026 11:58 | | | X | X | X | | X | | | | X | | | |
| 159 | 3886 | | Steven | Lepore | stevenglepore@gmail.com | It would be foolish for an internationally renowned, historic o | N/A | N/A | 3/17/2026 11:59 | | | | X | | | | | | | X | | | |
| 160 | 3887 | | Andrew | Bigelow | novimousers@gmail.com | It would be a tragedy and a travesty for the S.S. United State | N/A | N/A | 3/17/2026 12:01 | | | | X | | | | | | | X | | | |
| 161 | 3888 | | Jake | Proctor | jakeproctor79@yahoo.com | Save the SS USA, she can be revived and live on for genera | N/A | N/A | 3/17/2026 12:03 | | | | X | | | | | | | X | | | |
| 162 | 3889 | | john | Lukac,Jr | J_Lukac@yahoo.com | This ship is a symbol of everything that is right with our coun | +1 (732)382-5690 | N/A | 3/17/2026 12:07 | | | | X | | | | | | | X | | | |
| 163 | 3890 | | PATRICIA | KERRIGAN | pat82348@aol.com | The S.S. United States, the Flagship of the United States, wa | +1 (978)365-9475 | N/A | 3/17/2026 12:12 | | | | X | | | | | | | X | | | |
| 164 | 3891 | | Stephen | Droppelman | stepdropp@aol.com | The SS United States should be considered a national landm | +1 (502)931-4151 | N/A | 3/17/2026 12:14 | | | X | X | | | | | | | X | | | |
| 165 | 3892 | | Jason | Kozlowski | casejck@gmail.com | Please do not issue permits to sink the ocean liner SS Unitec | N/A | N/A | 3/17/2026 12:15 | | | | X | | | | | | | X | | | |
| 166 | 3893 | | Ayden | Cairns | twrgaming26862@gmail.com | The SS united states (SSUS) for short was a cornerstone of | N/A | N/A | 3/17/2026 12:19 | | | X | X | | | | | | | X | | | |
| 167 | 3894 | | Amanda | Miller | Amiller2850@wi.rr.com | The SS United States is a historic property of exceptional na | N/A | N/A | 3/17/2026 12:21 | | | | X | | | | | | | X | | | |
| 168 | 3895 | | Steve | Gospodinoff | sgpowerequip@cytechusa.com | The USS US is an important piece of our past history. It shou | +1 (828)692-4246 | Power Equipr | 3/17/2026 12:24 | | | | X | | | | | X | | X | | | |
| 169 | 3896 | | Randall | Kress | rlkress@yahoo.com | Do not sink the SS United States! It is a piece of significant A | N/A | kay Resale Ir | 3/17/2026 12:37 | | | X | X | | | | X | | | X | | | |
| 170 | 3897 | | Alan | Berlin | alanberlin@autistici.org | The SS United States is a unique national treasure. As the fa | +1 (223)259-9186 | N/A | 3/17/2026 12:42 | | | | X | | | | | | | X | | | |
| 171 | 3898 | | Kathleen | Senese | ksenese@comcast.net | Please save this piece of America and engineering history! I | +1 (609)335-6781 | N/A | 3/17/2026 12:44 | | | | X | | | | | | | X | | | |
| 172 | 3899 | | Addison | Lim | addisonlim58@gmail.com | Save the SS United States, she is a historic piece of america | +63 9228604050 | N/A | 3/17/2026 12:47 | | | | X | | | | | | | X | | | |
| 173 | 3900 | | Josh | Maier | Jsh_maier@yahoo.com | SS United States needs to be preserved for future generatio | +1 (813)966-2854 | N/A | 3/17/2026 12:51 | | | | X | | | | | | | X | | | |
| 174 | 3901 | | Robert | Childs | N/A | I support in the initiative to stop the sinking of the SS UNITEI | N/A | N/A | 3/17/2026 12:52 | | | | X | | | | | | | X | | | |
| 175 | 3902 | | Cindy | Matthews | N/A | This ship should have been declared a national treasure on t | +1 (410)409-6254 | N/A | 3/17/2026 12:54 | | | | X | | | | | | | X | | | |
| 176 | 3903 | | Timothy M. | Norris | norrisaurus@hotmail.com | I live in Mystic CT, home to Mystic Seaport and its host of his | +1 (860)245-4983 | mothy M. Nor | 3/17/2026 12:56 | | | | X | | | | | | | X | | | |
| 177 | 3904 | | Simon | Hull | N/A | I would love to see this iconic vessel saved for future genera | +1 (785)713-9155 | N/A | 3/17/2026 12:59 | | | | X | | | | | | | X | | | |
| 178 | 3905 | | Danny | Bowes | itpbackup@hotmail.com | To Whom It May Concern:This is a piece I wrote on the incre | +1 (613)227-2986 | port Tractor Pa | 3/17/2026 13:04 | | | | X | | | | | | | X | | | |
| 179 | 3906 | | Timothy | Funderburk | N/A | The SS United States should not be sunk and made a reef. I | N/A | N/A | 3/17/2026 13:09 | X | | | X | | | | | | | X | | | |
| 180 | 3907 | | Judy | Neiswander | jneiswander@gmail.com | Please don't sink this ship! It deserves to be a National Histo | +1 (215)829-8987 | N/A | 3/17/2026 13:14 | | | | X | | | | | | | X | | | |
| 181 | 3909 | | Kelby | Bauder | N/A | The S.S. United States has significant historical value to our | N/A | N/A | 3/17/2026 13:23 | | | | X | | | | | | | X | | | |
| 182 | 3910 | | Todd | Hutt | Fierokids@yahoo.com | to make this ship accessable only to divers will limit most pec | +1 (315)262-8981 | N/A | 3/17/2026 13:24 | | | | X | | | X | | | | X | | | |
| 183 | 3912 | | Chris | Traves | christraves@yahoo.com | What a criminal shame it would be to sink this beautiful piece | N/A | N/A | 3/17/2026 13:27 | | | | X | | | | | | | X | | | |
| 184 | 3913 | | Craig | Shikles | Cshikles@windstream.net | Dear recipient, This beautiful ship is too historically sagnifica | N/A | N/A | 3/17/2026 13:32 | | | | X | | | | | | | X | | | |
| 185 | 3914 | | James | Williams | SUBMARINE633@YAHOO.COM | Ships such as the SS United States are part of our history ar | +1 (518)798-3923 | N/A | 3/17/2026 13:38 | | | | X | | | | | | | X | | | |
| 186 | 3915 | | Eric | Bennett | ericrb76@gmail.com | Don't destroy the SS United States! Restore and preserve A | +1 (484)437-0043 | N/A | 3/17/2026 13:48 | | | | X | | | | | | | X | | | |
| 187 | 3916 | | Levi | French | Levifrench431@gmail.com | I personally do not want to see such a historic ship sunk. I pe | +1 (304)786-7655 | N/A | 3/17/2026 13:48 | | | | X | | | | | | | X | | | |
| 188 | 3917 | | Jonathan | Lamb | Jmlamb80@yahoo.com | The proposal to intentionally sink the SS United States as an | N/A | N/A | 3/17/2026 13:49 | X | | X | X | | | | | | | X | | | |
| 189 | 3918 | | Jakob | Lawrence | N/A | I wish to see the vessel known as the S.S. UNITED STATES | N/A | N/A | 3/17/2026 13:50 | | | | X | | | | | | | X | | | |
| 190 | 3919 | | John | Howland | N/A | When I first heard that Okaloosa County in Florida wanted to | N/A | N/A | 3/17/2026 13:50 | | | X | X | | | | | | | X | | | |
| 191 | 3920 | | Danielle | Kent | dkent10024@yahoo.com | I think this ship should be saved and landmarked. | +1 (917)903-3632 | N/A | 3/17/2026 13:51 | | | | X | | | | | | | X | | | |
| 192 | 3921 | | Peter | van Daal | anchar661@yahoo.com | Please designate the ship as a historic landmark and preser | N/A | N/A | 3/17/2026 13:52 | | | | X | | | | | | | X | | | |
| 193 | 3922 | | Lane | Jarvis | Nightclaw47947@gmail.con | Please do not sink this valuable piece of United States histor | N/A | N/A | 3/17/2026 13:54 | | | | X | | | | | | | X | | | |
| 194 | 3923 | | Robert | Schell | bravehearted6@yahoo.com | This is a travesty . The ship was subsidized heavily by tax do | +1 (209)223-9200 | N/A | 3/17/2026 13:56 | | | X | X | | | | | | | X | | | |
| 195 | 3924 | | Jonathan | Richardson | jarichardson66@gmail.com | The SS UNITED STATES should NOT BE SUNK, She shoul | N/A | N/A | 3/17/2026 14:00 | | | | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 196 | 3925 | | Gary | Noyes | zenteknics@aol.com | The only difference between SS United States and other irre | +1 (281)480-9200 | N/A | 3/17/2026 14:06 | | | | X | | | | | | | X | | | |
| 197 | 3926 | | Roxanne | Manzone | Ocalaroxanne@gmail.com | I am writing in opposition to reefing the SS United States. Th | N/A | N/A | 3/17/2026 14:07 | | | | X | | | | | | | X | | | |
| 198 | 3927 | | Tamara | McFarlane | rebuildingkaty@icloud.com | The environment impact to the United States by the chemica | +1 (281)223-2023 | N/A | 3/17/2026 14:19 | | | X | | | | | | | | X | | | |
| 199 | 3928 | | Gary | Acker | awaken96@gmail.com | Please do not sink this ship! | +1 (978)967-7496 | N/A | 3/17/2026 14:21 | | | | | | | | | | | X | | | |
| 200 | 3929 | | Ben | Venable | Bengvenable@gmail.com | On the topic of the preservation of the SS United States, it is | +1 (360)865-6211 | N/A | 3/17/2026 14:21 | | | | X | | | | | | | X | | | |
| 201 | 3930 | | Gregory | Vassilakos | greg_christine@hotmail.com | Please approve the sinking of the SS United States to form a | +1 (757)813-7619 | N/A | 3/17/2026 14:25 | | | X | X | X | | X | | | X | | | | |
| 202 | 3931 | | Ed | Mctaggart | N/A | I dont think that the ship should be reefed, shes very historic | N/A | N/A | 3/17/2026 14:29 | | | | X | | | | | | | X | | | |
| 203 | 3932 | | Michael | Richman | M.Richman.media@gmail.com | It seems fitting that of all states, it is Florida that will sink the | N/A | N/A | 3/17/2026 14:30 | | | | | | | | | | | | X | | |
| 204 | 3933 | | Tim | O'Konski | tcokonski@gmail.com | This historic one of a kind ship that is the fastest of its class s | +1 (650)323-8353 | N/A | 3/17/2026 14:34 | | | | X | | | | | | | X | | | |
| 205 | 3934 | | Ethan | Taube | ethantaube@icloud.com | I am against sinking the SS United States. | +1 (302)841-0852 | N/A | 3/17/2026 14:39 | | | | | | | | | | | X | | | |
| 206 | 3935 | | Clifford | Scott | scottfab6@gmail.com | The SS UNITED STATES is a staple of our country exhibiting | +1 (360)761-9525 | N/A | 3/17/2026 14:41 | | X | | X | | | | | | | X | | | |
| 207 | 3936 | | Patrick | Weiss | 22racing.weiss@gmail.com | The SS United States is still a vessel of sound construction, | +1 (570)801-0315 | N/A | 3/17/2026 14:42 | X | | X | | X | | X | | | | X | | | |
| 208 | 3937 | | John | Garland | jfgarland@cox.net | I support the sinking of this ship as an reef | +1 (850)517-7060 | N/A | 3/17/2026 14:44 | | | | | | | | | | X | | | | |
| 209 | 3938 | | Klint | Bush | klintbush@hotmail.com | I object to the sinking of this ship. It has a rich history of Am | +1 (936)641-7104 | N/A | 3/17/2026 14:45 | | X | | X | | | | | | | X | | | |
| 210 | 3939 | | Linda | Greulich | N/A | I support SAVING the SS UNITED STATES....This is a cheris | N/A | N/A | 3/17/2026 14:49 | | | | | | | | | | | X | | | |
| 211 | 3940 | | Willie | Billingslea | wdbillingslea@earthlink.net | Transforming the SS United States into an artificial reef woul | N/A | N/A | 3/17/2026 14:53 | X | | | | X | | X | | | X | | | | |
| 212 | 3941 | | george | hussey | dr914@autoatlanta.com | I am totally against sinking an icon of the United States, and | +1 (404)308-5652 | N/A | 3/17/2026 15:02 | | | | X | | | | | | | X | | | |
| 213 | 3942 | | John | Harden | j.harden.dnp.crna@gmail.com | It is imperative that the SS United States be used as an artifi | +1 (850)450-3035 | N/A | 3/17/2026 15:13 | X | | | | X | | X | | | X | | | | |
| 214 | 3943 | | Wish | Stuckey | Wish6908@outlook.com | Please don't let them sink her. She is a piece of history. W | +1 (601)868-5165 | N/A | 3/17/2026 15:18 | | | | X | | | | | | | X | | | |
| 215 | 3944 | | Christine | Scarpa | cmscarpa@aol.com | It is 2026, the 250th anniversary of our founding. Surely, giv | N/A | N/A | 3/17/2026 15:27 | | | | X | | | | | X | | X | | | |
| 216 | 3945 | | Christopher | Simmons | Csimmons@heritage123.com | I am commenting to express my opinion that SS United State | +1 (215)421-9280 | N/A | 3/17/2026 15:28 | X | | | X | | | | | | | X | | | |
| 217 | 3946 | | Charles | Jackson | bubba1991@gmail.com | I am submitting this comment in opposition to the proposed a | +1 (254)800-8003 | N/A | 3/17/2026 15:32 | | | | X | | | | | | | X | | | |
| 218 | 3947 | | Andrew | Barclay | N/A | SAVE THE SS UNITED STATES. America's Flag shit | N/A | N/A | 3/17/2026 15:32 | | | | | | | | | | | X | | | |
| 219 | 3948 | | Mariah | Hunter | N/A | This shouldnt even be sunk its not gonna do nothing but rust | N/A | N/A | 3/17/2026 15:34 | | | | X | | | | | | | X | | | |
| 220 | 3949 | | louis | griffis 3 | N/A | I think that this is a bad idea due to the material that was use | N/A | N/A | 3/17/2026 15:38 | | | X | | X | | | | | | X | | | |
| 221 | 3951 | | Justin | Bogart | explorerj1916@gmail.com | I believe that the artificial reefing of the SS United States is a | N/A | N/A | 3/17/2026 15:49 | | | X | X | | | | | | | X | | | |
| 222 | 3952 | | Ellen | Weisbecker | Jul415@aol.com | This is a plea to save the SS United States and keep her afl | N/A | N/A | 3/17/2026 15:57 | | | | X | | | | | | | X | | | |
| 223 | 3953 | | Fred | Wagner | fred_46158@yahoo.com | This great piece of American history and engineering going t | +1 (317)847-8724 | N/A | 3/17/2026 15:59 | | | | X | | | | | | | X | | | |
| 224 | 3954 | | Colin | Mooney | Colinmooney69@gmail.com | This ship cannot be sunk, it would be an absolute disappoint | +419 45885 | N/A | 3/17/2026 16:04 | | | | X | | | | | | | X | | | |
| 225 | 3955 | S.S. United States.docx | Jeffrey | Hansen | N/A | Integrity | N/A | N/A | 3/17/2026 16:07 | | | | | | | | | | | | X | | |
| 226 | 3957 | | Zachery | Montgomery | lunamontgomery7@gmail.com | The SS United States should not be sunk because of her im | +1 (352)484-4511 | N/A | 3/17/2026 16:09 | | | | X | | | | | | | X | | | |
| 227 | 3958 | | PATRICK | MASON | sbfdchief91@yahoo.com | This ship is our Countries namesake with a great History. Th | +1 (484)330-0832 | N/A | 3/17/2026 16:09 | | | | X | | | | | | | X | | | |
| 228 | 3959 | | Shane | Gibson | Shane.gibbi@yahoo.com | I have vehemently and wholeheartedly stand against the sin | N/A | acred Defens | 3/17/2026 16:14 | | | | X | | | X | | | | X | | | |
| 229 | 3960 | | Isaak | Rubis | isaakr26@gmail.com | The sinking of the SS United States, while it would provide a | +1 (267)997-0155 | N/A | 3/17/2026 16:14 | | | X | X | X | X | | | | | X | | | |
| 230 | 3961 | | Michael | Smith | N/A | I believe that the SS United States (Big U) should be saved a | N/A | N/A | 3/17/2026 16:18 | | | | X | | | | | | | X | | | |
| 231 | 3962 | | Robert | Beckett | rb.sinzia@gmail.com | I am adamantly against the sinking of this specific historic sh | N/A | N/A | 3/17/2026 16:26 | | | | X | | | X | | | | X | | | |
| 232 | 3963 | | Angie | Thomas | ammanfredo@outlook.com | Im asking from the heart please dont let the SS United State | +1 (480)392-5201 | N/A | 3/17/2026 16:29 | | | | X | | | | | | | X | | | |
| 233 | 3964 | | Dan | Muldowney | muldodb@gmail.com | Sinking this ship is a travesty. Restoring her and preserving | N/A | N/A | 3/17/2026 16:29 | | | | X | | | | | | | X | | | |
| 234 | 3965 | | Jalin | Leatherman | Jalin.Leatherman@protonmail.com | Rather than allowing her to be scrapped or sunk as an artific | +1 (704)473-5108 | N/A | 3/17/2026 16:31 | | | | X | | | | | | | X | | | |
| 235 | 3966 | | Dan | Curley | dpcurley1988@gmail.com | I believe the reason to not make the United States a reef is t | N/A | N/A | 3/17/2026 16:33 | | | X | X | | | | | | | X | | | |
| 236 | 3967 | | Dillon | Vargas | Dillonv022@gmail.com | I do not support sinking the SS United States as an artificial r | +1 (908)461-3181 | N/A | 3/17/2026 16:40 | | | | X | | | X | | | | X | | | |
| 237 | 3968 | | Robert | Milewski | Rtmilewski@yahoo.com | Due to the history of this ship it should not be sunk. By sinkin | N/A | N/A | 3/17/2026 16:44 | | | | X | | | X | | | | X | | | |
| 238 | 3969 | | Jonathan | Whitley | jdw21357@gmail.com | I think we should turn the SS United States into a floating mu | +1 (901)228-2163 | N/A | 3/17/2026 16:45 | | | | X | | | | | | | X | | | |
| 239 | 3970 | | Joseph | Davis | josephdavis1488@gmail.com | Launched in 1952, the SS United States shattered transatlan | N/A | N/A | 3/17/2026 16:46 | X | | | X | | | | | | | X | | | |
| 240 | 3971 | | Greg | Wusaty | gpwusaty@gmail.com | Sinking the SS United States would deliver permanent cultur | +1 (403)870-9557 | N/A | 3/17/2026 16:48 | | | X | X | | | | | X | | X | | | |
| 241 | 3972 | | Don | R | N/A | Time to let the SS US go to her final resting place with dignit | N/A | N/A | 3/17/2026 16:50 | X | | | | | | | | | X | | | | |
| 242 | 3973 | | Chandler | Caudle | chandlercaudle@gmail.com | I feel like the ship should be preserved in a way anyone coul | +1 (919)618-9843 | N/A | 3/17/2026 16:57 | | | | X | | | | | | | X | | | |
| 243 | 3974 | | Bob | Camatta | Bob.e.picou@outlook.com | The SS United States is a major part of our countrys maritim | N/A | N/A | 3/17/2026 16:58 | | | | X | | | | | | | X | | | |
| 244 | 3975 | | Greg | Goodwin | greggto@bellsouth.net | This ship stands for everything that was good with the Unitec | +1 (954)495-7233 | N/A | 3/17/2026 16:58 | | | | | | | | | | | X | | | |
| 245 | 3976 | | David | Miller | rmiller880@comcast.net | The SS United States that must be saved so that people can | N/A | N/A | 3/17/2026 17:02 | | | | X | | | | | | | X | | | |
| 246 | 3977 | IMG_3102.jpeg | Shawn | Josey | Shawnjosey71@gmail.com | The ship should not go to the bottom of the gulf. Not only do | N/A | N/A | 3/17/2026 17:09 | | | X | X | | | | | | | X | | | |
| 247 | 3979 | | Peter | Wellington | N/A | To the U.S. Army Corps of Engineers,I respectfully submit th | N/A | N/A | 3/17/2026 17:13 | | | | X | | | | | | | X | | | |
| 248 | 3980 | | Jayden | Comer | rectorcomer42@gmail.com | The SS United States is a Historic Vessel the deserved to re | N/A | N/A | 3/17/2026 17:21 | | | | X | | | X | | | | X | | | |
| 249 | 3981 | | Michael | Hutchinson | mh2214980@gmail.com | Please save the SS United States! This ship is a huge part o | N/A | N/A | 3/17/2026 17:28 | | | | X | | | | | | | X | | | |
| 250 | 3983 | | Daniel | Pendleton | N/A | Think the ship deserves to be saved and restored and prese | N/A | N/A | 3/17/2026 17:43 | | | | | | | | | | | X | | | |
| 251 | 3984 | | John | Pagano | johnbpagano325@hotmail.com | I support this initiative to preserve a historically significant pie | +1 (917)626-8371 | N/A | 3/17/2026 17:45 | | | | X | | | | | | | X | | | |
| 252 | 3985 | | Debbie | Rogers | cpldrogers@aol.com | Please save this ship! Its already lost many significant items. | +1 (615)335-1557 | N/A | 3/17/2026 17:52 | | | | X | | | | | | | X | | | |
| 253 | 3986 | | Linda | Villarreal | lindaj1957@gmail.com | This ships pride has been stripped away, all people see is m | N/A | N/A | 3/17/2026 17:52 | | | X | | | | | | | | X | | | |
| 254 | 3988 | | Jacob | Leggiero | jacobleggiero03@aol.com | Subject: Public Comment on Permit Application SAJ-1996-03 | +1 (914)306-0556 | N/A | 3/17/2026 17:54 | | | | X | | | X | | | | X | | X | X |
| 255 | 3989 | | Kyle | Perkins | Kingcaptainkyle@gmail.com | The SS United States is the only American ocean liner left. V | N/A | N/A | 3/17/2026 17:58 | | | | X | | | | | | | X | | | |
| 256 | 3990 | | Styrk | Lunestad | N/A | SAVE SS UNITED STATE... IT is us history. | N/A | N/A | 3/17/2026 18:04 | | | | X | | | | | | | X | | | |
| 257 | 3991 | | Paris | Smith | thespacenerd252@gmail.com | Concerning the proposed sinking of the SS United States, I a | N/A | N/A | 3/17/2026 18:04 | | | X | X | | | X | | | | X | | | |
| 258 | 3992 | | Rose | Prince | roseheartsryan@gmail.com | I am in favor of the sinking and reefing of the SS United Stat | N/A | N/A | 3/17/2026 18:07 | | | | X | | | | | | X | | | | |
| 259 | 3993 | | Rick | Trout | rick_trout@comcast.net | Hello, thank you for your time in reading this. I am sure I don | N/A | N/A | 3/17/2026 18:08 | | | | X | | | | | | | X | | | |
| 260 | 3994 | | Chris | Walters | chriswalters668@gmail.com | The ship deserves to be saved. It has so much connection to | +1 (641)990-4250 | reRail Produc | 3/17/2026 18:10 | | | | X | | | | | | | X | | | |
| 261 | 3995 | | Tim | Burton | amxtim@juno.com | Please don't sink the SS United States. This ship is a symbo | +1 (303)505-5069 | N/A | 3/17/2026 18:18 | | | | X | | | | | | | X | | | |
| 262 | 3996 | | constance | franz | cfranz1040@aol.com | Per your own determination, "The Corps determined that the | +1 (520)546-0356 | N/A | 3/17/2026 18:18 | | | | X | | | | | | | X | | | |
| 263 | 3997 | | travis | null | tmnull@hotmail.com | The SS United States is a significant piece of American mari | +1 (352)390-0288 | N/A | 3/17/2026 18:20 | | | | X | | | | | | | X | | | |
| 264 | 3998 | | Isaac | Heitman | isaacheitman@gmail.com | My main concern is how many ocean liners do we have left a | N/A | N/A | 3/17/2026 18:28 | X | | | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 265 | 3999 | | Ivaylo | Mehandzhiev | imehandzhiev@gmail.com | I believe that the SS United States is far more than an aging | +689 017681677699 | N/A | 3/17/2026 18:31 | X | | | X | | | | | | | X | | | |
| 266 | 4000 | | Daniel | Shafer | N/A | I believe it is the ships purpose to stay afloat as an antique p | N/A | N/A | 3/17/2026 18:36 | | | X | X | | | | | | | X | | | |
| 267 | 4001 | | Ronald | Torres | Rctorres74@protonmail.ch | The SS United States is a historic ocean liner. This should be | +1 (801)792-6676 | N/A | 3/17/2026 18:37 | | | | X | | | | | | | X | | | |
| 268 | 4002 | | Karen | Oselka | Kcoselka@gmail.com | Please send this ship out of Florida so it can benefit business | +1 (269)470-7525 | N/A | 3/17/2026 18:40 | X | | | | | | | | | | X | | | |
| 269 | 4003 | | Traven | Bussell | N/A | The SS. United States is a tricky situation. On one side it wo | N/A | N/A | 3/17/2026 18:44 | | | | X | | | | | | X | | | | |
| 270 | 4004 | | Harriet | Harrington | babygirllibby1972@icloud.com | I believe the SS United States should be turned into a museu | N/A | N/A | 3/17/2026 18:45 | | | | X | | | | | | | X | | | |
| 271 | 4005 | | Josh | Bolinger | bolingerj78@gmail.com | Sink the thing put it out of it misery , it's a gutted stripped rus | +1 (765)513-7342 | N/A | 3/17/2026 18:46 | | | | X | | | | | | X | | | | |
| 272 | 4006 | | Judson | Reece | judson_reece@hotmail.com | I do not agree with the sinking of this ship in the area named | N/A | N/A | 3/17/2026 18:52 | | | X | X | X | | | | | | X | | | |
| 273 | 4007 | ForwebsiteSSUS_0.jpg | Sean | Mead | smcmparadise@gmail.com | The S.S. United States is nothing short than an American Te | +1 (321)444-9522 | N/A | 3/17/2026 18:58 | | | X | X | | | | | | | X | | | |
| 274 | 4008 | | Daniel | Harrington | shiner_89er@yahoo.com | It would be an insult to everything that ship stands for and ev | +1 (160)548-1119 | N/A | 3/17/2026 18:59 | | | | | | | | | | | X | | | |
| 275 | 4009 | | David | Carco | carcod@icloud.com | The ship will cause undue hardship to our beloved ocean er | +1 (978)846-6452 | N/A | 3/17/2026 19:00 | | | X | | X | | | | | | X | | | |
| 276 | 4010 | | Alexander | Collier | collieralexanderw@gmail.com | Save the SS United States. It is the last ocean liner of its kin | +1 (201)675-3689 | N/A | 3/17/2026 19:03 | | | | X | | | | | | | X | | | |
| 277 | 4011 | | Gayle | Tonkovich | gstonkovich@gmail.com | Since the S.S. United States has recently been determined t | +1 (219)659-1776 | N/A | 3/17/2026 19:03 | | | | X | | | | | | | X | | | |
| 278 | 4012 | | Logan | Kuhn | kuhn2500@outlook.com | Would like to see it become a museum ship like Queen Mary | N/A | N/A | 3/17/2026 19:04 | X | | | X | | | X | | | | X | | | |
| 279 | 4013 | | Taylor | Oselka | N/A | I firmly believe as an American citizen, such a historic nation | N/A | Oselka marina | 3/17/2026 19:05 | | | | X | | | | | | | X | | | |
| 280 | 4014 | | Cooper | Thompson | Cwthompson99@gmail.com | The SS United States is an important historical ship. We h | +1 (435)553-1275 | N/A | 3/17/2026 19:07 | | | | X | | | | | | | X | | | |
| 281 | 4015 | | Andrew | Sparks | cammoo1984rs@gmail.com | The SS United States should be saved as a national Registry | +1 (757)277-5201 | N/A | 3/17/2026 19:08 | | | | X | | | | | | | X | | | |
| 282 | 4016 | | James | Wilson | jmanstamp@gmail.com | The ship is one of the last surviving examples by naval archi | N/A | N/A | 3/17/2026 19:19 | | X | | X | | | | | | | X | | | |
| 283 | 4017 | | Michael | Frazier | michaelcfrazier90@gmail.com | I think that SS United States should be considered a historica | +1 (609)576-1982 | N/A | 3/17/2026 19:21 | | | | X | | | | | | | X | | | |
| 284 | 4018 | | Jack | Riegel | Clarion190@yahoo.com | I support saving the USS United States. It's legendary life de | +1 (253)880-9241 | N/A | 3/17/2026 19:22 | | | | X | | | | | | | X | | | |
| 285 | 4019 | | Mark | Bond | rmarkbond007@gmail.com | The SS United States one of a kind and the last of her kind. | +1 (812)664-6564 | N/A | 3/17/2026 19:24 | | | | | | | | | | | X | | | |
| 286 | 4020 | | Benjamin | Duffey | N/A | I believe the sinking of the historic ship United States is a tra | N/A | N/A | 3/17/2026 19:26 | | | | X | | | | | | | X | | | |
| 287 | 4021 | | Catherine | Eveleth | Catmando_Ent@msn.com | It would be an absolute shame to not turn her into a museum | N/A | N/A | 3/17/2026 19:36 | | | | X | | | | | | | X | | | |
| 288 | 4022 | | Stewart | Marshall | Stewartmarshall07@gmail.com | Hello. My name is Stewart. I am from Lompoc California, and | +1 (820)227-7518 | N/A | 3/17/2026 19:45 | | | | | | | | | | | X | | | |
| 289 | 4023 | | Richard | Estes | richestes@gmail.com | The SS United States should be preserved due to its Historic | N/A | N/A | 3/17/2026 19:46 | | | | | | | | | | | X | | | |
| 290 | 4024 | | Jacob | Neilsen | jacob.neilsen@maritime.edu | Due to cultural, historical, and maritime significance, it should | +1 (413)454-7617 | N/A | 3/17/2026 19:51 | | | | X | | | | | | | X | | | |
| 291 | 4025 | | Erica | Larson | N/A | Preserve history. | N/A | N/A | 3/17/2026 19:53 | | | | X | | | | | | | X | | | |
| 292 | 4026 | | Benjamin | Scovil | benscovil@gmail.com | Please do not sink this incredible piece of American history. | +1 (302)233-5332 | N/A | 3/17/2026 19:55 | | | | X | | | | | | | X | | | |
| 293 | 4027 | | Dirk | Van Rees | N/A | She is long gone, let her go and be a reef. | N/A | N/A | 3/17/2026 19:58 | | | | | | | | | | X | | | | |
| 294 | 4028 | | Brian | Guei | Brian.guei@yahoo.com | This ship should be preserved for posterity instead of being s | N/A | N/A | 3/17/2026 20:01 | | | | | | | | | | | X | | | |
| 295 | 4029 | | Justin | Forte | wolf251982@yahoo.com | The SS United States is a part of America's Golden Age and | N/A | N/A | 3/17/2026 20:02 | | | | X | | | | | | | X | | | |
| 296 | 4030 | | Thomas | Dineen | Tomdineen1@gmail.com | It would be a part of history and beneficial to keep this ship a | +518 5185659845 | N/A | 3/17/2026 20:02 | | | | X | | | | | | | X | | | |
| 297 | 4031 | | Braden | Sanderson | N/A | It would be cool to see the SS United States preserved, and | +1 (218)214-1124 | N/A | 3/17/2026 20:03 | | | | X | | | | | | X | | | | |
| 298 | 4032 | | Lloyd | M | N/A | The SS United States with its historical transatlantic crossing | N/A | N/A | 3/17/2026 20:06 | | | | X | | | | | | | X | | | |
| 299 | 4033 | | Thomas | Buckley | Twobuckexpress@aol.com | The SS UNITED STATES IS A Americsn treasure.There is n | +1 (210)380-5158 | N/A | 3/17/2026 20:06 | | | | X | | | | | | | X | | | |
| 300 | 4034 | | Mativa | Taoipu | Taytaoipu@gmail.com | This beautiful ship beats the namesake of our country. It still | N/A | N/A | 3/17/2026 20:08 | | | X | X | | | | | | | X | | | |
| 301 | 4035 | | Jaime | Alejandro | jack.7405.alejandro@gmail.com | The SS United States is absolutely a ship that deserves to be | N/A | N/A | 3/17/2026 20:10 | | | | X | | | | | | | X | | | |
| 302 | 4036 | | Reid | Klahold | 20rklahold@gmail.com | Hearing about the fate the lies before the SS United States is | +1 (717)654-7099 | N/A | 3/17/2026 20:11 | | | | X | | | X | | | | X | | | |
| 303 | 4037 | | Kevin | Brown | kbrown522@bellsouth.net | I think history should be saved! Please don't sink the ship no | N/A | N/A | 3/17/2026 20:20 | | | X | X | | | | X | | | X | | | |
| 304 | 4038 | | Hans | Rolla | hans.rolla@verizon.net | The SS United States should be retrieved, refurbished and d | +1 (617)653-5690 | N/A | 3/17/2026 20:22 | | | | X | | | | | | | X | | | |
| 305 | 4039 | | John-David | Shrewsbury | JDTSHREWSBURY@GMAIL.COM | This Ship Deserves To Be Kept As A National Icon Instead O | +1 (502)594-4441 | N/A | 3/17/2026 20:24 | | | | X | | | | | | | X | | | |
| 306 | 4040 | | James | Zabala | N/A | This ship deserves to be preserved and not sunk as an artific | N/A | N/A | 3/17/2026 20:26 | | | | X | | | | | | | X | | | |
| 307 | 4041 | | Cindy | Campbell | Lgdfan@gmail.com | I just can't seem to wrap around my head taking a piece of o | +1 (405)902-4002 | N/A | 3/17/2026 20:31 | | | | X | | | | X | | | X | | | |
| 308 | 4042 | | Cody | Cramer | N/A | Im not against the creation of the reef necessarily. I would w | N/A | N/A | 3/17/2026 20:33 | | | | X | | | | | | | X | X | | |
| 309 | 4043 | | Vikki | Seck | Dnvseck@yahoo.com | Please save her | N/A | N/A | 3/17/2026 20:33 | | | | | | | | | | | X | | | |
| 310 | 4044 | | John | Adams | johngrizzly24@gmail.com | The s.s united states sould be saved as a historical landmar | +1 (513)388-8357 | N/A | 3/17/2026 20:41 | | | X | X | | | X | | | | X | | | |
| 311 | 4045 | | Dominick | Catterson | djcatt12@gmail.com | I believe the SS United States should NOT be sunk as an ar | +1 (941)735-4543 | N/A | 3/17/2026 20:42 | | | | X | | | | | | | X | | | |
| 312 | 4046 | | George | Masciarelli | gmash@earthlink.net | Looking forward to bringing people from Panama City Beach | +1 (478)952-6325 | Dive Locker | 3/17/2026 20:49 | | | | | | | X | | | X | | | | |
| 313 | 4047 | | Dave | Seck | Dnvseck@yahoo.com | Please save the SS. United States. It's a shame to sink some | N/A | N/A | 3/17/2026 20:52 | | | | X | | | | | | | X | | | |
| 314 | 4048 | | Elye | Posada | elyepos@icloud.cpm | This is a ship that not only broke and held the blue ribbon for | N/A | N/A | 3/17/2026 20:59 | | | | X | | | | | | | X | | | |
| 315 | 4049 | | John | Forden | jforden321@gmail.com | How many artificial reefs does the Gulf of America (Mexico) | +1 (215)760-9590 | N/A | 3/17/2026 20:59 | | | | | | | | | | | X | | | |
| 316 | 4050 | | Brian | Holtin | N/A | The SS United States saga has already ended. Let it rest. | N/A | N/A | 3/17/2026 21:00 | | | | | | | | | | X | | | | |
| 317 | 4052 | | Roland | Jacobs | N/A | Lease do not allow the sinking of the SS United States witho | N/A | N/A | 3/17/2026 21:06 | | | | X | | | | | | | X | | | |
| 318 | 4053 | | Charles | Pfeiffer | cg@charles-pfeiffer.con | Okaloosa MUST NOT be slowed to Scuttle the SS UNITED S | +1 (805)618-8412 | N/A | 3/17/2026 21:12 | | | | X | | | | | | | X | | | |
| 319 | 4054 | | Bryan | Hadley | bryanrhadley@gmail.com | The SS United States is a national treasure. Why have we sa | +1 (941)915-3529 | N/A | 3/17/2026 21:14 | | | X | X | | | X | X | | | X | | | |
| 320 | 4055 | | Wade | Sisson | wadesisson@yahoo.com | I am writing to urge you to save the SS United States. Her m | +1 (816)835-5316 | Wade Sisson | 3/17/2026 21:15 | | | | X | | | | | | | X | | | |
| 321 | 4056 | | Monte | Kiefer | montekiefer@gmail.com | Why do we hold THE QUEEN MARY on a pedestal and opt t | N/A | N/A | 3/17/2026 21:16 | | | | | | | | | | | X | | | |
| 322 | 4057 | | Joe | Mehrlich | Mehrlichjoe@gmail.com | The SS United States serves as the flagship of our nation an | +1 (794)437-7764 | N/A | 3/17/2026 21:18 | | X | | X | | | | | | | X | | | |
| 323 | 4058 | | Thomas | Kaufmann | artisthistorian@gmail.com | Greetings and Best Regards; As a very concerned citizen o | +1 (334)430-3171 | N/A | 3/17/2026 21:18 | | | X | X | X | | X | | | | X | | | |
| 324 | 4059 | | C | Kwan | cynthiakwan@hotmail.com | Please find a wayvto make this ship vusutable by all people. | +1 (267)702-4312 | N/A | 3/17/2026 21:22 | | | | X | | | X | | | | X | | | |
| 325 | 4060 | | Kevin | McCulley | mcculleykp@gmail.com | This ship is a peak example of American engineering and ing | +1 (910)263-9311 | N/A | 3/17/2026 21:23 | | | | X | | | | | | | X | | | |
| 326 | 4062 | | Kyle | Linardo | N/A | I strongly urge you to oppose any approval of plans to reef th | N/A | N/A | 3/17/2026 21:38 | | | | X | | | | | | | X | | | |
| 327 | 4063 | | Samuel | Wilcox | samuel.wilcox@gmail.com | Please save this ship. Its a great testament to our old shipbu | +1 (817)917-7036 | N/A | 3/17/2026 21:39 | | | | X | | | | | | | X | | | |
| 328 | 4064 | | William | Nylen | billnylen@gmail.com | Destruction and sinking of SS United States would be a disgr | +1 (907)888-6688 | N/A | 3/17/2026 21:39 | | | | X | | | | | | | X | | | |
| 329 | 4065 | | June | Cutchins | jpcutchins@icloud.com | Most sincere thanks to the USACE for diligent research in re | +1 (334)220-3636 | N/A | 3/17/2026 21:41 | | | X | X | X | | X | X | | | X | | | |
| 330 | 4066 | | Alicia | Gavin | agavin2342@gmail.com | I respectfully urge the U.S. Army Corps of Engineers to reco | N/A | N/A | 3/17/2026 21:45 | | | | X | | | | | | | X | | | |
| 331 | 4067 | | Aaron | Wethington | N/A | The ss United States should be saved and made into a muse | N/A | N/A | 3/17/2026 21:48 | | | | X | | | | | | | X | | | |
| 332 | 4068 | | Alexander | Crate | alexander.vincent.crate@gmail.com | The SS United States, both in the red, white, and blue colors | +1 (903)905-1038 | N/A | 3/17/2026 21:58 | | | | X | | | | | | | X | | | |
| 333 | 4069 | | Elijah | Wheelus | Elijahwheelus@gmail.com | I believe the reefing of the SS United States would be a trage | N/A | N/A | 3/17/2026 21:58 | | | X | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 334 | 4070 | | Ryan | Davis | rydavis826@gmail.com | Please help us save the SS United States, it is Americas onl | +1 (631)559-5426 | N/A | 3/17/2026 22:00 | | | | X | | | | | | | X | | | |
| 335 | 4071 | | MacGyver | Nethercutt | N/A | The SS United States is an incredible piece of American hist | N/A | N/A | 3/17/2026 22:05 | | | | X | | | | | | | X | | | |
| 336 | 4072 | | Neil | Krout | kickinpony.66@gmail.com | I would like to see the SS United States saved as a National | +1 (816)226-2664 | N/A | 3/17/2026 22:11 | | | X | | | | | | | | X | | | |
| 337 | 4073 | | Norman | Nemec AIA | Normannemec2@gmail.com | US Army Corps must not allow the SS United States, US His | +1 (516)220-2784 | N/A | 3/17/2026 22:16 | | | | X | | | | | | | X | | | |
| 338 | 4074 | | John | Trapp | banditrapper@aol.com | I think this is a great idea to help with eco system . fish will d | +1 (352)789-9744 | N/A | 3/17/2026 22:18 | | | X | | X | | X | | | X | | | | |
| 339 | 4075 | | Joel | Lund | Sprockitz@msn.com | Please restore this historic vessel. | N/A | N/A | 3/17/2026 22:19 | | | | X | | | | | | | X | | | |
| 340 | 4076 | | Max | Lobster | maxkr1197@gmail.com | Hello,My name is Max and im a 28 year old man from the Ne | +31 630114326 | N/A | 3/17/2026 22:29 | | | | X | | | | | X | | X | | | |
| 341 | 4077 | **IMG_2399.jpeg**, IMG_2397.jpe | Morgan | Underwood | morganman08@icloud.com | The SS United States must be saved at ALL COSTS She is | +1 (318)820-1625 | N/A | 3/17/2026 22:29 | | | | X | | | | | | | X | | | |
| 342 | 4078 | | Chris | Gunshore | cgunshore@yahoo.com | There's not many examples of such a magnificent ship as th | +1 (570)606-8442 | N/A | 3/17/2026 22:30 | | | | X | | | | | | | X | | | |
| 343 | 4079 | | Danny | Rowsell | drowsell@shaw.ca | Sink the Ship. There is nothing original in the insides as ever | +1 (250)507-9728 | dr1953 | 3/17/2026 22:30 | | | | | | | | | | X | | | | |
| 344 | 4080 | | Joshua | Dea | N/A | The SS United States is the last remaining American ocean | N/A | N/A | 3/17/2026 22:40 | | | | X | | | | | | | X | | | |
| 345 | 4081 | | Garlon | Carter | t.carter76@yahoo.com | SS United States stiil holds significant physical integrity and | +1 (478)697-9574 | N/A | 3/17/2026 22:55 | | | | X | | | | | | | X | | | |
| 346 | 4082 | | John | Waller | John@mikeradford.org | Dont sink the ship. It needs to be preserved | +1 (803)546-1897 | N/A | 3/17/2026 22:57 | | | | X | | | | | | | X | | | |
| 347 | 4083 | | Josh | Dively | divelyjosh@gmail.com | What a waste of a historic ship. | +1 (304)238-6961 | N/A | 3/17/2026 23:02 | | | | X | | | | | | | X | | | |
| 348 | 4084 | | Micah | Tasker | micah@thevintagewatchman.com | Sinking the SS United States is a sin. This ship made history | N/A | N/A | 3/17/2026 23:02 | | | | X | | | | | | | X | | | |
| 349 | 4085 | | Ryan | Scott | N/A | This has gone on long enough. In the 57 years since the ship | N/A | N/A | 3/17/2026 23:10 | | | | | | | | | | X | | | | |
| 350 | 4086 | | Kelley | Montgomery | kelleydmontgomery@hotmail.com | I am astounded at the decision made to sink our nation's flag | +1 (724)266-3195 | N/A | 3/17/2026 23:11 | | | | X | | | | | | | X | | | |
| 351 | 4087 | **Dont-Sink-SS-United-States.j** | Eli | Wilks | eliwil@waiopehu.ac.nz | Why would you sink a piece of history like that? The ship cou | N/A | N/A | 3/17/2026 23:23 | | | | X | | | | | | | X | | | |
| 352 | 4088 | | Devin | Knoke | N/A | I believe we should save the ship as a museum. The SS Unit | N/A | N/A | 3/17/2026 23:26 | | | | X | | | | | | | X | | | |
| 353 | 4089 | | Miriam | Wolff | m_wolff_d22@yahoo.com | The SS United States is a historic ocean liner. Please do not | +1 (646)667-9027 | N/A | 3/17/2026 23:27 | | | | X | | | | | | | X | | | |
| 354 | 4090 | **DSC_0254.jpeg** | Joshua | Martinez | N/A | SS United States should be saved and preserved for future g | N/A | N/A | 3/17/2026 23:28 | | | | X | | | | | | | X | | | |
| 355 | 4091 | | Michael | Kovacs | michaelkovacs1361@gmail.com | The SS United States is a very important piece of transporta | N/A | N/A | 3/17/2026 23:34 | | | | X | | | | | | | X | | | |
| 356 | 4092 | | Brandon | Reed | BrandonReedAlt@gmail.com | I am here to pass along my comments regarding the proposa | +1 (734)752-0116 | N/A | 3/18/2026 0:07 | | X | X | X | X | | | X | | | X | | | |
| 357 | 4093 | | Daniel | Zandi | N/A | I think the ship should not be sunk, it was the fastest vessel | N/A | N/A | 3/18/2026 0:07 | | | | X | | | | | | | X | | | |
| 358 | 4094 | | Will | Werzen | Jwergz@gmail.com | SS United States should not be wasted by being turned into | +1 (973)818-2496 | N/A | 3/18/2026 0:15 | | | | X | X | | | | | | X | | | |
| 359 | 4095 | | Christian | Makropoulos | cmakropoulos611@gmail.com | As a historian it pains me to see and hear the history of the S | +1 (609)969-9499 | N/A | 3/18/2026 0:25 | | | X | X | | | X | | | | X | | | |
| 360 | 4096 | | Kevin | Henderson | N/A | The SS United States is a testament to the engineering abilit | N/A | N/A | 3/18/2026 0:26 | | | | X | | | | | | | X | | | |
| 361 | 4097 | | Austin | Smith | N/A | The SS United States should not be turned into a reef. As the | N/A | N/A | 3/18/2026 0:32 | | | | X | | | | | | | X | | | |
| 362 | 4098 | | Allen | Auchenbaugh | Allena3@verizon.net | The Ss United States was the flagship of our country, the fas | +1 (631)466-1790 | N/A | 3/18/2026 0:48 | | | | X | | | | | | | X | | | |
| 363 | 4099 | | Gino | Lanzi | gdlanzi@gmail.com | I feel that this vessel is of enough historical significance that | N/A | N/A | 3/18/2026 0:49 | | | | X | | | | | | | X | | | |
| 364 | 4100 | | Ian | McCulloch | N/A | To sink our nations flagship would be a disgrace to her name | N/A | N/A | 3/18/2026 0:56 | | | | X | | | | | | | X | | | |
| 365 | 4101 | | Anthony | Edwards | anthony.edwards9918@gmail.com | I am writing to formally object to the permit application for the | N/A | N/A | 3/18/2026 1:23 | | | X | X | X | | | X | | | X | | | |
| 366 | 4102 | | Nicole | Harris | Nicnic0201@gmail.com | I am writing to formally object to the permit application for the | N/A | N/A | 3/18/2026 1:29 | | | X | X | X | | | X | | | X | | | |
| 367 | 4103 | | Barbara | Major | bjmajor@mac.com | This ship, which was and remains the fastest, safest ship eve | N/A | N/A | 3/18/2026 1:30 | | | | X | | | | | | | X | | | |
| 368 | 4105 | | Tim | Francis | timothy.s.francis@gmail.com | This is a historical ship and every effort should be taken to p | +1 (503)709-7378 | N/A | 3/18/2026 1:40 | | | | X | | | | | | | X | | | |
| 369 | 4106 | | Hunter | Eldred | Heldred@gmail.com | This is one of the last ocean liners in existence and still holds | +1 (315)569-6365 | N/A | 3/18/2026 1:48 | | | | X | | | | | | | X | | | |
| 370 | 4108 | | Rj | Krauss | richardkraussrj@gmail.com | I hope ss United States is saved, she was and still is a very b | N/A | N/A | 3/18/2026 1:51 | | X | | X | | | | | | | X | | | |
| 371 | 4109 | | Austin | Black | Austinmblack15@gmail.com | The ss United States must be saved at all costs shes our na | N/A | N/A | 3/18/2026 2:00 | | | | X | | | | | | | X | | | |
| 372 | 4110 | | Andrew | Aalderks | Andrew.aalderks@gmail.com | Sinking the SS United States would not be an act of preserva | N/A | N/A | 3/18/2026 2:07 | | | | X | | | | | | | X | | | |
| 373 | 4111 | | Lisa | Berg | N/A | The history of the United States (the nation, not the ship) is b | N/A | N/A | 3/18/2026 2:15 | | X | | X | | | | | | | X | | | |
| 374 | 4112 | | Carter | Moen | N/A | Do to the increase in rate of lionfish, the wreak would just he | N/A | N/A | 3/18/2026 2:17 | | | X | | X | | | | | | X | | | |
| 375 | 4113 | | Sean | Jones | jonesfamily2204@gmail.com | Should people presurved as a part of history. | +1 (469)785-2854 | N/A | 3/18/2026 2:26 | | | | X | | | | | | | X | | | |
| 376 | 4114 | | Robert | McGuire | Rmcg8301@outlook.com | Hello, i wanted to make my voice heard about the fate of Uni | N/A | N/A | 3/18/2026 2:32 | | | X | X | X | | | X | | | X | | | |
| 377 | 4115 | | Michael | Govorchin | scenicruiser@yahoo.com | I am opposed to reefing the SS United States for both enviro | +1 (650)504-0931 | N/A | 3/18/2026 2:34 | | | X | X | X | | X | X | | | X | | | |
| 378 | 4116 | | William | Marques | wmarques40@hotmail.com | I support the proposed reefing of the SS United States, spea | N/A | N/A | 3/18/2026 2:42 | | | | | | | | | | X | | | | |
| 379 | 4117 | | Adam | McDonald | mcdonald53010@yahoo.com | Can't wait to dive the world's largest artificial reef!What a gre | +1 (920)204-4139 | N/A | 3/18/2026 2:44 | | | | | | | X | | | X | | | | |
| 380 | 4118 | | Chris | Thatcher | N/A | Ship should be preserved afloat as a historical landmark. It | N/A | N/A | 3/18/2026 2:47 | | | | X | | | | X | | | X | | | |
| 381 | 4119 | | Tom | Taubensee | ttaubensee@gmail.com | This ship is a national treasure and deserves a better fate th | N/A | N/A | 3/18/2026 2:47 | | | | X | | | | X | | | X | | | |
| 382 | 4120 | | Ronald | Carter | darthfury78@yahoo.com | The Big U is a victim of mismanagement by those who didn't | +1 (305)495-8598 | N/A | 3/18/2026 2:48 | | | | X | | | | | X | | | X | | |
| 383 | 4121 | | Jonathan | Da Silva | jdasilva@libertyellisfoundation.org | S.S. United States is one of only two Ellis Island era ships re | N/A | N/A | 3/18/2026 2:52 | | | | X | | | X | | | | X | | | |
| 384 | 4122 | | Ron | Steckly | N/A | Im very concerned about the sinking of this ship. It is an imp | +1 (646)797-7472 | N/A | 3/18/2026 3:06 | | | X | X | | | | | | | X | | | |
| 385 | 4123 | | Carver | Sanders | maverick.sanders.ms@gmail.com | This piece of American history should be preserved. Not sun | N/A | N/A | 3/18/2026 3:23 | | | | X | | | | | | | X | | | |
| 386 | 4124 | | Jaxson | Massimino | N/A | I oppose the proposed sinking of the SS United States. While | N/A | N/A | 3/18/2026 3:25 | | | | X | | | | | X | | X | | | |
| 387 | 4125 | | John | Longabaugh | cmtwoodcraft@comcast.net | Dear Army Corps of Engineers and all concerned, I have lor | +1 (408)836-2218 | Cmt Woodcra | 3/18/2026 3:30 | | | | x | | | | | | | X | | | |
| 388 | 4126 | | Jason | Dwyer | jasonvincentdwyer@gmail.com | Environmental concerns regarding sinking. Also, optics on si | +1 (719)660-6965 | N/A | 3/18/2026 3:48 | | | x | x | | | | | | | X | | | |
| 389 | 4127 | | John | Hill | j.patrick.hill.m@gmail.com | To the Army Corps of Engineers: I support restoring the SS U | +1 (442)455-8206 | N/A | 8-MAR-2026 03:53:57 | | | | XX | | | | | X | | X | | | |
| 390 | 4128 | | Peter | Marszalek | peternickima@gmail.com | The SS United States is an important part of American histor | +1 (339)223-6406 | N/A | 3/18/2026 3:55 | | | | X | | | | | | | X | | | |
| 391 | 4129 | | Miles | Linscott | miles@motormayhem.net | I am against the utilization of the SS United States for a subs | N/A | N/A | 3/18/2026 4:18 | | | | X | | | | | | | X | | | |
| 392 | 4130 | | Charles | Lang | charlessamuellang@gmail.com | I was on the crew of the YouTube show Aurora Restoration I | +1 (530)574-0261 | arles Lang Mu | 3/18/2026 5:09 | | | | | | | | | | | X | | | |
| 393 | 4131 | | Hector | Aponte III | hectoraponte3rd@mail.com | The S.S. United States is a unique piece of American maritin | N/A | N/A | 3/18/2026 5:15 | | | X | X | X | | | X | | | X | | | |
| 394 | 4132 | | Kaleena | Brigham | N/A | This is a beautiful peace of our history with incredible signific | N/A | N/A | 3/18/2026 5:26 | X | | | X | | | X | | | | X | | | |
| 395 | 4133 | | alessandro | disabatino | N/A | this ship is a historical vessel and is better left floating and pr | N/A | N/A | 3/18/2026 7:03 | | | | X | | | X | | | | X | | | |
| 396 | 4134 | | Brian | Abare | abqbears@aol.com | Please do not sink this ship. The environmental impact would | +1 (303)829-2658 | N/A | 3/18/2026 7:17 | | | X | X | | | | | | | X | | | |
| 397 | 4135 | | Andrew | Leverett | electric.kimchi@icloud.com | The ship should be preserved and not sunk as it plays a maj | N/A | N/A | 3/18/2026 7:59 | | | | X | | | | | | | X | | | |
| 398 | 4136 | | James | Davis | raffydavis@yahoo.co.uk | This vessel is highly historic and needs to be kept above wat | +44 440776115394 | N/A | 3/18/2026 9:27 | | | | X | | | | | | | X | | | |
| 399 | 4137 | | Daniel | Perez | keis_link@hotmail.com | Symbols are a powerful thing. Sinking a ship that represents | N/A | N/A | 3/18/2026 9:27 | | | | X | | | | | | | X | | | |
| 400 | 4138 | | Steve | Swierczek | nortcheez@msn.com | The SS United States should be preserved as part of our nat | +1 (484)612-3399 | N/A | 3/18/2026 9:42 | | | | X | | | | | | | X | | | |
| 401 | 4139 | | David | Rooney | rooney.dave@yahoo.co.uk | I am British living in the UK and realise I may not have much | N/A | N/A | 3/18/2026 10:32 | | | X | X | | | X | | | | X | | | |
| 402 | 4140 | | Jordan | Bevan | N/A | As an American citizen with a great admiration for the histori | N/A | N/A | 3/18/2026 10:38 | | | | X | | | | X | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 403 | 4141 | | Brandon | Ekleberry | N/A | This ship is legendary and still holds records to this day she | N/A | N/A | 3/18/2026 10:56 | | | | X | | | X | | | | X | | | |
| 404 | 4142 | | Timothy | McElroy | N/A | This ship should absolutely not be sunk. It is an irreplaceable | N/A | N/A | 3/18/2026 12:05 | | | | X | | | | | | | X | | | |
| 405 | 4143 | | Leslie | Knipe | arrowcatlk@aol.com | Hello, The SS United States should be kept as a historic plac | N/A | N/A | 3/18/2026 12:53 | | | | X | | | | | | | X | | | |
| 406 | 4144 | | Logan | Hughes | N/A | This ship is unique because it is one of a kind in the united s | N/A | N/A | 3/18/2026 12:59 | | | | X | | | | | | | X | | | |
| 407 | 4145 | | Timothy | Harper | N/A | They SS UNITED STATES should not be sunk because of th | N/A | N/A | 3/18/2026 13:00 | | | X | X | | | | | | | X | | | |
| 408 | 4146 | | Joy | McCartney | Joymccartney@marionnelson.com | The SS United States contains hazardous chromium-based | +1 (863)528-8507 | N/A | 3/18/2026 13:20 | | | X | X | | | | | | | X | | | |
| 409 | 4147 | | Paul | Chicky | paul.chicky@gmail.com | We are about to let a very important piece of American histor | N/A | N/A | 3/18/2026 13:43 | | | | X | | | | | | | X | | | |
| 410 | 4148 | | Blaine | Jackson | Titaniclover1920s@gmail.com | Why I think the SS United States should be saved and not su | +1 (816)491-6393 | N/A | 3/18/2026 14:15 | | | | X | | | | | | | X | | | |
| 411 | 4149 | | Spring | Bacon | baco.spring@gmail.com | We should restore our history into a muesum liek we have d | +1 (715)302-5696 | N/A | 3/18/2026 14:39 | | | | X | | | | | | | X | | | |
| 412 | 4150 | | Tait | Samons | N/A | Save the SS United States! Don't turn it into a reef! | +1 (780)862-5961 | N/A | 3/18/2026 15:07 | | | | | | | | | | | X | | | |
| 413 | 4151 | | Nathanael | Miller | sparks1524@gmail.com | This is ridiculous. The ship has been so stripped doen (de-p | +1 (301)648-7944 | N/A | 3/18/2026 15:20 | X | | | | X | | | | | X | | | | |
| 414 | 4152 | | Isaac | Eldridge | Isaaceldridge64@gmail.com | In my opinion I think that the SS United States should not be | N/A | N/A | 3/18/2026 15:24 | | | | X | | | | | | | X | | | |
| 415 | 4155 | **SS United States Support Le** | Scott | Brar | scottbrar@hotmail.com | A group of MN State Senators and myself have sent a letter | +1 (612)791-9041 | N/A | 3/18/2026 15:33 | | | | | | | | | | | X | | | |
| 416 | 4157 | | Gilma | Fields | mtnjen39@gmail.com | Thank you! I read your Public Notice as a lifeline to save our | +1 (757)477-1731 | ired Civil Serv | 3/18/2026 16:28 | | | | X | | | | | | | X | | | |
| 417 | 4158 | | Susan | Goldwater | Sjilly@aol.com | My parents and brother saiked from Germany to the USA on | +1 (847)812-3378 | N/A | 3/18/2026 16:51 | | | | X | | | | | | | X | | | |
| 418 | 4160 | | Alec | Becker | Alecrexbecker@gmail.com | I am writing to respectfully oppose the proposal to sink the S | N/A | N/A | 3/18/2026 17:11 | X | | X | X | | | | | | | X | | | |
| 419 | 4161 | | Dalton | Ogden | daltonogden2001@gmail.com | Our ship needs to be saved! It is an utter embarrassment tha | +1 (812)230-8147 | N/A | 3/18/2026 17:13 | | | | | | | | | | | X | | | |
| 420 | 4162 | | Greg | Ahrens | gregahrens@aol.com | I am concerned that SS UNITED STATES is a unique ship in | +1 (573)239-2010 | N/A | 3/18/2026 17:27 | | | X | X | | | | | | | X | | | |
| 421 | 4163 | | Denise | Spatola | Acesangel13@gmail.com | Please dont sink ship. Fastest ship to ever cross the Atlantic | +1 (856)332-1640 | N/A | 3/18/2026 17:28 | | | | X | | | | | | | X | | | |
| 422 | 4167 | | Andrew | Smith | andrews0513@icloud.com | Please stop the SS United States from being sunk! This ship | +1 (615)355-4467 | N/A | 3/18/2026 18:06 | | | | | | | X | | | | X | | | |
| 423 | 4169 | | Samuel | Lemke | N/A | When people think of the United States, New York City come | N/A | N/A | 3/18/2026 18:46 | | | | X | | | | | | | X | | | |
| 424 | 4170 | | Ross | Rader | rossraderwilliam@gmail.com | The SS United States should not be sent to the bottom. She, | N/A | N/A | 3/18/2026 19:13 | | | X | X | | | | | | | X | | | |
| 425 | 4176 | | Jared | Turner | jaredt1117@icloud.com | The SS United States should be a monument for all and not | N/A | N/A | 3/18/2026 21:05 | | | | X | | | | | | | X | | | |
| 426 | 4178 | | Brian | Kaufman | bjkpma@gmail.com | The SS United States has a rich and important history that s | +1 (207)462-6200 | N/A | 3/18/2026 21:15 | | | | X | | | | | | | X | | | |
| 427 | 4179 | | Michael | Bowers | mdavidbowers@gmail.com | Due to her historic nature, the SS United States should not b | +1 (770)696-7211 | N/A | 3/18/2026 21:50 | | | | X | | | | | | | X | | | |
| 428 | 4180 | | Brandon | Knapp | brandonjohnknapp@gmail.com | To whom this may concern at the US Army Corps of Enginee | +1 (480)553-1493 | N/A | 3/18/2026 21:57 | | X | | X | | | | | | | X | | | |
| 429 | 4181 | | Ethan | Tilton | ethan.productions@comcast.net | The SS United States doesn't deserve to be sunk in the Gulf | N/A | N/A | 3/18/2026 22:00 | | | X | X | X | | X | | | | X | | | |
| 430 | 4182 | | jay | Bolton | jaybolton@comcast.net | The SS United States is needed to help meet the needs ex | +1 (860)460-9209 | N/A | 3/18/2026 22:00 | | | | | | | | | | | X | | | |
| 431 | 4186 | **2099309f-eadf-41be-8d8c-feb** | Glenn | Waters | curtismathes95@gmail.com | The Humiliations of a National Treasure Ladies and gentlem | +1 (931)329-0602 | e Cutis Mathe | 3/19/2026 0:14 | | | | X | | | | | | | X | | | |
| 432 | 4187 | **3597cfa8-557f-4826-8203-4c4** | Edward | Waters | watersedward748@gmail.com | The SS United States, Lady of the Sea, Ocean Liner of Drea | +1 (931)329-0602 | , the Flag Shi | 3/19/2026 0:35 | | | | X | | | | | | | X | | | |
| 433 | 4188 | | david | urban | ssunitedstatesbigu1952@gmail.com | The SS United States, known as "America's Flagship," is wid | N/A | N/A | 3/19/2026 1:01 | | | X | X | X | | X | | | | X | | | |
| 434 | 4189 | | Marcus | Norman | racecarmarcus22@gmail.com | We cannot lose this ship ship is an icon for the USA. There h | +1 (814)969-3723 | N/A | 3/19/2026 1:12 | | | | X | X | | | | | | X | | | |
| 435 | 4190 | | Connor | Lamoureux | N/A | The SS United States needs to be preserved. The Governm | N/A | N/A | 3/19/2026 1:55 | | | | X | | | | | | | X | | | |
| 436 | 4191 | | Bruce | Brackley | BBrackley@Wyoming.com | I wholeheartedly support the preservation of the SS United S | +1 (307)413-8042 | N/A | 3/19/2026 5:44 | | | | X | | | | | | | X | | | |
| 437 | 4192 | | Amanda | Bessette | bessamanda99@gmail.com | The SS United States is an important piece of American & m | N/A | N/A | 3/19/2026 7:07 | | | | X | | | X | | | | X | | | |
| 438 | 4193 | | David | David | davidzadorozhnyi2@gmail.com | Save the SS United States | +380 0638121699 | N/A | 3/19/2026 9:57 | | | | | | | | | | | X | | | |
| 439 | 4194 | | Nancy | Rogers | rogers1920@comcast.net | Please do not destroy and sink this ship | +1 (815)508-1581 | N/A | 3/19/2026 12:20 | | | | | | | | | | | X | | | |
| 440 | 4195 | | Todd | Billett | N/A | This ship needs to be saved from sinking. It is one if the mos | N/A | N/A | 3/19/2026 12:21 | | | | X | | | | | | | X | | | |
| 441 | 4197 | | Philip | Koons, Jr. | N/A | Please do not sink the SS United States, a ship. | N/A | N/A | 3/19/2026 13:11 | | | | | | | | | | | X | | | |
| 442 | 4200 | | Bernard | Hyland | Bernie.hyland.o6@gmail.com | The SS United States should be a national historical landma | +1 (301)536-2348 | N/A | 3/19/2026 14:07 | | | X | X | | | | | | | X | | | |
| 443 | 4201 | | Anthony | Thursby | N/A | To sink the United States would be a slap in the face to our c | N/A | N/A | 3/19/2026 14:23 | | | | X | | | | | | | X | | | |
| 444 | 4205 | **Floating Palaces Colorful_SS** | Richard | Abramson | nhrr379@charter.net | Sinking the SS United States would be a national tragedy. In | N/A | N/A | 3/19/2026 15:17 | | | | X | | | | | | | X | | | |
| 445 | 4208 | | Clare | Rocheford | crocheford@aol.com | I am among many citizens concerned about plans to sink the | +1 (910)571-8989 | N/A | 3/19/2026 16:11 | X | | X | X | | | | X | X | | X | | | |
| 446 | 4209 | | Clare | Rocheford | crocheford@aol.com | I forgot to request that a public hearing be held regarding thi | +1 (910)571-8989 | N/A | 3/19/2026 16:16 | X | | X | X | | | | X | X | | X | | X | X |
| 447 | 4210 | | Margaret | Zirrolli | zirrollim@gmail.com | I am among many citizens concerned about plans to sink the | +1 (910)571-8485 | N/A | 3/19/2026 16:20 | | | | | | | | | | | X | | X | X |
| 448 | 4211 | | Timothy | Becker | beckert224@gmail.com | The SS United States is not just another aging vesselit is a li | +1 (865)393-2970 | N/A | 3/19/2026 16:50 | X | | | X | | | | | | | X | | | |
| 449 | 4212 | | Austin | Brod | brodaustin0@gmail.com | I believe that the SS United States should be saved as she is | N/A | N/A | 3/19/2026 17:11 | | | X | X | | | | X | | | X | | | |
| 450 | 4213 | | Josef | Szabo | stefaniesavannah@att.net | The SS United States is a true piece of American Maritime h | +1 (760)408-3396 | N/A | 3/19/2026 17:17 | | | | X | | | | | | | X | | | |
| 451 | 4216 | | William | Humphries | w.a.humphries@gmail.com | Our country is currently devoid of identity, of respect, of disci | N/A | N/A | 9-MAR-2026 18:01:15 | | | | | | | | | | | X | | | |
| 452 | 4217 | | Dominic | Felicioni | N/A | This ship should be saved (kept intact above water), if feasib | N/A | N/A | 3/19/2026 18:06 | | | | | | | | | | | X | | | |
| 453 | 4218 | | Nicholas | Buska | Nickwantschik@gmail.com | Truly this ship is an icon of what America was and is; in thes | N/A | N/A | 3/19/2026 18:09 | | | | X | | | | | | | X | | | |
| 454 | 4219 | | Alice | Ervin | ervina@u.arizona.edu | Disposition of the SS United States by sinking it in Fla. water | +1 (520)400-4186 | N/A | 3/19/2026 18:49 | | | X | X | | | | | | | X | | | |
| 455 | 4223 | | Lisa | Conner | maryconner153@comcast.net | I am writing with regards to the SS United States, and even t | +1 (856)693-9372 | N/A | 3/19/2026 19:33 | | | | X | | | | | | | X | | | |
| 456 | 4228 | | Patrick | Erwin | pkeii@aol.com | I am against the SS United States getting turned into an artif | +1 (908)809-9740 | N/A | 3/19/2026 23:56 | | | | X | | | | | | | X | | | |
| 457 | 4229 | **IMG_1317.jpeg** | Susan | Evatte | susan@evatte.com | I am but one of hundreds of thousands of voices all over the | +1 (904)514-8380 | N/A | 3/20/2026 0:03 | | | | X | | | | | | | X | | | |
| 458 | 4231 | | Mark | Curatolo | mark1960@att.net | I believe it would be a tragic to consign the S.S. United State | +1 (518)399-3553 | N/A | 3/20/2026 0:24 | | | | X | | | | | | | X | | | |
| 459 | 4234 | | Broderick | Voss | N/A | The ss united states deserves to be a historic vessel that is t | N/A | N/A | 3/20/2026 0:34 | | | | X | | | | | | | X | | | |
| 460 | 4236 | | david | plant | davidplant119@gmail.com | I believe the USS United States ship should not be sunk and | N/A | N/A | 3/20/2026 1:13 | | | | X | | | | | | | X | | | |
| 461 | 4238 | **IMG_5625.jpeg** | Elizabeth | Parrish | ElizabethParrish11@gmail.com | I feel strongly about the need to preserve the SS United Stat | N/A | N/A | 3/20/2026 1:18 | | | | X | | | | | | | X | | | |
| 462 | 4239 | | Gregg | Polley | g.polley@polleytech.com | Preserving the SS United States, the fastest ocean liner eve | +1 (812)521-3173 | N/A | 3/20/2026 1:58 | | | X | X | | | X | | | | X | | | |
| 463 | 4240 | | Mary | Portelli | portelli523@gmail.com | The S S United States was a symbol of our country for deca | N/A | N/A | 3/20/2026 2:08 | | | | X | | | | | | | X | | | |
| 464 | 4241 | | Gina | Dasilva | Gds6014@gail.com | Save as united states | N/A | N/A | 3/20/2026 2:19 | | | | | | | | | | | X | | | |
| 465 | 4242 | | Chase | Taylor | Chasejtaylor@outlook.com | The Ss United States should not be sunken because it is an | N/A | N/A | 3/20/2026 2:52 | | | | X | | | | | | | X | | | |
| 466 | 4243 | | Eli | Foreman | eforeman432@gmail.con | The SS United States is too important of a historical ship and | +1 (337)563-0047 | N/A | 3/20/2026 3:00 | | | | X | | | | | | | X | | | |
| 467 | 4245 | | Cliff | Saunders | N/A | The SS United States is an American icon that should not be | +1 (631)680-2290 | N/A | 3/20/2026 3:24 | | | | X | | | | | | | X | | | |
| 468 | 4246 | | Jenny | Fields | mtnjen39@gmail.com | Lyrics set to music about the ship. Title: "You Can't Sink Hist | +1 (757)477-1731 | ired Civil Serv | 3/20/2026 3:27 | | | | X | | | | | | | X | | | |
| 469 | 4248 | | Gilma | Fields | mtnjen39@gmail.com | I truly believe that if we, as Americans, allow Okaloosa Coun | +1 (757)477-1731 | ired Civil Serv | 3/20/2026 3:56 | | | | X | | | | | | | X | | | |
| 470 | 4249 | | Richard | Meeks | meeksrltacwa@msn.com | Creating an artificial reef of dubious use out of a historical sh | +1 (360)257-1547 | N/A | 3/20/2026 3:58 | | | | X | | | | | | | X | | | |
| 471 | 4250 | | Gilma | Fields | mtnjen39@gmail.com | You have thrown out a LIFELINE for all of us who love our S | +1 (757)477-1731 | ired Civil Serv | 3/20/2026 4:10 | | | | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 472 | 4251 | | Sam | Martin | N/A | The Steam Ship United States is one of the very very few oc | +1 (616)438-5484 | N/A | 3/20/2026 4:28 | | | | X | | | | | | | X | | | |
| 473 | 4252 | | Sebastian | Baertschiger | N/A | The SS United States bears the name of the great nation tha | +1 (775)848-4311 | N/A | 3/20/2026 5:02 | | | | X | | | | | | | X | | | |
| 474 | 4253 | | Jim | Oselka | N/A | Please do not sink the USS United States | N/A | N/A | 3/20/2026 10:50 | | | | | | | | | | | X | | | |
| 475 | 4254 | | Jonathan | Romero | bigredone45@hotmail.com | The SS United States is not only a worthwhile historic landm | +1 (205)454-9224 | N/A | 3/20/2026 12:22 | X | | | X | | | X | | | | X | | | |
| 476 | 4255 | | Jenny | Fields | mtnjen39@gmail.com | Today my comment is a question for which I have NO answe | +1 (757)477-1731 | ired Civil Serv | 3/20/2026 12:35 | | | | X | | | | | | | X | | | |
| 477 | 4256 | | Joseph | Zloch | josephzloch@gmail.com | SS United States is an icon of midcentury design. She is the | +1 (857)239-9243 | N/A | 3/20/2026 13:29 | | | | X | | | | | | | X | | | |
| 478 | 4257 | | James | Waldman | N/A | I believe that the ocean liner, S.S. United States should be s | N/A | N/A | 3/20/2026 14:21 | | | X | X | | | | | | | X | | | |
| 479 | 4258 | | Jordan | Hougland | legoboyjph@outlook.com | dont sink her bro | +1 (843)798-8011 | N/A | 3/20/2026 14:22 | | | | | | | | | | | X | | | |
| 480 | 4259 | | Jenny | Fields | mtnjen39@gmail.com | Opening the Army Corps of Engineers to receive comments | +1 (757)477-1731 | ired Civil Serv | 3/20/2026 14:48 | | | X | | | | | | | | X | | | |
| 481 | 4260 | | Hal | Bryan | hal_bryan@hotmail.com | Add my voice to the many who are asking all involved parties | +1 (425)466-9040 | N/A | 3/20/2026 15:56 | | | | X | | | | | | | X | | | |
| 482 | 4261 | | Noel P. | Pugh | jawhite2@optonline.net | It would be a shame to see a US icon from when United Stat | +1 (201)768-8570 | jh Interior Des | 3/20/2026 15:56 | | | X | X | | | | | | | X | | | |
| 483 | 4262 | | Quentin | Carpenter | N/A | The current plan for the SS United States is very upsetting. | N/A | N/A | 3/20/2026 16:37 | | | | X | | | | | | | X | | | |
| 484 | 4263 | | Tristan | Eissing | eissingtristan@gmail.com | Hello, I would like to state my personal opinion on the SS Un | +49 1627578933 | N/A | 3/20/2026 17:37 | | | | X | | | | | | | X | | | |
| 485 | 4264 | | Daniel | Elliot | N/A | The only thing I want to say is that make it like the queen ma | N/A | N/A | 3/20/2026 17:45 | | | | X | | | | | | | X | | | |
| 486 | 4266 | inbound12823308844328841 | Erik | James | ejames0070@gmail.com | What do all these pictures have in common?They were all cl | +1 (561)801-6917 | N/A | 3/20/2026 18:11 | | | | X | | | | | | | X | | | |
| 487 | 4267 | | Brandon | Carden | brandoncardenwv@gmail.com | The SS United States, which is still structurally sound, has a | +1 (304)419-0213 | N/A | 3/20/2026 18:24 | | | X | X | X | | | | | | X | | | |
| 488 | 4268 | | Matthew | Scanlan | N/A | The SS United States should be preserved in full, not sunk. I | N/A | N/A | 3/20/2026 18:28 | | | | X | | | | | | | X | | | |
| 489 | 4269 | | Brett | James | ssd8541@gmail.com | This ship is historically significant to the USA and its planned | +1 (859)396-0612 | N/A | 3/20/2026 18:45 | | | | X | | | | | | | X | | | |
| 490 | 4271 | | Adam | Emory | aemoryphd@gmail.com | I am here on behalf of myself and other ship enthusiastsI pe | +1 (252)515-4462 | N/A | 3/20/2026 18:57 | | | | | | | | | | | X | | | |
| 491 | 4272 | | Sam | Adams | N/A | The SS United States is a historical landmark and should no | N/A | N/A | 3/20/2026 19:15 | | | | X | | | | | | | X | | | |
| 492 | 4273 | | Brendan | Ryan | N/A | I feel that the dismantling and proposed sinking of the SS Ur | N/A | N/A | 3/20/2026 19:17 | | | | X | | | | | | | X | | | |
| 493 | 4274 | | Ron | Kerstens | r-kerstens@outlook.com | Please save her, she deserves it. Greetings from the Nether | N/A | N/A | 3/20/2026 19:30 | | | | | | | | | | | X | | | |
| 494 | 4276 | | Joseph | Silvers | j63436050@gmail.com | Please save the SS United States, I believe she can success | N/A | N/A | 3/20/2026 20:26 | | | | | | | | | | | X | | | |
| 495 | 4277 | | Philipp | Schmitt | N/A | I find the idea of an artificial reef unacceptable. The SS Unite | N/A | N/A | 3/20/2026 20:29 | | | | X | | | | | | | X | | | |
| 496 | 4278 | | Gabriel | Rhoades | gabrielrhoades5@gmail.com | The SS United States is part of American history and doesn't | N/A | N/A | 3/20/2026 21:21 | | | | X | | | | | | | X | | | |
| 497 | 4279 | | karen | Tilton | kstilton@comcast.net | Our family loves the Gulf of Mexico and have visited many tir | +1 (708)597-6066 | N/A | 3/20/2026 22:35 | | | X | | | | | | | | X | | | |
| 498 | 4280 | | Karen | Lawrence | larry-karen@zoominternet.net | I would like to voice my opinion against the sinking of the SS | +1 (330)519-3880 | N/A | 3/20/2026 23:13 | | | X | X | | | | | | | X | | | |
| 499 | 4281 | | Todd | Kurzbard | Titanic401@comcast.net | As a liner historian, I am well aware of the historical significa | +1 (561)625-6041 | N/A | 3/20/2026 23:51 | X | | | X | | | | | | | X | | | |
| 500 | 4282 | | Jonathan | Todd | N/A | I am requesting that the SS United States be saved from scu | N/A | N/A | 3/21/2026 0:07 | | | | X | | | | | | | X | | | |
| 501 | 4283 | my-grandparents-ss-united-s | Garrett | Hopkins | outatimegarret@gmail.com | The SS United States isnt just an old ship sitting at a dockits | +301 301800211 | N/A | 3/21/2026 0:12 | | | X | X | | | | | | | X | | | |
| 502 | 4284 | | Cooper | Dickson | N/A | Preserving the SS United States, the fastest ocean liner ever | N/A | N/A | 3/21/2026 0:20 | | | X | X | | | X | X | | | X | | | |
| 503 | 4285 | | Rodney | Huffaker | N/A | Save this historic ship | N/A | N/A | 3/21/2026 1:00 | | | | X | | | | | | | X | | | |
| 504 | 4286 | | Madeline | Youngberg | N/A | I'm hopeful this ship can be saved and restored | N/A | N/A | 3/21/2026 1:16 | | | | | | | | | | | X | | | |
| 505 | 4287 | | David | Ketchum | davidketchum74@yahoo.com | Please keep the ship afloat. It needs to be restored. | N/A | N/A | 3/21/2026 1:27 | | | | | | | | | | | X | | | |
| 506 | 4288 | | Charles | Tinc | N/A | I am against the sinking of the SS United States because if th | N/A | N/A | 3/21/2026 1:43 | | | | X | | | X | | | | X | | | |
| 507 | 4289 | | Dick | FRODERMAN | N/A | The SS United States is a piece of American history that mus | +1 (443)618-6427 | N/A | 3/21/2026 2:26 | | | | X | | | | | | | X | | | |
| 508 | 4290 | | Kemp | David | justmattsphone@gmail.com | I believe Thes S S United States is as valid a ship as any to | +1 (502)819-9970 | N/A | 3/21/2026 3:00 | | | | X | | | | | | | X | | | |
| 509 | 4291 | | Levi | Bishop | levibishop1701@gmail.com | As a proud service member, and American, this is my plea to | +1 (423)223-4992 | N/A | 3/21/2026 6:38 | | | | X | | | | | | | X | | | |
| 510 | 4292 | | Conor | Riordan | N/A | The SS United States should be preserved, America has alre | N/A | N/A | 3/21/2026 7:05 | | | | X | | | | | | | X | | | |
| 511 | 4293 | | Joshua | Pahoski | Joshuapahoski@gmail.com | The SS United States is an icon of the United States of Ame | +1 (570)536-2486 | N/A | 3/21/2026 7:27 | | | | X | | | | | | | X | | | |
| 512 | 4294 | | Kei woon | Krause | N/A | I believe the ship would be a better learning tool if kept afloa | +1 (224)261-4728 | N/A | 3/21/2026 8:14 | | | | X | | | | | | | X | | | |
| 513 | 4296 | | Adam | Mulholland | adammulholland420@icloud.com | I must strongly implore you to prevent Olooska county from e | N/A | N/A | 3/21/2026 13:06 | | | | X | | | | | | | X | | | |
| 514 | 4298 | | Aidan | Randall | morguemeat0@gmail.com | I dont see any reason on my end why she should not be sun | N/A | N/A | 3/21/2026 18:32 | | | | | | | | | | X | | | | |
| 515 | 4299 | | Aidan | Randall | morguemeat0@gmail.com | Ammendment that should say AL not AB | N/A | N/A | 3/21/2026 18:35 | | | | | | | | | | | | X | | |
| 516 | 4300 | | Christopher | Dewey | crdewey@gmail.com | I support the proposal to turn the SS United States into an ar | N/A | N/A | 3/21/2026 18:50 | | | | | | | X | | | X | | | | |
| 517 | 4301 | | Jamin | Miller | N/A | Due to the historic nature of this vessel and the dubious and | N/A | N/A | 3/21/2026 19:07 | | | | X | | | | | | | X | | | |
| 518 | 4303 | | Karen | McCormack | mrs_trumble@msn.com | Save the iconic ocean liner SS UNITED STATES from scuttli | N/A | N/A | 3/21/2026 21:42 | | | | X | | | X | | | | X | | | |
| 519 | 4304 | | Margaret | Corradino | Corrmarge@hotmail.com | Please save this historical ship | +1 (708)388-2629 | N/A | 3/22/2026 0:11 | | | | X | | | | | | | X | | | |
| 520 | 4305 | | Arthur | Corradino | Artcorradino@gmail.com | Please do not sink this ship | +1 (708)743-6448 | N/A | 3/22/2026 0:14 | | | | | | | | | | | X | | | |
| 521 | 4306 | | Adam | Hudson | Hudson.adam1701@gmail.com | I think this ship represents America at our best. This historic | +1 (919)798-5757 | N/A | 3/22/2026 0:26 | | | | X | | | X | | | | X | | | |
| 522 | 4307 | | Tracy | Hudson | Tracy.hudson@yahoo.com | I think this ship represents America at our best. This historic | +1 (919)986-5147 | N/A | 3/22/2026 0:28 | | | | X | | | X | | | | X | | | |
| 523 | 4308 | | Christopher | Lepore | chrisprr6100@aol.com | The SS United States is a national treasure it should be save | N/A | N/A | 3/22/2026 0:36 | | | | X | | | | | | | X | | | |
| 524 | 4309 | | Jerry | Bourget | jerrybourget@gmail.com | The SS United States, in my opinion, needs to be saved fron | N/A | N/A | 3/22/2026 1:10 | | | | X | | | | | | | X | | | |
| 525 | 4310 | | Andrew | Connell | andrewmconnell08@gmail.com | When asked about my thoughts on the future of the SS Unite | N/A | N/A | 3/22/2026 1:22 | | | | X | X | | | | | | X | | | |
| 526 | 4311 | | Mark | Kelley | auxarcexplorer@yahoo.com | Subj: Reefing of a United States historic maritime vessel, the | +1 (501)804-1018 | US Army | 3/22/2026 1:40 | | | | X | | | | | | | X | | | |
| 527 | 4312 | SSUS.jpg | Ian | Hopper | ianhoppertx@gmail.com | The United States has a real responsibility to hold onto its ov | +1 (940)255-6972 | N/A | 3/22/2026 3:16 | | | | X | | | | | | | X | | | |
| 528 | 4313 | | Gage | Bogenschuetz | N/A | I believe the ss United States should be saved for preservati | N/A | N/A | 3/22/2026 5:40 | | | | | | | | | | | X | | | |
| 529 | 4314 | 106 hearing.pages | Peter | Mitchell | petermitchell539@btinternet.com | I strongly believe the SS United States should not be sunk be | N/A | N/A | 3/22/2026 11:26 | X | | X | X | | | X | | | | X | | X | X |
| 530 | 4315 | | Lonnie | Coe | lonniecoe7782@gmail.com | Please send a request to congress to have government help | +1 (216)799-2533 | N/A | 3/22/2026 11:38 | | | | X | | | | | | | X | | | |
| 531 | 4321 | | Benjamin | Pollock Hay | bpollockhay@gmail.com | The SS United States is a marvel of Ocean Liner, and Ameri | +44 7710802649 | N/A | 3/22/2026 15:01 | | | X | X | | | X | | | | X | | | |
| 532 | 4325 | | Finn | Litwa | Finnlitwa@gmail.com | The SS United States is more than just a ship, she represent | +1 (610)800-5344 | N/A | 3/22/2026 17:42 | | X | | X | | | | | | | X | | | |
| 533 | 4326 | | William | Iwerks | Rkiwerks@gmail.com | save the ship! please! | +1 (828)305-4239 | N/A | 3/22/2026 17:48 | | | | | | | | | | | X | | | |
| 534 | 4327 | | Deakon | Longo | deakonlongo@gmail.com | The ship should be preserved because we do not want to de | N/A | N/A | 3/22/2026 18:15 | | | | X | | | X | | | | X | | | |
| 535 | 4328 | | Ryan | Dundas | N/A | I am submitting comments regarding the proposed artificial r | N/A | N/A | 3/22/2026 18:29 | | | | X | | | X | | | X | | | | |
| 536 | 4329 | David Di Gregorio SS United | David | Di Gregorio | ddigregorio@gmail.com | I respectfully oppose the proposed permit to reef the SS Unit | +1 (551)655-8661 | n to Save the | 3/22/2026 18:31 | | | | X | | | | | | | X | | | |
| 537 | 4333 | IMG_1050.webp | Asa | Dennis | Dennisasa4@gmail.com | The SS United States is an American Icon. The fastest ocea | N/A | N/A | 3/22/2026 21:31 | | | | X | | | | | | | X | | | |
| 538 | 4335 | | Aidan | Randall | morguemeat0@gmail.com | I also move that all reusable and historically significant items | N/A | N/A | 3/22/2026 21:45 | | | | | | | | | X | X | | | | |
| 539 | 4336 | | Josh | Calibey | N/A | I believe is is a bad idea to sink the ship. It has symbolic mea | N/A | N/A | 3/22/2026 21:52 | | | | X | | | | | | | X | | | |
| 540 | 4339 | | Ron | Fraser | ronfraser1974@gmail.com | Please save our ship- this is a national treasure that with the | N/A | N/A | 3/22/2026 23:28 | | | | X | | | | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 541 | 4341 | | Rich | Quinley | N/A | This ship served a significant purpose to the United States. T | N/A | N/A | 3/23/2026 0:16 | | | | X | | | | | | | X | | | |
| 542 | 4342 | | Arjan | de Carpentier | adecarpentier@vtxmail.ch | In my humble opinion it is a shame that the great United Stat | +41 794053870 | N/A | 3/23/2026 0:38 | | | | X | | | | | | | X | | | |
| 543 | 4343 | | Brady | Cloud | bradycloud05@gmail.com | The SS United States holds significant historic value, regardl | +1 (417)412-0506 | N/A | 3/23/2026 0:39 | | | | X | | | | | | | X | | | |
| 544 | 4344 | **Army Corps SS United States** | Benjamin | Kleschinsky | benjiwillisboston@aol.com | Hello Army Corps,I look at this issue before me and I think to | +978 3191234 | N/A | 3/23/2026 1:07 | | | X | X | | | | X | | | X | | | |
| 545 | 4345 | **Screenshot_20260322_21300** | Aidan | Randall | morguemeat0@gmail.com | I am released from unofficial co ownership and caretaking o | N/A | N/A | 3/23/2026 1:34 | | | | | | | | | | | | X | | |
| 546 | 4347 | | Chris | Maples | N/A | I believe that sinking this ship would cause adverse effects a | N/A | N/A | 3/23/2026 4:38 | | | | X | | | | | | | X | | | |
| 547 | 4348 | | Michael | Rambeau | ARCHERMIKE896@GMAIL.COM | OUR PARENTS TAX DOLLARS CONTRIBUTED TO ITS BU | +1 (626)960-6773 | N/A | 3/23/2026 6:31 | | | | | | | | | | | | X | | |
| 548 | 4349 | | Jim | Hatfield | jim@hatfieldsurveying.co.uk | The S S United States is the greatest express liner ever built | +44 07889289190 | C 96 Trust - (t | 3/23/2026 10:19 | | | | X | | | | | | | X | | | |
| 549 | 4350 | **SSUS Letters.pdf** | Johnathan | Radzewicz | captainjohnathanr@gmail.com | The SS United States is a irreplaceable piece of American n | +1 (407)461-0703 | N/A | 3/23/2026 10:35 | | | | X | | | | | | | X | | | |
| 550 | 4351 | | Jan | KÃ¤kenmeister | N/A | Even as a non-U.S. citizen, I want this milestone in American | N/A | N/A | 3/23/2026 10:51 | | | | X | | | | | | | X | | | |
| 551 | 4352 | | mike | minnick | N/A | Sink the damn thing already! | +1 (610)509-3806 | N/A | 3/23/2026 13:47 | | | | | | | | | | X | | | | |
| 552 | 4353 | | Elvy | Ridgeway | Crazyhorse.er@gmail.com | I am writing to request that you do not sink the ship. I love th | +1 (215)410-1863 | N/A | 3/23/2026 17:11 | | | | X | | | | | | | X | | | |
| 553 | 4355 | | EUGENE | Kain | eugene.kain@comcast.net | Please do not turn the ship into a reef it is a part of history it | +1 (912)622-3796 | N/A | 3/23/2026 17:58 | | | | X | | | | | | | X | | | |
| 554 | 4357 | | Jason | Holloway | | To whom it may concern,I call upon the U.S. Army Corps. of | N/A | N/A | 3/23/2026 19:24 | | | X | X | | | | | | | X | | | |
| 555 | 4362 | **Titanic vs United States - Tw** | Adrian | Saker | info@raisetitanic.org | Titanic vs United States - Two icons from different eras.Titan | N/A | MS Titanic Fo | 3/23/2026 20:35 | | | | X | | | | | | | | X | | |
| 556 | 4364 | | Tyler | Finocchio | Tfinocchio@ymail.com | The USS United States should be preserved for it historical s | +1 (423)384-5331 | N/A | 3/23/2026 20:55 | | | | X | | | | | | | X | | | |
| 557 | 4366 | | John | Ramsey | johnr09@gmail.com | Oceanliner's are undoubtably a part of the history of America | +1 (217)440-7329 | ohn M Ramse | 3/23/2026 21:09 | | | | X | | | | | | | X | | | |
| 558 | 4367 | **SS_United_States_980x612_** | James | Geraci | jamesgeraci281@gmail.com | I am a strong supporter of the preservation of the SS United | +1 (917)769-8098 | N/A | 3/23/2026 23:01 | | | | X | | | | | | | X | | | |
| 559 | 4368 | | Matthew | Barravini | matthewbarravini@gmail.com | Request that The SS United states should not become an ur | +1 (443)223-7301 | N/A | 3/23/2026 23:58 | | | X | X | | | | | | | X | | | |
| 560 | 4369 | | Peter | Tulay | pmtulay@gmail.com | The SS United States is a monument to U.S. engineering ex | N/A | N/A | 3/24/2026 0:56 | | | | X | | | | | | | X | | | |
| 561 | 4370 | | Zachary | O'Connell | N/A | Hello there, I am a young ship enthusiast who believes in the | N/A | N/A | 3/24/2026 1:43 | | | | X | | | | | | | X | | | |
| 562 | 4371 | | OG | 1 | johnnysloughter816@gmail.com | This is our flagship, we are in one of the greatest country's, v | +316 6012973544 | N/A | 3/24/2026 2:12 | | | | X | | | | | | | X | | | |
| 563 | 4374 | **Dr. Todd Osbourne.txt** | Deborah | Broyles | tworabbits@intrstar.net | I am from Charleston,SC. Charleston goes to extreme levels | +1 (919)810-9008 | N/A | 3/24/2026 5:05 | | | X | X | X | | X | | | | X | | | |
| 564 | 4375 | **SS_United_States_Formal_C** | Brian | Jenn | jbrian1@alaska.edu | DE Project Reflection/Context" Federal Administrative Par | +1 (907)201-2739 | N/A | 3/24/2026 5:05 | | | | X | | | X | | | | X | | | |
| 565 | 4376 | | Dallas | McKenzie | TheNugget1203@gmail.com | Destroying American history is nothing short of treason! Sink | N/A | N/A | 3/24/2026 5:16 | | | | X | | | | | | | X | | | |
| 566 | 4378 | **SS_United_States_Formal_C** | Brian | Jenn | jbrian1@alaska.edu | DE Project Reflection/Context" Federal Administrative Par | +1 (907)201-2739 | N/A | 3/24/2026 5:32 | | | X | X | | | | | | | X | | | |
| 567 | 4379 | **IMG_5734.jpeg,** IMG_5735.jpe | Jenny | Fields | mtnjen39@gmail.com | The attached pictures show her magnificent profile and the c | +1 (757)477-1731 | Retired | 3/24/2026 13:30 | | X | | X | | | | | | | X | | | |
| 568 | 4380 | SS_United_States_980x612_1 | Levi | Danielson | levidanielson69@gmail.com | As a proud American, I am deeply disappointed with what Ol | N/A | N/A | 3/24/2026 13:58 | | | | X | | | X | | | | X | | | |
| 569 | 4385 | | Matthew | Vincent | matthewvincent1689@yahoo.com | Please do not allow the sinking and us of the US United Stat | +1 (214)709-7388 | N/A | 3/24/2026 14:45 | | | | X | | | | | | | X | | | |
| 570 | 4390 | | Roberto | Marozza | marozza.roberto@gmail.com | Save the SS United States; it is a historical monument to Am | +39 3928828467 | Banca d'Italia | 3/24/2026 16:48 | | | | X | | | | | | | X | | | |
| 571 | 4392 | | Margaret | Vogt Pimm | 1mvpdvm@gmail.com | I would like the SS United States to be saved and preserved | +1 (330)636-1168 | N/A | 3/24/2026 18:22 | | | X | X | X | | | | | | X | | | |
| 572 | 4395 | | D | Hart | danielhartv1@gmail.com | I'm in support of saving the United States from being sank. T | N/A | N/A | 3/24/2026 21:17 | | | | X | | | X | | | | X | | | |
| 573 | 4396 | | Aidan | Randall | morguemeat0@gmail.com | Retract last two comments | N/A | N/A | 3/24/2026 22:15 | | | | | | | | | | | | X | | |
| 574 | 4399 | | Geraldine | McDaid | geraldinemcdaid@hotmail.co.uk | Greetings to the USACEI am writing to you from Scotland, ne | N/A | N/A | 3/25/2026 0:04 | | | | X | | | | | | | X | | | |
| 575 | 4400 | **Strong Opposition to the Pro** | Jane Ashley | Jordan | JORDANJA@HAWAII.EDU | Strong Opposition to the Proposed Sinking of the SS United | +1 (860)389-4501 | N/A | 3/25/2026 0:42 | | | | X | | | | | | | X | | | |
| 576 | 4403 | | Robert | Bray | N/A | The SS United States is a part of our nations history and sho | +1 (415)990-5984 | N/A | 3/25/2026 2:22 | | | | X | | | | | | | X | | | |
| 577 | 4404 | | Alexa | Martinez | lexmar0113@yahoo.com | To Whom It May Concern: I am a Florida resident that has b | N/A | N/A | 3/25/2026 3:16 | | | X | X | X | | | X | | | X | | | |
| 578 | 4405 | **In Defense of SSUS.pdf** | Blair | Hastedt | blairhastedt@icloud.com | The attachments provided are my sentiments on the fate of t | N/A | N/A | 3/25/2026 4:10 | | | | X | X | | | | | | X | | | |
| 579 | 4406 | | Olivier | Jordan | oli_jordan@yahoo.fr | SSUS is a significant piece of history, not only for United Sta | N/A | N/A | 3/25/2026 8:06 | | | | X | | | | | | | X | | | |
| 580 | 4407 | | Victoria | Kaminski | VictoriaK419@gmail.com | The preservation of the SS United States is not merely a ma | N/A | N/A | 3/25/2026 10:13 | | | | X | | | | | | | X | | | |
| 581 | 4409 | | Gregory | Leo, St | Ggleofamily@aol.com | The SS United States should be prevented from being disma | N/A | N/A | 3/25/2026 11:15 | | | | X | | | | | | | X | | | |
| 582 | 4411 | | Teodoro | Leo | TeodoroALeo@gmail.com | I respectfully urge the Army Corps to deny the application to | +1 (973)219-6327 | N/A | 3/25/2026 12:33 | | | | X | | | | | | | X | | | |
| 583 | 4412 | | Celia | Leo | sealeo911@gmail.com | DENY APPLICATION TO SINK the SS UNITED STATES. D | +1 (973)219-0229 | N/A | 3/25/2026 13:13 | | | | X | | | | | | | X | | | |
| 584 | 4413 | | Thomas | Jensen | Tjensen5878@yahoo.com | Sinking this ship would cause harm to the environment of the | N/A | N/A | 3/25/2026 13:59 | | | X | X | | | | | | | X | | | |
| 585 | 4414 | | Charles | Dragonette | cdragon@rcn.com | I respectfully submit these comments in response to USACE | +1 (571)329-9122 | N/A | 3/25/2026 14:18 | | | | X | X | X | | | X | X | | | | |
| 586 | 4417 | | Patrick | Hennessy | N/A | If we can afford to put money towards the queen Mary why c | N/A | N/A | 3/25/2026 15:46 | | | | X | | | | | | | X | | | |
| 587 | 4418 | | Matthew | Thurston | cherokee5412@gmail.com | SS United States is incredibly historically relevant and I woul | +1 (614)551-8073 | N/A | 3/25/2026 16:56 | | | | X | | | | | | | X | | | |
| 588 | 4421 | | William | McCormack | N/A | SS UNITED STATES should be preserved above water as a | N/A | N/A | 3/25/2026 18:42 | | | | X | | | | | | | X | | | |
| 589 | 4422 | | Zachary | Elder | N/A | Would like to see ship restored it would only be the second r | N/A | N/A | 3/25/2026 18:57 | | | | X | | | | | | | X | | | |
| 590 | 4423 | **SAJ-1996-03565 - Preservin** | Benjamin | Sarao | bmsarao@hotmail.com | Attached Submittal: Preserving Innovation - Why the SS Unit | +1 (425)736-2821 | neral public w | 3/25/2026 19:34 | | | X | X | | | | | X | | X | | | |
| 591 | 4424 | | Michael | Strasbaugh | MDStrasbaugh@hotmail.com | I am submitting the following comment regarding the USACE | +1 (470)678-5420 | N/A | 3/25/2026 21:33 | | | | X | X | X | | | X | X | | | | |
| 592 | 4425 | | Matt | Bailey | mattbailey59298@gmail.com | The SS United States deserves to be a museum. She's one | +1 (912)677-3558 | N/A | 3/25/2026 21:37 | | | | X | | | | | | | X | | | |
| 593 | 4427 | | Joseph | Parr | Joe.parr6@gmail.com | A culture preserves what it loves, that which its people can s | +1 (813)362-8127 | N/A | 3/25/2026 22:52 | | | | X | | | | | | | X | | | |
| 594 | 4428 | | Connor | Anderson | Connorwanderson2007@gmail.com | I think we should save the S.S. United States. No reef! | +1 (678)260-6150 | N/A | 3/25/2026 23:23 | | | | | | | | | | | X | | | |
| 595 | 4429 | | Erin | Barnes | erbarnes2018@gmail.com | I would prefer this ship be registered as a national historic ve | +1 (478)978-6176 | N/A | 3/26/2026 1:05 | | | | X | | | | | | | X | | | |
| 596 | 4430 | | Marc-Yves | Tumin | marcyvestumin@gmail.com | Why are we killing the goose that laid the golden eggs?Why | +1 (212)724-3594 | N/A | 3/26/2026 3:21 | | | | X | | | X | | | | X | | | |
| 597 | 4444 | | Suzanne | Hokanson | suzyhokanson@gmail.com | I am strongly opposed to the sinking of the SS United States | +1 (518)265-0514 | WHFiberWork | 3/26/2026 13:01 | | | X | X | XX | | | | | | X | | | |
| 598 | 4464 | | Bram | van der Starre | vdstarrebram@gmail.com | Dear U.S. Army Corps of Engineers,My name is Bram, I am | +31 684094568 | N/A | 3/26/2026 18:52 | | | | X | | | | | | | X | | | |
| 599 | 4467 | | Josephine | Lavorini | JLavorini01@gmail.com | The SS United States should be purchased by the US goveri | +1 (215)251-4195 | N/A | 3/26/2026 19:38 | | | X | X | X | | X | | | | X | | | |
| 600 | 4470 | **SSUS+Environmental+Reviev** | Maxim | Shumylo | maximashumylo@gmail.com | As a history teacher and enthusiast, I am writing to respectfu | +1 (732)956-1524 | N/A | 3/26/2026 20:20 | | | X | X | | | | | | | X | | | |
| 601 | 4474 | | Jack | Enriquez-Pullara | jackgavyn2425@gmail.com | SS United States is a one of a kind achievement and icon for | +1 (719)420-9261 | N/A | 3/26/2026 22:47 | | | | X | | | | | | | X | | | |
| 602 | 4476 | | Douglas | Wilhoit | busguy64@aol.com | Sink it! | N/A | N/A | 3/26/2026 23:09 | | | | | | | | | | X | | | | |
| 603 | 4478 | | Nicolas | Bariani | fwbrabox32@gmail.com | I am writing to formally express my strong support for the pre | N/A | N/A | 3/27/2026 0:24 | | | | X | | | | | | | X | | | |
| 604 | 4480 | | Serafina | Baroody | fina@westfamily.farm | As the last remaining American-built ocean liner, there is eve | N/A | N/A | 3/27/2026 1:33 | | | | X | | | | | | | X | | | |
| 605 | 4481 | | Samuel | Fleming | Epicstormchaser1941@gmail.com | The SS United States is a masterpiece of American Shipbuil | N/A | N/A | 3/27/2026 2:07 | | | | X | | | | | | | X | | | |
| 606 | 4483 | | Joe | Parr | Joe.parr6@gmail.com | S.S.United States has been a hidden landmark, poorly public | +1 (813)362-8127 | N/A | 3/27/2026 2:22 | | | | X | | | | | | | X | | | |
| 607 | 4484 | | Alex | Steenhoek | ast2226@dmcs.org | The SS United States is a very important part of our nation's | +1 (515)414-1019 | N/A | 3/27/2026 3:48 | X | | | X | | | X | | | | X | | | |
| 608 | 4485 | | Michael | Nowell II | N/A | The historic significance of the SS United States in itself sho | N/A | N/A | 3/27/2026 4:18 | | | | X | | | | | | | X | | | |
| 609 | 4488 | | John | Kellum | johnkellum505@gmail.com | The USS United States. A national heritage and stamp on th | N/A | N/A | 3/27/2026 10:20 | | | | X | | | X | | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 610 | 4498 | | Jon | Berkemeyer | N/A | To quote Allen Shepard.. Let's light this candle. Move forwar | N/A | N/A | 3/27/2026 16:18 | | | | | | | | | | X | | | | |
| 611 | 4499 | | Jon | Berkemeyer | N/A | Hi.. Jon here again. I'd like to correct my misspelling of Alan | N/A | N/A | 3/27/2026 16:22 | | | | | | | | | | X | | | | |
| 612 | 4500 | | Kaleb | Edmund | N/A | Please don't sink the ship! | N/A | N/A | 3/27/2026 17:18 | | | | | | | | | | | X | | | |
| 613 | 4503 | | Daniel | Smith | N/A | The SS United States is a monument to U.S. engineering ex | N/A | N/A | 3/27/2026 18:11 | | | | X | | | X | | | | X | | | |
| 614 | 4504 | | Louis | Schoppet | lou@magnuminc-gc.com | The SS United States is part of American History. She still h | +1 (215)738-0889 | Magnum Inc. | 3/27/2026 18:11 | | | | X | | | X | | | | X | | | |
| 615 | 4505 | | Daniel | Johnson | N/A | The SS United States is a monument to U.S. engineering ex | N/A | N/A | 3/27/2026 18:12 | | | | X | | | X | | | | X | | | |
| 616 | 4507 | Testimony to the USACE.pdf | Sunmer | Lukes | slukes1109@gmail.com | A summary is on why the SS United States shouldn't be sun | +224 12243393185 | N/A | 3/27/2026 19:17 | | | | X | | | | | | | X | | | |
| 617 | 4509 | | Jenny | Fields | mtnjen39@gmail.com | The SS United States is a historic property and that is not in | +1 (757)477-1731 | Retired | 3/27/2026 19:46 | | | | X | | | | | | | X | | | |
| 618 | 4511 | | Dominick | Bianchi | treybianchi@gmail.com | Before we were married, my wife and I would sit at ikea and | +1 (813)528-2670 | Trey | 3/27/2026 20:48 | | | | | | | X | | | | X | | | |
| 619 | 4513 | SS United States US Army C | Alec | Bogart | akbogart1@gmail.com | The SS United States is a National Historic Landmark and re | N/A | N/A | 3/27/2026 21:19 | | | | X | | | X | | | | X | | | |
| 620 | 4514 | | Jenny | Fields | mtnjen39@gmail.com | Thank you for offering this opportunity. Our ship deserves to | +1 (757)477-1731 | Retired | 3/27/2026 21:41 | | | | X | | | | | | | X | | | |
| 621 | 4515 | | Steve | Fargiano | sfargiano@yahoo.com | My concern is for the existing marine life once this vessel is | N/A | N/A | 3/27/2026 21:51 | | | X | | X | | | | | | X | | | |
| 622 | 4522 | SOS for SS United States_G. | Gillian | Carmoodie | gillian@vintagehighlandsmedia.com | I am a maritime writer from the UK who is deeply saddened | +44 07765022918 | Highlands Me | 3/27/2026 23:16 | | | | X | | | | | | | X | | | |
| 623 | 4523 | | Allan | Hruby | allan.hruby@yahoo.com | It is with great anguish, disgust and frustration that a symbol | +1 (507)995-9262 | N/A | 3/27/2026 23:40 | | | X | X | | | | | | | X | | | |
| 624 | 4525 | | William | McDaniel | N/A | Lets quit dragging our feet for this and stop delaying the inev | +1 (803)679-9014 | N/A | 3/27/2026 23:50 | | | | | | | | | | X | | | | |
| 625 | 4527 | IMG_0619.jpeg, IMG_0623.pn | Spencer | Chew | Sdc9668@yahoo.com | Hello USACE members. Allow me to introduce myself. My na | +1 (915)562-0246 | N/A | 3/28/2026 0:37 | X | | X | X | X | | X | X | | | X | | | |
| 626 | 4528 | | Adam | Hruby | adam.hruby@yahoo.com | The SS United States is a historic treasure that deserves to | N/A | N/A | 3/28/2026 0:46 | | | | | | | | | | | X | | | |
| 627 | 4529 | | Tammy | Sweet | tammy.sweet@yahoo.com | I am concerned and disappointed over the lack of due dilige | +1 (507)995-1091 | N/A | 3/28/2026 0:56 | | | X | X | | | | | | | X | | | |
| 628 | 4530 | FINAL SS United States Lette | J.W. | Glass | jwglass@biologicaldiversity.org | Please see the attached comments from the Center for Biolo | +1 (813)833-5301 | or Biological | 3/28/2026 1:22 | | | | | | | | | | | X | | | |
| 629 | 4532 | | Jon | Matthews | N/A | The use of the SS United States as an artificial reef is an abs | N/A | N/A | 3/28/2026 3:20 | | | | X | | | | | | | X | | | |
| 630 | 4533 | | Brandon | Chamberlain | N/A | Look, I am under no delusions. The SS United States needs | N/A | N/A | 3/28/2026 3:36 | | | | X | | | | | | | X | | | |
| 631 | 4534 | | Ryan | Kelly | RyanKelly179@aol.com | The S.S. United States needs to be preserved above water f | +1 (631)365-5947 | N/A | 3/28/2026 3:40 | | | | X | | | | | | | X | | | |
| 632 | 4535 | | Michael | Mead | mmead3@cfl.rr.com | Please save our history, she is the last of her kind. This is a | +1 (407)415-3215 | N/A | 3/28/2026 3:46 | | | X | X | | | | | | | X | | | |
| 633 | 4536 | | Gaye Lea | Chesser | gaye.chesser@gmail.com | Hello! I am writing to you concerning the S.S. United States, | +1 (407)415-8478 | N/A | 3/28/2026 3:49 | | | X | X | | | | | | | X | | | |
| 634 | 4537 | | Hunter | Krone | hmlrone@hotmail.com | Dear USACE representative, The SS United States is curren | +1 (608)957-3264 | N/A | 3/28/2026 3:51 | | | X | | X | | | | X | | X | | | |
| 635 | 4538 | | Peter | Mack | pmack62@verizon.net | The SS United States is deserving of a better fate than beco | N/A | N/A | 3/28/2026 3:57 | | | X | X | | | | | | | X | | | |
| 636 | 4539 | | Timothy Dean | Watson DDS | TimWatsonDDS@gmail.com | ****2026 March 27thTo the USACE:Thank you for the opport | +1 (317)454-6252 | tson Family T | 3/28/2026 3:59 | | | | X | | | | | | | X | | | |
| 637 | 4540 | | Armando | Cologna | amcnorthstar93@yahoo.com | I strongly believe that this ship deserves a second chance at | +1 (352)746-2345 | N/A | 3/28/2026 3:59 | | | | X | | | | | | | X | | | |
| 638 | 4541 | USACE_Comment.pdf | Caden | Kish | ckish2026@gmail.com | This comment is meant to address the importance of the ves | N/A | N/A | 3/28/2026 4:17 | | | | X | | | | | | | X | | | |
| 639 | 4542 | | Aiden | Vaughan | N/A | This ship should not be sinked due to toxic chemicals such a | +1 (715)851-7189 | N/A | 3/28/2026 4:18 | | | X | X | X | | | X | | | X | | | |
| 640 | 4543 | Petition SSUS April 2025.nun | Jason | Wade | Jasonwade1992@gmail.com | TO: U.S. Army Corps of Engineers, Regulatory DivisionRE: V | +1 (916)385-4748 | N/A | 3/28/2026 4:30 | | | X | X | X | | X | X | X | | X | | | |
| 641 | 4544 | | Michaela | Dehner | diggeroffossils@gmail.com | I'm a big fan of the SS United States, and I've seen this form | +1 (985)629-1409 | N/A | 3/28/2026 4:57 | | | X | | | | X | | | X | | | | |
| 642 | 4545 | SSUS Visit..webp, SSUS.web | Sean | Dale | seandale77@icloud.com | The S.S United States is a Historical American Oceanliner T | N/A | N/A | 3/28/2026 5:07 | | | | X | | | | | | | X | | | |
| 643 | 4546 | | Jonathan | Grow | jonny@rmfvw.com | My name is Jonathan Grow, and I have been fascinated by | N/A | RMF3, LLC | 3/28/2026 5:31 | | | X | X | X | | | X | | | X | | | |
| 644 | 4547 | | Nicholas | Butcher | N/A | The loss of the SS United States would be insurmountable s | N/A | N/A | 3/28/2026 5:48 | | | | X | | | | | | | X | | | |
| 645 | 4548 | SS United States.pdf | Victoria | Lindholm | victoria94.lindholm@gmail.com | The attachment is a detailed five-page PDF file (originally a | N/A | N/A | 3/28/2026 6:21 | | | X | X | X | | X | X | | | X | | | |
| 646 | 4549 | NicoleChase_Zinc Chromate | Nicole | Chase | nicolechase13@gmail.com | Hello,My name is Nicole Chase and I live in Jacksonville, Flo | +1 (419)346-6273 | N/A | 3/28/2026 9:28 | | | X | X | X | | X | X | | | X | | X | X |
| 647 | 4550 | | Simon | Conolly | simon@chappystails.com | Howdy folks from Australia. I just want to express my concer | N/A | N/A | 3/28/2026 10:19 | | | | X | | | X | | | | X | | | |
| 648 | 4552 | | Donald | Vivier | kitcarguy@gmail.com | The only thing to take into consideration is that since 1969 m | N/A | N/A | 3/28/2026 12:52 | X | | | X | | | | | X | X | | | | |
| 649 | 4554 | | JC | Henderson | jc.henderson2020@gmail.com | I think this vessel is worth saving. It's one of the last titans of | +1 (171)958-0859 | N/A | 3/28/2026 13:32 | | | | X | | | | | | | X | | | |
| 650 | 4559 | PXL_20240908_203935589.M | James | Doan | officerdoan@yahoo.com | To whom it may concern, I am deeply concerned and sadde | +1 (267)247-2997 | N/A | 3/28/2026 15:48 | | | | X | | | X | | | | X | | | |
| 651 | 4560 | | James | Kaplan | Jskaplanesq@gmail.com | I oppose the sinking of the SS United States as an artificial r | +1 (646)383-3688 | n to Save the | 3/28/2026 15:56 | | | | X | | | | | | | X | | | |
| 652 | 4563 | | Rebecca | Howland | rebecca.howland@gmail.com | Besides all the groundbreaking and historical reasons for pre | +1 (301)233-6330 | N/A | 3/28/2026 16:26 | X | | X | X | | | X | X | | | X | | | |
| 653 | 4564 | | Karen | Howland | N/A | It is tragic that on the eve of the United States' 250th an | N/A | N/A | 3/28/2026 16:40 | | | | X | X | | | | | | X | | | |
| 654 | 4565 | | Kevin | Hicks II | kdhicks1224@gmail.com | The historical significance of the steamship "United States" g | +1 (617)875-7192 | N/A | 3/28/2026 16:51 | | | | X | | | | | | | X | | | |
| 655 | 4566 | | Barbara | Young | barbaraty@gmail.com | The sinking and reefing of the SS United States must be sto | +1 (202)966-0028 | N/A | 3/28/2026 16:55 | | | X | X | X | | X | X | | | X | | | |
| 656 | 4567 | | Daniel | Berk | danielianberk@gmail.com | The proposed plan by Okaloosa County makes no sense. W | +1 (917)439-5772 | N/A | 3/28/2026 16:58 | | | | X | | | | | | | X | | | |
| 657 | 4570 | | Ren-Horng | Wang | renhorng.wang@gmail.com | Dear U.S. Army Corps of Engineers,I am writing as a concer | +1 (310)989-8389 | N/A | 3/28/2026 17:10 | | | X | X | | | | | X | | X | | X | X |
| 658 | 4573 | | Jake | Bible | jjacobo2002@gmail.com | The SS United States is more than just a ship; it is a symbol | +1 (507)995-7179 | N/A | 3/28/2026 17:34 | | | | X | | | | | | | X | | | |
| 659 | 4574 | | Marilyn | Sweet | marilyn.sweet@iclound.com | I am so concerned over the environmental risks that the sink | N/A | N/A | 3/28/2026 17:35 | | | X | | | | | | | | X | | | |
| 660 | 4576 | | Vito | Solo | pontiacsse@yahoo.com | To whom it may concern,I just wanted to make a comment a | +1 (352)249-6117 | N/A | 3/28/2026 17:51 | | X | | X | | | | | | | X | | | |
| 661 | 4580 | | Steve | Perry | solaSSteve@yahoo.com | The SS United States is more than just a ship; she is an icon | N/A | N/A | 3/28/2026 20:24 | | | X | X | X | | X | X | | | X | | | |
| 662 | 4581 | | DAVID | MAIER | DMPRDCTNS@AOL.COM | The S.S. United States, Americas Flagship, represents amor | +1 (818)284-1745 | *Craft Divers | 3/28/2026 20:48 | | | | X | | | | | | | X | | | |
| 663 | 4583 | UAAFinal Draft For Save the | Brian | Jenn | jbrian1@alaska.edu | I have also included a PDF file of this text and will also send | +1 (907)201-2739 | Student and | 3/28/2026 21:37 | | | X | X | | | | X | | | X | | | |
| 664 | 4584 | | Neil | Foster | planeguyb1b@gmail.com | Why are they being allowed to scuttle a HISTORIC VESSEL | +1 (425)518-2669 | N/A | 3/28/2026 22:02 | | | | X | | | | | | | X | | | |
| 665 | 4586 | | Kate | Finnegan | kate.finnegan@btinternet.com | My name is Kate Finnegan and I live in Southampton, Hamp | N/A | N/A | 3/28/2026 22:35 | | | | X | | | | | | | X | | | |
| 666 | 4587 | | Michael | Corley | myoldflame@comcast.net | I am in full support of this project. | +1 (941)278-9219 | N/A | 3/28/2026 22:44 | | | | | | | | | | X | | | | |
| 667 | 4589 | | Anthony | Perna | EMAIL2285@GMAIL.COM | I am writing to express my strong support for the preservatio | +1 (201)406-9787 | N/A | 3/28/2026 22:57 | | | X | X | | | | | | | X | | | |
| 668 | 4590 | | Kelly | Davis | N/A | The SS United States should really say it all. I really cannot | +1 (507)327-2712 | N/A | 3/28/2026 23:19 | | | X | X | | | X | X | | | X | | | |
| 669 | 4591 | | Nancy | Perry | nperry1@sbcglobal.net | I have been aware of the SS United States since I was a kid. | +1 (818)426-3191 | N/A | 3/28/2026 23:20 | | | X | X | X | | X | | | | X | | | |
| 670 | 4592 | | Linda | Ezekiel | Hrubeze@hotmail.com | Please stop polluting our oceans. We've have done enough | +1 (210)273-1121 | N/A | 3/28/2026 23:35 | | | X | | | | | | | | X | | | |
| 671 | 4593 | | Thomas | Howell | thomas.howell.98@gmail.com | Please do not create an artificial reef or sink this ocean liner | N/A | keasy Barbe | 3/28/2026 23:38 | | | | | | | X | | | | X | | | |
| 672 | 4595 | | Joseph | LeBlanc | treyleblanc@hotmail.com | Using USS UNITED STATES as an artificial reef is a bad ide | +1 (251)490-5512 | Gulf Maritime | 3/28/2026 23:52 | | | X | X | | | X | | | | X | | | |
| 673 | 4597 | | Ronnie | Abbazio | N/A | Save the ship! | N/A | N/A | 3/29/2026 1:04 | | | | | | | | | | | X | | | |
| 674 | 4598 | | Jess | Dettling | dettling.jessica@gmail.com | Please protect our ocean life from carcinogens, do not sink t | +1 (507)323-1600 | N/A | 3/29/2026 1:07 | | | | X | X | | | | | | X | | | |
| 675 | 4599 | | Sophia | Arias | sophiaarias98@duck.com | I dont agreee with this motion as it will cause significant pollu | N/A | N/A | 3/29/2026 1:18 | | | | | | | | X | | | X | | | |
| 676 | 4600 | | Allan | Jordan | Aejordan@aol.com | Needs more review to deal with potential pollution to marine | N/A | N/A | 3/29/2026 1:27 | | | X | X | | | | X | | | X | | | |
| 677 | 4601 | | Jon | K. | Jpatrick@att.net | SS United States is more than just a ship; she is amazing ex | N/A | N/A | 3/29/2026 1:30 | | | | X | | | | | | | X | | | |
| 678 | 4602 | | Edward | Nelson | cbsed@sbcglobal.net | I first saw the SS United States in Philadelphia while coverin | N/A | N/A | 3/29/2026 1:30 | | | X | X | X | | X | X | | | X | | | |

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 679 | 4603 | | Ryan | Miller | Ryan2850@outlook.com | The S.S. United States, currently moored in Mobile, AL, is be | +1 (262)672-0889 | N/A | 3/29/2026 1:49 | X | | X | X | X | | X | X | | | X | | | |
| 680 | 4604 | | Paul | STIPKOVICH | N/A | The SS UNITED STATES was and is a national/international | N/A | N/A | 3/29/2026 2:01 | | | | X | | | | | | | X | | | |
| 681 | 4605 | | Andrew | Beppler | gandyalf@yahoo.com | The SS United States is a historically and artistically significa | +1 (330)495-3531 | N/A | 3/29/2026 2:21 | | | | X | | | | | | | X | | | |
| 682 | 4606 | | Katrina | Culler | kculler98@gmail.com | I believe that it is against the best interest of all parties involv | +1 (612)759-3016 | N/A | 3/29/2026 2:27 | | | X | X | | | | | | | X | | | |
| 683 | 4607 | | Tyler | Hruby | tyler.j.hruby@gmail.com | The SS United States is the last ship of its kind and stands a | +1 (507)995-7207 | N/A | 3/29/2026 2:37 | | | X | X | X | | | | | | X | | | |
| 684 | 4608 | | Theo | Mandopoulos | tkmando@hotmail.com | "The SS United States is more than just a ship; she is an ico | +1 (347)323-1079 | ındopoulos Co | 3/29/2026 2:39 | | | X | X | X | | X | X | | | X | | | |
| 685 | 4610 | | Steve | Perry | solaSSteve@yahoo.com | I am a 1985 graduate of the U.S. Merchant Marine Academy | +1 (917)364-1703 | n & Engineeri | 3/29/2026 2:54 | | | | | | | | | | | X | | | |
| 686 | 4611 | | DAVID | DOOLEY | regal4280@gmail.com | Please find the following comments as a request to preserve | +1 (513)583-8225 | N/A | 3/29/2026 3:17 | | | | X | | | | | | | X | | | |
| 687 | 4612 | | Steve | Perry | solaSSteve@yahoo.com | "The SS United States is more than just a ship; she is an ico | +1 (917)364-1703 | n & Engineeri | 3/29/2026 3:21 | | | X | X | X | | X | X | | | X | | | |
| 688 | 4613 | | Cory | Evan | N/A | The SS United States should be preserved because it is a or | N/A | N/A | 3/29/2026 3:23 | | | | X | | | X | | | | X | | | |
| 689 | 4614 | | Cory | T | N/A | Preserving the SS United States also offers meaningful econ | N/A | N/A | 3/29/2026 3:27 | X | | | X | | | X | | | | X | | | |
| 690 | 4615 | | Nicole | O'Donnell | nicoleodonnell@gmail.com | This is an important part of our history and some h ing that w | +1 (215)272-5229 | N/A | 3/29/2026 3:49 | | | | X | | | | | | | X | | | |
| 691 | 4616 | | Al | Stewart | super_geep@hotmail.com | Hello, My name is Al Stewart. I've been following the SS Uni | N/A | N/A | 3/29/2026 3:54 | | | | X | | | X | | | | X | | | |
| 692 | 4617 | | Justin | Hruby | justin.a.hruby@gmail.com | Hello, I'm the Chief Sustainability Officer for the SS United St | +1 (507)995-2697 | 'es Preservati | 3/29/2026 3:58 | | | X | X | X | | X | X | | | X | | X | x |
| 693 | 4618 | **USACE Public Notice SAJ 19** | Carlos | Camacho Jr | cco@ssuspreservationfoundation.com | The Foundation submits this formal comment for the adminis | +1 (732)664-5119 | sion by Carlo | 3/29/2026 3:59 | | | X | X | X | | | | X | | X | | | |
| 694 | 4619 | | Susan | Sturch | susansturch907@gmail.com | Dear US Army Corps of Engineers/Holly Millsap: Please gra | N/A | N/A | 3/29/2026 4:07 | | | | X | | | | | | | X | | X | X |
| 695 | 4620 | | Louis | Lafferty | loufferty@gmail.com | I grew up in Philadelphia, with the SS United States in the ba | +1 (610)639-7964 | N/A | 3/29/2026 4:51 | | X | | | | | | | | | X | | | |
| 696 | 4621 | **On My 40th Birthday A Refle** | Carlos | Camacho Jr | Carloscamachojr42@gmail.com | To the U.S. Army Corps of Engineers, Jacksonville District,M | +1 (732)664-5119 | N/A | 3/29/2026 5:34 | | | | X | | | | | | | X | | | |
| | | | | | | | | | | | | | | | | | | | | | | | |
| | Email | | Carlos | Camacho Jr | CCO@ssuspreservationfoundation.com | See admin record | 732-664-5119 | SSUSPF | numerous 8/3/2025- | X | X | X | X | X | X | X | X | X | | X | | | |
| | Email | | Gary | Quigg | gfquigg@gmail.com | See admin record | | SSUSPF | numerous | | X | X | X | X | | | | | | X | | | |
| | Email | | Matt | JL | mjlesiw@gmail.com | See admin record | | NYCCSSSUS | numerous | | X | | X | | | | | | | X | | | |
| | Email | | Rhonda | Sincavage | Rsincavage@savingplaces.org | See admin record | | NTHP | numerous | | X | | X | | | | | | | X | | | |
| | Email | | Betsy | Merritt (Counsel) | emerritt@savingplaces.org | See admin record | | NTHP | numerous | | X | X | X | X | | X | | | | X | | | |
| | Email | | Andrea | Ferster | andreaferster@gmail.com | See admin record | (202)669-6311 | SSUSPF | 6/15/2026 | | X | X | X | X | | X | | X | | X | | | |
| | Email | | Edward | Farley | e.farley@yahoo.com | See admin record | Rye, NH | | numerous 3/14/2025, December 30, 2025 – April 17, | | | | X | | | | | | | X | | | |
| | Email | | Alan | Looper | alanlooper@yahoo.com | See admin record | 1 Gold St Unit 12-C, Ha | 860-836-6718 | numerous 8/21/2025 - 4/7/2026 | | | X | X | X | X | X | | X | | X | | X | X |
| | Email | | Unknown | | ctc.legomasterbuilder@gmail.com | See admin record | | | 1/22/2026, 4/9/2026 | | | X | X | | | | | | | X | | | |
| | Email | | Clare | Rocheford | rocheford@gmail.com; crocheford@ao | See admin record | Troy, NC | | 10-Jan-26 | X | | X | X | | | | | X | | X | | | |
| | Email | | Peter | Mitchell | petermitchell539@btinternet.com | See admin record | | | 12/12/2026 - 4/20/26 | | | X | X | | | | | | | X | | X | X |
| | Email | | Jiana | Tarabein | jianamichaelsilver@gmailc.om | See admin record | 251-209-4628, 20511 County Road 3 | | 3/4/2026 | | | X | | X | | X | | | | X | | | |
| | Email | | Scott | Miller | smiller2850@hotmail.com | See admin record | 2850 Cherry Tree Ct, Caledonia, WI | | 9/8/2025 | X | | X | X | X | | X | | | | X | | | |
| | Email | | Brad | Scarp | scvr0603@hotmail.com | See admin record | | | 5/9/2025 | | | | X | | | | | | | | | | |
| | Email | | Christian | Wagley | christian@healthygulf.org | See admin record | POB 13412, Pensacola | Healthy Gulf | 3/27, 30/2026 | | | X | | X | | X | | | | X | | | |
| | Email | | J.W. | Glass | jwglass@biologicaldiversity.org | See admin record | 813-833-5301 | for Biological D | 3/27/2026 | | | X | X | X | | X | | X | | X | | | |
| | Email | | Jason | Lashin | jlashin81@gmail.com | See admin record | | | 30-Jan-26 | | | X | X | | | | | | | X | | X | X |
| | Email | | Daniel Lanier | Lanier | daniellanier@hotmail.com | See admin record | | | 30-Jan-26 | | | X | X | | | | | | | X | | X | X |
| | Email | | Deborah | Broyles | tworabbits@intrstar.net | See admin record | 6625 Portsmouth Lane Raleigh, NC 2 | | 30-Jan-26 | | | X | X | | | | | | | X | | X | X |
| | Email | | Phillip | Crifasi | pcrifasi@msn.com | See admin record | Red Bank, NJ | SUS Assoc In | 5/27-28/2026 | | | | X | | | | | | | X | | | |
| | Email | | Joy | McCartney | joymccartney@marionnelson.com | See admin record | Lake Wales, FL | | 20-Aug-25 | | | XX | X | X | | | | | | X | | | |
| | **Letter** | | US Historic Preservation Alliance | | | See admin record | | USHPA | 8/28/2026 - 9/11/2026 | | | | | | | | | | | X | | | |

# APPENDIX B

## *REFERENCES*

# APPENDIX B

**REFERENCES**

Elderfield.H. Chromium Speciation in Sea Water. Earth and Planetary Science Letters 9 (1970) 10-16.

Fischer, Marten, Donna-Lee Garrick, Katja von Bargen, Jennifer Mayer, Torben Kirchgeorg, Burkard T. Watermann. Quantification of paint flakes and metal emissions during pro-active in-water hull cleaning. Chemosphere 376 (2025) 144291.

Furman, S.A., F.H. Scholes, , A.E. Hughes, D. Lau. Chromate leaching from inhibited primers Part II. Modelling of leaching. Progress in Organic Coatings 56 (2006) 33–38.

Lagerström, Maria, J. Fredrik Lindgren, Albin Holmqvist, Mia Dahlström, Erik Ytreberg. In situ release rates of Cu and Zn from commercial antifouling paints at different salinities. Marine Pollution Bulletin 127 (2018) 289–29.

Miller, Robert J., Adeyemi S. Adeleye, Henry M. Page, Li Kui, Hunter S. Lenihan, Arturo A. Keller. Nano and traditional copper and zinc antifouling coatings: metal release and impact on marine sessile invertebrate communities. J Nanopart Res (2020) 22: 129. https://doi.org/10.1007/s11051-020-04875-x.

Ramos-Filho, A.M.; Rodrigues, P.d.A.; de Oliveira, A.T.; Conte-Junior, C.A. A Systematic Review on Contamination of Marine Species by Chromium and Zinc: Effects on Animal Health and Risk to Consumer Health. J. Xenobiot. **2025**, 15, 121. https://doi.org/10.3390/jox15040121.

Scholes, F.H, S.A. Furman, A.E. Hughes, T. Nikpour, N. Wright, P.R. Curtis, C.M. Macrae, S. Intem c, A.J. Hill. Chromate leaching from inhibited primers Part I. Characterisation of leaching. Progress in Organic Coatings 56 (2006) 23–32.

Urios, L. Metallic. Shipwrecks and Bacteria: A Love-Hate Relationship. Microorganisms 2025, 13, 1030. https://doi.org/10.3390/microorganisms13051030

Van Landuyt J, Kundu K, Van Haelst S, Neyts M, Parmentier K, De Rijcke M and Boon N (2022). 80 years later: Marine sediments still influenced by an old war Ship. Front. Mar. Sci. 9:1017136. doi: 10.3389/fmars.2022.1017136

Venkatramreddy Velma, S.S. Vutukuru, and Paul B. Tchounwou. Ecotoxicology of Hexavalent Chromium in Freshwater Fish: A Critical Review. Rev Environ Health. 2009; 24(2): 129–145.

# APPENDIX C

*SECTION 106*

A. Memorandum and Synopsis of the CESAJ Section 106 Review for *SS United States*, SAJ 1996-03565 with attachments

**DEPARTMENT OF THE ARMY**
**U.S. ARMY CORPS OF ENGINEERS, JACKSONVILLE DISTRICT**
**701 SAN MARCO BOULEVARD**
**JACKSONVILLE, FLORIDA 32207**

USACE-CESAJ 16 March 2026

MEMORANDUM FOR SECTION 106 CONSULTING PARTIES

SUBJECT: Section 106 Review, SS *United States*, SAJ 1996-03565

The attached document summarizes the review of adverse effects to historic properties for the proposed sinking of the historic passenger vessel SS *United States*, under the Department of Army permit SAJ 1996-03565.

The synopsis includes the Corps' review assessments following 36 CFR 800 and documents the consideration of resolution of adverse effects.

Encl.
Synopsis Document
and attachments

ROBIN E MOORE
Jacksonville District, Regulatory Division
Regulatory Senior Archaeologist

# SYNOPSIS OF SECTION 106 ASSESSEMENT

# FOR SS UNITED STATES, SAJ 1996-03565

**Area of Potential Effect (APE) and Corps Permit Area** (reference 36 CFR 800.4)

The APE is the buffered footprint of the proposed sinking location in the Gulf of America (Figure 1) and the ship itself wherever the vessel is located during the Sec 106 review for this undertaking. The Corps' permit area is the entirety of the LAARS A, B, and C locations for which the Department of Army permit SAJ 1994-03565 applies (Figure 2). For more details on how this APE was established please refer to the Section 106 update document provided by the Corps to consulting parties on 18 February 2026 (the update document is hereafter referred to as "consult letter B"). The undertaking is focused on the sinking of a single, historic ship and the preparations to the ship that are necessary for sinking.




Figure 1. Proposed location in LAARS C for sinking of the SS *United States*.




Figure 2. Locations of Corps permitted LAARS A, B, and C under the SAJ 1996-03565 permit.

**Historic Properties Identification Efforts**

As the undertaking is focused entirely on one ship, the identification of historic properties focused on the vessel itself. Existing information researched by the Corps includes websites, National Register of Historic Places (NR) documentation, publications on the vessel's history, information provided by consulting parties, and an onboard visit to the ship on 22 October 2025. The identification efforts provided information on the vessel's unique design and construction, its interior appointments for passenger service, its success as a passenger vessel and its fame in the social fabric of America during the 1950s and 1960s, its later history of use and disuse, references to the removal of many interior (and some exterior) defining features over the 30 years the vessel has been in disuse, and observation of exterior features removed in the recent past prior to the October site visit.

Cumulatively, these efforts indicated that the ship qualifies as a historic property as defined in 36 CFR 800.16 and despite the stripping of the interior appointments of the

vessel over time and the removal of certain character-defining exterior features (see Attachment 1) that the vessel retains sufficient integrity to remain eligible for listing on the National Register under Criteria C (Design/Construction) as detailed in the ship's NR documentation. This evaluation was conducted in accordance with 36 CFR 800.4(c). For additional details on this evaluation please see the Corps' initial determination of effects provided to consulting parties on 18 November 2025 (this initial document is hereafter referred to as "consult letter A").

**Assessment of Adverse Effects** (reference 36 CFR 800.5)

The results of the identification efforts resulted in the assessment by the Corps that the proposed undertaking, the sinking of the vessel, would cause adverse effects to the historic property. Consulting parties, which at this time included the SS United States Preservation Foundation (SSUSPF), the New York Coalition to Save the SS United States (NYCSSSUS), the Florida State Historic Preservation Office (SHPO), and Okaloosa County, were notified of this assessment in consult letter A.

Notably, while the determination of adverse effect was made by the Corps in November, the APE did not, at that time, include the vessel itself while in Mobile, AL as the undertaking was directly related to a requested permit modification to LAARS B, which was modification needed to accommodate the size of the SS United States within LAARS B. At that time, the APE only included the proposed sinking footprint. Therefore, the determination of adverse effect at that time was based on the actual sinking of the vessel into LAARS B as noted in consult Letter A. The APE was reconsidered and expanded in January and February following the revelation that the permittee had changed their plans to sinking the ship into LAARS C, for which a permit modification was not necessary, as detailed in consult letter B. The focus of the undertaking changed solely to the actual sinking of the vessel under an existing Corps permit, as opposed to review of a permit modification request. The APE expansion included the ship itself at dock in Mobile, AL. Based on this expansion, it was appropriate to include the preparatory activities occurring in Mobile as part of the undertaking and as part of the assessment of adverse effects.

The conclusions regarding the historical significance of the vessel were not altered as result of the APE change as this conclusion had already considered the removal of various character-defining features while in Mobile, and while in Newport News, Ukraine, and Philadelphia over the past 30 years (the vast majority of all interior finishings and items including finished walls and floors, all controls in the bridge/wheelhouse, and exterior, character-defining lifeboats (24) and associated davits (48) were removed during this timeframe prior to its journey to Mobile. For examples please see Attachment 1). While the finding of adverse effect remained the same following the change in the APE, the criteria for

adverse effects have been accordingly updated. Following the criteria referenced in 36 CFR 800.5 (a), these effects include (i) physical damage to part of the property as a result of removal of certain features of the vessel, (ii) alteration of a property as result of hazardous material remediation, (iii) removal of the property from its historic location atop the water to being sunk below the water, and reasonably foreseeable effects over a very long period of time to the structure in the future from chemical and physical changes while submerged (though it should be noted that deterioration has been steadily occurring over the past 30 years). While the criteria for adverse effects was updated, the Corps does not consider the additional review of these activities to change the fundamental determination that the activities constitute adverse effects to a historic property, nor does it change the Corps' assessment that the vessel would retain sufficient integrity to be considered NR eligible in spite of the adverse effects.

Consulting parties were notified of these findings in consult letter A and updated in consult letter B. The NYCSSUS and SSUSPF consulting parties provided responses to these letters as well as questions associated with the review. The Corps took these responses and views into consideration over this time period. Much of the comments have contributed to the history/details of the vessel, knowledge of the public interest, the consideration of the area of potential effect, the authority of the Corps in this permitted undertaking, and alternatives for avoidance. It should be noted, however, that many of the submitted questions were directed towards the Corps' internal and deliberative processes for Section 106 review advancement. Questions and comments of this nature were not directly addressed in the consultation review as they are not considered to be germane to the issues of adverse effect assessments and resolution.

Notification to the Advisory Council on Historic Preservation (ACHP) of adverse effects, along with an invitation to consult on the project, was provided to the ACHP on 8 January 2026 (as provided for in 36 CFR 800.6(a)(1). The ACHP responded on 22 January 2026 indicating they do not intend to participate as a consulting party but provided advisory comments. The ACHP also indicated they are available to provide technical assistance throughout the consultation process. The Corps has included the ACHP in this capacity for all relevant consultation letters and meetings.

As the potential for adverse effects was determined by the Corps and initial coordination with consulting parties indicated general agreement with the determination, the Corps continued consultation with a focus on resolution of adverse effects as prescribed in 36 CFR 800.6(b)(1) to consider options for avoidance, minimization, or mitigation. During this time, an additional organization, the National Trust for Historic Preservation (NTHP), was invited as a consulting party upon agreement by the SHPO and Corps. Though the SSUSPF

indicated that they had been in dialogue with the NTHP two months prior (email from Gary Quigg, November 17, 2025), and that the NTHP may request consulting party status (email from Mr. Quigg, November 19, 2025), the Corps did not receive a request by the NTHP for consulting party status until February 20, 2026, immediately prior to the planned 2nd consulting party meeting. Thus the request by the NTHP for consulting party status was received at a much later date in the consultation process, so consultation with this organization has not proceeded on the same timeframe as the other consulting parties.

**Resolution of Adverse Effects** (reference 36 CFR 800.6)

During consultation, parties proposed alternatives to sinking the vessel. Attachment 2 to this document summarizes the documents submitted to the Corps related to alternatives. The Corps notes that well-developed alternatives were presented by the SSUSPF and the NYCSSSUS consulting parties for avoidance of sinking the vessel. The development of these proposed alternatives apparently began in 2024 prior to the Corps' knowledge of the planned sinking of the vessel. These alternatives were presumably submitted to the applicant for consideration prior to and independent of the Corps' Section 106 review in an effort to convince the permittee to re-align their plans to sink the ship. The alternatives were later presented to Corps following initiation of the Section 106 assessment.

The main alternative proposed by these consulting parties is for the SS *United States* to be transferred to the federal government (with appropriate recompense to the current owner of the vessel) through Executive and Congressional action, and for federal funding to be allotted to assist in rehabilitation of the vessel. The SSUSPF and the NYCSSSUS suggested that the ship could be homeported in New York City for various proposed end uses. These consulting parties also proposed that the applicant could receive, in exchange, one of the SL-7 Fast Sealift Ships which MARAD intends to decommission in the next several years. The consulting parties noted that MARAD's SL-7 Fast Sealift Ships are of a size that would likely meet the goals of the applicant for a large-scale artificial reef ship.

The Corps has concluded this alternative (or combination of alternatives) for avoidance of adverse effects to the SS United States is theoretically viable. However, the alternatives are entirely dependent upon Congressional action and funding and would likely require approval and support from various federal agencies. To date, there is no evidence indicating that such an endeavor is supported or that Congress or any federal agencies have any interest in taking such actions. Similarly, no evidence has been presented that MARAD has any plans or interest in conveying a decommissioned ship directly to Okaloosa County, a process that would certainly carry with it many inherent challenges and uncertainties. It also is of consideration that, based upon the many funding and management challenges associated with efforts to rehabilitate the ship in the past (see

Attachment 2), these alternative scenarios of preserving the ship are tenuous and ultimately may not be viable in terms of the funds and management needed to successfully accomplish the preservation goals.

Finally, and perhaps most significantly, the alternative proposed by the SSUSPF and the NYCSSSUS depends entirely upon the owner of the ship being willing to sell it to another party. However, the Corps does not have the legal authority to force the sale of the ship. Additionally, the current record does not provide adequate support to take action pursuant to the Corps' regulations and the provisions of Okaloosa County's Corps permit to prevent the deployment the ship as an artificial reef. At this point, the adverse effects to the ship are not sufficient grounds when assessing the public good factors to justify the Corps taking action to rescind Okaloosa County's permit or to otherwise seek to prevent the sinking of the ship. This statement is further addressed below in the discussion of minimization and mitigation efforts.

**Minimization and Mitigation**

Consulting parties from the SHPO and Okaloosa County (also the owner and applicant) offered thoughts on potential mitigative requirements that could be specified in a memorandum of agreement (MOA) during the course of review. In the case of the SS *United State*s, it is notable that voluminous documentation concerning its design, construction, and history currently exists in repositories such as the Mariner's Museum in Newport News, VA. Additionally, the SS *United States* Conservancy, the former owner of the ship, has (and continues to) actively researched, documented, and acquired a large collection of documents, memorabilia, and artifacts/items from the ship itself with the intent of long-term conservation and interpretation.

The minimization of impacts to the vessel, though secondary in the undertaking, are significant preservation steps and are related to a) the level of impacts to the vessel during preparatory activities in Mobile, and b) the efforts to preserve features removed from the vessel during this time. The minimization of impacts includes keeping the historically significant aluminum superstructure intact, keeping the hull intact, and generally keeping the interior layout intact. The propulsion system and all of the large boilers, turbines, and shafts will also remain intact. The larger impacts to the vessel in Mobile are generally those impacts that are necessary for the sinking of the vessel and do not include major steel and aluminum demolition (scrapping) for the selling off of this material. Likewise, the sinking strategy for the ship does not include explosives or major impacts to the hull for water ingress but is designed largely to use existing through-hull access points aided by water pumps, thus minimizing hull impacts.

The following are the specific artifacts:

1) Builder's plate
2) Five-bladed propeller
3) Four-bladed propeller cap[1]
4) Bridge table
5) Whistle control box (if located)
6) Radar mast and radar stand
7) Bridge equipment stored in cargo hatch B deck forward
8) Cabin class smoking room bar
9) Tourist class smoking room bar
10) Telephone switchboard exchange
11) Selected pantry equipment (no more than 3)
12) Print shop printer
13) Swimming pool ladder and railing
14) Instructional USCG placard
15) Samples of illuminated signage (no more than 5)
16) Samples of port lights (no more than 5)
17) Samples of promenade deck door handles (no more than 5)
18) Samples of engine room control panels (no more than 3)

Figure 3. Items/artifacts committed to the SS United States Conservancy for preservation.

The preservation of the major features removed from the ship is also a minimization choice. The applicant committed to providing the SS United States Conservancy with certain, select artifacts that were still aboard the vessel at the time of sale. Figure 3 shows a list of these items that the applicant agreed to preserve and provide to the SSUSC. The applicant has also dedicated significant funds to ensuring the removal of the two smokestacks and the radar mast is done in a fashion that preserves the features and assures appropriate storage and transport of the features for the SSUSC to take possession of as opposed to removing and processing them with the intent of "scrapping" the metal.

The applicant, as part of their overall plan to promote the ship as a unique recreational destination, have recognized the unique historical role the ship holds in American maritime history and have ensured commitments to honor that history. If permitted, they have committed to mitigation measures that include: saving various removed features (as noted above) for future public display in lieu of scrapping the metal for sale; documenting the interior and exterior of the vessel using three-dimensional laser scanning; committing $800,000 dollars to the SSUSC to assist in public interpretation of the ship's history though if the SSUSC does not choose to follow through on those plans then the money would revert back to the County for investment in additional public interpretation of the ship; committing to developing a short documentary film in Imax format illustrating the ship's journey from Philadelphia to its proposed location on the seabed; offering various items to other ship museum's around the nation for use as parts that these vessels are missing; placing the ship on the Florida Historical Shipwreck Trail managed by the Florida Division of Historical Resources; and other mitigative measures. For a current list of these proposed measures please refer to Attachment 3.

Cumulatively, the efforts to minimize impacts to the vessel, the existing documentation and collections associated with the vessel, the accessibility of the ship for recreational engagement, the planned public interpretation of the vessel, and the measures planned for mitigation provide a level of benefit to the public that is substantial when assessing the Corps' permitting of the undertaking and the mitigation of adverse effects.

**Additional Considerations**

During the course of consultation, topics not already addressed above have been discussed. These items are directly addressed below. They include: 1) the Corps' consideration of a violation of Section 110K for work on the ship in Mobile and the concept that this work in Mobile coupled with sinking of the vessel should be considered demolition or total destruction, 2) public awareness of the undertaking, and 3) the role of the USCG in the undertaking especially in relation to USCG-required affects to the vessel.

1. **Section 110k Violation Consideration**

   The Corps stated in Letter A an assessment that the applicant did not violate Section 110K of the National Historic Preservation Act. This assessment is based upon two considerations. First, a violation of Section 110K indicates an intent to avoid Section 106 review by intentionally significantly adversely affecting a historic property. While it is reasonable to state that the historic property (the ship) was adversely affected by the activities occurring in Mobile, the Corps finds that it cannot be shown that the intent of the applicant was to avoid Section 106 review. It is clear that the guiding objectives of the applicant was to initiate preparation for sinking the ship as quick as possible based upon the high cost of wharfage and based upon the legal agreements with the seller. Furthermore, the available information indicates that the applicant was not entirely aware of the necessary scope of Section 106 review at this time. The main activities that may constitute adverse effects to the ship were the removal of the two smokestacks and the radio mast, which were specifically addressed in the purchase and sale agreement between the two parties with regards to preservation of these items for future preservation and interpretation. The Corps was not specifically aware of the removal activities while they were occurring in early August, 2025, the intent of the removals however were in keeping with the original purchase and sale agreement, and in keeping with the focused efforts to prepare the vessel for sinking. The intent, however, does not appear in any way to have been affected by the desire to avoid Section 106 review, nor did the activities negate a Section 106 review.

   Finally, and apart from intent, while the removal of these features may be considered adverse effects, the Corps does not consider those effects to have destroyed the vessel's ability to convey its original, significant design elements.

2. **Public Engagement**

   The Corps took into consideration the scope of the project which is the proposed sinking of a single, historically significant (though heavily gutted) ship utilizing

Department of Army permit SAJ 1996-03565. The scope does not include impacts to additional historic properties or to properties designated as National Historic Landmarks or Monuments. The Corps also considered the level of public awareness of the undertaking (which was nation-wide as noted below) in relation to this scope, the public comments received concerning the historical nature of the vessel (which included groups that have reached out to a myriad of other groups, people, and agencies – purporting to have around 15,000 signatures petitioning to save the vessel), and the engagement of three organizations as additional consulting parties representing 100s of members of the public.

The Permittee's preparatory actions for the sinking of the ship have received international broadcast with, according to the tracking by Okaloosa County, over 5,400 independent mentions on television, radio, internet and social media in over 80 countries since October 2024. Additionally, the County states that at Permittee public meetings over eight publicly noticed agenda items were presented related to the ship and public comment was received at 15 different public meetings.

Finally, the Corps issued a second public notice on February 13, 2026 seeking additional comment on the permit modification and on the adverse effect determination made by the Corps for the proposed sinking of the SS United States. If substantively new information is provided then they will be considered in a final determination.

3. **USCG Requirements**

During the second consultation parties meeting on February 2, 2026, the topic of the United States Coast Guard's role in the County's effort was mentioned. Specifically, Okaloosa County representatives noted that the USCG required certain safety protocols to be implemented for the vessel to be safely towed from Philadelphia to Mobile. Some of these requirements included "alterations to the ship" based upon stability analyses. These alterations included activities to seal certain doors/hatches to make them airtight, and to cut new hatches (minor in size and number) for the escape of personnel in the event this was needed. The Corps considers these alterations to be minor effects on the vessel and do not contribute to the adverse effects assessed by the Corps.

# Attachment 1

# History of Impacts on Character Defining Elements of the SS *United States*

# Timeline of Notable Impacts to Character Defining Elements of the SS *United States*

**1969** – Ship taken out of service following its 400th voyage. **Navy sealed the vessel with all furniture, fittings, and even uniforms remaining**; Unites States Maritime Administration (MARAD) assumed ownership in 1973 following Public Law 92-296 in 1972.

**1973** - MARAD attempted to establish a use for the ship, via sale or charter, and legal documents were created for that allowance. Ultimately, they attempted to auction the vessel off with rules on how the vessel would be used. No takers. So new terms were developed in legal documents, including declassification of formerly classified design features, and expansion of the allowable use of the vessel in 1976 (Public Law 94-536) . Richard Hadley, Seattle developer began steps for purchase of the vessel in 1978.

**1980** - Hadley ownership – neglect led to interior rusting, etc… interior items began to be auctioned off in 1984 in Norfolk, VA. **By 1992 the furnishings, and various equipment, and fittings were sold off; the majority of equipment, including the bridge control features were gutted during this timeframe**; ship taken out of legal ownership by district court due to wharfage fee issues, new buyers in 1992.

**1992** – new ownership, Kahraman Sadıkoğlu, sent to Turkey and Ukraine for **asbestos remediation which involved additional, major gutting of the ship including walls and flooring; to cover costs, additional features including the 24 lifeboats, 48 davits, and most the plumbing were sold off**.

**1996** – towed to Philadelphia under authority of Federal government; many proposals and plans offered but nothing materialized; purchased by Edward Cantor in 1997; placed on National Register of Historic Places at this time.

**2003** – purchased by Norwegian Cruise Lines from Cantor's estate, no major plans initiated and 2008 financial collapse ended the investment.

**2009** – NCL put it up for sale, no buyers; by 2010 NCL made plans for scrapping the vessel

**2010 to 2024** - a grant from philanthropist H.F. Lenfest allowed SS United States Conservancy to purchase the gutted vessel for preservation. **Various "obsolete" features of the of ship were sold off to help with wharf fees** over the years.

**2016** - tentative agreement with SSUSC and Crystal Cruise Lines to put vessel back in passenger service; conceptual plans included drastic modifications to the hull and superstructure. Crystal pulled out of the agreement after major survey, indicating the change of power plants is too much of a burden.

**2024** - efforts at creating an end-use did not fully materialize and the SSUSC sold the ship to Okaloosa County with a purchase and sale agreement that included its use as an artificial reef.

**2025** – ship towed to Mobile, AL where **removal of the funnels and radar tower occurred in addition to removal of various, items remaining in the vessel** not suitable for underwater deployment

**Examples of Changes Prior to Arrival in Mobile**

The majority of these changes occurred between 1980s and 1996; most all interior furniture, fittings, aluminum wall finishings, etc... removed during this timeframe.

( 1950s historic images copied from *SS United States, An Operational Guide to America's Flagship*)



Najavo Lounge, 1950s



Probable Navajo Lounge, 2025



Cabin Class Lounge, 1950s



Probable Cabin Class Lounge, 2025



Grand Ballroom, 1950s



Grand Ballroom, 2025



Bridge/Wheelhouse, 1950s/1960s



Bridge/Wheelhouse, 2025

Exterior Alterations

(photos copied from the web for analytical purposes)




Historic view of ship, note lifeboats and davits



SS United States docked in Philadelphia. 2020s. Lifeboats and davits removed, last remaining propellor secured to forward deck.



SS United Sates docked in Mobile, 2025. Forward stack and radar mast removed. Aft stack prepared for removal.

# Attachment 2

# Summary of Alternatives Documents

# Submitted by Consulting Parties

## Alternatives Related Documents Submitted to the Corps and Considered in Alternatives Analysis

1. **America 250 Maritime Heritage Act proposa**l – draft proposed legislation, bill proposal to designate the SS United States as a National Maritime Monument.
   - *No US Congressional action has been taken as of this date.*

2. **Adverse Effect Response NYCSSSUS Letter** – letter detailing the potential for alternatives including probable legal empowerment of the Secretary of Commerce of the United States to purchase the ship at any time for particular uses. This is based upon Public Laws 92-296 and 94-536 from the 1970s.
   - Public Law 92-296 authorized "the foreign sale of certain passenger vessels." Sec 2 states "the Secretary of Commerce is authorized and directed to purchase the steamship United States… for layup in the National Defense Reserve Fleet"…
   - Public Law 94-536 added wording for potential use as a floating hotel by private investors.
   - Collectively, these laws were associated with the Merchant Marine's efforts to establish ownership of the vessel and then ultimately find an end use for the SS United States and to encourage the lease or sale of the vessel for an appropriate use.

3. **Resolution 0649-2024**, **New York City Council** – document is a draft resolution proposed by 14 sponsors from the New York City Council; resolution called for "the United States Congress to pass, and the President to sign, legislation allocating funds for the restoration of the SS United States and for its relocation to the City of New York". * this resolution was passed by the New York City Council on 11/21/2024
   - *No US Congressional action, funding, or other action has been taken as of this date*.

4. **SS United States Master Advocacy Document (MAD)** - document proposing "Legal Pathway for Federal Reacquisition of the SS United States; refers to *America 250 Maritime Heritage Act* proposal

- Provides concern about meeting various Federal requirements
- Several of the Section 106 concerns were addressed in sec 106 review and consultation following this document submittal
- Provides consideration of an alternative to use of the SS United States, indicating that use of SL-7 Fast Sealift Ships would be a suitable replacement for artificial reefing and that they are scheduled for decommissioning and disposal over the next several years.

5. **EO- The Great American Comeback, Saving the SS United States for America 250** - Provides copy of a letter to the President requesting an Executive Order to create a path for the *America 250 Maritime Heritage Act* alternative. Provides proposed Executive Order document.
   - EO proposal includes designation of ship as a National Monument, direction to MARAD to identify a SL-7 Fast Sealift Ship to be traded for SS United States (in addition to additional just compensation to owner), establish Federal ownership of SS United States, and direct for museum and preservation coordination.
   - *No Presidential or Executive Branch action has been taken as of this date*, though the letter was forwarded from Washington DC to the US Army Corps of Engineers for their awareness. A reply was sent to Mr. Camacho/SSUSPF from the Corps as acknowledgement.

6. **Letter from State Senator Noah Robinson, Oregon State Senate -** Letter to the SSUSPF expressing support of the proposed American 250 Maritime Heritage Act, and assessing the plan as a “well though out and practical approach for the saving the great ship”.

# ATTACHMENT 3

## PROPOSED DRAFT MITIGATION STIPULATIONS

*The following draft stipulations are provided for consideration of mitigation for adverse effects in the event the applicant receives permitting for their proposed undertaking.*

*Final stipulations would be included in a Memorandum of Agreement (MOA) establishing a legal agreement for the agreed upon mitigation measures.*

The Corps shall ensure that the following measures are carried out:

I. DOCUMENTATION

The following pre- and post-deployment documentation and salvage of the Vessel will be undertaken by the Permittee and provided to the Corps and SHPO. The Permittee may seek coordination with appropriate external entities to implement the terms of this MOA or to undertake additional documentation or interpretive efforts . If such coordination is not practicable or does not result in completion of the required actions, the Permittee shall remain responsible for fulfilling the terms of this MOA.

a. Prior to deployment

i. Laser scan, photogrammetric, and any other reality capture scans of exterior and various interior spaces . The files will be processed and provided to the Florida Master Site File (FMSF) and the National Park Service.

ii. Detailed list of any distinct features/components of the Vessel that were removed while in Mobile, Alabama and the disposition of those elements distinct features/components of the Vessel, which include but are not limited to: the funnels, radar mast, emergency generators, anchor, propellor, and a bars. (See Appendix B for a Purchase and Sale Agreement and an Amendment for the Vessel which provides for an extensive list of preserved distinct features/components).

iii. A report documenting the remote sensing survey of the buffered footprint in which the Vessel will be placed. The survey, at a minimum, will include side scan sonar and SCUBA dive survey.

b. Post deployment

i. A picture-survey of the Vessel on the seabed floor for the purposes of mapping the dive site as well as documenting the initial status of the Vessel post deployment.

ii. Prepare a submittal to the National Register of Historic Places for reassessment of the Vessel's NRHP eligibility. The goal will be to submit sufficient documentation for its

continued listing on the NRHP. This submittal must be done by a Secretary of the Interior-qualified historian or architectural historian.

iii. A two-year collaborative scientific study of the physical changes to the historic Vessel/property. (See Appendix D for a prospectus related to the proposed longer-term physical monitoring in collaboration with Woods Hole Oceanographic Institution.)

## II. PUBLIC INTERPRETATION AND EDUCATION

The Permittee will fund and provide in-kind support for the creation of public education exhibits or displays dedicated to conveying the Vessel's historical and nautical significance. The Permittee may seek coordination with appropriate external entities to implement the terms of this MOA or to undertake additional documentation or interpretive efforts. If such coordination is not practicable or does not result in completion of the required actions, the Permittee shall remain responsible for fulfilling the terms of this MOA.

a. The Permittee shall coordinate with the SHPO and provide all necessary materials to apply for the Vessel's inclusion on the Florida Panhandle Shipwreck Trail.

b. The Permittee shall provide funding (up to $1 million) for the preservation of salvaged artifacts and the creation of a land-based museum (s), interpretive displays, or other exhibits. If physical displays are not possible, a web-based public education component may be appropriate but will require approval by the other signatories.

## B. Timeline of Section 106 Review

**Timeline of Notable Section 106 Review Events SAJ 1996-03565**

| **Date** | **Activity** | **Notes** |
|---|---|---|
| 3/13/25 | Inquiry from the Advisory Council on Historic Preservation (ACHP) | Alerted Corps to the possible sinking of the SS United States in the LAARS based upon inquires from the public to the ACHP |
| 3/14/2025 - 8/25 | Public comments received | Comments and inquiries from the interested public in opposition to sinking the ship received. |
| 3/14/25 - 5/19/25 | Background Research and Assessment and Federal Handle review | Continued background research on LAARS past permitting, and discussions on the Corps' role in the review of the sinking as an undertaking under Sec 106; inquiries with vertical chain |
| 5/19/25 - 6/18/25 | RAIs to applicant, applicant engagement | Requests to applicant for site visit and for additional information on the ship |
| 6/18/25 | Sec 106 meeting with applicant | |
| 6/18/25 | Request received via email from SSUSPF requesting consulting party status | |
| 6/18/25 - 10/25 | Research, data gathering, internal coord | Further comms with OC staff; historical review, assessment of current status of ship, preparation to develop a determination of effects |
| 10/22/25 | Field visit aboard SS United States | Guided by Alex Fogg, included USCG participants; photos taken |
| 11/7/25 | Consulting party invitation to SSUSPF | Invited consulting party status agreed to between SHPO and USACE |
| 11/11/25 | Memo received from SSUSPF re "preliminary concerns" | Email also confirmed their acceptance of consulting party invitation |
| 11/18/25 | Adverse Effect consultation letter sent to SHPO and SSUSPF | 30 day response request |
| 11/23/25 | Meeting of consulting parties online | USACE, SHPO, SSUSPF; meeting held on MS Teams |
| 11/21/25 | Consulting party request from NYCSSSUS | |
| 12/5/25 | Consulting party invitation to NYCSSSUS | Invitation sent following SHPO and USACE agreement |
| 12/5/25 | NYCSSSUS email reply accepting consulting party invitation | |

| Date | Activity | Notes |
|---|---|---|
| 12/8/25 | Adverse Effect consultation letter to NYCSSSUS | 15 day response request |
| 12/9/25 | Adverse Effect consultation letters to tribes | STOF, MTIF, MCN, SNOK |
| 12/17/25 | Letter received from NYCSSSUS via email, reply to adverse effect letter | Letter details NYCSSSUS concerns, offers alternatives scenarios |
| 12/18/25 | SHPO reply letter received | Response to consultation letter; concurrence with the adverse effect determination |
| 1/8/26 | Notification to the ACHP of adverse effects | Following SHPO consult letter reply. ACHP had requested via verbal comm that we hold off sendng notification until SHPO responds to initial consult letter. |
| 1/21/26 | Meeting with C Camacho and Steve Perry in Pensacola USACE office | Meeting in Corps offices, discussed enviro concerns, notes on activities in Mobile, and Steve's knowledge of and experience working with the ship in Philadelphia |
| 1/23/26 | Sec106 update letter and email to consulting parties | In addition to the updates, the Corps confirmed that the change from LAARS B to LAARS C does not relieve the permittee of a Section 106 review requirement |
| 1/22/26 | ACHP letter to USACE | Provided advisory comments, declined consulting party status, offered technical advisory capacity |
| 1/27/26 | Corps meeting with permittee | The Corps clarified that Section 106 is still a requirement under the LAARS permit inspite of change of deployment location |
| 2/4/26 | SSUPFS submittal of request for information | Requests answers to various questions, many predicated on the ACHP comments. |
| 2/6/26 | Confirmation inquiry email to Okaloosa County | Status as a consulting party was asssumed, but not confirmed until a direct inquiry; they confirmed this on same date |
| 2/17/26 | Sec 106 update letter and attachement to consulting parties | Notification of change from LAARS B to LAARS C; updated APE; attachement provides detailed answers to SSUSPF's submitted questions of 2/04/26 , which also directly addresses the ACHP comments provided on 1/22/26 |

| Date | Activity | Notes |
|---|---|---|
| 2/20/26 | National Trust for Historic Preservation request for consulting party status received | |
| 2/23/26 | Corps and SHPO invite NTHP as a consulting party | |
| 2/24/26 | Second consulting party meeting | SSUSPF, NYCSSSUS, NTHP, FL SHPO, USACE, ACHP; meeting held via MS Teams |
| 2/26/26 | Phone call to Eric Sipes, Assistant State Archaeologist and Section 106 Program Head, Alabama Historical Commission | Sipes indicated they don't feel it is appropriate to consult on private owned vessel that is getting sunk in Florida waters; confirned they prefer not to consult |
| 3/13/26 | Public Notice for sinking and for modification issued | 15 day response request |
| 3/16/26 | Sec 106 Synopsis MFR sent to consulting parties | Details Sec 106 efforts and findings to date |
| 3/16/26 - 8/5/2026 | Receipt and processing of public comments | |
| 3/20/26 | Email from Gary Quigg (SSUSPF) re Public Notice | Includes comments and concerns related to the public notice that was issued on 3/16. Response from USACE provided 3/20/26 |
| 3/28/26 | Letter from the NTHP received | Includes comments and concerns |
| 4/7/26 | Update letter to consulting parties | Addresses comments from consulting parties; provided draft MOA and request for comments within 15 days |
| 5/22/26 | Sec 106 update letter to consulting parties | Includes Corps conclusion that a third meeting is not planned; provides Corps' response to comments; provides second draft of the MOA document for comments; 10-day review request period. |
| 6/25/26 | Sec 106 update letter to consluting parties; final MOA draft attached | Attachment includes Corps final draft of MOA draft and reply to comments |
| 7/9/26 | Final MOA sent to signatories for signature | Okaloosa County, SHPO, and Corps |
| 7/15/26 | Signed MOA received in email from Okaloosa County | |
| 7/16/26 | Email from Alissa Slade-Lotane (SHPO) with signed MOA | |
| 7/16/26 | USACE signs MOA | MOA becomes in force |

| **Date** | **Activity** | **Notes** |
|---|---|---|
| 7/24/26 | Sec 106 update letter to consulting parties; final MOA attached | Notification of the signed MOA and notificaton of the closure of the Sec 106 consultation |
| 8/6/26 | ACHP email received; cc to all consulting parties | Confirms receipt of signed MOA and notes the Corps has fulfilled the Sec 106 requirements for the project |

## C. Consulting Party Common Themes from Comments with CESAJ Replies and Notes

## Consulting Party Comment Themes

| Common theme | Summary | USACE Notes |
|---|---|---|
| *Consultation adequacy and timing* | Repeated concern that review windows were too short, significant information arrived late, and additional consultation was needed before finalizing the MOA. | The Corps notes that all consultation steps and all review windows for documents provided to consulting parties fell within appropriate parameters as prescribed within 36 CFR 800. Appeals by consulting parties regarding additional consultation were not supported by sufficient reasoning in line with 36 CFR 800 processes. Reference final consultation update letter from Corps dated 25 June 2026; and email from ACHP to Camacho dated 2 June 2026. |
| *Administrative-record completeness and transparency* | Repeated requests for meeting documentation, decision records, draft circulation information, comment tracking, and explanations of how submissions were considered. | The Corps notes that there were repeated requests in consulation comments to "complete the administrative record" for party review. The majority of this requested information was considered by the Corps to be internal, administrative information and not relevant to the objectives of the consulting party input. Reference consultation letter update from Corps dated 25 June 2026, and consultation synopsis by the Corps sent to parties on 16 March 2026. |
| *MOA finalization or pause* | Many comments contend that the MOA should not be finalized or executed until procedural, documentation, and consultation issues are resolved. | The Corps notes that all consultation steps and all review windows for documents provided to consulting parties fell within appropriate parameters as prescribed within 36 CFR 800. Appeals by consulting parties to discuss procedural and administrative details were not supported by sufficient reasoning in line with 36 CFR 800 processes. Reference final consultation update letter from Corps dated 25 June 2026; and email from ACHP to Camacho dated 2 June 2026. |

| | | |
|---|---|---|
| *Mitigation adequacy and enforceability* | Comments question whether mitigation is specific, enforceable, adequately funded, accountable, and sufficient to address the vesselâ€™s historic loss. | The consulting parties were provided opportunities to comment on the two drafts of the mitigation agreement. All comments received were reviewed and considered. The Corps provided feedback on these comments and updated the drafts to address stated concerns. Reference MOA comments attachment provided in the Corps' 25 June 2026 letter. |
| *Ongoing vessel alterations and adverse effects* | Comments raise concerns that continuing preparation, removal of features, and other modifications may further harm historic integrity while consultation remains active. | The Corps' consideration and assessment of these concerns were addressed on an ongoing basis through several updates to consulting parties. The ACHP likewise provided consulting parties with their assessment that these topics were appropriately addressed by the Corps in their consultation documentation. |
| *Alternatives to reefing* | Several comments argue that preservation or other non-destructive alternatives should receive fuller consideration before reefing proceeds. | Alternatives submitted by consulting parties, and others from the the public, were considered in the Section 106 analsyis. Reference consultation synopsis by the Corps sent to parties on 16 March 2026, |
| *Environmental and NEPA review* | Comments seek clarity on the status and scope of environmental review, handling of submitted environmental information, and potential effects of vessel preparation and deployment. | As repeatedly noted to consulting parties, the Section 106 review of this undertaking was separate from the NEPA review. All environrmental concerns brought up in Section 106 consultation was sent to the Corps project manager for NEPA consideration, but not addressed directly in Section 106 consultation. |
| *Area of Potential Effects and agency coordination* | Comments question the scope of the undertaking and Area of Potential Effects, including Mobile-based activities and coordination with the Alabama State Historic Preservation Office. | These topics were addressed clearly in consulting party updates from the Corps. The APE changed during consultation and that change was likewise addressed directly to consulting parties. |
| *Public notice and meaningful public participation* | Comments question whether the public received adequate notice and an informed opportunity to comment on the undertaking as it evolved. | Inspite of the fact that the public was well aware of the undertaking based upon public comments received, the Corps published a public notice seeking input on the undertaking and potential adverse effects. This resulted in over 700 public comments recieved. Such input and efforts by the Corps were in keeping with the 36 CFR 800 regulations. |

## D. Summary of Consulting Party Comments

# Summary of Consulting Party Comments Submitted During Consultation*

| Date | Organization and Comments |
| --- | --- |
| | **SSUSPF** |
| 11-Nov-25 | Raised preliminary concerns about removal of character-defining features before completion of consultation, hazardous materials and remediation, and continued alterations affecting the vessel's historic integrity. Requested a pause in permit-related actions pending full interagency review and compliance with historic-preservation and environmental requirements. |
| 4-Feb-26 | Supported Advisory Council on Historic Preservation (ACHP) and State Historic Preservation Office observations and requested clarification of the undertaking's scope, inclusion of vessel-preparation activities, Area of Potential Effects (APE), alternatives, mitigation, consulting-party membership, document sharing, and handling of confidential materials. |
| 12-Feb-26 | Requested agenda items addressing undertaking scope, APE definition, alternatives, and mitigation. Submitted supplemental information for the administrative record and requested clarification on how it would be considered in the ongoing Section 106 and National Environmental Policy Act (NEPA) reviews. |
| 23-Feb-26 | Requested prompt consideration of the National Trust for Historic Preservation's request for consulting-party status before the scheduled consultation meeting. |
| 23-Apr-26 | The SS United States Preservation Foundation objects to the draft Memorandum of Agreement (MOA) and contends that the Section 106 review should not advance to resolution of adverse effects at this stage.<br>The Foundation states that the Corps acknowledged legal and procedural objections from consulting parties but did not provide sufficient responses for those parties to evaluate and address the issues.<br><br>The Foundation argues that the Corps retains responsibility for ensuring compliance and should resolve claimed procedural deficiencies before moving forward.<br><br>The Foundation contends that the Corps is advancing to mitigation and an MOA before fully completing review of effects, avoidance, minimization, and alternatives.<br><br>The Foundation states that the National Environmental Policy Act review remains incomplete and that related information has not been made available to consulting parties. |

The Foundation argues that the applicant's unwillingness to pursue alternatives does not relieve the Corps of its responsibility to evaluate avoidance and minimization options.

The Foundation cites project records as evidence that reefing-related activities and removal of vessel features were planned or ongoing during review, raising concerns about a predetermined project outcome.
The Foundation questions the accuracy and sufficiency of the public notice, undertaking description, and identified Area of Potential Effects, asserting that these issues undermine meaningful consultation.
The Foundation states that several preservation and substitution alternatives have been submitted and should be evaluated before the Corps advances toward an MOA.
The Foundation asks the Corps to clarify the scope and status of environmental review; provide relevant environmental and alternatives documentation; explain how preparatory actions are being considered; describe its alternatives analysis; and reassess whether an MOA is appropriate at this stage.

7-May-26 The SS United States Preservation Foundation (SSUSPF) states that finalizing the draft Memorandum of Agreement (MOA) is premature because consultation, record development, and coordination issues remain unresolved.

SSUSPF notes that consulting-party comments, meeting-minute revisions, procedural requests, and administrative-record development continued after the draft MOA was circulated. It argues that the active and evolving consultation process warrants further review before finalization.

The Foundation notes that the February 24, 2026 consulting-party meeting had no formal transcript or recording and that its minutes were still being corrected and supplemented during the MOA process.

SSUSPF raises continuing questions about the scope of the undertaking, including how preparatory activities and their effects are considered as part of the overall review.

The Foundation states that environmental review remained ongoing and seeks clarification on how environmental submissions accepted into the record were evaluated within the broader permit and undertaking review.

SSUSPF cites continuing questions about the specificity, certainty, enforceability, and long-term execution of the proposed mitigation measures. It notes that other consulting parties and the Advisory Council on Historic Preservation also identified unresolved implementation concerns.

The Foundation notes that the Advisory Council on Historic Preservation encouraged an additional meeting focused on unresolved mitigation and implementation issues. SSUSPF supports continued consultation before the MOA is finalized.

SSUSPF requests clarification on coordination with relevant state historic-preservation authorities after the undertaking and Area of Potential Effects were expanded to include preparatory activities in Mobile, Alabama.

SSUSPF asks the Corps to continue consultation; clarify the status of environmental review; address outstanding comments and procedural questions; continue coordination on scope, preparatory activities, and adverse effects; and circulate any revised MOA for consulting-party review before execution.

27-May-26

The consulting parties request Advisory Council on Historic Preservation (ACHP) guidance before the U.S. Army Corps of Engineers (USACE) proceeds with execution of the proposed Memorandum of Agreement (MOA).

The parties question whether the consultation process is sufficiently complete and procedurally mature for MOA finalization, given unresolved questions about the project scope, Area of Potential Effects (APE), documentation, alternatives, and participation.

The parties argue that written comments alone do not provide the interactive consultation contemplated by Section 106 when significant procedural and preservation issues remain unresolved.

The parties support holding an additional consultation meeting previously recommended by ACHP. They state that USACE declined to convene the meeting despite support from multiple consulting parties.

The parties seek clarification on the evolved undertaking, expanded APE, Mobile-based preparation activities, associated adverse effects, and coordination with the Alabama State Historic Preservation Office.

The parties raise concerns about the completeness of the administrative record, including meeting documentation, public-notice timing, consultation records, alternatives evaluation, and documentation of adverse effects.

The parties note concern that ongoing alterations to the vessel before consultation concludes may reduce available mitigation options and result in lost documentation of character-defining features.

The parties object to increasingly compressed review periods while the permit authorization was extended because consultation remains active. They argue that this may undermine meaningful participation.

The parties ask ACHP to address whether: the process is ready for MOA finalization; consulting parties have had a meaningful opportunity to participate; additional consultation is necessary; documentation issues should be resolved before execution; the compressed timeline is appropriate; and the previously recommended meeting remains necessary.

28-May-26 The SS United States Preservation Foundation (SSUSPF) contends that the Memorandum of Agreement (MOA) should not be finalized until concerns about consultation timing, agency coordination, and the administrative record are resolved.

SSUSPF argues that significant revisions to the undertaking and Area of Potential Effects (APE) were provided shortly before a consulting-party meeting, limiting the parties ability to review the materials and provide informed input. It characterizes this as part of a broader pattern of abbreviated review periods.

SSUSPF notes that the underlying permit deadline was extended through December 2026 but states that consulting parties have not received written documentation explaining the applicants request, the Corps' rationale, or the basis for the extension.

The Foundation argues that providing additional time to the applicant while imposing shortened response periods on consulting parties is inconsistent with meaningful participation in the Section 106 process.

SSUSPF seeks clarification on the revised undertaking and APE, which included the vessel and preparation activities in Mobile, Alabama, and on how those activities are considered in the adverse-effect analysis.

SSUSPF states that it is unaware of written documentation showing that the Alabama State Historic Preservation Office declined participation or was otherwise consulted after the APE and undertaking were revised. It contends that this creates unresolved coordination and consultation-completeness questions.

The Foundation raises concerns that continued preparation or alteration of the vessel during consultation could affect available alternatives and the ability to evaluate mitigation.

SSUSPF identifies unresolved questions regarding environmental-review coordination, mitigation implementation, and whether less harmful alternatives remain available.

SSUSPF requests that USACE provide the relevant record materials or clarify that they do not exist and include these timing, coordination, and record-completeness concerns in the administrative record before proceeding toward MOA finalization.

1-Jun-26 The SS United States Preservation Foundation (SSUSPF) states that the second draft Memorandum of Agreement (MOA) is not ready for execution because the record is incomplete, consultation issues remain unresolved, and the proposed mitigation cannot yet be adequately evaluated.

SSUSPF asserts that consulting parties lack records needed to assess major decisions, including changes to the undertaking and Area of Potential Effects (APE), permit extension, Alabama State Historic Preservation Office consultation, vessel alterations, and environmental review.

The Foundation requests a complete account of completed and planned vessel alterations, including dates, removed components, their disposition, retained materials, and the cumulative effect on the vessel's historic significance.

SSUSPF argues that mitigation is too dependent on future actions, undefined commitments, and parties that may not be signatories. It seeks specific, enforceable mitigation measures tied to identified adverse effects.

The Foundation requests an inventory of character-defining features; enforceable documentation and artifact-treatment requirements; deadlines; review opportunities; public-interpretation commitments; a dispute-resolution process; and clear accountability for any third-party commitments.

SSUSPF contends that earlier public notice did not adequately describe the affected historic property, the scope of the undertaking, or Mobile-related preparation activities. It requests renewed public notice and an opportunity for public comment before the Section 106 process concludes.

The Foundation requests clarification on the status and level of National Environmental Policy Act review, evaluation of submitted environmental information, alternatives and cumulative-impact analysis, and how environmental concerns have informed agency decision-making.

SSUSPF states that it submitted alternatives intended to avoid or minimize adverse effects while allowing the artificial-reef objective to proceed through other means. It maintains that these alternatives have not been adequately addressed.

SSUSPF requests that USACE pause MOA finalization or execution; provide missing records; clarify Alabama SHPO and Mobile APE issues; disclose environmental-review status; revise the MOA with specific and enforceable mitigation; allow review of missing materials; and reconvene consulting parties before execution.

15-Jun-26 Requested clarification on the apparent circulation of a June 10 revised MOA draft, including whether it was provided to consulting parties, Okaloosa County, or the Advisory Council on Historic Preservation; why it was not distributed to all consulting parties if it reflected their comments; and whether the final draft would be circulated before execution with a defined review period. The comment also questioned how the Corps reconciled abbreviated review periods, denial of an additional consultation meeting, and its statement that there had been ample time for comments with development and circulation of later revisions.

**Ferster on behalf of SSUSF**

6/1/2026 The letter asserts that ongoing vessel deconstruction and the planned sinking are proceeding before completion of required National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA) reviews.

It argues that the County's dismantling activities trigger the Corps' responsibilities under Section 110(k) because the actions allegedly cause intentional adverse effects to a historic property before completion of review.

The letter cites Corps regulations limiting applicant actions before a record of decision, finding of no significant impact, or categorical exclusion determination, particularly actions that could create environmental effects or constrain reasonable alternatives.

It contends that continued physical work on the vessel may cause irreversible harm to historic features and improperly foreclose alternatives that could avoid or reduce adverse effects.

| | |
|---|---|
| | The letter requests that the Corps immediately direct the County to stop current deconstruction activities until required NEPA review is complete and advise the Foundation of the steps it will take. |
| | It states that the Foundation is prepared to pursue legal action if the Corps does not take appropriate action to prevent alleged irreparable harm to the vessel and environment. |
| | **NYCSSSUS** |
| 17-Dec-25 | Supported the finding of adverse effects but argued that proposed mitigation was inadequate. Objected to removal of historic fixtures before the determination and urged denial of the permit in favor of above-water preservation alternatives. |
| 19-Dec-25 | Reported City Council support for federal funding to restore and relocate the vessel to New York City, presenting it as support for a viable non-destructive alternative. |
| 11-Mar-26 | Objected to advancing mitigation discussions before key review issues were resolved. Raised concerns about public notification, consideration of public comments, and accountability for the planned museum mitigation. |
| 22-Apr-26 | Stated that the absence of promised notes or a transcript from the consulting-party meeting limited the Coalition,s ability to provide informed comments on the draft agreement. Requested the documentation or an explanation for its unavailability. |
| 6-May-26 | Supported a virtual mitigation meeting. Raised concerns about enforcement, accountability, contingencies, and the permittee's continuing commitment to the mitigation scope. |
| 1-Jun-26 | Rejected the second draft agreement as insufficient. Objected to the compressed review timeline, sought another mitigation meeting, questioned the feasibility and transparency of the proposed museum mitigation, and continued to support review of non-destructive alternatives. |
| | **National Trust for Historic Preservation** |
| 28-Mar-26 | The National Trust for Historic Preservation (NTHP) objected to the abbreviated comment period for the Section 106 assessment materials, stating that it did not provide adequate time for review. It also raised concerns regarding the proposed findings on adverse effects, alternatives, mitigation, public engagement, and potential Section 110(k) issues. |

| | |
|---|---|
| 24-Apr-26 | NTHP agreed with concerns raised by other consulting parties and objected to the limited review period for the first draft Memorandum of Agreement (MOA). It argued that the applicant's actions constituted anticipatory demolition, requested that harmful activities cease pending further consultation, asserted that less harmful alternatives were being foreclosed, and characterized the proposed mitigation as inadequate. |
| 3-Jun-26 | NTHP endorsed the June 1 comments submitted by the SS United States Preservation Foundation and the New York Coalition to Save the SS United States, including the legal concerns they raised. It requested notice of agency responses and further consultation opportunities. |

* the comment summaries include comments provided in submitted letters as well as email narrative; these summaries do not include sumbittals focused solely on environmental topics or communications that are not comment-oriented such as information requests, meeting coordinations, etc...

E. Executed Memorandum of Agreement

# MEMORANDUM OF AGREEMENT BETWEEN THE U.S. ARMY CORPS OF ENGINEERS, THE FLORIDA STATE HISTORIC PRESERVATION OFFICER, AND OKALOOSA COUNTY REGARDING THE DEPLOYMENT OF THE SS *UNITED STATES* AS AN ARTIFICIAL REEF, *OKALOOSA COUNTY, FLORIDA*

**WHEREAS,** the U.S. Army Corps of Engineers, Jacksonville District (Corps), under the authority of Section 10 of the Rivers and Harbors Act, issued a Department of Army permit (SAJ-1996-03565) (DA permit) that provides authorization to Okaloosa County (Permittee) to deploy artificial reefs in navigable waters of the northern Gulf of America within three prescribed areas, which are referred to as Large Area Artificial Reef Site A (LAARS A), LAARS B, and LAARS C;

**WHEREAS,** in the context of evaluating a requested modification of the DA permit, the Corps became aware that pursuant to the authorization provided by the Corps in the DA permit, the Permittee plans to deploy (sink) the historic ship SS *United States* (Vessel) in LAARS C, where it will serve as an artificial reef;

**WHEREAS,** the Corps determined that the deployment and preparations for deployment of the Vessel to LAARS C constitutes the undertaking in accordance with 36 C.F.R. § 800.16(y); 33 C.F.R. § 325, Appendix C, at § 1(f);

**WHEREAS,** the Corps defined the undertaking's area of potential effects (APE) as the proposed vessel deployment area as shown in Attachment A and includes the Vessel itself wherever the Vessel (the body of the ship, not items that have been removed from the ship in the past) may be prior to deployment, including its location at the Mobile, Alabama Shipyard where it is docked in preparation for deployment;

**WHEREAS,** the Corps determined that the undertaking will have an adverse effect on the Vessel, which is listed in the *National Register of Historic Places*, and has consulted with the Florida State Historic Preservation Officer (SHPO) pursuant to 36 C.F.R. Part 800, the regulations implementing Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108), and 33 C.F.R. § 325, Appendix C, at § 7(d);

**WHEREAS,** the Corps invited the following Indian Tribes (Tribes) to consult: the Seminole Tribe of Florida, the Miccosukee Tribe of Indians of Florida, the Seminole Nation of Oklahoma, and the Muscogee Nation on the undertaking, and none of the Tribes responded to coordination letters;

**WHEREAS,** the Corps notified the Alabama State Historic Preservation Office regarding the undertaking and APE on February 26, 2026, and the Alabama State Historic Preservation Office declined to participate in consultation to resolve adverse effects;

**WHEREAS,** the Corps consulted with the SS United States Preservation Foundation, the New York Coalition to Save the SS United States, and the National Trust for Historic Preservation regarding the effects of the undertaking on historic properties;

**WHEREAS,** in accordance with 36 C.F.R. § 800.6(a)(1), the Corps notified the Advisory Council on Historic Preservation (ACHP) of its adverse effect determination with specified

documentation, and the ACHP chose *not to* participate in the consultation pursuant to 36 C.F.R. § 800.6(a)(1)(iii);

**WHEREAS,** the Corps issued a public notice notifying the general public of the proposed undertaking and of the potential adverse effects to the Vessel;

**WHEREAS,** the Corps received and assessed proposed alternatives for avoidance of adverse effects submitted by the consulting parties and by the public and, with concurrence of the SHPO, has determined that alternatives to avoid effects are not practicable here;

**WHEREAS,** in accordance with 36 C.F.R. § 800.6(c), the Corps, SHPO, and the Permittee are entering into this Memorandum of Agreement (MOA) to resolve the adverse effects to the historic property;

**WHEREAS,** the below stipulations for resolution of adverse effects require actions by the Permittee who remains responsible, as overseen by the Corps, for carrying out the mitigation as detailed further below and therefore, has been asked to sign the MOA as an Invited Signatory; and

**NOW, THEREFORE,** the Corps and the SHPO agree that the undertaking shall be implemented in accordance with the following stipulations in order to take into account the effects of the undertaking on historic properties.

## STIPULATIONS

**The Corps** shall ensure that the following stipulations are carried out.

## I. DOCUMENTATION

The following pre- and post-deployment documentation of the Vessel will be prepared by the Permittee and provided to the Corps and SHPO. In addition to the stated submittal requirements below, all documentation will be provided by the Permittee to the Florida Division of Historic Resources, Compliance and Review Section.

A. Prior to deployment:

i. Provide proof of captured laser scan and photogrammetric images, and any other reality capture scans of exterior and various interior spaces necessary to save for posterity. The files will be processed and provided to the Florida Master Site File (FMSF) and the National Park Service Heritage Documentation Program.

ii. Provide a detailed list of any distinct features/components of the Vessel that were removed while in Mobile, Alabama, as well as the disposition of those components, which include but are not limited to the funnels, radar mast, emergency generators, anchor, propellor, and portholes. This list will serve to document changes to the Vessel in the historical record.

iii. A report documenting the remote sensing survey of the buffered footprint in which the Vessel will be placed. The survey, at a minimum, will include side scan sonar and SCUBA diver survey.

iv. The products of the above stipulations above (§ I.A.i.–iii.) must be submitted to the Corps and SHPO for approval prior to deployment. These agencies must respond with any comments on the documentation within 10 days of submittal. If no comments are made or provided to the Permittee, then the documentation is considered acceptable for the purposes of this MOA.

B. Post-deployment:

i. Develop a 3D photogrammetric model of the Vessel in collaboration with Reef Smart Guides for the purposes of mapping the dive site as well as documenting the initial status of the Vessel post-deployment, and for use in interpretative documentation. This requirement must be completed within 6 months of deployment of the Vessel .

ii. Prepare a submittal to the National Register of Historic Places (NRHP) for reassessment of the Vessel's NRHP eligibility. The goal will be to submit sufficient documentation for its continued listing on the NRHP. This submittal must be developed by a Secretary of the Interior-qualified historian or architectural historian. The NRHP reassessment document must be provided to the Corps and the SHPO for comment prior to submitting the documentation to the Florida Bureau of Historic Preservation. The Corps and SHPO will have 15 days to provide comments. Following draft updates to the documentation, the permittee will provide the final draft to the Corps and SHPO for concurrence. The Corps and SHPO will have 10 days to provide concurrence or additional comments. Once a final draft is complete, the NRHP reassessment will be submitted via email to nationalregister@dos.fl.gov for review by the Florida Division of Historical Resources, Bureau of Historic Preservation. The permittee will provide all comments to the Corps and SHPO following the Bureau's review. The Corps and SHPO will review any updated documents for additional submittal to the Bureau and will have 10 days to provide these comments to the permittee. The permittee will then complete all necessary steps as stipulated by the Bureau of Historic Preservation for submitting the documentation to the National Park Service. This requirement must occur within 12 months of deployment.

iii. Perform a two-year collaborative scientific monitoring study with Woods Hole Oceanographic Institute of the Vessel, which will provide important data for the study of shipwreck site dynamics. The study will produce high resolution video of the Vessel and establish a baseline for future, long-term studies to understand heritage resources impacts on environmental and cultural resources in an ocean environment. The collected data and reports will be held at Woods Hole Oceanographic Institute.

iv. Within 6 months of deployment, provide copies of the processed files required in Section I.A.i. above to the Florida Master Site File (FMSF) and the National Park Service Heritage Documentation Program.

## II. PUBLIC INTERPRETATION AND EDUCATION

The Permittee will fund and provide in-kind support for the creation of public education exhibits or displays dedicated to conveying the Vessel's historical and nautical significance. The Permittee will seek coordination with appropriate external entities to implement the terms of this MOA, including but not limited to carrying out additional documentation or interpretive efforts. If such coordination is not practicable or does not result in completion of the required Stipulations, the Permittee shall remain responsible for fulfilling the terms of this MOA in consultation with the Signatories.

A. The Permittee shall coordinate with the SHPO and provide all necessary materials to apply for the Vessel's inclusion on the State's *Florida Panhandle Shipwreck Trail.* This requirement must be initiated within 6 months of deployment. Completion of the effort must be within 18 months of deployment.

B. The Permittee shall provide funding (a minimum of $800,000.00) for the preservation of salvaged artifacts, the fulfillment of the measures below (excluding Section 2.B.vi.), and/or for the creation of a land-based museum(s), interpretive displays, or other exhibits. Accounting of this funding shall be provided in the bi-annual reports required in Section 2.B.vi of this MOA.

   i. Within 6 months of deployment, the Permittee agrees to establish exhibits at its two welcome/visitor centers. The exhibits will consist of SSUS display items such as a ship replica, pictures, video, ship artifacts, and informational handouts on the history of the Vessel.

   ii. Within 12 months of deployment, the Permittee agrees to create a printed and online informational brochure honoring the history of the Vessel and its legacy. At a minimum, such brochures shall be made available to the public at the exhibits referenced in Section 2.B.i. above.

   iii. The Permittee agrees to create an interpretive display at the reefing celebration ceremony for those attending, plus a celebration program that includes testimonials and video related to the Vessel's history. This stipulation shall follow the review and comment timeline in Section I.A.iv. above.

   iv. Within 12 months of deployment , the Permittee will create a flexible SSUS traveling exhibit that encourages visitors to dive the Vessel and celebrates its history that can be used for booth display at tourism conferences, festivals, and other special events. A listing of each event where the exhibit is displayed shall be included in the bi-annual summary report referenced in section V.I. of this MOA.

v. Within 24 months of deployment, the Permittee agrees to create a professionally developed, in-depth, online web-based public education website detailing the history, specifications/information, pictures and videos, and testimonials of SSUS workers and passengers. The outlined plans for the website, as well as the final draft version, will require approval by the Signatories (i.e. the SHPO and the Corps) prior to finalization and implementation. The Permittee must provide the outline plan for review prior to actual website development. This detailed website requirement may be rescinded if a land-based museum is created or delayed if the land-based museum is in progress. If rescinded, the Signatories will follow Stipulation VIII to amend the MOA accordingly.

vi. Within 18 months of deployment, the Permittee agrees to undertake a $500,000.00, multi-year marketing campaign, both, to promote the Vessel for tourism purposes, while also promoting its history and driving people to the online historical brochure, videos, and other information on the Vessel. This requirement shall be separate and apart from the $800,000.00 described in Section II.B. above.

## III. REVIEW PROCEDURES

For all documents and deliverables produced in fulfillment of this MOA, the Permittee will provide a draft to the Signatories for review prior to implementation and/or fabrication. Unless another timeframe is specifically listed with the stipulation, any comments submitted within 30 calendar days from the date of distribution will be considered in any necessary revisions of the deliverable. Administratively, the Corps will note any comments received and document how those comments were considered or addressed. Concurrence from the Signatories on the final draft of deliverables is required prior to implementation and/or fabrication and shall extend to no more than 60 days from the submittal of the initial draft.

## IV. DURATION

This MOA will expire if its terms are met within five (5) years from the date of its execution. If the requirements of Sections I and II above are not fully met, the initial term may be extended for up to an additional five (5) years, upon written approval of the Signatories. If the requirements of Sections I and II above are not met, and there is no agreement to extend the MOA, the Corps may consult with the other Signatories to reconsider the terms of the MOA and amend it in accordance with Stipulation VIII below and in accordance with the conditions of the Permittee's Department of Army Permit.

## V. POST-REVIEW DISCOVERIES

If potential historic properties are discovered or unanticipated effects on historic properties are identified during the course of the undertaking, the Signatories shall consult in accordance with 36 C.F.R. § 800.13. In such instances, the terms of this MOA will be reconsidered and may be amended in accordance with Stipulation below.

## VI. MONITORING AND REPORTING

Every 6 months following the execution of this MOA until it expires or is terminated, the Permittee shall provide the Signatories with a summary report detailing work undertaken pursuant to its terms. Such report shall include any scheduling changes proposed, any problems encountered, and any disputes and objections received in the Permittee's efforts to carry out the terms of this MOA. Failure to provide such summary report may be considered noncompliance with the terms of this MOA.

## VII. DISPUTE RESOLUTION

Should any Signatory or Invited Signatory (i.e. Okaloosa County) to this MOA object at any time to any actions proposed or the manner in which the terms of this MOA are implemented, the Corps shall consult with such Signatory to resolve the objection. If the Corps determines that such objection cannot be resolved, the Corps will:

A. Forward all documentation relevant to the dispute, including the Corps' proposed resolution, to the ACHP. The Corps shall request the ACHP provide the Corps with its advice on the resolution of the objection within thirty (30) days of receiving adequate documentation. Prior to reaching a final decision on the dispute, the Corps shall prepare a written response that takes into account any timely advice or comments regarding the dispute from the ACHP and all Signatories (i.e. SHPO, the Corps, and Okaloosa County) and provide them with a copy of this written response. The Corps will then proceed according to its final decision within 60 days.

B. If the ACHP does not provide its advice regarding the dispute within the thirty (30) day time-period, the Corps may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, the Corps shall prepare a written response that takes into account any timely comments regarding the dispute from all Signatories to the MOA and provide them and the ACHP with a copy of such written response.

C. The Corps' responsibility to carry out all other actions subject to the terms of this MOA that are not the subject of the dispute remain unchanged.

## VIII. AMENDMENTS

This MOA may be amended when such an amendment is agreed to in writing by all Signatories. The amendment will be effective on the date a copy signed by all of the Signatories is filed with the ACHP.

## IX. TERMINATION

If any Signatory or Invited Signatory to this MOA determines that the MOA's terms will not or cannot be carried out, that party shall immediately consult with all other Signatories to attempt to

develop an amendment per Stipulation VIII, above. If, within thirty (30) days (or another time period agreed to by all Signatories), an amendment cannot be reached, any Signatory may terminate the MOA upon written notification to the other Signatories.

Once the MOA is terminated, and prior to work continuing on the undertaking, the Corps must either (a) execute an MOA pursuant to 36 C.F.R. § 800.6 or (b) request, take into account, and respond to the comments of the ACHP under 36 C.F.R. § 800.7. The Corps shall notify all Signatories as to the course of action it will pursue.

Execution of this MOA by the Corps and SHPO and implementation of its terms evidence that the Corps has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

***************************Signature Page to Follow******************************

# Attachment A

## Location Maps and Address for SS *United States*

**(Gulf of America Reefing Location in LAARS C and Mobile Alabama Shipyard)**




Proposed location in LAARS C for sinking of the SS *United States* off the coast of Destin, FL.




Location of SS *United States* during preparation activities for artificial reef sinking, Mobile, AL.

**SIGNATORIES**:

U.S. ARMY CORPS OF ENGINEERS

Shawn H. Zinszer Date: 7/16/26

Shawn H. Zinszer
Chief, Regulatory Division, Jacksonville District, USACE

FLORIDA STATE HISTORIC PRESERVATION OFFICER

Alissa Lotane Date: 7/16/26

Alissa Slade Lotane
Florida State Historic Preservation Officer

**INVITED SIGNATORIES:**

OKALOOSA COUNTY

____________________ Date: July 14, 2026

Robert A. "Trey" Goodwin, III
Chairman, Okaloosa Board of County Commissioners

# APPENDIX D

*PERMIT SPECIAL CONDITIONS*

# APPENDIX D

Permit Special Conditions:

1. **Reporting Addresses:** The Permittee shall reference this permit number, SAJ-1996-03565 (MOD-HMM), on all correspondence. Unless specifically notified to the contrary, the Permittee shall use the following addresses for transmitting correspondence to the referenced agencies:

   a. For electronic mail (preferred): SAJ-RD-Enforcement@usace.army.mil (not to exceed 15 MB).

      For standard mail: U.S. Army Corps of Engineers, Regulatory Division, Enforcement Section, P.O. Box 4970, Jacksonville, FL 32232-0019

   b. Department of Commerce
      National Oceanic and Atmospheric Administration (NOAA)
      Nautical Data Branch, N/CS26
      1315 East-West Highway
      Silver Springs, MD 20910-3282

      Or email (preferred) at ocs.ndb@noaa.gov

   c. Commander, U.S. Coast Guard (USCG)
      Heartland District
      Hale Boggs Federal Building

      500 Poydras Street, Suite 1324

      New Orleans, LA 70130

   d. Florida Fish and Wildlife Conservation Commission
      Artificial Reef Program
      1875 Orange Avenue East
      Tallahassee, Florida 32311

      Or email at artificialreefdeployments@myFWC.com

   *Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4).

2. **Initial Agency Notification**: The Permittee shall provide to the Corps, NOAA, and USCG written notification of the planned deployment start date at least 2 weeks prior to each deployment on the authorized artificial reef site to the addresses listed in **Reporting Addresses** Special Condition.

*Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4).

3. **Permit Availability**: The Permittee shall provide all contractors associated with construction of the authorized activities a copy of the permit, drawings, and attachments. A copy of the permit shall be available on the work vessels and at the construction site at all times.

   *Rationale*: Required to ensure compliance with Corps oversight of the project (33 CFR 325, App. A, and 325.4 Conditioning of Permits

4. **Authorized Reef Materials**: No reef materials or module will weigh less than 500 pounds. Reef materials shall be clean and free from asphalt, petroleum, other hydrocarbons and toxic residues, loose free-floating material or other deleterious substances. All artificial reef materials and/or structures will be selected, designed, constructed, and deployed to create stable and durable marine habitat. The Permittee shall deploy only the following authorized reef materials:

   a. Prefabricated artificial reef modules composed of ferrous and/or aluminum-alloy metals, ¼ inch or more in thickness, concrete, rock, or a combination of these materials.

   b. Natural rock boulders and other pre-cast concrete material such as culverts, stormwater junction boxes, power poles, railroad ties, jersey barriers, or other similar concrete material.

   c. Clean steel and concrete bridge or large building demolition materials such as slabs or pilings with all steel reinforcement rods severed as close to the concrete surface as possible but not to extend more than 6 inches to ensure the rod will not create a fishing tackle or diver ensnaring hazard.

   d. Heavy gauge ferrous & aluminum alloy metal material components or structures, ¼ inch or more in thickness, such as utility poles and antenna towers.

   e. Heavy gauge ferrous and aluminum alloy metal hulled vessels which equal or exceed 60 feet hull length prepared and deployed in accordance with all applicable U.S. Coast Guard, U.S. Environmental Protection Agency, Florida Fish and Wildlife Conservation Commission, or other applicable state or federal agency regulations or policies. The vessel shall not be deployed until all necessary inspections and clearances have been obtained or waived and a stability analysis has been completed demonstrating the vessel will be stable during a 50-year storm event based on vessel and deployment site characteristics. The Permittee shall follow the national guidance regarding preparation of vessels for deployment as artificial reefs which are available at https://www.epa.gov/sites/default/files/2015-09/documents/artificialreefguidance.pdf and also attached to this permit

modification (Attachment 2). The Permittee shall provide a record of all inspections, clearances or waivers to the Corps along with the pre-deployment notification.

*Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4).

5. **Reef Parameters**: The Permittee shall deploy all reef materials within the ¼-mile buffer boundary as defined on the attached permit drawings. The following minimum clearances shall be maintained between the tops of reef materials and the elevation of the Mean Lower Low Water (MLLW): A minimum clearance of 60 feet below MLLW within LAARS A, 60 feet below MLLW within LAARS B, and 50 feet below MLLW within LAARS C.

   *Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4).

6. **Emergency Reef Parameters Notification:** In the event reef material is deployed in a location or manner contrary to the **Reef Parameters** Special Condition, the Permitee shall immediately notify the USCG Station and provide information as requested by the Station. The Permittee shall notify NOAA, USCG, and the Corps in writing within 24 hours of the occurrence. The written notification shall include, but is not limited to, a timeline of events leading to the unanticipated deployment, a description of the material, a description of the vessel traffic in the area, and the deployment location in nautical miles at compass bearing from obvious landmarks, the location of the unauthorized material in latitude and longitude coordinates (degree, minute, decimal format to the third decimal place), and the water depth above the material from the MLLW. The document will list the information provided by telephone to the USCG as noted above and include the time of the call and name of the USCG personnel receiving the information.

   *Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4).

7. **Protection of Existing Resources:** The Permittee shall not deploy artificial reef materials until an assessment of the bottom conditions have been accomplished by diver, submersible video camera, fathometer, depth/bottom sounder (e.g. “fish finder”), or side-scan sonar. The inspection of the deployment area may occur at the time of deployment, but no more than one year prior to deployment. The Permittee shall maintain a deployment buffer of at least 200 feet from any submerged beds of seagrasses, coral reefs, live bottom, areas supporting growth of sponges, sea fans, soft corals, and other sessile macroinvertebrates generally associated with rock outcrops, oyster reefs, scallop beds, clam beds, or areas where there are unique or unusual concentrations of bottom-dwelling marine organisms. Should the assessment find any evidence of cultural/archaeological resources such as sunken

vessels, ballast, historic refuse piles, or careenage areas, the Permittee shall also maintain a deployment buffer of at least 200 feet from any of these resources.

The Permittee shall provide the information obtained from the assessment to the Corps no less than 14 days prior to deployment of material on an artificial reef in conjunction with the pre-deployment notification.

*Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), 322.5(b)(2) through (4), and the Magnuson-Stevens Fishery Conservation and Management Act.

8. **Pre-Deployment Notification**: No less than 14 days prior to deployment of material on an artificial reef, the Permittee shall transmit by electronic mail ("email") a complete and signed "Florida Artificial Reef Materials Cargo Manifest and Pre-Deployment Notification" form (Attachment 3), to the Corps and FWC at the addresses listed in the **Reporting Addresses** Special Condition to allow inspection of the proposed reef materials as deemed necessary by the agencies. Inspection is allowable at the staging area. By signing the Pre-Deployment Notification, the Permittee certifies all materials are free from asphalt, petroleum, other hydrocarbons and toxic residues. The Permittee shall not deploy material if notified by the Corps or FWC that the material is questionable. The material needs to be evaluated before it is released for deployment. Any material deemed unacceptable for reef material will be disposed in an approved upland disposal site.

   Deployment of the material shall not occur until after the end of the 14-day inspection period. The Permittee shall ensure both a copy of this permit and the signed "Florida Artificial Reef Materials Cargo Manifest and Pre-Deployment Notification" form are maintained aboard the deployment vessel at all times during loading, transit, and deployment.

   *Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), and 322.5(b)(2) through (4).

9. **Post-Deployment Placement Report/As-Built Drawing**: Within 30 days after deployment of materials, the Permittee shall transmit by email to the Corps, FWC, and NOAA a complete and signed "Florida Artificial Reef Materials Placement Report and Post-Deployment Notification" form (Attachment 4) at the addresses listed in the Reporting Addresses Special Condition. Please note, the Corps requires the latitude and longitude to be accurate within 5 meters horizontal distance on the post-deployment report. The report shall include an as-built drawing by a registered surveyor/engineer licensed in the State of Florida, that certifies the project is constructed as authorized; and must include an accurate depiction of the location and configuration of the completed activity, and the height of material after placement in relation to the mean low water of the navigable water. Depth shall be verified utilizing fathometer, depth sounder, or similar device accurate to within 1 meter. Also, include information on the condition of the material at the time of

deployment. The report and drawing shall be limited to a few pages per deployment. Representative photographs and/or video, if available, should be submitted.

*Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), and 322.5(b)(2) through (4).

10. **Ownership/Maintenance/Liability**: By signing this permit, the Permittee certifies and acknowledges ownership of all artificial reef materials deployed on the reef, accepts responsibility for maintenance of the artificial reef, and possesses the financial ability to assume liability for all damages that may arise with respect to the artificial reef.

    *Rationale*: Required to ensure compliance with 33 CFR 320.3(o), 322.2(g), and 322.5(b)(2) through (4).

11. **Assurance of Navigation and Maintenance:** The Permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structures or work herein authorized, or if in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the Permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

    *Rationale*: As of 18 April 2000, Headquarters requires this special condition to be included in all Section 10 authorizations to more clearly notify the Permittee that, if future navigation needs require it, the structure or work authorized by the permit must be removed at the Permittee's expense. The project is a Section 10 activity and navigational obstructions are prohibited (CECW—OR Memorandum, 18 April 2000); therefore, the Permittee is required to comply with the assurance of navigation and maintenance condition.

12. **Biological Opinion**: This permit does not authorize the Permittee to take an endangered species, in particular the Green sea turtle, Hawksbill sea turtle, Kemp's ridley sea turtle, Leatherback sea turtle, Loggerhead sea turtle, Giant manta ray, Gulf sturgeon, Smalltooth sawfish, Oceanic white tip shark, and Rice's whale. In order to legally take a listed species, the Permittee must have separate authorization under the Endangered Species Act (ESA) (e.g., an ESA Section 10 permit, or a BO under ESA Section 7, with "incidental take" provisions with which you must comply). The enclosed Choose one Biological Opinion (BO) (Attachment 5) contains mandatory terms and conditions to implement the reasonable and prudent measures that are associated with the incidental take statement set forth in the BO. Authorization under this permit is conditional upon compliance with all of the mandatory terms and conditions and reasonable and prudent measures associated with the incidental take statement in the enclosed BO, which are incorporated by

reference in this permit. Failure to comply with the terms and conditions and reasonable and prudent measures associated with the incidental take statement set forth in the BO, would constitute noncompliance with this permit. In addition, failure to comply with the terms and conditions and reasonable and prudent measures associated with the incidental take statement set forth in of the BO, where a take of the listed species occurs, would constitute an unauthorized take. The NMFS is the appropriate authority to determine compliance with the terms and conditions of its BO, and with the ESA.

*Rationale*: Required pursuant to Section 7 of the ESA for NMFS, in accordance with the Biological Opinion dated 25 August 2025.

13. **Protected Species Construction Conditions:** The Permittee shall comply with National Marine Fisheries Service's "Protected Species Construction Conditions, NOAA Fisheries Southeast Regional Office" dated June 2026 (Attachment 6).

    *Rationale*: Required pursuant to Section 7 of the ESA and in accordance with Section 2.1.2 of NMFS Biological Opinion dated 25 August 2025.

14. **Vessel Strike Avoidance Measures**: The Permittee shall comply with the "Vessel Strike Avoidance Measures and Reporting for Mariners", revised June 2026 (Attachment 7) for marine turtles and marine mammals.

    *Rationale*: Required pursuant to Section 7 of the ESA and in accordance with Section 2.1.2 of NMS Biological Opinion dated 25 August 2025.

15. **Monitoring**: As part of an annual monitoring program, the Permittee will conduct a fathometer scan once per year of a minimum of ten percent (10%) of the artificial reef deployments made during the previous year. The monitoring shall verify material location and condition and compare to such information from the *Florida Artificial Reef Materials Placement Report and Post-Deployment Notification* and/or previous monitoring events to distinguish changes in either location or condition. The monitoring report shall be submitted to the Corps annually and include a spreadsheet representation of the site inspected and data collected with a written narrative. The report must be submitted in accordance with the **Reporting Addresses** special condition. The Permittee is responsible for maintenance associated with the site, including the removal of entanglement hazards and other such assessments to ensure safe operation.

    Rationale: This condition is intended to assist the Corps with monitoring compliance with the permit.

16. **Manatee Conditions**: The Permittee shall comply with the "Standard Manatee Conditions for In-Water Work – 2011" (Attachment 8). The most recent version of the Manatee Conditions must be utilized.

*Rationale*: Required pursuant to Section 7 of the ESA for USFWS, in accordance with the Corps of Engineers, Jacksonville District and the State of Florida Effect Determination Key for the Manatee in Florida (Manatee Key) dated April 2013 and the subsequent addendum dated 13 May 2019.

17. **Memorandum of Agreement:** A Memorandum of Agreement (MOA) between the Corps, SHPO, and Okaloosa County (Permittee) was signed by all parties and went into effect on July 16, 2026 for resolution of adverse effects to the historic SS United States. The executed MOA is attached to this permit (Attachment 9). The Permittee shall adhere to all requirements in the MOA. Non-compliance with the MOA may result in suspension or revocation of this Department of Army permit until non-compliance has been resolved.

    *Rationale*: Compliance with Section 106 off the National Historic Preservation Act (NHPA), or its implementing regulation (36 CFR part 800), 33 CFR 325, App. A, and 33 CFR 325.4 Conditioning of Permits.

18. **Cultural Resources/Historic Properties:**

    a. No structure or work shall adversely affect, impact, or disturb properties listed in the *National Register of Historic Places* (NRHP), or those eligible for inclusion in the NRHP.

    b. If, during permitted activities, items that may have historic or archaeological origin are observed the Permittee shall immediately cease all activities adjacent to the discovery that may result in the destruction of these resources and shall prevent his/her employees from further removing, or otherwise damaging, such resources. The permittee shall notify both the Florida Department of State, Division of Historical Resources, Compliance Review Section at (850)-245-6333 and the Corps, of the observations within the same business day (8 hours). Examples of submerged historical, archaeological or cultural resources include shipwrecks, shipwreck debris fields (such as steam engine parts, or wood planks and beams), anchors, ballast rock, concreted iron objects, concentrations of coal, prehistoric watercraft (such as log "dugouts"), and other evidence of human activity. The materials may be deeply buried in sediment, resting in shallow sediments or above them, or protruding into water. The Corps shall coordinate with the Florida State Historic Preservation Officer (SHPO) to assess the significance of the discovery and devise appropriate actions. Project activities shall not resume without verbal and/or written authorization from the Corps.

    c. Additional cultural resources assessments may be required of the permit area in the case of unanticipated discoveries as referenced in accordance with the above Special Condition and, if deemed necessary by the SHPO or Corps, in accordance with 36 CFR 800 or 33 CFR 325, Appendix C (5). Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Corps may modify, suspend, or revoke the permit in

accordance with 33 CFR Part 325.7. Such activity shall not resume on non-federal lands without written authorization from the SHPO for finds under his or her jurisdiction, and from the Corps.

d. In the event that unmarked human remains are identified on non-federal lands; they will be treated in accordance with Section 872.05 Florida Statutes. All work and ground disturbing activities within a 100-meter diameter of the unmarked human remains shall immediately cease and the Permittee shall immediately notify the medical examiner, Corps, and State Archaeologist within the same business day (8-hours). The Corps shall then notify the appropriate SHPO. Based on the circumstances of the discovery, equity to all parties, and considerations of the public interest, the Corps may modify, suspend, or revoke the permit in accordance with 33 CFR Part 325.7. Such activity shall not resume without written authorization from the SHPO and from the Corps.

e. If a vessel or item proposed for deployment as an artificial reef is listed on the NRHP, or is eligible for listing on the NRHP, then the permittee must notify the Corps of its intent to deploy the vessel or item prior to preparatory remediation efforts. The Corps shall assess the historic property in accordance with 36 CFR 800 and 33 CFR 325, Appendix C prior to remediation activities. Deployment shall not occur without written authorization from the SHPO and from the Corps.

*Rationale*: Compliance with Section 106 of the NHPA, or is implementing regulation (36 CFR part 800), 33 CFR 325, App. A, and 325.4 Conditioning of Permits.

19. **Agency Changes/Approvals:** Should any other agency require and/or approve changes to the work authorized or obligated by this permit, the Permittee is advised a modification to this permit instrument is required prior to initiation of those changes. It is the Permittee's responsibility to request a modification of this permit from the Pensacola Permits Section. The Corps reserves the right to fully evaluate, amend, and approve or deny the request for modification of this permit.

*Rationale*: This special condition is included to more clearly notify the Permittee that a modification to the permit is necessary if changes to the authorized work are required or approved by another agency.