**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

SS UNITED STATES PRESERVATION FOUNDATION, INC., et al.,

Case No. 3:26cv5339-MCR-HTC

Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

Defendants.

---

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs, the SS United States Preservation Foundation (the "Foundation") and Steven R. Perry ("Perry") pursuant to Federal Rule of Civil Procedure 65, respectfully move for an emergency temporary restraining order and preliminary injunction prohibiting Defendants, the United States Army Corps of Engineers (the "Corps") and Okaloosa County ("County"), and their respective officers, employees, agents, contractors, and persons acting in concert with them, from proceeding with the towing, deployment, and sinking of the *SS United States* as an artificial reef in the Gulf of America pending further order of this Court.

In support of this Motion, the Plaintiffs state as follows:

## BACKGROUND

This action challenges the Corps' decision to permit Okaloosa County Florida to sink the *SS United States*, a historic ocean liner, at Large Area Artificial Reef Site ("LAARS") C, approximately 22 nautical miles southwest of Destin East Pass in the Gulf of America, in connection with Department of the Army Permit SAJ-1996-03565.[1] Among other things, the lawsuit alleges that the Corps failed to adequately evaluate the significant environmental consequences of introducing a vessel containing substantial quantities of toxic zinc chromate paint, including hexavalent chromium (Cr(VI)), into the marine environment, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* [2] The sinking of the ship will permanently introduce its remaining chromium-bearing coatings into Gulf waters, where seawater exposure and deterioration could release hazardous contaminants into the surrounding waters and marine sediments, causing harm that may be difficult or impossible to reverse.

The Foundation presented evidence to the Corps establishing that the *SS United States* contains zinc chromate paint, including paint containing hexavalent

[1] A detailed statement of facts is set forth in the Complaint (Doc. 1), filed November 3, 2026.

[2] The Foundation's Complaint also alleges that the Corps' permit was issued without adequate compliance with the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306108, 306113, and the Endangered Species Act.

chromium, a known human carcinogen that also poses significant risks to aquatic organisms and the marine environment. Certified laboratory testing performed by York Analytical Laboratories identified high concentrations of chromium and hexavalent chromium in paint samples collected from the vessel. Dr. Todd Osborne, Professor of Estuarine and Aquatic Biogeochemistry at the University of Florida, reviewed the laboratory results and the vessel's historical shipbuilding specifications. Based on that information, Dr. Osborne concluded that zinc chromate coatings were used aboard the vessel and that chromium-bearing coatings could be released when the vessel is submerged and continuously exposed to seawater. Dr. Osborne further explained that reduction of hexavalent chromium to trivalent chromium does not occur readily in oxygenated environments. Dr. Osborne's signed assessment estimated approximately 59,334 pounds of zinc chromate based on historical coating specifications and modeled surface area, rather than direct measurement of the quantity remaining aboard. His assessment identifies potential harm to fish and invertebrates, contamination of sediments, and movement of contaminants into the food web, with potential consequences for humans through seafood consumption. *See* Complaint, Exhibit 3, pp. 1–2 (Doc. 1-3).

The County's response reproduced in the Environmental Assessment and Statement of Findings (the "EA" or "EASOF"), which plaintiffs received on

October 19, 2026, pursuant to their May 2026, Freedom of Information Act (FOIA) request, characterized Dr. Osborne's estimate as assuming that the paint was 100 percent zinc chromate. *See* Doc. 1-1, p. 12 (Applicant Response). His assessment expressly assumed an average zinc-chromate content of 50 percent by weight. *See* Doc. 1-3, p. 2. The County's criticism therefore misstates the composition assumption used in his calculation. That dispute concerns the estimated quantity, not the laboratory-confirmed presence of hexavalent chromium in sampled coatings or the historical specifications identifying zinc-chromate primer applications aboard the vessel.

Despite this evidence, the Corps issued an EASOF concluding that the Project would not have significant environmental impacts.[3] *See* Doc. 1-1. The EASOF acknowledged that the analyzed paint samples indicated the presence of zinc chromate paint containing hexavalent chromium and zinc in sampled portions of the vessel. *See* Doc. 1-1, pp. 11–12. However, rather than requiring the applicant to undertake additional analysis of the paint to determine the extent of these hazardous materials, the EASOF simply concluded that the limited paint samples analyzed by York Laboratories did "not establish a vessel-wide inventory of

[3] The Foundation made repeated requests since February 2026, that the Corps provide its environmental assessment to the Foundation and, in May 2026, formally requested this and other relevant records pursuant to the Freedom of Information Act ("FOIA"). The environmental assessment was not provided until October 19, 2026, when the Corps released the October 2, 2026, EASOF. *See* Doc. 1, ¶ 79.

Cr(VI) or zinc chromate, nor does it establish the concentration or rate of constituent release that would occur following deployment." *Id.* Based on this limited information, the EASOF found that the Project would have no more than a minimal adverse effect on marine organisms in the vicinity of the vessel. Although the Corps discussed chromium release, it did not adequately explain why the studies and assumptions on which it relied supported a prediction of minimal adverse effects under the vessel's proposed marine conditions, despite acknowledged uncertainty concerning the concentration and rate of contaminant release following deployment. *See* Doc. 1-1, pp. 12–14.

Dr. Jeremy Fein, Professor of Civil and Environmental Engineering and Earth Sciences at the University of Notre Dame and Director of its Center for Environmental Science and Technology, rebutted the EASOF's scientific reasoning in his October 29, 2026, letter. *See* Doc. 1-5. Dr. Fein concluded that the Corps' analysis of the potential environmental consequences of chromium and potentially lead contamination was based on faulty logic or insufficient data. *Id.* Specifically, Dr. Fein explained that release rates measured in small-volume reactor experiments can slow as the water approaches equilibrium with the tested material, whereas continued exposure to ocean water may sustain contaminant release. *Id.* He also challenged the assumption that released hexavalent chromium would readily convert to less toxic trivalent chromium in oxygenated seawater and

the application of exterior antifouling guidance to interior corrosion-inhibiting primers not intended for continuous seawater immersion. *Id*. Acknowledging uncertainty in the quantity estimates, he nevertheless concluded that the evidence demonstrated "a reasonable potential for Cr and Pb contamination" and warranted further environmental assessment before sinking. *Id.*

The Corps' failure to investigate and evaluate these reasonably foreseeable environmental consequences is particularly serious because the proposed action is permanent. Once the vessel is sunk, its coatings will be exposed to seawater, corrosion, and physical and biological deterioration. Any resulting release of toxic contaminants may be difficult or impossible to reverse, and the resulting injury to marine organisms, aquatic habitat, and the Foundation's members' recreational, aesthetic, and conservation interests cannot be adequately remedied through monetary damages.

Defendant Okaloosa County has announced that it intends to tow the vessel from Mobile, Alabama, to Florida coastal waters on November 9, 2026, and, upon its arrival, promptly sink it as an artificial reef. Unless the Court intervenes immediately, the vessel may be sunk before the Court can meaningfully consider the merits of this action. Plaintiffs therefore seek an immediate order preserving the status quo by prohibiting Defendants from towing the vessel to the proposed sinking location, placing it on the seabed, or otherwise proceeding with its

deployment as an artificial reef until the Corps has completed legally adequate environmental review and this Court has had an opportunity to adjudicate the Foundation's claims. Unless restrained, Defendant Okaloosa County will proceed with the Project before the Court can determine whether the Corps' environmental review complies with NEPA.

The requested temporary relief would preserve the Court’s ability to review the challenged authorization before deployment permanently exposes the vessel’s remaining coatings to Gulf waters. Once the vessel is sunk, recovering it or addressing any resulting contamination could require extensive and expensive remediation. Dr. Osborne warned that such contamination could potentially require cleanup under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commonly known as Superfund. *See* Exhibit 1 (Dr. Todd Z. Osborne, Video Testimony Transcript, p. 4.

## ARGUMENT

### I. LEGAL STANDARD FOR ISSUANCE OF INJUNCTIVE RELIEF

A temporary restraining order (“TRO”) and preliminary injunction are governed by Federal Rule of Civil Procedure 65. The United States Supreme Court has set forth four requirements for preliminary injunctive relief:

a. A substantial likelihood of success on the merits;

b. A substantial likelihood of irreparable injury absent injunctive relief;

c. The threatened injury to the plaintiff outweighs the harm the proposed injunction may cause the opposing party; and

d. The injunction would not be adverse to the public interest.

*Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008).

Rule 65(b)(1) authorizes a TRO without notice only when specific facts established by affidavit or verified complaint demonstrate that immediate and irreparable injury will occur before the adverse party can be heard and counsel certifies the efforts made to provide notice and the reasons notice should not be required. The certification of counsel below details the measures taken to notify Defendants of this motion. Plaintiffs request expedited relief on notice to Defendants to the extent practicable.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF

A showing of irreparable injury must be actual and imminent, rather than remote or speculative. *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (en banc). Here, the Foundation and its members will suffer irreparable injury if the *SS United States* is sunk before the Corps has completed adequate environmental review.

The Supreme Court has also recognized that environmental injury may be irreparable where it threatens natural resources and interests that cannot readily be restored through monetary relief. *Amoco Production Co. v. Village of Gambell*,

480 U.S. 531, 545 (1987). The *SS United States*, an historic ocean liner listed in the National Register of Historic Places, will be irreparably harmed without injunctive relief. The ship's historic importance cannot be overstated. As described by the *New York Times*, the SS United States is a "ship bigger than the Titanic, one that is nearly as long as the Chrysler Building is tall. A ship so luxurious that it was the first choice of presidents and royalty. A ship so trusted that it once carried the Mona Lisa. A vessel so fast that its mammoth propellers and hull design, churning the sea beneath its grand promenades and shipboard orchestras, were Cold War state secrets. The SS United States is the last American-built ocean liner remaining afloat, the largest passenger ship ever built in the United States." Quoted in Complaint, Doc. 1 at ¶ 27. The Corps has acknowledged that sinking the ship into an artificial reef will adversely affect the historic ocean liner. While the Corps engaged in some consultation under Section 106 of the NHPA, no actual measures to preserve the ship resulted from those reviews. Complaint, Doc. 1 at ¶ 68.

The sinking will also permanently place the ship's extensive painted surfaces into a marine environment in which they will be exposed to seawater, corrosion, deterioration, and physical disturbance. Dr. Osborne estimated approximately 59,334 pounds of zinc chromate based on historical specifications and modeled surface area, rather than a direct measurement of the quantity

remaining aboard or the amount that would be released. His assessment explains that deterioration of zinc-chromate-bearing coatings could release chromium and zinc into Gulf waters and marine sediments, potentially harming marine organisms and creating persistent contamination. *See* Doc. 1-3, pp. 1–2. Although the estimate does not establish the amount that would be released, Dr. Fein explained that the available evidence demonstrated a reasonable potential for contamination and challenged the applicability of the small-volume studies supporting the Corps' release-rate analysis. Plaintiffs contend that the Corps therefore lacked an adequately supported basis for predicting minimal environmental effects. See Doc. 1-5, p. 1, items 1–2. The release of hexavalent chromium and zinc into ocean waters may cause acute and chronic toxicity to marine organisms, including endangered species and critical habitat known to occur or be located in the area where the ship will be sunk. Once the vessel is submerged, the release of contaminants may continue over an extended period. It may be difficult or impossible to recover the vessel, remove all contaminated coatings, or remediate the surrounding marine environment. This potential environmental injury will directly impair the recreational, aesthetic, scientific, and conservation interests of the Foundation's members who use and enjoy the affected marine waters and resources.

For example, Foundation member Tracy Steely, a resident of Walton County, Florida, regularly uses Gulf coastal waters and beaches for swimming, snorkeling, fishing, boating, and observing marine wildlife, including snorkeling near the jetties in Okaloosa County and boating to Crab Island. She visits local beaches approximately weekly, observes marine wildlife almost daily, and intends to continue these established activities regularly while remaining a resident of the area. Her recreational interests in these waters and marine resources are concrete, particularized, and continuing. The potential release of hazardous contaminants from the vessel threatens to impair her use and enjoyment of those waters and marine resources, including her interest in observing threatened and endangered species. See Doc. 1, ¶ 16.

Likewise, Plaintiff and Foundation member Steven R. Perry resides in Miami, Florida. Perry had studied and conducted technical work about and aboard the *SS United States* for 35 years, including planning and redevelopment efforts in 2016, where he was specifically chosen to serve as a Marine Engineering Consultant for Atlantic Logistics, Inc. on behalf of Crystal Cruises during its return-to-service feasibility study, wherein he further developed his close familiarity with the ship, including the interior spaces, systems, configuration and physical condition of the *SS United States*. Further, Perry has studied the *SS United States* for nearly fifty years, has been aboard the ship hundreds of times over the

last thirty years, and has maintained close contact with the *SS United States* through his ongoing research and public speaking engagements focused on the vessel, while establishing and maintaining a professional relationship with every private owner since 1992. See Doc. 1 at ¶ 10. Foundation members, including Plaintiff Perry, have personally used, studied, visited and enjoyed the *SS United States* on numerous occasions and have a continuing and concrete intention to do so in the future. *Id*. at ¶ 11. Both Perry and Steely have a concrete, particularized, and continuing interest in the preservation and use of the *SS United States*, a specific historic resource currently located in Mobile, Alabama.[4]

Moreover, the sinking of the ship will irrevocably destroy the historic *SS United States*. As a result of this action, "[c]onsideration of alternative plans ... is permanently foreclosed." *Boston Waterfront Residents Association v. Romney,* 343 F. Supp. 89, 91 (D. Mass. 1972). As the Second Circuit noted in affirming the grant of an injunction against the demolition of historic buildings, "the district judge was surely correct in finding irreparable injury; demolition is generally irreparable." *WATCH v. Harris*, 603 F.2d 310, 312, n.2 (2d Cir. 1979).

This risk of irreparable harm is imminent. The Corps' EASOF, issued on October 2, 2026, states that "the permit will be issued with appropriate conditions

---

[4] These injuries are also sufficient to confirm that the Foundation has associational standing to assert this NEPA challenge. *See Center for a Sustainable Coast v. U.S. Army Corps of Engineers*, 100 F.4th 1354, 1357–59 (11th Cir. 2024).

included to ensure minimal effects," allowing Okaloosa County to sink (deploy) the historic *SS United States* at Large Area Artificial Reef Site ("LAARS") C. Doc. 1-1 at p. 72. In its October 29, 2026, Marine Safety Information Bulletin, U.S. Coast Guard Sector Mobile identified November 9, 2026, as the anticipated tow departure date, subject to weather conditions or unforeseen delays. *See* Exhibit 2 (U.S. Coast Guard Sector Mobile, Marine Safety Information Bulletin 149-26, (October 29, 2026). Okaloosa County has announced that the vessel is scheduled to be deployed on November 12, 2026, weather permitting, in the Gulf of America, about 22 nautical miles southwest of Destin-Fort Walton Beach, with deployment operations scheduled to begin at the deployment site on November 12 at 10 a.m. *See* Exhibit 3 (Okaloosa County, SS United States Deployment Announcement).

## III. THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR NEPA CLAIM

While the Plaintiffs' complaint also alleges violations of the NHPA and ESA, for purposes of this motion the Plaintiffs focus on the violations of NEPA, which present a compelling and urgent risk of irreparable injury. As discussed below, the Plaintiffs are likely to succeed on the merits of their claim that the Corps violated NEPA by failing adequately to evaluate in its EASOF the significant, reasonably foreseeable risk that the exterior and interior paint of the *SS United States*, which contains zinc chromate coatings containing hexavalent chromium, will be released into the surrounding marine environment if the *SS*

*United States* is submerged. Hexavalent chromium is a hazardous material, the release of which could cause significant harm to the marine environment, including endangered species.

A. The Corps failed to take a hard look at the reasonably foreseeable environmental consequences of sinking the *SS United States*.

NEPA requires federal agencies to prepare an environmental impact statement (EIS) for major Federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). Where the agency determines that a proposed action does not have a reasonably foreseeable significant effect, or where the significance of the effect is unknown, the agency must prepare an environmental assessment. 42 U.S.C. § 4336(b)(2); 33 C.F.R. § 333.12.

An agency's decision not to prepare an EIS is reviewed under an "arbitrary and capricious" standard of review. *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998). In determining whether an agency's decision not to prepare an EIS is arbitrary and capricious, the court considers four criteria:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Id.* (citations omitted).

Here, the Corps failed to take the required "hard look" at the environmental consequences of the release of zinc chromate coatings containing hexavalent chromium when the *SS United States* is sunk. As the Corps acknowledges, paint samples analyzed by York Laboratories indicated that paint samples from the *SS United States* were coated with zinc chromate paint, which contains hexavalent chromium and zinc. Doc. 1 at ¶ 80. Eurofins Environmental Testing also detected chromium and hexavalent chromium in a separate coating sample. *See* Doc. 1-1 at p. 11. When the ship is permanently submerged in seawater, its painted surfaces will be exposed to corrosion, deterioration, and physical and biological processes that may release chromium and zinc into the surrounding marine environment. The Corps' EASOF does not adequately address the potential environmental consequences of this contaminant release, as explained by Dr. Fein's specific criticisms of its release-rate assumptions and chromium-conversion analysis. See Doc. 1-5, pp. 1–2. In particular, the Corps failed to determine the extent of the zinc chromate coatings, the amount of hexavalent chromium present, the likelihood and rate of contaminant release, or the potential consequences for marine organisms, sediments, water quality, endangered species, and critical habitat.

The Corps' failure is especially significant because the agency was presented with the opinions of independent scientific experts, including Dr. Fein, who stated that the analyzed samples "appear to be representative of the extensive paint

coatings still present on the interior of the ship." *See* Doc. 1-6. Nonetheless, the Corps did not require the County to conduct additional sampling or otherwise determine the extent of the hazardous coatings before authorizing the sinking. Instead, the EASOF stated that the limited paint samples analyzed by York Laboratories did "not establish a vessel-wide inventory of Cr(VI) or zinc chromate, nor does it establish the concentration or rate of constituent release that would occur following deployment." Doc. 1-1, p. 12.

That reasoning is without any support in the record. The Corps' EASOF acknowledged the presence of zinc chromate paint containing hexavalent chromium. Nevertheless, the Corps failed adequately to explain why the acknowledged limitations in the sampling, considered together with the laboratory findings and expert evidence, supported its prediction of minimal adverse effects from introducing the vessel's chromium-bearing coatings into the marine environment. Plaintiffs contend that the Corps' conclusion rests on an unsupported assumption that the remaining uncertainty concerning the extent of the coatings and contaminant release is consistent with minimal environmental effects, contrary to the laboratory findings and the specific scientific objections identified by Dr. Fein, and is therefore arbitrary and capricious. *See* Doc. 1- 5, pp. 1–2. The absence of comprehensive sampling does not establish that the vessel contains insignificant amounts of hazardous material or that those materials will not be released.

Rather than take the required hard look, the Corps failed to investigate these disputed scientific conclusions and failed to undertake any investigation that might have identified the vessel-wide presence of zinc and chromium. This information was necessary to make an informed determination concerning the potential environmental consequences of the Project. *See Hill*, 144 F.3d at 1451 (finding that the record did not support the Army Corps refusal to evaluate the impacts of a pipeline based on an unsupported assumption that the pipeline would be re-located) Accordingly, the Corps' finding that the Project would have no significant environmental impact based on its unsupported assumption that zinc and chromium were not present vessel-wide is arbitrary and capricious.

B. The Corps' conclusion that the Project will have no significant environmental impact is contradicted by the scientific evidence.

The evidence submitted to the Corps establishes a substantial basis for concern that the sinking will introduce hazardous contaminants into the marine environment. First, York Analytical Laboratories conducted physical testing of paint samples collected from the vessel and identified high concentrations of chromium and hexavalent chromium. *See* Doc1-2. The EASOF also acknowledges separate Eurofins testing confirming hexavalent chromium in a coating sample. *See* Doc. 1-1, p. 11. Second, a subject matter expert, Dr. Osborne, independently evaluated the laboratory results and the vessel's historical painting specifications and concluded that the vessel contains zinc chromate and hexavalent chromium

coatings, and that there is a significant likelihood that contaminants from these coatings could be released through erosion and dissolution when continuously exposed to seawater.

A second expert, Dr. Jeremy Fein, independently reviewed the laboratory analyses and confirmed their reliability, including the analytical methods and quality assurance procedures. Dr. Fein agreed with Dr. Osborne's conclusions concerning the likelihood of contaminant release. Dr. Fein then reviewed the Corps' EASOF, and identified deficiencies in the Corps' analysis, concluding that the EASOF's treatment of chromium and potentially lead contamination was based on faulty logic or insufficient data and that a more detailed environmental impact assessment was necessary before sinking the vessel.

As stated above, the Corps' rejection of the evidence presented by Dr. Osborne is without any support in the record, and impermissibly shifted the burden onto the public to undertake the necessary environmental evaluation. Moreover, if an agency receives additional information after it publishes its Finding of No Significant Impact, it "must make an additional NEPA determination: the agency must determine whether the changes create, or the information reveals, significant effects on the quality of the human environment not previously considered." *See Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir. 2008). There is no evidence here that the Corps complied with this obligation.

The Corps' refusal to acknowledge the possibility of vessel-wide contamination is also inconsistent with the EPA and Maritime Administration's National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs (May 2006), which recognizes the potential toxicity of vessel coatings and recommends removal of harmful active exterior hull coatings and deteriorating paint before deployment. *See* Exhibit 4 (EPA/MARAD, National Guidance: Best Management Practices for Preparing Vessels Intended to Create Artificial Reefs, May 2006), pp. 40–42. At a minimum, this evidence establishes that the Corps could not reasonably conclude that the Project would have no significant environmental effects without first addressing the potential release and environmental consequences of the identified contaminants. Accordingly, Plaintiffs have established a substantial likelihood of success on the merits of its NEPA claim.

## IV. THE EQUITIES WEIGH HEAVILY IN FAVOR OF MAINTAINING THE STATUS QUO

The balance of equities favors a temporary prohibition on the towing and sinking of the *SS United States* pending adequate environmental review. The requested injunction will not necessarily prohibit the County from pursuing the Project permanently. It will simply preserve the status quo long enough to permit the Corps to comply with its statutory environmental review obligations and allow the Court to determine whether the Corps' authorization was lawful.

By contrast, allowing the sinking to proceed will permanently alter the vessel's location and expose its painted surfaces to the marine environment before the Corps has evaluated the potential release of hazardous contaminants. The County's financial expenditures and logistical arrangements associated with preparing and transporting the vessel do not outweigh the potential for permanent environmental harm.

The balance of equities therefore favors maintaining the status quo until the Court can consider the merits of the Foundation's claims.

V. AN INJUNCTION IS IN THE PUBLIC INTEREST

The public has a substantial interest in ensuring that federal agencies comply with federal environmental laws before authorizing actions that may cause significant and irreversible environmental harm. NEPA is intended to ensure that federal agencies take a hard look at environmental consequences before making decisions and that the public is informed of those consequences. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349–50 (1989). The public also has an interest in protecting marine water quality, marine habitat, wildlife, and the ecological resources of the Gulf.

NO OR ONLY A NOMINAL BOND SHOULD BE IMPOSED

Plaintiffs request that the Court waive the security requirement under Federal Rule of Civil Procedure 65(c), or alternatively require only nominal

security, because the requested injunction serves the public interest and Defendants will suffer no cognizable irreparable injury from a temporary delay in the Project. The district court retains the discretion to waive Rule 65(c)'s security requirement. *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC,* 425 F.3d 964, 971 (11th Cir. 2005); *L.W. v. Commissioner of the Georgia Department of Community Health*, No. 24-12774 (11th Cir. May 18, 2026). Courts have exercised this discretion to waive the bond in public interest litigation. *Disability Rights Florida, Inc. v. Jacobs*, 473 F. Supp. 3d 1335, 1340 (M.D. Fla. 2019). As one Court explained, "when a party is seeking to vindicate the public interest served by NEPA, a nominal bond amount is proper." *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002).

Here, given the Foundation's status as nonprofit organization acting as private attorneys general to enforce statutory obligations and the public interest nature of this case, Plaintiffs request that either no or a nominal bond be imposed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

A. Grant this Emergency Motion for Temporary Restraining Order;

B. Temporarily stay the effectiveness of the Corps' permit modification pursuant to 5 U.S.C. § 705;

C. Prohibit the Corps and Okaloosa County, together with their respective officers, employees, agents, contractors, and persons acting in concert with them who receive actual notice of the Court's order, from towing, deploying, or sinking the *SS United States* as an artificial reef pending further order of the Court;

D. Set an expedited hearing on the Foundation's request for a preliminary injunction;

E. Following that hearing, enter a preliminary injunction maintaining the prohibition on towing, deployment, and sinking pending resolution of this action or further order of the Court;

F. Waive the bond requirement under Rule 65(c), or require only nominal security; and

G. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 4th day of November, 2026.

FARMER & FITZGERALD, P.A.

/s/ Matthew Farmer
Matthew P. Farmer
Fla. Bar No. 0793469
800 W. De Leon St.
Tampa, Florida 33606
(813) 928-1131
FAX (813) 224-0269
MattFarmer1@aol.com

*COUNSEL FOR PLAINTIFFS*

CERTIFICATION REGARDING NOTICE

Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), counsel for the Foundation certifies as follows:

1. On November 4, 2026, at 8:47 a.m. EST, counsel for the Plaintiffs, Matthew Farmer, by email, provided two Assistant United States Attorneys in the Civil Division of the Office of the United States Attorney for the Northern District of Florida, and the Okaloosa County Attorney, with a copy of the Complaint and Exhibits, and t provided notice of the Foundation's intention to seek emergency injunctive relief on today's date.

2. As of November 4, 2026, at 6:00 p.m. EST, counsel has received no response.

3. In addition, on November 3, 2025, counsel provided by one-day delivery a copy of the complaint and exhibits to the following: Col. Brandon Bowman, U.S. Army Corps of Engineers, Jacksonville Division, Adam Telle, Acting Secretary of the Army, Lt. General William H. Graham, Jr, Commanding General of the U.S. Army Corps of Engineers, Attorney General Todd Blanche, and the Civil Process Clerk of the Office of the United States Attorney for the Northern District of Florida.

4. Given the County's announced intention to begin towing the vessel on November 9, 2026, and to sink it promptly upon its arrival in Florida, expedited consideration is essential.

5. The Plaintiffs request that the Court hear this matter on an expedited basis and, if practicable, after providing Defendants an opportunity to respond. If the Court determines that relief must be granted before Defendants can be heard, counsel requests that the Court consider the specific facts and supporting declarations establishing the imminence of the threatened injury.

I certify that the foregoing is true and correct this 4th day of November, 2026.

*/s/ Matthew Farmer*

Matthew Farmer